UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

YESICA PRADO, et al.,

Plaintiffs,

v.

CITY OF BERKELEY,

Defendant.

Case No.  23-cv-04537-EMC

**ORDER DENYING PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION**

Docket No. 2

United States District Court
Northern District of California

Plaintiffs are four individuals: Yesica Prado, Lucian Jeffords, Erin Spencer, and Angel
Kennett.  Plaintiffs are currently unhoused and reside in or use an encampment located in
Defendant the City of Berkeley – specifically, the encampment located in the area of 8th Street
and Harrison Street.  Plaintiffs filed suit over the Labor Day weekend after the City issued a notice
indicating that there would be an emergency abatement of at least part of the encampment.  This
Court issued a temporary restraining order enjoining the City from taking action through
September 27, 2023, *i.e.*, the date of the hearing on Plaintiffs' motion for a preliminary injunction.
Plaintiffs now ask for a preliminary injunction to "restrain[] [the City] from displacing the
residents of 8th and Harrison until adequate shelter is available for them and until [the City] can
do so without violating the constitutional and statutory rights of Plaintiffs."  Mot. at 2.  Plaintiffs
also seek a preliminary injunction enjoining the City from destroying their property.  *See* Mot. at
2.

Having considered the parties' briefs and accompanying submissions, as well as the oral
argument of counsel, the Court hereby **DENIES** Plaintiffs' motion for a preliminary injunction.
The Court shall allow the City to proceed with abatement of that part of the encampment located

1  at Harrison, between 7th and 8th, but **subject to certain conditions as specified below**.

2  ### I.     FACTUAL & PROCEDURAL BACKGROUND

3  A.     Encampment

4  The homeless encampment at issue is generally in the area of 8th and Harrison. A part of

5  the encampment – not the entire encampment – is located on Harrison between 7th and 8th.

6  It is not clear from the record how long the overall encampment, or even that specific part,

7  has been there. It appears, however, that all or part of the encampment has existed for several

8  years. In addition, it appears that the City has provided certain services to the encampment since

9  2021 – *e.g.*, dumpsters, port-a-potties with wash stations, access to mobile showers and a laundry

10  service, and even, on occasion, tents and tubs. *See* Radu Decl. ¶ 7(a)-(c), (g). There have been

11  nine deep cleanings of the encampment. *See* Radu Decl. ¶ 7(f).

12  At some point in February 2022, the encampment was closed, and there have been three

13  "partial closures" thereafter. *See* Radu Decl. ¶ 7(e). The record does not reflect how the present

14  encampment reappeared. This pending suit was filed after the City issued notices indicating that it

15  intended to abate part of the encampment – as now clarified, that part located on Harrison between

16  7th and 8th.

17  B.     Housing Options

18  The City has contracts with shelters to provide housing options for homeless persons. This

19  includes the Berkeley Inn and the Super 8 Motel (also known as the Campus Motel). Both the

20  Berkeley Inn and the Super 8 provide for noncongregate housing. *See* Radu Decl. ¶ 8. In

21  addition, at both locations, there are no curfews, and a resident can come and go as he or she

22  pleases. *See* Radu Decl. ¶ 9. "Shelter participants may bring up to two 64-gallon trash bags of

23  personal belongings into their room and the City has also provided additional onsite storage."

24  Radu Decl. ¶ 9.

25  C.     Plaintiffs

26  The evidence of record reflects the following about Plaintiffs.

27  • **Ms. Prado** is a 31-year-old woman. *See* Prado Decl. ¶ 2. She is a journalist

28  working with the nonprofit newsroom *San Francisco Public Press* and a Berkeley

*United States District Court*
*Northern District of California*

2

United States District Court
Northern District of California

1    community advocate.  She has been unhoused and living in an RV since 2017.  *See*

2    Prado Decl. ¶ 3.  In August 2018, she began to live in her RV at the encampment at

3    8th and Harrison.  *See* Prado Decl. ¶ 3.  The RV is "currently parked on 8th Street

4    between Harrison and Gilman Streets" – *i.e.*, outside the area subject to abatement.

5    Prado Decl. ¶ 4.  The RV is operable but has mechanical issues that prevent it from

6    being moved more than a few hundred feet.  *See* Prado Decl. ¶ 4.  Ms. Prado had an

7    intake appointment for shelter at the Super 8 Motel on September 12, 2023.  At the

8    time she accepted the appointment, she was not told what the conditions of housing

9    were.  *See* Prado Decl. ¶ 8.  Subsequently, she was told that she cannot park her RV

10   at the motel and that she cannot leave it at 8th and Harrison.  *See* Prado Decl. ¶ 11.

11   She also has been told that she cannot have visitors at the motel even though her

12   "community is critical to [her] mental health."  Prado Decl. ¶ 11.  The City

13   indicates that, on September 12, Ms. Prado did not relocate to the Super 8 Motel

14   because "she unexpectedly requested that she record her intake (which takes place

15   with a non-profit, not city staff) and have her attorney present. . . . The intake was

16   rescheduled for September 28 . . . ."  Radu Decl. ¶ 12(a)(iii).

17   • **Mr. Jeffords** has lived in the encampment for five years.  He currently lives in an

18   RV which "can be moved but only [for] short distances."  Jeffords Decl. ¶ 2.

19   According to the City, he was repeatedly offered shelter at both the Super 8 Motel

20   and at Berkeley Inn, as well as permanent housing at the Depot in Hayward.  "He

21   declined the Super 8 offers, stating that he did not want to be near his Harrison St[.]

22   neighbors, but stated he was interested in the Berkeley Inn and Depot housing

23   option."  Radu Decl. ¶ 12(c).  Mr. Jeffords, however, was told that he cannot park

24   his RV at the Berkeley Inn, *see* Jeffords Decl. ¶ 4, and he is not aware of an area in

25   Berkeley where he can park the RV "for a long time on the street."  Jeffords Decl. ¶

26   3.  According to the City, Mr. Jeffords has admitted that his RV is infested with

27   rats, *see* Radu Decl. ¶ 12(c)(i), but Mr. Jeffords disputes such.  Mr. Jeffords was

28   also told that Berkeley Inn would only allow him to keep one of his cats.  *See*

United States District Court
Northern District of California

1    Jeffords Decl. ¶ 8. *But see* Radu Decl. ¶ 12(c) (indicating that the City offered to

2    take the additional cat to the animal shelter to find a new home).  As indicated

3    above, Mr. Jeffords was also offered shelter at Abode Housing in Hayward, but he

4    was unable to go to Hayward to view the housing option "due to medical issues."

5    Jeffords Decl. ¶ 3.  Mr. Jeffords has medical issues that have left him "unable to eat

6    for days at a time and very physically weak."  Jeffords Decl. ¶ 5.  He is not able to

7    "engage in any physical activity such as moving objects and remaining on [his] feet

8    for long periods of time."  Jeffords Decl. ¶ 5.  Mr. Jeffords affords no other

9    description of his alleged disability.

10   • **Mr. Spencer** is a retired member of the marines.  He has lived at the encampment

11   at 8th and Harrison for a year.  *See* Spencer Decl. ¶ 3.  He has a "service-related

12   disability in [the] right shoulder."  Spencer Decl. ¶ 2.  Specifically, his "collar bone

13   puts pressure on the nerve that goes underneath, causing [him] chronic pain and

14   limiting [his] range of motion and ability to left heavy objects."  Spencer Decl. ¶ 2.

15   Mr. Spencer has received an offer of shelter at the Super 8 but he has "not accepted

16   it because it does not accommodate [his] disability and other needs; specifically, no

17   visitors are allowed, and there are severe limitations on how many personal items"

18   can be brought which affects his ability to do work (*e.g.*, using his tools).  Spencer

19   Decl. ¶ 7.  In addition, he cannot cook for himself at the Super 8 Motel.  *See*

20   Spencer Decl. ¶ 7.  According to the City, Mr. Spencer has been repeatedly offered

21   shelter but has declined on the basis that the shelter offered does not allow visitors.

22   *See* Radu Decl. ¶ 12(b).

23   • **Ms. Kennett** is a 41-year-old woman with several disabilities, "including OCD and

24   anxiety."  Kennett Decl. ¶ 3.  She also had ovarian cancer in the past.  *See* Kennett

25   Decl. ¶ 3.  She currently has a place at the Berkeley Inn but she keeps items that

26   she is not allowed to take there in the encampment at 8th and Harrison.  This

27   includes, *e.g.*, bedding and a tent.  *See* Kennett Decl. ¶ 4.  She also feels safer being

28   outside instead of at the Berkeley Inn because of the rules and practices it

maintains.  *See* Kennett Decl. ¶ 7.  For example, Berkeley Inn has a no visitors policy, and it also bars residents from socializing with other residents (which prevents Ms. Kennett from socializing with her brother).  *See* Kennett Decl. ¶ 8.  Also, Berkeley Inn prohibits residents from deadbolting doors from the inside.  *See* Kennett Decl. ¶ 9.  Ms. Kennett has been at the Berkeley Inn since mid-March 2023.  *See* Radu Decl. ¶ 12(d).

D.      City Notices

As indicated above, Plaintiffs brought suit over the Labor Day weekend after the City issued notices indicating that, *e.g.*, there would be an emergency abatement of a certain part of the encampment.  The City has provided evidence indicating what led to the issuance of the notices.  That evidence reflects as follows.

From May through July 2023, three community meetings were held between City staff and residents and advocates of the encampment "to discuss resources and how to improve safety."  Radu Decl. ¶ 7(i).

Subsequently, on August 23, 2023, the City conducted an investigation of the encampment.  The investigation was initiated by the City's Homeless Response Team ("HRT").[1]  The Environmental Health Division and the Fire Department participated in or attended the investigation.  *See* Torres Decl. ¶ 3; Shaffer-Killey ¶ 7.

On August 30, 2023, the Environmental Health Division and the Fire Department each provided the City Manager's Office with a memo detailing its findings related to the encampment.

The memo from the Environmental Health Division stated, *inter alia*, that there "several areas along the north side of Harrison St." which were problematic.  Torres Decl., Ex. A (Environ. Memo. at 1).  The memo further stated that the conditions rose "to the level of an imminent health hazard, particularly [given] findings of used syringes, areas where raw sewage was observed and

---

[1] The City created the HRT "to bring multiple departments together in addressing the needs of the unhoused population.  The HRT has representatives from Fire; Police; Public Works; Parks, Recreation, and Waterfront; Environmental Health; Parking Enforcement; Health, Housing, and Community Services; and other departments and divisions as necessary."  Radu Decl. ¶ 4.

United States District Court
Northern District of California

the proliferation of rat burrows all along the Harrison St[.] corridor."[2]  Torres Decl., Ex. A (Environ. Memo. at 1).  Thus, the Division recommended that "those areas identified in the . . . report be summarily abated to minimize the impact to the residents and general public."  Torres Decl., Ex. A (Environ. Memo. at 1); *see also* Torres Decl. ¶ 4 (testifying that "[t]he presence of rat burrows and accumulation of food and debris on Harrison Street between Seventh and Eighth Streets created an environment conducive to the proliferation of rats, which increases the disease transmission from rats to residents of the area and the surrounding community"); Torres Decl. ¶ 3(b) (testifying that there were "used hypodermic needs scattered over a 400 square foot area along the north side of Harrison St[.], between Seventh and Eighth St.," that "[t]he presence of the used hypodermic needles alone constitutes a significant potential for possible disease transmission by accidental prick," and that "the large amounts of personal belongings mixed in with other miscellaneous debris and trash increases the potential for accidental needle pricks").

The Fire Department's memo noted, *inter alia*, that, from January through August 2023, there were 29 fire-related incidents at the part of the encampment on Harrison between 7th and 8th.  *See* Shaffer-Killey Decl., Ex. A (Fire Memo. at 1-2) (listing incidents).  The memo also stated that it found "multiple fire and building code violations" based on the August 23 investigation – *e.g.*, "[t]he structure does not have adequate fire separation distance and fire-resistive construction," and "[a]ccumulations of combustible waste materials are present in and around the structure and the adjacent encampment areas."[3]  Shaffer-Killey Decl., Ex. A (Fire Memo. at 2).  Finally, the memo stated that "[t]he number and types of calls combined with the observed code violations are sufficiently concerning for the Berkeley Fire Department to recommend that the encampments on the north side of Harrison St. be abated summarily."  Shaffer-Killey Decl., Ex. A (Fire Memo. at 2).

On August 31, *i.e.*, the day after the memos from the Environmental Health Division and Fire Department were provided, Peter Radu (the Assistant to the City Manager) wrote a memo to

[2] The memo includes some photographs related to the Environmental Health Division's concerns.

[3] The memo includes some photographs related to the Fire Department's concerns.

United States District Court
Northern District of California

1    the City Manager.  Mr. Radu provided some history on service efforts for the encampment and

2    then provided an assessment on current conditions there.

3
>        [F]or months (and at present) the [Homeless Response Team]
4        continues to observe dead animals, open food sources and spoiled
>        food, used uncapped drug needles, combustible materials like
5        flammable gas containers inside unsafe wooden structures, bottles of
>        urine, human feces, animal feces, soiled clothing and sheltering
6        material, and other unidentifiable liquid and waste products.  In
>        addition, the large accumulation of debris and ad-hoc sheltering
7        structures has completely blocked the sidewalk and extended into
>        the roadway, creating numerous concerning fire and traffic safety
8        hazards.
>
9        RECOMMENDATION
>
10       The HRT and City Manager's Office will continue to work to
>        finalize the Good Neighbor Guidelines for future implementation at
11       encampments around the City and will continue the ongoing process
>        of moving residents inside the new Super 8 or other City shelter
12       resources.  The City has also formally engaged the Alameda County
>        CoC with a recommendation to prioritize this encampment for
13       permanent supportive housing referrals, with a memo dated July
>        20, 2023, and that recommendation is under discussion.
14
>        In the meanwhile, however, the Berkeley Fire Department and
15       Environmental Health Divisions have observed alarming conditions
>        that justify their declaring Harrison St between 7th and 8th Streets
16       an imminent health hazard (see attached memos and reports).
>        Therefore, **to resolve these dangerous nuisance conditions now as
17       we work towards a fuller resolution of the entire encampment in
>        the near future, we recommend a summary nuisance abatement
18       of the encampment conditions Harrison St between 7th and 8th
>        Streets.**

19   Radu Decl., Ex. A (Memo. at 2-3) (emphasis in original).

20        The City Manager responded the same day, approving summary abatement.  *See* Radu

21   Decl., Ex. B (email).  The following day, September 1, 2023, two different notices were issued

22   and posted.  The notices were not handed out to campers or placed on vehicles belonging to

23   campers but rather were publicly posted.[4]  *See, e.g.*, Prado Decl. ¶¶ 5-6.

24        One notice was a **Notice of Abatement** ("Notice of Imminent Health Hazard and

25

26   _____

27   [4] In its papers, the City notes that a third set of notices was given to Mr. Spencer specifically.  *See* Shaffer-Killey Decl. ¶¶ 9-10 (testifying that "I posted a Notice of Fire Hazard on a structure . . . later identified as [one] belonging to [Mr.] Spencer" as well as a warning notice stating that "the structure was unsafe").  Plaintiffs do not appear to contest this set of notices to Mr. Spencer.  *See* Shaffer-Killey Decl., Exs. B-C (notices).

28

1   Emergency Abatement Beginning Sept 4, 2023"); the other notice was a **Notice of Violation**

2   ("Shared Sidewalk Policy – Notice of Violation").  *See* Prado Decl. ¶ 10 & Exs. A-B (notices).

3               1.      Notice of Abatement

4          The Notice of Abatement was issued to "Persons Encamped and Vehicles Parked on

5   Harrison Street between 7th Street and 8th Street."  *See* Prado Decl., Ex. A (Not. of Abatement at

6   1).  The City emphasizes that

7               that precise section of the larger encampment is the only area subject
                to the notice and the only section the City intends to clear pursuant
8               to the imminent health hazard declaration.  Any RVs parked along
                8th Street (e.g., Plaintiff Prado's) are not subject to the specific
9               notice being challenged.  This is also why Plaintiff Prado's intake
                interview was scheduled for September 12, 2023, after the
10              abatement; as they were not going to be affected by the abatement.

11  Radu Decl. ¶ 16.

12         The Notice of Abatement began by noting that, on August 23, 2023, the Environmental

13  Health Division and Fire Department for the City had conducted a site visit which

14              revealed significant health and safety hazards due to the presence of
                excessive amounts of accumulated garbage, raw sewage, open food
15              sources, unsafe structures with combustible materials, numerous
                loose syringes and various personal property items which have
16              expended onto the City's rights-of-way.  The conditions observed at
                the time of the site visit are conducive to the proliferation of rats,
17              which increases the potential for disease transmission from rats to
                the residents in this area and the surrounding community.  The
18              presence of numerous rat burrows within and adjacent to the
                encampment is evidence of a thriving rat population.
19

20  Prado Decl., Ex. A (Not. of Abatement at 1).

21         The Notice of Abatement then stated that the Manager of Environmental Health had

22  "declared the conditions to be an imminent health hazard and public nuisance pursuant to Berkeley

23  Municipal Code Sections 11.36.030 and 11.36.050, and the City Manager ordered a summary

24  abatement of these conditions, on August 31, 2023."[5]  Prado Decl., Ex. A (Not. of Abatement at

25

26  [5] Section 11.36.030 provides: "For the purpose of this chapter, the existence of the following
    condition is declared to constitute an imminent health hazard: the discharge of sewage, garbage or
27  any other organic filth into or upon any place in such a manner that transmission of infective
    material to human beings may result therefrom."  Berkeley Mun. Code § 11.36.030.

28         Section 11.36.050 provides: "Each health and safety hazard as defined in this chapter is

United States District Court
Northern District of California

United States District Court
Northern District of California

1). The underlying Municipal Code violations identified in the notice were: violations of §§

11.32.050, 11.32.070, 17.20.030, and 17.20.050.[6] *See* Prado Decl., Ex. A (Not. of Abatement at

1). The notice also indicated that there were violations of Berkeley Municipal Code §

14.48.020.[7]

Abatement would include "destruction of any property constituting [a] nuisance if the

nuisance cannot be abated otherwise." Campers were instructed to "address the nuisance

conditions listed below, by discarding garbage and any items creating a rodent harborage or other

health hazards, and reduce your belongings to a 9-square-foot footprint by or before September 4,

2023 [*i.e.*, Labor Day]." Prado Decl., Ex. A (Not. of Abatement at 1-2).

---

declared to be a public nuisance and may be abated as provided in Sections 11.40.040 through
11.40.120 of this code. Each imminent health hazard as defined in this chapter is declared to be a
public nuisance and may be abated as provided in Sections 11.40.130 through 11.40.160 of this
code." Berkeley Mun. Code § 11.36.050.

[6] Section 11.32.050 provides: "No person shall possess, occupy or maintain, or cause or permit
another person to occupy or maintain, any building, structure, vehicle or any other place in such a
condition as will permit the breeding or harboring therein, or thereon, of rodents or any other
vermin." Berkeley Mun. Code § 11.32.050.

Section 11.32.070 provides: "No person shall place, leave, dump or permit to accumulate
any garbage or rubbish in or upon any building, structure or place so that the same shall afford
food and/or harborage for rodents. No person shall accumulate or permit the accumulation on any
place, premises or on any open lot any lumber, building material, boxes, paper, rags, excess or
dense vegetation, or any material that may be permitted to remain thereon that may serve as a
rodent harborage, unless the same shall be place don open racks that are elevated not less than
eighteen inches above the ground and evenly piled or stacked, or otherwise made reasonably
unsuitable as a rodent harborage by such manner as may be approved by the chief of
environmental health." Berkeley Mun. Code § 11.32.070.

Section 17.20.030 provides: "Except as otherwise expressly exempted below, it is unlawful
to discharge any matter except stormwater into the storm drain system." Berkeley Mun. Code §
17.20.030.

Section 17.20.050 provides (in relevant part): "Any person engaged in activities which will
or may result in pollutants entering the storm drain system shall undertake all practicable measures
to reduce or prevent the contamination of stormwater by pollutants. Such measures shall include,
but are not limited to, adherence to the following requirements [*e.g.*, littering prohibited,
requirements for construction and development]." Berkeley Mun. Code § 17.20.050.

[7] Section 14.48.020 provides (in relevant part): "It is unlawful for any person to place or cause to
be placed anywhere upon any Sidewalk, Parklet or roadway, any object which obstructs, restricts,
or prevents the use of any portion of such Sidewalk, Parklet or roadway, except as set forth in this
Chapter or in a regulation promulgated by the City Manager and adopted by the City Council."
Berkeley Mun. Code § 14.48.020.

The Notice stated that the City

> will discard items you no longer wish to keep at your request.  The City can temporarily store a limited amount of certain types of personal property up to 90 days, depending on value.  However, **please ensure that you keep with you all necessary personal belongings (medications, identification, electronics, wallets), items of value, clean and unsoiled shelter items, and items of special importance to you**.  Personal property left unattended may be collected and stored pursuant to the City's policy, if it meets certain requirements, described in more details below:
>
> 1. **Personal property that *may* be stored up to 90 days** includes property of a personal nature such as identification; photos/photo albums; tents, sleeping bags, bedding (which is deemed to be in serviceable condition); luggage, backpacks, purses; clothing; documents (together in a packet bound or secured in some way); jewelry; medication; eyewear; electronic equipment; tools; bicycles and other non-motorized methods of transportation which are in working order.
> 2. **Items that will not be stored and are subject to disposal if left on public property at the time of the abatement include but are not limited to:** soiled or moldy items; loose or scattered papers; wet or damp clothing, bedding or sleeping bags; perishable food or personal products; personal hygiene products such as toothbrushes or hairbrushes; bike carcasses and parts; mattresses, futons, furniture; shopping carts (items easily identified as personal belongings and meeting the criteria for storage may be stored); broken or disassembled items or items stripped of parts; weapons; items that attract rodents or insects (containers for recycling or food storage); hazardous or explosive items such as gasoline cans, propane tanks, batters.  **Property that is so entangled with hazardous material that it is unsafe for the City to sort through** (i.e., visible presence of needs, rodents, bodily waste, etc.) **will not be sorted and stored and will be subject to disposal.**
>
> Unattended property will be handled in accordance with City policy. Individuals who wish to reclaim their property may call "311" to contact the City's Customer Service Center during regular business hours (Monday-Friday, 9:00 AM to 3:00 PM), or call (510) 981-2489 or (510) 981-CITY.  Alternatively, information regarding retrieval of unattended and stored property is available in the lobby of the Berkeley Civic Center, 2180 Milvia Street, Berkeley, during regular business hours.
>
> Vehicles may be subject to two and impound if authorized by the Vehicle Code and community caretaking needs.

Prado Decl., Ex. A (Not. of Abatement at 2) (emphasis in original).

The Notice of Abatement concludes by warning that "[f]ailure to comply may result in the City abating the unsafe and hazardous conditions pursuant to BMC Chapter 11.40.  **The City**

United States District Court
Northern District of California

10

**prefers not to cite or arrest in order to gain your compliance with this notice.  However, absent voluntary compliance, failure to comply may result in citations and/or arrest.**" Prado Decl., Ex. A (Not. of Abatement at 3) (emphasis in original).  It also provides information about appeal rights (to the City Manager) – but "because of the imminent health hazards at this location, any request for a hearing will not prevent the city from abating the hazards as soon as possible beginning Sept 4, 2023, if you do not comply prior to that date." Prado Decl., Ex. A (Not. of Abatement at 3).

The City maintains that it is

> prepared to offer shelter to Harrison St[.] residents during the emergency abatement action.  The City is also prepared to store all belongings that can be properly stored under City policies (including the use of a 40-foot shipping container purchased with HRT funds and located at the Super 8 motel for this very purpose), discard any remaining hazardous items, and provide help in moving Plaintiffs' belongings that can be kept at the shelter.

Radu Decl. ¶ 18.

### 2.  Notice of Violation

The Notice of Violation was issued either to "Persons at Harrison" or "Persons at Harrison Between 8th/7th." *See* Radu Decl. ¶ 17; *see also* Radu Decl., Ex. D (Not. of Violation).

The Notice of Violation refers to a violation of the City's "Shared Sidewalk Policies, BMC sections 14.48.020 and 14.48.120, due to the accumulation of your possessions at the above-listed location."[8] Prado Decl., Ex. B (Not. of Violation at 1).  It directs individuals to "pack or reduce your belongings to 9 square feet.  [¶] The City prefers not to cite or arrest in order to gain your compliance with this notice.  However, absent voluntary compliance, failure to comply may result in citations and/or arrest." Prado Decl., Ex. B (Not. of Violation at 1) (emphasis omitted).  The notice then goes on to contain some of the same language contained in the Notice of Abatement –

---

[8] Section 14.48.120 provides (in relevant part): "The City Manager may adopt regulations specifying what TNC [Temporary Noncommercial] Objects may be permitted under this Section and where such TNC Objects may be permitted . . . ." Berkeley Mun. Code § 14.48.120. TNC is defined as personal belongings "[i]n the immediate custody and control of a person or persons at substantially all times," "[n]ot offered for sale or exchange or involved in the solicitation of money for immediate payment"; and "[n]ot otherwise prohibited and of a size, weight and quantity that can be easily moved by the owner." *Id.*

11

1    *i.e.*, regarding discarding of property, unattended personal property, storage thereof, etc.

2    E.      Operative Pleading

3            Based on, *inter alia*, the above, Plaintiffs filed suit asserting the following causes of action:

4            • Exposure to state-created danger under the Fourteenth Amendment to the U.S.

5                Constitution and Article I, § 7(a) of the California Constitution.

6            • Unreasonable search and seizure under the Fourth and Fourteenth Amendments to

7                the U.S. Constitution and Article I, § 13 of the California Constitution.

8            • Discrimination against persons with disabilities under the Americans with

9                Disabilities Act ("ADA") and California Government Code § 11135.

10           • Infliction of cruel and unusual punishment under the Eighth Amendment (*i.e.*, a

11               claim under *Martin v. City of Boise*, 902 F.2d 1031 (9th Cir. 2019)).

12                              **II.      DISCUSSION**

13   A.      Legal Standard

14                   [P]laintiffs seeking a preliminary injunction must establish that (1)
                     they are likely to succeed on the merits, (2) they are likely to suffer
15                   irreparable harm absent preliminary relief, (3) the balance of equities
                     tips in their favor, and (4) an injunction is in the public interest. [A
16                   court] employ[s] a "sliding scale test," which allows a strong
                     showing on the balance of hardships to compensate for a lesser
17                   showing of likelihood of success. Thus, when plaintiffs establish
                     that the balance of hardships tips sharply in their favor, there is a
18                   likelihood of irreparable injury, and the injunction is in the public
                     interest, they need only show "serious questions" on the merits.
19

20   *Where Do We Go Berkeley v. Cal. DOT*, 32 F.4th 852, 859 (9th Cir. 2022) [hereinafter *WDWGB*].

21   B.      Irreparable Harm/Balancing of Hardships

22           The Court begins its analysis by considering whether Plaintiffs are likely to suffer

23   irreparable harm absent preliminary relief.  At the hearing, the City made multiple representations

24   that impact the Court's view of the irreparable harm factor.

25           • The City stated that any City action here will affect only a portion of the

26               encampment – specifically, Harrison between 7th and 8th – and not the entire

27

28

United States District Court
Northern District of California

1    encampment.[9]

2    • The City stated that it will only abate the area on Harrison between 7th and 8th. In

3    other words, the City will not be closing that part of the encampment, and people

4    will not be barred from returning to the area to set up camp again once the

5    abatement is completed, at least not in connection with the current abatement

6    action.

7    • The City stated that, historically, abatements have taken only a few days to be

8    completed. Although the City added that more time could be needed for the

9    specific abatement contemplated here (depending on what is uncovered), there is

10   nothing to suggest, as a facial matter, that the abatement would need to continue

11   beyond a week or two.

12   • The City confirmed that it is offering all campers located on Harrison between 7th

13   and 8th housing during the time of abatement (and potentially beyond).

14   Specifically, campers are being offered housing at the Super 8 Motel and Berkeley

15   Inn. Both places provide noncongregate housing, and residents are free to come

16   and go as they wish.

17   • The City confirmed that it will store impacted campers' belongings during the

18   period of abatement (up to 90 days), subject to valid health and safety concerns.

19   • The City confirmed that it will help campers to move their belongings to the

20   shelters and/or storage.

21   • The City stated that, if essential habitation items such as bedding or tents cannot be

22   stored and will need to be destroyed (*e.g.*, because they are soiled or contaminated),

23   the City will offer the affected campers comparable replacements.[10] (Replacements

24   need not be identical, but they should be reasonably comparable.)

25

26   [9] Given this limitation, Ms. Prado is not impacted by the abatement at all. She currently lives in a different part of the encampment.

27   [10] The City voluntarily offered to provide comparable replacements after the Court asked whether campers could bag their own bedding and/or tents (in order to minimize safety risk to City workers), with the bags then being placed in storage.

13

United States District Court
Northern District of California

1    • The City did not voice objection to a new notice of abatement being issued,

2    including notice 72 hours in advance (not counting weekend days) of the

3    abatement.

4    Plaintiffs protest that, in spite of the City's representations above, they will likely suffer

5    irreparable harm without preliminary injunctive relief. Their main criticism is that the housing

6    options offered by the City are insufficient given their disabilities. For example, Plaintiffs

7    maintain that they have mental impairments that make it difficult for them to follow the shelters'

8    rules and regulations which will then lead to their being evicted from the shelters for failure to

9    comply. There is no evidence of record, however, to support this specific claim of mental

10   impairments.[11] And even if the Court were to accept the representations made by Plaintiffs about

11   their disabilities – whether in the record or at the hearing – the Court must still balance the

12   hardships claimed by Plaintiffs (if no preliminary injunction relief were to issue) with the

13   hardships claimed by the City (if such relief were to issue). Moreover, the balance of hardships

14   must tip sharply in Plaintiffs' favor in order for them to obtain relief because, as discussed below,

15   they have not shown they are likely to prevail on the merits of their claims and have shown at

16   most serious questions going to the merits.

17   The City has provided sufficient evidence to support their contention that enjoining

18   abatement – whether entirely or for a significant period of time – would pose a significant

19   hardship on the City. More specifically, enjoining abatement entirely would impose a hardship on

20   both the encampment and the larger community the City represents because there are serious

21   health and safety issues at the encampment that need to be addressed in a timely fashion, as

22   supported by the memos from the Environmental Health Division and Fire Department. This

23   includes used syringes, raw sewage, rat infestations, and fire threats. On the other hand, the

24   hardship to the Plaintiffs of allowing the City to move forward with the conditions attached as

25   articulated herein, would be minimal. The Court, therefore, cannot say at this juncture that the

26

27   [11] As noted above, Ms. Prado is not living in the part of the encampment subject to abatement.
     The record indicates that Mr. Jeffords and Mr. Spencer have physical impairments only, not

28   mental. Although the record indicates that Ms. Kennett has some mental impairments, she has
     been living in the Berkeley Inn since mid-March 2023.

14

United States District Court
Northern District of California

1    balance of hardships tips sharply in Plaintiffs' favor; this is particularly true given that the City has

2    not only provided evidence of the substantial hardship it would suffer but also made

3    representations to the Court as to how it would temper hardships to Plaintiffs (as well as others in

4    the affected part of the encampment), and the Court will impose conditions to lifting the temporary

5    injunctive relief.

6    C.      Public Interest

7           The public interest factor weighs in favor of Defendants.  While there is a public interest in

8    ensuring that "members of the community, including the unhoused, are not endangered or parted

9    from their homes and community without cause." Docket No. 11 (Order at 2), Defendants have

10   offered noncongregate housing to Plaintiffs during the abatement.  On the other hand, there is also

11   a strong public interest in abating a significant hazard, and on a timely basis.

12   D.      Likelihood of Success on the Merits

13          Particularly because the City is offering alternative housing and assistance in moving

14   Plaintiffs and their belongings to that housing, Plaintiffs have not shown a likelihood of success on

15   the merits.  They still have, however, raised serious questions on the merits for many of their

16   claims.

17          For example, on the ADA claim, even if the program here were to be defined narrowly –

18   *e.g.*, a program of abating an imminent health or safety hazard – there are still serious questions as

19   to whether Plaintiffs should be given some time and support to relocate before the abatement takes

20   place.  On the state-created danger claim, there are serious questions as to whether the City has

21   exhibited deliberate indifference, particularly as at least some Plaintiffs are disabled and the City's

22   abatement could deprive them of essential items of living such as bedding, tents, and RVs should

23   those be destroyed and not replaced.  With respect to the unlawful seizure claim, there are serious

24   questions as to whether adequate notice of the seizure was given in the first instance.  Even if the

25   Berkeley Municipal Code did not require advance notice to be given to Plaintiffs, that does not

26   mean that the Fourth Amendment and/or Due Process Clause did not require such notice.

27   However, with the conditions imposed herein and the new notice to be given, the legal concerns of

28   Plaintiffs are substantially mitigated.

15

United States District Court
Northern District of California

E.      Summary

Taking into account the preliminary injunction factors, the Court finds that Plaintiffs have established at most serious questions going to the merits on many of their claims but have not shown that the balance of hardships tips sharply in their favor.  Nor have they shown a likelihood of success on this record on their legal claims. The Court's evaluation of the hardships might have been different if the City had not made the representations it did at the hearing and/or in its papers. In other words, without those representations, the hardships to Plaintiffs would be far greater (*e.g.*, they would not have had a place to stay during the period of abatement and their property essential for habitation could be destroyed).  But because of those representations, the hardships to Plaintiffs have been tempered significantly.

The Court, therefore, shall dissolve the TRO and not grant Plaintiffs preliminary injunctive relief.  In addition, the Court shall allow the City to abate the part of the encampment located at Harrison, between 7th and 8th, but subject to the following conditions (which largely align with the representations made by the City at the hearing):

- The City shall issue a new notice of abatement.
- Abatement cannot begin unless Plaintiffs are given seventy-two hours' notice of the abatement.  The seventy-two hours does *not* include weekend days.
- Out of an abundance of caution, the notice shall also be publicly posted and placed on structures and vehicles located in the affected area.
- The notice shall specify that the only area to be abated is that part of the encampment located on Harrison, between 7th and 8th.
- The notice shall specify the exact date that the abatement shall begin and shall provide an estimate as to how long the abatement will take to complete.
- The notice shall specify that people are allowed to return to the area to camp after the abatement is complete.
- The notice shall provide the information provided in the prior notice and further shall provide instructions to campers on how to designate property for storage and how to designate property for their 9-square foot allotments.

16

- The notice shall specify that, if essential items for habitation are not appropriate for storage and must be destroyed (*e.g.*, because they are soiled or contaminated), the City shall provide comparable replacements.
- The City shall provide comparable replacements for essential habitation items that are destroyed.
- Mr. Jeffords's RV shall not be moved or destroyed but may be cleaned and/or treated for pests.
- The City shall provide housing for campers at the Super 8 or Berkeley Inn, at the very least during the period of abatement.
- The City shall help campers move themselves or their belongings to the Super 8 or Berkeley Inn and/or to storage.
- The housing at Super 8 and Berkeley Inn shall permit one emotional support animal.

## III.      CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction is denied, and the City may abate the part of the encampment located at Harrison, between 7th and 8th, but subject to the conditions specified above.  A violation of these specified conditions may be deemed a violation of this Court's order.

This order disposes of Docket No. 2.

**IT IS SO ORDERED**.

Dated: September 27, 2023

_____
EDWARD M. CHEN
United States District Judge