UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YESICA PRADO, et al., | Case No.  23-cv-04537-EMC |
| Plaintiffs, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS** |
| CITY OF BERKELEY, | |
| Defendants. | Docket No. 51 |

## I.     INTRODUCTION

Named Plaintiffs and the organization, Where Do We Go Berkeley ("WDWG") have brought a class action on behalf of unhoused disabled individuals living in the City of Berkeley ("the City").  Plaintiffs allege that, throughout the City's abatements, evictions, and treatment of disabled unhoused persons, the City has violated the Fourth Amendment's prohibition against unreasonable search and seizure, the Americans with Disabilities Act (ADA), the Fair Housing Act, the Eighth Amendment pursuant to *Martin v. City of Boise*, 920 F.3d 584 (9th Cir. 2019), and the Plaintiffs' due process rights by placing them in a state-created danger (and the corresponding state law claims where applicable).  In response, the City challenges WDWG's standing and moves to dismiss each of Plaintiff's causes of action.

For the reasons set forth below, the motion is GRANTED IN PART and DENIED IN PART.

## II.     FACTUAL BACKGROUND

The named Plaintiffs are seven unhoused, disabled individuals who live in the City of Berkeley.  Most of them live or have lived at a homeless encampment which spans several blocks around the intersection of 8th Street and Harrison Street in Berkeley, California ("the 8th and

Harrison Encampment").  FAC, ¶ 134.  The encampment has been established for ten years and has been the site of several abatements and evictions.  *Id*.

A.    Plaintiff Yesica Prado

Plaintiff Yesica Prado lives at the 8th and Harrison Encampment in an RV parked on 8th Street between Harrison and Gilman.  FAC, ¶ 23.  Ms. Prado has been diagnosed with Post Traumatic Stress Disorder ("PTSD") and Attention Deficit Hyperactivity Disorder ("ADHD").  *Id*. ¶ 22.  She alleges that "these disabilities limit her major life activities by affecting her ability to handle stressful situations, feel safe, learn, read, think, and communicate."  *Id*.  As a result of her ADHD, to be able to process information, she often needs to take notes or record conversations to be able to re-listen to them.  *Id*.  She alleges that "being in community and being able to live with others is critical to her mental health and ameliorating her PTSD.  Her experiences living as an unhoused person in Berkeley have contributed to her PTSD, which makes it difficult for her to trust and be around representatives of the City."  *Id*.

Ms. Prado received an offer of shelter at the Campus Motel but was told that she could not park her RV there.  FAC, ¶ 23.  She was told she could park it on the streets, but there are no places in Berkeley to park an RV for more than 72-hours without having to move it.  *Id*.  If she went to temporary shelter, and was not allowed to stay, and her RV were seized and destroyed, she would have nowhere to go.  *Id*. ¶ 26.  She told the City that, as an accommodation for her mental health disabilities, she needs to be able to have visitors in her space at any shelter, because her community is critical to her mental health.  *Id*. ¶ 25.  She was told that all motel shelters have a "no visitor" policy and no accommodation was offered to her.  *Id*.

B.    Plaintiff Lucien Jeffords

Plaintiff Lucien Jeffords lives at the 8th and Harrison Encampment in his RV on Harrison Street between 7th and 8th Street.  FAC, ¶ 27.  Mr. Jeffords alleges that:

> He has serious respiratory and gastrointestinal issues that have left him very physically weak, and he becomes easily winded, cannot walk long distances, and needs assistance to move his belongings. Mr. Jeffords has intellectual disabilities that affect his memory and ability to think clearly and understand written materials.  When abatement or eviction notices are posted, such as the ones posted prior to Labor Day 2023 as well as the ones posted prior to the

November 7, 2023 abatements, he finds them confusing and hard to follow, and he is left feeling scared.

*Id*. ¶¶ 27- 28.

Mr. Jeffords was offered a space at the Berkeley Inn in late August 2023, before a notice of abatement was posted where he lives at the Harrison encampment in early September.  FAC, ¶ 28.  The offer was made to Mr. Jeffords around the time he frequently left the encampment to attend appointments related to a medical procedure.  *Id*.  After the procedure, Mr. Jeffords returned to his RV, and there were no further discussions with the city about the offer of shelter.

Since then, the City's offer of shelter has been renewed, but the City will not permit Mr. Jeffords to bring his second emotional support animal, nor has it provided Mr. Jeffords with the accommodations and support necessary for him to access shelter (though the FAC does not say what other accommodations he needs).  FAC, ¶ 28.  He is concerned about the shelter's no-visitor's policy because he relies on the support of his neighbors to watch out for him and check on him with respect to his health issues.  *Id*. ¶ 30.  Further, Mr. Jeffords has been told that if he accepts a space at the Berkeley Inn, the City will "take care of his RV."  *Id*. ¶ 29.  When he asked what this meant, he was told they would impound it and then sell or destroy it.  *Id*.

C.    Plaintiff Erin Spencer

Plaintiff Erin Spencer's disabilities include "injuries in his shoulder and back that cause him significant chronic pain and limit his shoulder mobility and ability to engage in daily life activities such as lifting and carrying objects and cleaning his space."  *Id*. ¶ 37.  He has been diagnosed with Major Depressive Disorder and PTSD.  *Id*. ¶ 38.  He allegedly has:

> [C]omplex trauma from a childhood of abuse and neglect, from his time in the military, and from his time in jail. …  These disabilities impact his ability to function within rigid, hierarchical rule structures, to comply with orders, to process information when he is stressed, and sometimes lead to panic attacks. …  Evictions are also traumatizing for him.  He has had panic attacks during evictions.  When workers surround him and begin throwing away his belongings and taking apart his home, he can only see the people around him as enemies and his experience from the military overwhelms him.  His mental health disabilities require him to have close contact with his social support.

*Id*.

Mr. Spencer has repeatedly had his belongings taken and his shelter destroyed by the City,

after which he would have to start over, re-gathering materials for shelter and survival—

sometimes as often as every two weeks.  FAC, ¶ 32.  He has been offered a place at the Campus

Motel temporary shelter program, but the restrictive policies, including the prohibition on visitors,

limitations on storage, and lack of privacy mean that the motel program is not a viable option for

him given his mental health needs.  *Id.* ¶ 40.  He does not feel comfortable or safe living in an

enclosed environment where he does not have control over who comes into his space.  *Id.*  "He

believes that if he went into a motel program, the environment would invoke a trauma response,

and he would have immense difficulty complying with the rules.  He would likely soon be kicked

out of the program, without any of the items that he needs to survive on the streets."  *Id.*

D.     Plaintiff Amber Whitson

       Plaintiff Amber Whitson is a "qualified person with a disability"; she has Complex Post-

Traumatic Stress Disorder (CPTSD), ADHD, Gastrointestinal Reflux Disease, and sciatica.  FAC,

¶ 45.  She alleges that "her disabilities impact major life activities by making it difficult for her to

live in places where she does not feel secure and be without her pets who she relies on for

emotional support."  *Id.*  She lives in an RV and receives constant tickets because she is not able to

move her RV every 72 hours.  *Id.* ¶ 49.  She alleges that "the constant threat and actuality of

negative contacts with the police while she is parked illegally on the street triggers her CPTSD.

*Id.* ¶ 50.  She has not been offered shelter.  At the beginning of 2023, she was told she would get

help to find housing, but she was not evaluated for eligibility and has not heard about her

application since then.  *Id.* ¶ 47.

E.     Plaintiff Rufus Lee White, Jr.

       Plaintiff Rufus Lee White Jr.'s disabilities are the result of:

              [I]njuries from a serious accident, being hit by a car, and physical
              attacks by others.  In an accident ten years ago, Mr. White Jr. broke
              his neck and suffered nerve damage in his lower body.  *Id.*  He has
              screws in his neck and his lower body is partially paralyzed and he
              often needs assistance getting in and out of his wheelchair.  *Id.*  He
              also has an amputated middle finger on his left hand, and he has
              suffered from a head injury, which has impacted his long-term
              memory.  He experiences chronic pain.  He also has no peripheral
              vision, and he has glaucoma.  *Id.*  These disabilities restrict his
              ability to walk, lift items, move his belongings, clean his space, and
              comprehend instructions. … He experiences depression, panic

> attacks and mood swings. ... Mr. White Jr.'s intellectual and mental
> health disabilities impact his memory, and limit his attention,
> concentration, executive functioning, and ability to sustain
> employment and relationships with others.

FAC, ¶¶ 51-52.

Mr. White Jr. alleges that:

> The City has taken and thrown away [his] belongings on multiple
> occasions when they have come to Harrison Street to pick up trash
> or do abatements. They have taken his tent with all his belongings
> that were inside four times including important personal documents
> that he needs to access benefits and services. When his property is
> taken and thrown away, he endures a long process of replacing
> documents such as his ID and SSI cards and locating replacement
> survival gear, including tents, sleeping bags, blankets, clothes, and
> mobility devices.

FAC, ¶ 53.

In September of 2023, a City outreach worker came to Harrison Street and verbally offered

Mr. White Jr. shelter in one of its temporary shelter motel programs. FAC, ¶ 57. When he

followed up with the City through counsel regarding the offer, the City told him that it could not

provide him with shelter at that time because there were "no open ADA rooms," and he would

need to wait until one became available. *Id.*

F.    Plaintiff Jermaine Lee "Cat" White

Plaintiff Jermaine Lee "Cat" White has severe PTSD and anxiety which impacts his major

life activities, including his ability to concentrate, think and communicate. FAC, ¶ 59. The City

has destroyed his belongings in a number of evictions. *Id.* During one sweep, the City destroyed

his four bikes, his guitar, and everything else in his camp, all of which were destroyed by trash

compactors. *Id.* Another time, the City came out in riot formation to destroy people's belongings,

and he was too traumatized to stay and watch his belongings be destroyed. *Id.* The City has never

stored any of his belongings during any of the evictions he has been subjected to. *Id.* ¶¶ 59, 64.

Mr. White alleges that:

> He wants assistance to be housed, but for services to be accessible to
> him, he needs accommodations and mental health services to help
> him overcome his past trauma and fears of losing all his belongings
> again. When outreach and services are offered to him, he needs
> reasonable accommodations to understand the specifics of what is
> being offered to him, including being able to discuss options with
> his caseworker or other trusted individuals.

> Mr. White has not received any outreach from the City from mental
> health workers, nor has he received any information regarding
> support or services for his mental health issues.

FAC, ¶¶ 65-66.

G.     <u>Plaintiff Monique Williams</u>

Plaintiff Monique Williams currently lives at the Campus Motel in Berkeley.  FAC, ¶ 67.

She has PTSD related to an abusive relationship and other incidents, and impaired short-term

memory from getting hit on the back of the head with a gun.  *Id*.  Ms. Williams suffers from a

serious hip injury which makes sitting for long periods extremely difficult, and she has metal pins

in her arms that hurt when it is cold outside or when she is exposed to extreme elements.  *Id*.

"These disabilities impact major life activities, including her ability to withstand exposure to the

cold and elements and sit for long periods of time because of the pain in her hip and arms, and her

ability to process information, feel safe, rest, and leave her room given the trauma she has

experienced."  *Id*.

Ms. Williams had previously lived in an RV.  FAC, ¶ 68.  She alleges that:

> Based on conversations she had with the City, she understood that if
> she accepted the motel option, her RV would be stored by the City.
> … However, once Ms. Williams accepted a spot at the motel, the
> City took the keys and title to her RV, towed the RV away, and
> destroyed it, thereby destroying Ms. Williams's only source of
> permanent, safe shelter.  She cannot live in a tent due to her
> disabilities because it gets too cold and the metal pins in her arm
> cause her pain.

*Id*.  This is especially harmful for Ms. Williams who cannot live in a tent because she is a survivor

of domestic violence, and her abuser is actively pursuing her.  *Id*. ¶ 73.  He has tried to kill her

multiple times before.  She fears that he would slash open the sides of a tent and harm or even kill

her.

The program at the Campus Motel does not accommodate Ms. Williams's disability-

related needs:

> Due to her mental health issues and short-term memory loss, she has
> a hard time understanding and remembering the rules of the
> program.  She feels like the rules are unclear and always changing
> and fears accidentally breaking a rule she did not know about and
> then being kicked out of the program. … The no-visitor policy has
> had a detrimental impact on her mental health.  Ms. Williams needs
> to be able to see her family and friends as an accommodation in

order to mitigate her PTSD.

FAC, ¶ 70.  Additionally, the lack of privacy at the motel makes her feel her possessions are

unsafe.  *Id*. ¶ 71.  The staff members also knock and enter immediately without waiting for a

response.  *Id*.  One time they came in while she was in the shower.  She states that "these

invasions of privacy make her feel violated and trigger her PTSD."  *Id*.

H.     Plaintiff Where Do We Go Berkeley

Plaintiff Where Do We Go Berkeley ("WDWG") is a 501(c)(3) nonprofit Corporation

whose board is made up of people who are homeless or housing insecure and advocates.  FAC, ¶

77.  WDWG's mission is to serve, support and advocate for homeless individuals in the East Bay.

*Id*.  WDWG was founded in September 2019 in response to local government policies and

practices of "evicting" and "sweeping" homeless encampments without providing residents with

accessible shelter, housing, or any legal place to go.  *Id*.  WDWG provides direct outreach,

advocacy, and material support for people living on the street and for people temporarily housed in

shelters and transitional facilities funded by government and operated by nonprofits.  *Id*. ¶ 78.

The FAC alleges that:

> When evictions happen, established encampments that [WDWG]
> has supported and supplied with material resources are disbanded,
> and individuals who had been living in those encampments scatter.
> [WDWG] is then forced to expend resources providing replacement
> resources and also finding residents who have left and then
> reestablishing a relationship. …

> Evictions without the provision of accessible alternatives make it
> particularly difficult to provide services to people with disabilities.
> Additionally, the evictions make it difficult for [WDWG] to keep
> track of the sick, elderly, mentally and physically disabled it has
> been working to help.  …

> When the City destroys people's possessions in the course of sweeps
> and evictions, it drains the resources of WDWG, which is forced to
> expend limited funds replacing belongings the City is destroyed that
> are essential for survival on the street.  …  WDWG has resupplied
> people with new shelters and tents, sleeping bags, clothes,
> undergarments, food, shoes, tent heaters, tarps, buckets for fecal
> waste, toothbrushes, toothpaste, toilet paper, socks, deodorant,
> blankets, medicines, storage tubs, and many other items, after they
> were taken by the City during the eviction.

> WDWG has been required to divert resources to advocating for
> people residing in transitional facilities such as motels operated by
> non-profit service providers under contract with the City.  …

> WDWG has received numerous complaints about service providers that operate these facilities who do not accommodate the disabilities of residents and enforce rules and regulations arbitrarily in ways that render the facilities inaccessible to people with disabilities. It receives complaints about the poor quality of food provided residents; failure to assure the safety of residents, particularly female residents; failure to respect the privacy of residents; excessively strict enforcement of curfews that result in vulnerable and disabled residents being locked out for the night; failure to provide housing navigation services to move people into permanent housing; failure to accommodate people with disabilities in the provision of services; and failure to provide a fair and accessible way that people can bring grievances to the organization facilities and have complaints fairly evaluated and addressed. The need to devote a disproportionate amount of time to dealing with grievances about transitional facilities frustrates the mission of WDWG to support the greatest possible number of people experiencing homelessness in the East Bay.

FAC, ¶¶ 81-84.

## I.    Class Allegations

The proposed class is defined as: "All unhoused persons who have a 'disability' as defined under the Americans with Disabilities Act ("ADA"), who reside in a vehicle or other shelter in public spaces in Berkeley, California, or who reside in temporary or transitional shelters in Berkeley, California." FAC, ¶ 214. Of the 1,057 unhoused residents in Berkeley, 62.3% have disabilities, which means the class likely includes at least 658 members. *Id.* ¶ 217.

## J.    Factual Allegations[1]

The named Plaintiffs are seven unhoused, disabled individuals who live in the City of Berkeley; many of whom have lived at the 8th and Harrison Encampment. FAC, ¶ 134. The encampment has been established for ten years and has been the site of several abatements and evictions. *Id.* As of the most recent census of unhoused residents of Berkeley, in 2022, 62.3% of

---

[1] At this stage of the litigation, only the allegations that pertain to named Plaintiffs can be contemplated in the Court's analysis of the legal issues alleged, though the FAC discussed incidents involving additional disabled unhoused individuals. For example, one incident involved a woman named Eve who lives close to the Eighth and Harrison encampment but lives apart from Plaintiffs because her mental health issues are so severe. FAC, ¶ 107. She does not talk to Plaintiffs and does not read the notices posted in their encampment. *Id.* Because the City does not bring anyone with mental health training to talk to her, Eve was unaware of the looming evictions. *Id.* Before the August 22, 2023, abatement, Ms. Prado talked to Assistant City Manager Peter Radu and insisted that a trained mental health professional come speak to Eve, because she would otherwise be at risk of losing her shelter and could be arrested. *Id.* ¶ 109. Members of Berkeley Mental Health staff eventually agreed to come meet with Eve, and she engaged with them. *Id.*

United States District Court
Northern District of California

unhoused residents reported having a mental health disability, 33.1% reported a physical disability, 30.6% had a chronic health condition, and 18.3% had a developmental health condition. FAC, ¶ 86.  86.2% of the residents at the 8th and Harrison Encampment have mental health disabilities.  *Id*. at ¶ 111.  The City engages in outreach to unhoused individuals regarding service options and upcoming abatements and evictions, but mental health workers are not included in outreach to unhoused residents.  *Id*. ¶ 87.  Enforcement actions are conducted against encampments without any effort to accommodate the needs of unhoused people with disabilities.  *Id*.  Further, there is insufficient shelter space that is accessible to people with mobility disabilities and mental health conditions.  *Id*.

There are currently over 1,000 people in Berkeley experiencing homelessness.  FAC, ¶ 88.  In a memo submitted to the Berkeley City Council on September 21, 2023, assistant City Manager Peter Radu stated, "[o]n any average day, the HRT [Homeless Response Team] has fewer than 10 vacancies to work with across the entire shelter system, meaning that under the Ninth Circuit's rulings many encampments in our city must be able to remain in place. … It is critical to understand and accept that unsheltered homelessness is our new normal as a community."  *Id*. ¶ 91.

Nonetheless, over the past several years, the City and other agencies have closed or participated in the closure of a large number of encampments.  FAC, ¶ 92.  The City has also begun to more aggressively enforce parking regulations such as 72-hour and 4-hour parking limits that target people who live in their cars or RVs, decreasing the number of locations individuals who live in their vehicles can park.  *Id*. ¶ 92.

The complaint alleges:

There is nowhere in the City where unsheltered residents can legally camp.  Berkeley has passed and enforces a series of ordinances and regulations that, taken together, effectively make it impossible for a person experiencing homelessness to shelter in a public space.  They cannot legally erect a tent or structure on a sidewalk or in a park; they cannot park a vehicle and live in it without violating city ordinances and/or the California vehicle code.

FAC, ¶ 93.[2]  The City allegedly has a pattern and set of practices it employs when it abates or clears an encampment.  *Id*. at ¶ 123.  The elements of these pattern include:

> (1) posting vague notices that do not provide a specific time and date on when the City's abatement action will occur and do not clearly delineate the areas or property subject to "abatement";
> (2) not providing encampment residents with sufficient time to prepare, including noticing an abatement action on a Friday for an abatement that takes place on a Monday;
> (3) including vague instructions on the abatement notices regarding what encampment residents can do to comply with the notice;
> (4) threatening and conducting arrests of residents and issuing citations;
> (5) summarily destroying property, including vehicles, without providing individualized notice and an opportunity to be heard as to why a person should not be permanently dispossessed of their property; and
> (6) refusing to provide encampment residents with disability accommodations that they need in order to comply with the City's actions.

*Id*.  The outreach and abatement teams do not include mental health workers who can meaningfully explain what is happening to Plaintiffs.  *Id*. at ¶ 125.

For example, on September 30, 2022, the city posted a "Notice of Imminent Health Hazard and Emergency Abatement" near the intersection of 8th and Harrison, stating the abatement would take place three days later, on October 3, 2022.  FAC, ¶ 141.  The FAC alleges:

> City officials attaches copies of the notice to fences, tents, and telephone poles with duct tape.  Minimal effort was made to communicate with residents regarding what this "abatement" action would entail, and what residents could do to comply.  The "abatement" was authorized for purposes of addressing rodent harborage, although nothing in the notice indicated that residents were being asked to leave, or that their shelters would be removed.

> At 6:20 a.m. on October 4, 2022, [the City] moved in with heavy machinery, a phalanx of Berkeley Police officers, and city officials, to destroy 29 tents, three structures, and impound and then crush four vehicles that unhoused residents were relying on for shelter.  During the eviction, Peter Radu [the Assistant to the City Manager] admitted that there were more residents than available shelter beds, which is why the City was not asking people to leave.  However, despite the lack of beds, the City proceeded to destroy many residents' only source of shelter, offering no alternative or replacement.

---

[2] The specific Berkeley ordinances at issue are produced in the *Martin* section.

United States District Court
Northern District of California

…

[The City] threw away Plaintiff Rufus Lee White Jr.'s tent and all his belongings, including all his pants, despite his protests. He was offered a two-person tent but cannot access a two-person tent because his mobility disability prevents him from being able to get into the tent. Plaintiff White was left in his wheelchair without pants, completely without shelter. He ended up sleeping outside—wherever he got tired—for several days before LifeLong Medical donated a new tent to him.

FAC, ¶¶ 141-42, 144.

The City has a pattern of destroying Plaintiffs and Class members' property during abatements and closures, even when faced with individuals making legitimate claims of possessory interest in the property and protesting its seizure and destruction. FAC, at ¶ 130. On some occasions, the items being destroyed are mobility devices like wheelchairs, walkers, crutches, and medication. *Id*. The City does not provide Class members subject to abatement or encampment closures a meaningful opportunity to identify and preserve their property. *Id*. The City's practice is to arrive early in the morning with a backhoe to destroy encampment residents' possessions, without first identifying in advance who is there, whether they have alternative shelter to go to, what property they have, and where it will be stored. *Id*.

The City closes encampments and takes Plaintiffs survival gear, including "tents, bedding, jackets, medications, and mobility devices," FAC, ¶ 2, when they have no place to go and does not allow sufficient time for outreach workers to contact people being displaced to find them safe, accessible housing. *Id*. at ¶ 132. These dangers are particularly acute for the many people who have been displaced who have serious mental and physical disabilities. *Id*. The 8th and Harrison Encampment works for Plaintiffs because it is close to necessary establishments like grocery stores and gas stations. *Id*. ¶ 134. The community has a well-established system of mutual aid and support. *Id*. ¶ 135. Residents watch each other's belongings while individuals work, rest, complete chores, and obtain food and water. *Id*. They keep each other safe and keep each other company, which is critical for the residents who have mental and physical health needs. *Id*.

Additionally, Plaintiffs allege that the City has a practice of seizing and crushing Plaintiffs' RVs. Ms. Williams alleges that she previously lived in an RV. FAC, ¶ 68. She was in conversations with the City about moving to a motel, and she understood from her conversations

with the City, that if she accepted the motel option, her RV would be stored by the City. *Id*. However, once Ms. Williams accepted a spot at the motel, the City took the keys and title to her RV, towed it away, and destroyed it. *Id*. Further, as previously discussed, during the October 4, 2022 abatement, to the City destroyed "29 tents, three shelters, and impound and then crush four vehicles that unhoused residents were relying on for shelter." *Id*. ¶ 142.

## III.   LEGAL STANDARDS

A.   Federal Rule of Civil Procedure Rule 12(b)(1)

Under Rule 12(b)(1), a party may move to dismiss for lack of subject matter jurisdiction. Lack of such jurisdiction may occur where the plaintiff lacks standing; "lack of Article III standing requires dismissal for lack of subject matter jurisdiction under [Rule] 12(b)(1)." *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011).

The "irreducible constitutional minimum" of Article III standing requires that a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins* ("*Spokeo II*"), 136 S. Ct. 1540, 1547 (2016). These three elements are referred to as, respectively, injury-in-fact, causation, and redressability. *Planned Parenthood of Greater Was. & N. Idaho v. U.S. Dep't of Health & Human Servs.*, 946 F.3d 1100, 1108 (9th Cir. 2020). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements," which at the pleadings stage means "clearly . . . alleg[ing] facts demonstrating each element." *Spokeo II,* 136 S. Ct. at 1547 (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

A Rule 12(b)(1) jurisdictional attack may be factual or facial. *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "In a facial attack," "the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Id.* The Court "resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the Court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).

"[I]n a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone*, 373 F.3d at 1038.  In resolving such an attack, unlike with a motion to dismiss under Rule 12(b)(6), the Court "may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Id.*  Moreover, the Court "need not presume the truthfulness of the plaintiff's allegations." *Id.*

Either way, "it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing." *Warth*, 422 U.S. at 501; *see also Table Bluff Reservation (Wiyot Tribe) v. Philip Morris, Inc.,* 256 F.3d 879, 882 (9th Cir. 2001) (in assessing standing, the Court may consider "the complaint and any other particularized allegations of fact in affidavits or in amendments to the complaint").

B.     Federal Rule of Civil Procedure Rule 12(b)(6)

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  A complaint that fails to meet this standard may be dismissed pursuant to Rule 12(b)(6). *See* Fed. R. Civ. P. 12(b)(6).  To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014).  The Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (quoting *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014)).  "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the

1   misconduct alleged." *Iqbal*, 556 U.S. at 678.  "The plausibility standard is not akin to a

2   'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

3   unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

4   C.   Federal Rule of Civil Procedure 12(f)

5        Before responding to a pleading, a party may move to strike from a pleading any

6   "redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  The essential

7   function of a Rule 12(f) motion is to "avoid the expenditure of time and money that must arise

8   from litigating spurious issues by dispensing with those issues prior to the trial."  *Wang v. OCZ*

9   *Tech. Grp., Inc.*, 276 F.R.D. 618, 624 (N.D. Cal. Oct. 14, 2011) (quoting *Whittlestone, Inc. v.*

10  *Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010)).  Motions to strike are generally disfavored.

11  *See Shaterian v. Wells Fargo Bank, N.A.*, 829 F. Supp. 2d 873, 879 (N.D. Cal. 2011); *Platte*

12  *Anchor Bolt, Inc. v. IHI, Inc.*, 352 F. Supp. 2d 1048, 1057 (N.D. Cal. 2004).  A motion to strike

13  should only be granted if the matter sought to be stricken clearly has no possible bearing on the

14  subject matter of the litigation.  *See Colaprico v. Sun Microsystems, Inc.*, 758 F. Supp. 1335, 1339

15  (N.D. Cal. 1991); *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other*

16  *grounds, Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994) ("'Immaterial matter' is that which has no

17  essential or important relationship to the claim for relief or the defenses being pleaded.").

18  Statements that do not pertain to, and are not necessary to resolve, the issues in question are

19  impertinent.  *Id.*  If there is any doubt whether the portion to be stricken might bear on an issue in

20  the litigation, the Court should deny the motion to strike.  *Platte Anchor Bolt*, 352 F. Supp. 2d at

21  1057.  Just as with a motion to dismiss, the Court should view the pleading sought to be struck in

22  the light most favorable to the nonmoving party.  *Id.*

23              **IV.    DISCUSSION**

24  A.   The Allegations in the FAC That Occurred After September 4, 2023 Will Not Be Stricken

25        On September 29, 2023, the City filed a motion to dismiss.  Docket No. 27.  On October

26  16, 2023, the Court granted the parties' stipulated request to extend the plaintiffs' deadline to file

27  their FAC.  Docket No. 33.  In the stipulated Order, it stated that Plaintiffs sought to amend its

28  pleadings pursuant to Fed. R. Civ. Proc. 15(a)(1)(B).  In Plaintiffs' FAC, they added allegations

United States District Court
Northern District of California

14

United States District Court
Northern District of California

that occurred after September 4.

The City argues that allegations as to events occurring after September 4 should be stricken from the FAC.  This is because *amendment* does not permit Plaintiffs to add subsequent allegations (pursuant to Fed. R. Civ. Proc. 15(a)(1)(B)).  Rather, Plaintiffs would have to move to *supplement* its pleadings pursuant to Fed. R. Civ. Proc 15(d) to add subsequent allegations past the date the original complaint was filed.

The Ninth Circuit has stated that trial courts should "liberally construe Rule 15(d) absent a showing of prejudice to the defendant."  *Keith v. Volpe*, 858 F.3d 467, 475 (9th Cir. 1988).  Here, the City did not make a showing that they were prejudiced by Plaintiff's supplementing their complaint without making a formal Rule 15(d) motion.  "A strict interpretation of Rule 15(d) would emphasize the formality of pleading over substance."  *Id*. (quoting *H.F.G. Co. v. Pioneer Pub. Co.*, 7 F.R.D. 654, 656 (N.D. Ill. 1947)).  The Court could permit Plaintiffs leave to amend to formally supplement their complaint to add facts occurring after September 4, or it could simply deem the complaint so supplemented.  Here, in the interest in efficiency and in the absence of prejudice to Defendants liberally construes Rule 15(d), the Court will not strike the events in the FAC that occurred after September 4, 2023.

B.    WDWG has Sufficiently Plead Organizational Standing

As noted above, the "irreducible constitutional minimum" of standing requires that a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  "[T]he plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Lujan v. Defenders of Widlife*, 504 U.S. 555, 560 (1992).  The City contends that Plaintiffs fail to allege injury in fact on behalf of WDWG for organizational standing.

 "Under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), an organization may establish 'injury in fact if it can demonstrate: (1) frustration of its organizational mission; and (2) diversion of its resources to combat the particular [conduct] in question.'"  *Am. Diabetes Ass'n v.*

15

*United States Dep't of the Army*, 938 F.3d 1147, 1154 (9th Cir. 2019).  "Organizations cannot 'manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all,' but they can show they 'would have suffered some other injury' had they 'not diverted resources to counteracting the problem.'" *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 663 (9th Cir. 2021) (quoting *La Asociacion de Trabajadores de Lake Forest v. Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010)).  In cases where the Ninth Circuit found organizational standing, "the [organizations] were not 'simply going about their "business as usual,"' but had altered their resource allocation to combat the challenged practices."  *Am. Diabetes Ass'n*, 938 F.3d at 1154 (collecting cases).

   "This requirement was satisfied, for example, when an organization designed and disseminated literature to redress the effects of the challenged discrimination, *Fair Hous. Of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002), and when an organization started new campaigns targeting discriminatory roommate preference practices, *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216 1219 (9th Cir. 2012)."  *Friends of the Earth v. Sanderson Farms, Inc.*, 992 F.3d 939, 942 (9th Cir. 2021).  Both of these activities constituted a diversion of resources from normal activities.  Organizations "are not required to demonstrate some threshold magnitude of their injuries; one less client that they may have had but-for the Rule's issuance is enough.  In other words, plaintiffs who suffer concrete, redressable harms that amount to pennies are still entitled to relief."  *E. Bay Sanctuary Covenant*, 993 F.3d at 665 (after asylum eligibility was stripped from migrants who crossed into the U.S. between designated points of entry, inland organizations which assisted migrants seeking asylum had organizational standing in part because they expended resources sending staff to the borders).

   "In contrast, courts have found that merely continuing ongoing activities does not satisfy this requirement."  *Friends of the Earth*, 992 F.3d at 942 (citation omitted) (holding that an advocacy group did not have organizational standing because, despite defendant's false advertisements regarding its use of antibiotics in its farming practices, the advocacy group stated in depositions that it did not change its advocacy strategy because of Defendant's false advertising, and instead, continued with its business-as-usual).  In *Am. Diabetes Ass'n*, there was

no organizational standing when the Association challenged a policy which "creat[ed] an impermissibly 'burdensome accommodation review process'" for accommodations for children with diabetes in the army.  938 F.3d at 1150-51.  The only example of a resource the Association claimed it diverted as a result of this policy is that one of its staff attorneys took an intake call from an army parent and explained the new policy and the family's rights under federal law.  *Id*. at 1155.  The Ninth Circuit stated:

> [T]he Association did not divert any resources but was merely going about its business as usual.  Its staff attorneys dedicate a portion of their time to taking calls, and one Army parent used that service. The Association has not shown that, at the time the operative complaint was filed and as a result of the New Policy, the Association had altered or intended to alter its resource allocation to allow its attorneys to take a higher volume of calls or separately address the New Policy.

*Id*.

WDWG's organizational standing has previously been addressed by this Court.  *Where Do We Go Berkeley v. CA Dept. of Transportation (Caltrans)*, 2023 WL 5964594 at *5 (N.D. Cal. 2021).  In that case, Caltrans' actions frustrated WDWG's mission and WDWG diverted its resources to combat Caltrans' conduct.  *Id*.  Whereas WDWG would have otherwise spent their resources to support encampments, WDWG had to purchase tents and other equipment that people needed when they were forced to leave their established encampments, track former residents down, resupply them with tents and other necessities of life, and assist them in reestablishing contacts with service providers.  *Id*.[3]  That case is similar to the facts here in the case at bar:

> WDWG's mission is to serve, support and advocate for homeless individuals in the East Bay. ... WDWG provides direct outreach, advocacy, and material support for people living on the street and for people temporarily housed in shelters and transitional facilities.
> …
> When evictions happen, established encampments that WDWG has supported and supplied with material resources are disbanded, and individuals who had been living in those encampments scatter. WDWG is then forced to expend resources providing replacement resources and also finding residents who have left and then

---

[3] WDWG's claim for organizational standing was also granted in *Reed v. City of Emeryville*, 568 F.Supp.3d 1029, 1035 (N.D. Cal. 2012).  In that case, after plaintiffs were displaced for the third time in eight days without a meaningful offer of accessible shelter, WDWG "used its funds to pay for hotel rooms for" plaintiffs for several weeks.

reestablishing relationships.

…

Evictions without the provision of accessible alternatives make it particularly difficult to provide services to people with disabilities. Additionally, the evictions make it difficult for WDWG to keep track of the sick, elderly, mentally and physically disabled it has been working to help.

…

When the City destroys people's possessions in the course of sweeps and evictions, WDWG is forced to expend limited funds replacing belongings the City destroyed that are essential for survival on the street. Following evictions by the City, WDWG has resupplied people with new shelters and tents, sleeping bags, clothes, undergarments, food, shoes, tent heater, tarps, buckets for fecal waste, toothbrushes, toothpaste, toilet paper, socks, deodorant, blankets, medicines, storage tubs, and many other items, after they were taken by the City during the eviction.

WDWG has been required to divert resources to advocating for people residing in transitional facilities such as motels operated by non-profit service providers under contract with the City. … WDWG receives complaints that service providers who operate these facilities do not accommodate the disabilities of residents, provide poor qualify food, fail to assure the safety of its residents, fail to respect the privacy of residents, strictly and excessively enforce curfews that result in disabled residents being locked out for the night, and failure to provide a fair and accessible way for people to bring grievances to the facilities.

¶¶ 77-84. Here, as in *Where Do We Go Berkeley*, WDWG alleges it is forced to alter its resource allocation to address disabled unhoused individual's needs resulting from the City's actions.

For instance, the complaint alleges that during the October 4, 2022, sweep, Ian Cordova Morales, the President of WDWG, repeatedly asked Peter Radu, the Assistant to the City Manager, for assistance storing belongings. FAC, ¶ 145. Mr. Radu refused to get a truck to transport and store items and said the City would not store "bulky items" but did not specify what this meant. *Id.* As a result, WDWG expended resources buying tents and supplies for people whose belongings were taken. *Id.* ¶ 146.

WDWG has established that it "'would have suffered some other injury' had [it] 'not diverted resources to counteracting the problem,'" because its unhoused disabled members would be without survival gear and service providers after the City's sweeps, which WDWG counteracted by diverting its resource allocation. *E. Bay Sanctuary Covenant*, 993 F.3d at 663 (quoting *La Asociacion de Trabajadores de Lake Forest*, 624 F.3d at 1088). Though it only

provided one concrete example of a time it expended resources to buy tents and supplies for people, organizations "are not required to demonstrate some threshold magnitude of their injuries … plaintiffs who suffer concrete, redressable harms that amount to pennies are still entitled to relief." *E. Bay Sanctuary Covenant*, 993 F.3d at 665.  WDWG has shown that it has altered its resource allocation by buying more supplies in response to the City's actions.  Additionally, WDWG has shown that during the City's evictions and abatements, it has had to send advocates to the encampment sites to advocate for Plaintiffs; it may be inferred this is something it normally would not have to do.

Therefore, WDWG has organizational standing in this case.

C.     Plaintiffs Have Stated a Plausible Claim That the City Seizes Its Property Without Proper Notice in Violation of the Fourth and Fourteenth Amendments

The Plaintiffs have stated a plausible claim that the City's evictions and abatements violate Plaintiffs' Fourth and Fourteenth Amendment rights, because the destruction of Plaintiffs' property is unreasonable under the Fourth Amendment and the inadequate notice raises a due process issue.

1.     Seizure of Plaintiffs' Belongings

The Fourth Amendment "'protects two types of expectations, one involving "searches," the other "seizures."  A "seizure" of property occurs when there is some meaningful interference with an individual's possessory interests in that property.'"  *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1027 (9th Cir. 2012) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).  "A seizure conducted without a warrant is *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions."  *Brewster v. Beck*, 859 F.3d 1194, 1196 (9th Cir. 2017) (quoting *United States v. Hawkins*, 249 F.3d 867, 872 (9th Cir. 2001)).

A seizure conducted without a warrant may still be reasonable if the official believes the property is abandoned, *see Lavan*, 693 F.3d at 1026, believes the property poses an immediate threat to public health or safety, *see id*. at 1024, or holds the property for its return and notifies the property owner, *see id*. at 1030.  Absent these preconditions, a seizure is unreasonable.  In *Lavan*, Plaintiffs charged the City of Los Angeles with destroying their unabandoned personal

United States District Court
Northern District of California

19

1    possessions temporarily left on public sidewalks while Plaintiffs were eating, showering, and

2    using the restroom.  *Id*. at 1024.  The Ninth Circuit upheld the district court's preliminary

3    injunction, which barred the City from:

> 1. Seizing property in Skid Row absent an objectively reasonable
> belief that it is abandoned, presents an immediate threat to public
> health or safety, or is evidence of a crime, or contraband; and

> 2. Absent an immediate threat to public health or safety, destruction
> of said seized property without maintaining it in a secure location
> for a period of less than 90 days.

8    *Id*. at 1026.[4]    First, the Ninth Circuit confirmed that "Appellees need not show a

9    reasonable expectation of privacy to enjoy the protection of the Fourth Amendment against

10   *seizures* of their unabandoned property," because destroying one's *unabandoned* property

11   meaningfully interferes with one's possessory interest in their property, triggering the Fourth

12   Amendment's reasonableness requirement.  *Id*. at 1027-28, 1030.  Second, the court stated that the

13   City retains "great leeway … to protect public health and safety" and may destroy property if there

14   is "an immediate threat to public health or safety."  *Id*. at 1024.  Third, the Ninth Circuit stated that

15   "even if [a] seizure of [] property would have been deemed reasonable had the City held it for

16   return to its owner instead of immediately destroying it, the City's destruction of the property

17   rendered the seizure unreasonable."  *Id*. at 1030.  In other words, it may be reasonable to seize

18   property if, *inter alia*, the City holds the property for return to its owner.  If none of these

19   preconditions are met and one's property is summarily destroyed, it is unreasonable under the

20   Fourth Amendment.  *Id*.; *see also Garcia v. City of Los Angeles*, 11 F.4th 1113, 1117 (9th Cir.

21   2021) (holding that a provision of Los Angeles' municipal code which allowed  Los Angeles to

22   discard bulky items not being used as shelter without first impounding said items, "on its face

23   violates the Fourth Amendment's protection against unreasonable seizures."); *cf. Janosko v. City*

24   *of Oakland*, No. 3:23-CV-00035-WHO, 2023 WL 3029256 at *3 (N.D. Cal. Apr. 19, 2023) (there

25   was no Fourth Amendment violation where the City helped unhoused individuals move and store

26   some of their belongings, gave the unhoused individuals time and an opportunity to move any

27

---

28   [4] The preliminary injunction also required that the city provide plaintiffs with notice before taking their belongings.
The notice issue is discussed in section IV.C.2.

United States District Court
Northern District of California

1   items the City would not store, and only destroyed belongings that were hazardous or dangerous to

2   move or store). The Plaintiffs specifically allege that the City destroys their personal property,

3   including "tents, bedding, jackets, medications, and mobility devices," FAC, ¶ 2, and the City does

4   not provide Plaintiffs an opportunity to identify and preserve their property. *Id*. ¶ 130; *see also*

5   Yesica Prado, *Berkeley Says It Was Aggressive In Homeless Encampment Sweeps, Promises*

6   *Reforms*, SAN FRANCISCO PUBLIC PRESS (Aug. 2, 2023), https://www.sfpublicpress.org/berkeley-

7   apologizes-for-aggressive-homeless-encampment-sweeps-promises-reforms/.[5]  The FAC alleges

8   several incidents that illustrate the City destroying  Plaintiffs' property without holding the

9   property for Plaintiffs to reclaim it.

10          For example, at the October 4, 2022, abatement action, the City moved in with heavy

11   machinery, a phalanx of Berkeley Police officers, and city officials, to destroy 29 tents, three

12   structures, and impound and then crush four vehicles that unhoused residents were relying on for

13   shelter. *Id*. ¶ 142.  During this sweep, Ian Cordova Morales, who is the President of Plaintiff

14   WDWG, repeatedly asked Mr. Radu, the assistant to the City manager, for assistance storing

15   belongings.  *Id*. ¶ 145.  Mr. Radu, the assistant to the City Manager, refused to get a truck to

16   transport and store items and said the City would not store "bulky items" but did not specify what

17   this meant.  *Id*.  The City threw away Mr. Rufus White Jr.'s tent and nearly all his belongings.  *Id*.

18   ¶ 54.  They offered him a two-person tent, but he cannot access a two-person tent because his

19   mobility disability prevents him from being able to get into the tent.  *Id*. ¶ 144.  As a result, he was

20   left with nothing but his wheelchair – he did not even have pants.  He spent the next several nights

21   completely without shelter.  *Id*.  The City has destroyed Plaintiff Mr. Rufus White Jr.'s tent and

22   personal belongings four times.  *Id*. ¶ 53.  Here, the City did not have a warrant and it did not

23   identify that Mr. Rufus White Jr.'s property was a public safety and/or health risk or was

24   abandoned.  The City took and destroyed Mr. Rufus White Jr.'s property without providing him

25   the opportunity to reclaim it before it was destroyed.

26          The City has also repeatedly taken and destroyed Plaintiff Mr. Spencer's belongings.

27

28   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    [5] This article was incorporated by reference in Plaintiffs' FAC.

United States District Court
Northern District of California

1   FAC, ¶ 32.  The FAC alleges:

2           In about 2015, Mr. Spencer built a shelter under the Gilman freeway
            exit.  Then state authorities destroyed all his belongings, forcing him
3           to move from that location, and he built another shelter on the island
            across from the exit.  At Gilman, his shelter and belongings were
4           destroyed again, and again by Caltrans and City authorities,
            depending on Mr. Spencer's exact position.  Mr. Spencer then
5           relocated across from the Seabreeze encampment, near the
            University Avenue freeway exit, and built a new shelter.  Then he
6           came over to 8th and Harrison, had his belongings taken by the City
            again, and moved back to Seabreeze.  He lived there for about two
7           and a half years.  When the Seabreeze encampment was closed, he
            lost everything.  He then moved to near the Ashby freeway exit for
8           about a year, was evicted, moved to 2nd and Page, back briefly to
            Seabreeze, and then finally moved back to 8th and Harrison.  He has
9           been living at that location for a little over a year.

10  *Id*. ¶ 32.  In particular, on November 7, 2023, at the beginning of an abatement procedure, Mr.

11  Spencer was actively trying to leave the area with a cart containing many of his belongings when

12  he was surrounded by at least five officers.  *Id*. ¶ 166.  They grabbed him and handcuffed him,

13  allegedly despite the fact that he was crying out in pain and telling them he had a shoulder

14  disability and was stating he would not resist arrest.  *Id*.  They arrested him and bulldozed his

15  belongings including his property designated in a 3x3 foot square, per the City's own policy.  *Id*.

16  ¶¶ 167-68.  Here, the City's alleged destruction of Mr. Spencer's property before permitting him

17  the opportunity to reclaim it is constitutionally problematic for the reasons stated above.

18          For Plaintiff Mr. "Cat" White, after one of the sweeps, he moved to the Berkeley Inn for

19  28 days, but was told to leave the program because he had no income.  FAC, ¶ 61.  But during the

20  sweep, the City had taken and destroyed his camp, tent, and all of his other survival gear.  *Id*.  The

21  City gave him a two-person tent but never advised him where in Berkeley he could safely or

22  legally camp in the tent it provided.  *Id*.  His belongings have been seized in a number of evictions

23  (the FAC does not specify how many) and the City has never stored his belongings.  *Id*. ¶¶ 59, 64.

24  It is unreasonable for the City to take and destroy property without providing Plaintiffs an

25  opportunity to reclaim it.

26          This case is similar to *Lavan* where the Ninth Circuit stated that when the City of Los

27  Angeles destroyed unhoused Plaintiffs unabandoned personal possessions left on public sidewalks,

28  those seizures were unreasonable under the Fourth Amendment.  693 F.3d at 1030.  Here, the

United States District Court
Northern District of California

Plaintiffs have plausibly alleged that the City routinely destroys their property without adequate notice and opportunity to prevent its destruction.  They have stated claims under the Fourth Amendment.

    2.    <u>Seizure of Vehicles</u>

Plaintiffs allege that the City has a custom and practice of warrantless seizures of vehicles that Plaintiffs use as shelter.  Opp'n, 7.  "[T]he impoundment of an automobile is a seizure within the meaning of the Fourth Amendment."  *Miranda v. City of Cornelius*, 429 F.3d 858, 862 (9th Cir. 2005).  "Because warrantless searches and seizures are per se unreasonable, the government bears the burden of showing that a warrantless search or seizure falls within an exception to the Fourth Amendment's warrant requirement."  *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012) (citing *United States v. Hawkins*, 249 F.3d 867, 872 (9th Cir. 2001)).  Whether the doctrine applies "turns on the facts and circumstances of each case."  *Sandoval v. County of Sonoma*, 912 F.3d 509, 516 (9th Cir. 2018).

The City contends that its seizure of vehicles falls under the community caretaking exception.  Under the community caretaking exception, officers may "remove and impound automobiles which violate parking ordinances and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic."  *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976); *see also Cervantes*, 703 F.3d at 1141 (quoting *Miranda*, 429 F.3d at 864*).*  The Ninth Circuit stated that the application of the doctrine "depends on the location of the vehicle and the police officers' duty to prevent it from *creating a hazard to other drivers or being a target for vandalism or theft*."  *Miranda*, 429 F.3d at 862 (emphasis added).  "The reasonableness of an impoundment under the community caretaking function does not depend on whether the officer had probable cause to believe that there was a traffic violation, but on whether the impoundment fits within the 'authority of police to seize and remove from the streets *vehicles impeding traffic or threatening public safety and convenience* …'"  *Id*. at 864 (citations omitted) (emphasis added).

In *Long v. Gill*, police officers initiated a traffic stop on a car that had expired registration tags.  981 F. Supp. 2d 966 (D. Or. 2013).  The car driver also lacked a valid driver's license, and the police impounded the car.  After the driver sued, the police officers argued that the

impoundment of the driver's car was reasonable under the community caretaker exception.  The

district court disagreed:

> There is no dispute that at the time Deputy Gill pulled Long over, Long's truck was not registered and Long lacked a valid license and insurance.  However, those facts alone do not automatically justify Deputy Gill's decision to impound Long's truck.  *Miranda*, 429 F.3d at 865 (the question is not whether state law authorized the impoundment, but whether or not the seizure was reasonable under the Fourth Amendment) (internal citation omitted).  Additionally, impounding Long's truck solely as a means to deter Long from subsequently driving without a license, insurance, or registration is, on its own, unreasonable under the community caretaker doctrine. *See id.* at 866 ("The need to deter a driver's unlawful conduct is by itself insufficient to justify a tow under the 'caretaker' rationale."). Rather, in order *to fall under the community caretaker exception, Deputy Gill must have reasonably believed Long's truck jeopardized public safety or the efficient movement of traffic*.  *Id*. at 864 (quoting *Opperman*, 428 U.S. at 368-69.  The inquiry is fact specific, and includes a determination of whether the vehicle was subject to theft or vandalism.  *Id.* (internal citations omitted).

*Id*. at 969 (emphasis added).

Although *South Dakota* and *Miranda* state that the community caretaker exception requires

a risk to public safety and/or impeding traffic, some courts assumed and held that mere

unregistered status or illegal parking may be sufficient to invoke the community caretaker

exception even in the absence of a clear public safety or traffic risk.  For instance, in *United States

v. Hunnicutt*, the Tenth Circuit stated that police officers properly impounded a vehicle in their

community-caretaking function after they pulled over a driver who could not produce any

verification of insurance and had a suspended license.  135 F.3d 1345, 1351 (10th Cir. 1998).

Likewise, some courts have found seizures authorized by California Vehicle Code § 22651(o)

reasonable wherein section 22651 provides that a car may be impounded by a police officer if it is

found on a "highway" with "a registration expiration date in excess of six months before the date

is found[.]"  Cal. Veh. Code § 22651(o)(1)(A).  A "highway" includes a street.  Cal. Veh. Code §

360 (West 2020).  In an unpublished memorandum, the Ninth Circuit found the police were

justified in pulling plaintiffs car over for expired registration and impounding it.  *Hylton v.

Towing*, 563 F. App'x 570 (9th Cir. 2014).  *See Crago v. Knacke*, No. 2:19-cv-02509 MCE AC,

2020 WL 3073771, at *3 (E.D. Cal. June 10, 2020) (the police were justified in impounding

plaintiff's truck that was parked on the street, because its registration had expired more than a year before it was towed, and its smog certificate was outstanding).

Despite some unclarity in the law, *Miranda* appears to be good law.  In *United States v. Caseres*, the government failed to prove that the community caretaking rationale applied after it arrested Mr. Caseres and impounded his car.  533 F.3d 1064, 1075 (9th Cir. 2008).  The government was not able to show a justification because his car was legally parked two houses away from his home, so there was little risk his car would be stolen or vandalized.  *Id*.  Though Mr. Caseres had been driving on a suspended license, he was taken into custody, so there was no risk that he was going to unlawfully operate his vehicle.  *Id*.  In finding that "[t]he rationale of impounding vehicles merely to deter future illegal activity 'is incompatible with the principles of the community caretaking doctrine" *Id*.  The court quoted *Miranda*, 429 F.3d at 866.

In *Cervantes*, a police officer pulled a vehicle over for failing to come to a complete stop behind the limit line at an intersection.  703 F.3d at 1138.  The vehicle pulled to the curb appropriately.  After finding that the driver was driving without a driver's license and with no registration, the officers decided to impound and search the vehicle.  *Id*.  The Ninth Circuit found that the community caretaker exception did not apply because the officer did not provide any testimony that the vehicle was "parked illegally, posed a safety hazard, or was vulnerable to vandalism."  *Id*. at 1141.  The Ninth Circuit stated: "if 'the government fail[s] to establish a community caretaking function for the impoundment' then it 'fail[s] to establish the constitutional reasonableness of the seizure and subsequent inventory search.'"  *Id*. (quoting *Caseres*, 533 F.3d at 1075).

Here, Plaintiffs vehicles have been seized and then crushed on several occasions.  Ms. Williams alleges that she previously lived in an RV.  FAC, ¶ 68.  She was in conversations with the City about moving to a motel, and she understood from her conversations with the City, that if she accepted the motel option, her RV would be stored by the City.  *Id*.  Once Ms. Williams accepted a spot at the motel, the City took the keys and title to her RV, towed it away, and destroyed it.  *Id*.  Further, during the October 4, 2022 abatement, Plaintiffs allege that "[the City] moved in with heavy machinery, a phalanx of Berkeley Police officers, and city officials, to

25

destroy 29 tents, three shelters, and impound and then crush four vehicles that unhoused residents were relying on for shelter." FAC, ¶ 142.

In the City's motion, they fail to allege a reason they seized, impounded, and then, in some instances, destroyed Plaintiffs' vehicles. The City only states that by Plaintiffs own admission, the vehicles were not street legal. Mot. 10. In Plaintiffs' FAC, they stated:

> [P]eople attempting to live in their vehicles in Berkeley are at risk of having their vehicles towed or receiving numerous citations that they cannot pay, because their vehicles are considered not "street legal," lacking proper registration, smog certificates, or being inoperable, as a people living in them often do not have the money to make the necessary repairs, or pay the fines and fees required.

FAC, ¶ 101. In the City's motion to dismiss, they argue that plaintiffs admitted that their cars are not street legal. Plaintiffs do not respond to this in their opposition. From this quote, it is not clear that all Plaintiffs have admitted that their vehicles were "not street legal." The City has the burden to establish that the taking was warranted on a fact-specific basis, which they have failed to do. *See Cervantes*, 703 F.3d at 1144 (holding that the community caretaker exception did not apply because nobody "provided any testimony that defendant's vehicle was parked illegally, posed a safety hazard, or was vulnerable to vandalism or theft."). Moreover, the City has the burden to prove that the vehicles they impounded were "impeding traffic or threatening public safety and convenience," *Miranda*, 429 F.3d at 864, which the City has not shown. Just because Plaintiffs' cars were parked on a public street and may not have been "street legal" does not implicate that they were "impeding traffic or threatening public safety and convenience." *Id.*

Even if the City can show that the initial seizure fell under the community caretaking exception because the cars lacked proper registration, there is nothing to suggest that the City was permitted to then "crush" the vehicles, permanently depriving Plaintiffs of their property. *See United States v. Jacobsen*, 466 U.S. 109, 124 (1984) ("a seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable seizures'"). In *Brewster*, police stopped a driver who had a suspended license. 859 F.3d at 1195. The police impounded the driver's car for 30-days, pursuant to California Vehicle Code section

14602.6(a)(1), which states that cars impounded due to a suspended license must generally be held in impound for 30-days.  *Id.*  Three days later, the driver appeared at a hearing before the Los Angeles Police Department ("LAPD") with proof that she was the registered owner of the vehicle and her valid driver's license.  *Id.*  However, the LAPD refused to release the vehicle before the 30-day holding period had lapsed.  *Id.*  The parties agreed that the LAPD could impound the driver's car under section 14602.6(a)(1) pursuant to the community caretaking exception.  *Id.* at 1196.  However, "[t]he exigency that justified the seizure vanished once the vehicle arrived in impound and [the driver] showed up with proof of ownership and a valid driver's license."  *Id.* "The Fourth Amendment doesn't become irrelevant once an initial seizure has run its course," instead, "the government must cease the seizure or secure a new justification."  *Id.* at 1197 (citations omitted).

Likewise, in *Lavan*, as previously discussed, Los Angeles City employees seized and destroyed homeless residents' carts and small, collapsible mobile shelters filled with their personal possessions.  693 F.3d at 1025, n.4.  The Ninth Circuit clarified that even if plaintiffs had violated the city ordinance which prohibited leaving unabandoned property unattended on city sidewalks, the subsequent destruction of plaintiffs' property remained unreasonable.  "Violation of a City ordinance does not vitiate the Fourth Amendment's protection of one's property.  Were it otherwise, the government could seize and destroy *any illegally parked car* or unlawfully unattended dog without implicating the Fourth Amendment."  *Id.* at 1029 (emphasis added).

Here, the City has failed to proffer a community caretaking rationale for seizing and/or destroying Plaintiffs' RVs and vehicles as alleged herein.  *Sandoval*, 72 F.Supp.3d at 1007 ("[O]nce [a] vehicle has been removed from the street, or the threat to public safety has been removed, the community caretaking exception no longer justifies the warrantless seizure of property").  Plaintiffs have plausibly alleged that their cars were seized and destroyed in violation of the Fourth Amendment.

### 3.   Improper Notice

The City does not provide Plaintiffs with adequate notice of the seizure of their property, in violation of the due process clause.  The Fourteenth Amendment provides that no State shall

27

"deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend.

XIV, § 1.  In *Lavan* the Ninth Circuit stated:

> As we have repeatedly made clear, "[t]he government may not take
> property like a thief in the night; rather, *it must announce its*
> *intentions and give the property owner a chance to argue against*
> *the taking.*"  *Clement v. City of Glendale*, 518 F.3d 1090, 1093 (9th
> Cir. 2008).
> …
> Even if the City had seized Appellees' possessions in accordance
> with the Fourth Amendment, which it did not, *due process requires*
> *law enforcement "to take reasonable steps to give notice that the*
> *property has been taken so the owner can pursue available remedies*
> *for its return." City of West Covina v. Perkins,* 525 U.S. 234, 240,
> 119 S.Ct. 678, 142 L.Ed.2d 636 (1999).

693 F.3d at 1031-32 (emphasis added).  For example, in *Lavan*, the Ninth Circuit upheld a district

court's permanent injunction, directing the City to "leave a notice in a prominent place for any

property taken on the belief that it is abandoned, including advising where the property is being

kept and when it may be claimed by the rightful owner."  *Id*. at 1026.  In *Grimm v. City of*

*Portland*, the Ninth Circuit stated:

> Due process requires that individualized notice be given before an
> illegally parked car is towed unless the state has a "strong
> justification" for not doing so.  *Clement v. City of Glendale*, 518
> F.3d 1090, 1094 (9th Cir. 2008).  *Clement* explained that due
> process "require[s] that notice generally be given *before* the
> government may seize property," and held that failing to give notice
> before towing an unregistered car that had a planned non-operation
> (PNO) certification for noncompliance with the PNO certificate was
> a due process violation.

971 F.3d 1060, 1063 (9th Cir. 2020).

In *Grimm*, the City of Portland failed to provide a Portland resident with adequate notice

before towing his car.  *Id*.  Over the course of seven days, the City of Portland left six citations on

Grimm's illegally parked car and on the seventh day, Portland left a red tow slip on the

windshield.  *Id*. at 1062.  Then, it towed his car.  *Id*.  The red tow slip did not provide sufficient

notice because "additional reasonable steps were available to the State" given the circumstances.

*Id*. at 1066.  Portland "should have known that notice of the tow through posting on his car had

been ineffective when the car was not moved and the parking tickets remained on the car's

windshield."  *Id*.  Portland could have provided electronic notice to Plaintiff via the Portland

28

1   electronic parking app or could have obtained the car owner's current information to provide

2   notice given that the car was registered.  *Id*. (citing that *Mullane v. Central Hanover Bank & Trust*

3   *Co.*, 339 U.S. 306 (1950) governs adequacy of notice requirements).  The court stated that "due

4   process requires that individualized notice be given before an illegally parked car is towed unless

5   the state has a 'strong justification' for not doing so," for example, if the car is blocking traffic or

6   is clearly abandoned.  *Id*. at 1063-64.  However, "the default rule is advance notice and the state

7   must present a strong justification for departing from the norm."  *Id*. (quoting *Clement*, 518 F.3d at

8   1094).

9         Here, Plaintiffs allege many incidents in which the City provided vague eviction and

10  abatement notices and then seized and destroyed their personal property and vehicles.  The FAC

11  alleges that the City provides notice of an abatement or eviction on a Friday, with notice that the

12  abatement or eviction will occur on the following Monday or business day.  FAC, ¶¶ 141, 149.

13  The City's practice is to arrive early in the morning with a backhoe to destroy residents'

14  possessions, without first identifying who is there, whether they have alternative shelter, what

15  property they have, and where it will be stored.  *Id*. ¶ 130.  The notices are lengthy, internally

16  contradictory, and are published in small print.  *Id*. ¶ 126.  For example, on the first page of the

17  City's September 1, 2023 notice, the notice states:

18              Please be advised that, as soon as possible, but no sooner than Sept
            4, 2023, the City of Berkeley will conduct an emergency abatement
19          due to imminent health hazards at this location based on the extent
            of violations under BMC sections 11.32.050, 11.32.070, 11.36.030,
20          17.20.030, and 17.20.050.  Given the imminent health hazards, the
            City of Berkeley has determined that this encampment poses an
21          imminent threat for all residents, and the City Manager has ordered
            immediate abatement of the nuisance, including destruction of any
22          property constituting such a nuisance if the nuisance cannot be
            abated otherwise.  Please take this opportunity to address the
23          nuisance conditions listed below, by discarding garbage and any
            items creating a rodent harborage or other health hazards, and
24          reduce your belongings to a 9-square-foot footprint by or before
            Sept 4, 2023.

25

26  Compl. Ex. A at 1, Docket No. 1.  The notice then enumerates the Berkeley Municipal Code

27  sections it cited.  Then, on page three it states:

28              By or before Sept 4, 2023, eliminate all trash/debris, any items

                                        29

creating a rodent harborage or other health hazards, and reduce your possessions to a 9-square-foot footprint.

The City of Berkeley will discard items you no longer wish to keep at your request. …

Finally, on page 4 it states:

FAILURE TO COMPLY:

Failure to comply may result in the City abating the unsafe and hazardous conditions pursuant to BMC Chapter 11.40.  The City prefers not to cite or arrest in order to gain your compliance with this notice.  However, absent voluntary compliance, failure to comply may result in citations and/or arrest.

*Id*. at 4.  It is reasonable that Plaintiffs would find these notices confusing and would be unsure of how to comply or what to expect.

Before the October 3, 2022 Harrison abatement, the City posted notices on September 30, 2022 stating that the abatement was authorized for purposes of addressing rodent harborage. FAC, ¶ 141.  Residents did not know what they could do to comply and nothing in the notice indicated that residents were being asked to leave, or that their shelters would be removed, much less permanently destroyed.  *Id*.  On October 4, 2022, the City and Berkeley Police officers destroyed 29 tents, 3 structures, and 4 cars.  *Id*. ¶ 142

On September 1, 2023, the City posted notices for a planned abatement action at the 8th and Harrison Encampment to take place on Labor Day, September 4, 2023.  FAC, ¶ 149.  One notice was a "Notice of Imminent Health Hazard and Emergency Abatement Beginning Sept. 4, 2023."  *Id*.  It stated that by September 4, 2023, individuals must discard debris and reduce their possessions to a 3x3 foot area.  *Id*.  It stated that the City could store a limited amount of property but that items left unattended would be discarded.  *Id*.  It provided no guidance as to how individuals should mark their 3x3 foot area or designate the items they need to have stored.  *Id*. The notices were posted, not delivered to individuals as required by the Berkeley Municipal Code. *Id*. ¶ 232.  The notices did not identify a defined area to which it applied, and it did not include an enforcement date.  *Id*.  Plaintiffs state that the City provided similarly inadequate notices prior to the Adeline evictions in September 2023 and October 2023, and before Harrison abatement on November 7, 2023.  *Id*. ¶ 233.  At the November 7, 2023, abatement, City officials bulldozed all of

1   Mr. Spencer's property, including that property designated in his 3x3 foot square, violating its

2   own policy.  *Id*. ¶ 168.  The City destroyed most but not all of the residents' belongings.  *Id*. ¶¶

3   169-72, 176.  Plaintiffs have sufficiently alleged that the City seizes their personal belongings

4   without adequate notice.  *See Lavan*, 693 F.3d at 1031-32 ("due process requires law enforcement

5   'to take reasonable steps to give notice that the property has been taken…'").

6           With regard to Plaintiffs' vehicles, Plaintiffs allege that vehicles are taken and destroyed

7   without their receiving notice and "due process requires that individualized notice be given before

8   an illegally parked car is towed unless the state has a 'strong justification' for not doing so."

9   *Grimm*, 971 F.3d at 1063.  The City has stated that it takes Plaintiffs cars because they are not

10  "street legal."  Though a state may be justified in not providing notice to the owner of an

11  abandoned, unregistered car where the lack of registration means there is no way to notify the car

12  owner, *Id*. at 1064, here, Plaintiffs live in their cars, so this justification for not providing notice

13  does not obtain.  There is no reason why individualized notice cannot be delivered in such a

14  context.

15          Additionally, the City did not provide Plaintiffs with notice that it is going to crush and

16  destroy their cars.  Plaintiffs should receive notice before a permanent seizure.  *See Wright*, 981

17  F.3d at 729 ("even in cases after the government has lawfully seized property, reasonable notice

18  must be provided prior to a final deprivation").  Therefore, Plaintiffs have plausibly alleged a due

19  process violation.  *See id*. at 728 ("outright failures to even attempt to provide notice violate due

20  process").

21  D.      Plaintiffs Have Sufficiently Pled Most of Their ADA Claims

22          Plaintiffs allege that the City fails to accommodate their disabilities under the Americans

23  with Disabilities Act (ADA), 42 U.S.C. § 12131 et seq.  FAC, ¶ 244-61.  Title II of the ADA

24  provides that "no qualified individual with a disability shall, by reason of such disability, be

25  excluded from participation in or be denied the benefits of the services, programs, or activities of a

26  public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12312.  The

27  public entity may not "directly or through contractual or other arrangements, utilize criteria or

28  methods of administration … that have the purpose or effect of defeating or substantially

impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3)(ii).  Prohibited forms of disability discrimination include denying individuals with disabilities the opportunity to participate in a program or service, providing an unequal opportunity to participate in the program or service, or providing the entity's program or service in a way that is not effective in affording the individual with a disability an equal opportunity to obtain the same result as provided to others.  28 C.F.R. § 35.130(b)(1).  As discussed below, that denial of opportunity can occur be reason of the government's failure to provide reasonable accommodations.  Title II of the ADA requires that public entities "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  *Id*. at § 35.130(b)(7)(i).  "A disability discrimination claim under Title II of the ADA may be based on 'one of three theories of liability: disparate treatment, disparate impact, or failure to make a reasonable accommodation.'"  *Payan*, 11 F.4th at 738 (quoting *Davis v. Shah*, 821 F.3d 231, 260 (2d Cir. 2016)).

In *Payan*, the Ninth Circuit distinguished between a systemic disparate impact claim and an individualized reasonable accommodation claim:

> Although disparate impact and failure to accommodate are distinct theories of liability, they share some overlap.  If a public entity's practices or procedures deny people with disabilities meaningful access to its programs or services, causing a disparate impact, then the public entity is required to make reasonable modifications to its practices or procedures.  *Crowder*, 81 F.3d at 1485 (citing 28 C.F.R. § 35.130(b)(7)).  Thus, although failure to make a reasonable accommodation and disparate impact are two different theories of a Title II claim, a public entity may be required to make reasonable modifications to its facially neutral policies which disparately impact people with disabilities.  *Id.* at 1484–85.

> The important difference between these two theories is that a reasonable accommodation claim is focused on an accommodation based on an individualized request or need, while a reasonable modification in response to a disparate impact finding is focused on modifying a policy or practice to improve systemic accessibility.  *Compare McGary*, 386 F.3d at 1265–66 (considering reasonable accommodation claim against city over its failure to grant individual disabled plaintiff additional time to clean his yard before enforcing

United States District Court
Northern District of California

nuisance abatement code), *and Updike v. Multnomah County*, 870 F.3d 939, 949–53 (9th Cir. 2017) (considering reasonable accommodation claim against county over its denial of an ASL interpreter and auxiliary aids to individual deaf pretrial detainee), *with Crowder*, 81 F.3d at 1485–86 (considering reasonable modifications to Hawaii law requiring 120-day quarantine of all dogs entering the state, which was found to have a disparate impact on blind users of guide dogs), *and Rodde*, 357 F.3d at 995–98 (considering disparate impact claim against county over proposal to close county hospital providing rehabilitation and medical services to people with chronic disabilities).

…

Systemic barriers call for systemic reasonable modifications.  Where a plaintiff challenges a program's policy or practice of failing to remedy systemic barriers, rather than the individual's experience with requesting accommodations to address those barriers, this type of claim is more appropriately evaluated under the disparate impact framework than the failure to reasonably accommodate framework.

*Payan*, 11 F.4th at 738-39.  In the instant case, Plaintiffs have not alleged disparate impact, but denial of reasonable accommodations.  *Cf. McMillon v. Hawaii*, 261 F.R.D. 536, 544 (D. Haw. 2009) (denial of reasonable accommodation may be susceptible to class action where plaintiffs "suffer similar harm from [a defendant's] failure to accommodate their disabilities.").

To state a prima facie case for a violation of Title II based on failure to provide a reasonable accommodation, a plaintiff must show:

> (1) [They] "[are] an individual with a disability;"
> (2) [They] "[are] otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities;"
> (3) [They] "[were] either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity;" and
> (4) "[S]uch exclusion, denial of benefits, or discrimination was by reason of [their] disability."

*McGary*, 386 F.3d at 1265 (quoting *Thompson*, 295 F.3d at 895, *cert denied*, 538 U.S. 921).  "A plaintiff need not allege either disparate treatment or disparate impact to state a reasonable accommodation claim."  *McGary*, 386 F.3d at 1266.  Further, reasonable accommodations do not import a "comparative" approach requirement, meaning that there need not be "uneven treatment of similarly situated individuals."  *Id*.

A public entity is only required to provide a reasonable accommodation under the ADA if a disabled person "was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities…"  *Payan*, 11 F.4th at 737–38.  To determine what

constitutes a public entity's services programs, or activities, a court must identify a program's scope to determine what the "programs do and do not entail and therefore what could be a 'reasonable modification' of that program." *Where Do We Go Berkeley*, 32 F.4th at 861.[6]

### 1.   Failure to Assist in Moving Personal Property During Evictions/Abatements

Plaintiffs assert that the City should help disabled unhoused people move their belongings when the City evicts them.  The City contends that the FAC fails to allege that Plaintiffs asked the City for help moving their belongings as an accommodation for their disabilities, so the claim fails.

The Plaintiffs cite *Cooley v. City of Los Angeles*, where the unhoused plaintiff "told LAPD officers that she needed help to carry her property because of her disability and that she lost most of her essential property because her needs were not accommodated."  2019 WL 3766554 at *5 (C.D. Cal. 2019).  There, plaintiff's allegations were sufficient to allege that the City's practices violated the ADA by unduly burdening people with disabilities.  *Id*.  The City claims that the FAC does not allege facts similar to *Cooley* because the FAC does not allege that Plaintiffs asked for help moving their belongings and were denied; instead, it simply alleges that several plaintiffs are disabled and need help moving their belongings.  FAC, ¶¶ 27, 37, 52 (Mr. Jeffords, and Mr. Spencer, Mr. Lee White Jr.).

Generally, one may not challenge a rule or policy to which one "has not submitted himself by actually applying for the desired benefit."  *Madsen v. Boise State University*, 976 F.2d 1220, 1220 (9th Cir. 1992).  In *Madsen*, a student's claim challenging his school's handicap parking permit was barred because he did not actually apply for a permit.  *Id*.  Likewise, in *Csutoras v. Paradise High School*, a school was not liable for failing to provide a social-related accommodation to a student when "the parties agree[d] [that] social-related accommodation was never requested or denied."  12 F.4th 960, 969 (9th Cir. 2021).  In the employment context, there

---

[6] A disparate impact claim can be used to assert entitlement to relief with respect to a systematic practice.  "To assert a disparate impact claim, a plaintiff must allege that a facially neutral government policy or practice has the 'effect of denying meaningful access to public services' to people with disabilities."  *Payan*, 11 F.4th at 738 (quoting *K.M.*, 725 F.3d at 1102).  Here, Plaintiffs have not specifically alleged a disparate impact claim, so their claims are addressed solely as reasonable accommodations.

1     is an exception to this general rule "only when the employer '(1) knows that the employee has a

2     disability, (2) knows, or has reason to know, that the employee is experiencing workplace

3     problems because of the disability, and (3) knows, or has reason to know, that the disability

4     prevents the employee from requesting a reasonable accommodation.'" *Brown v. Lucky Stores,*

5     *Inc.*, 246 F.3d 1182, 1187 (9th Cir. 2001) (abrogated on other grounds) (quoting *Barnett v. U.S.*

6     *Air, Inc.*, 228 F.3d 1105 (9th Cir. 2000)).

7          The City is correct in its assertion that an ADA claim on this basis generally should be

8     predicated on a request for assistance which is denied.  *See Madsen*, 976 F.3d at 1220.  The Ninth

9     Circuit stated that "a plaintiff lacks standing to challenge a rule or policy to which he has not

10    submitted himself by actually applying for the desired benefit."  *Madsen*, 976 F.3d at 1220.

11    Plaintiffs have not alleged that the City knew that they had physical disabilities and that they

12    needed help moving their belongings.  Additionally, the Plaintiffs have not provided any authority

13    that suggests that there is an exception to this general rule in the public accommodation context

14    that applies here.  *Cf. Brown*, 246 F.3d at 1187.  Thus, this claim is dismissed with leave to amend

15    on the ground that Plaintiffs have not alleged they requested and were then denied reasonable

16    accommodations in not providing assistance in moving belongings.

17          2.        Enforcement of Parking Violations

18    Plaintiffs allege:

19                   Defendant's policies and practices in administering their ordinances
20                   and parking programs through threatened ticketing, towing, and
                     removal of vehicles used by unhoused people with disabilities has
21                   the effect of discriminating and imposing a disproportionate burden
                     on people with disabilities.  Similarly requiring them to surrender
22                   their vehicles or other property necessary to accommodate their
                     disabilities as a condition for accessing shelter has the effect of
23                   imposing disproportionate burdens on people with disabilities who
                     are more vulnerable to otherwise camping in the elements, and has
24                   the effect of screening out people with disabilities or otherwise
                     discriminating against people with disabilities by preventing them
25                   from accessing shelter programs.

26    FAC, ¶ 256.

27          In the City's Motion to Dismiss, it states "the City's parking enforcement does not

28    discriminate of the basis of disability."  Mot. at 13.  The City argues that "Plaintiffs admit that

United States District Court
Northern District of California

35

their vehicles are subject to impoundment not due to any alleged disability but because of Plaintiff's financial difficulties" and cites Plaintiffs' FAC where Plaintiffs admit that their vehicles are being towed because they are not "street legal." *Id.*; FAC, ¶ 101. Finally, the City states that it is "under no obligation to offer accommodations where the barrier to plaintiff's participation is not disability, but rather financial constraints," citing *Weinreich v. Los Angeles Cnty. Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997).

In *Weinreich*, a regional public transit system offered a Reduced Fare Program for elderly and disabled patrons. *Id.* at 978. For this Reduced Fare Program, disabled program participants were required to update their medical information every three years recertifying that they were disabled. *Id.* at 978. A disabled patron sought an exemption from the policy because he was indigent and could not afford to pay a private doctor to recertify his disability. *Id.* After the public transit system denied his request, he filed suit. The Ninth Circuit stated that the duty to provide reasonable accommodations under the ADA arises when a policy discriminates on the basis of disability, not on the basis of an individual's inability to pay. *Id.* Thus, the disabled patron was unable to get a reasonable accommodation under the ADA.

Here, the City's enforcement of its 72-hour parking rules effects some Plaintiffs on the basis of their disability and for others on the basis of their inability to pay. Mr. Jeffords has alleged that he needs an accommodation to the City's parking enforcements because of his disability. The FAC alleges: "Moving vehicles every 3 days to comply with the 72-hour ordinance is not possible for … Mr. Jeffords [who has] health or physical disabilities that make doing so exceedingly difficult. FAC, ¶ 102. Indeed, Mr. Jeffords "has serious respiratory and gastrointestinal issues that have left him very physically weak, and he becomes easily winded, cannot walk long distances, and needs assistance to move his belongings." *Id.* ¶¶ 27- 28. Mr. Jeffords needs a reasonable accommodation because he cannot move his vehicle every 72-hours "by reason of" his disability, and thus, his claim is viable.

However, other Plaintiffs such as Ms. Williams,[7] Ms. Prado,[8] and Ms. Whitson[9] claim that they live in their RVs, but they make no claim that they cannot move their car due to their disabilities.  Instead, it seems that the City's parking enforcements are unworkable for them because their cars are not "street legal."  The City is not obligated to accommodate persons who cannot comply with their policies due to financial concerns, pursuant to *Weinreich*.  Thus, these reasonable accommodation requests are denied with respect to Ms. Williams, Ms. Prado, and Ms. Whiston who have not demonstrated they cannot move their RVs every 72-hours due to a disability.  The Court gives them leave to amend their claims regarding parking enforcement.

### 3.   Outreach

Plaintiffs allege that the City's "outreach and housing navigation services" violate Title II because they fail to "provid[e] additional support in the form of mental health professionals to assist unhoused residents to access those outreach services."  FAC, ¶ 259.  Plaintiffs allege that the city has an existing outreach program—its city personnel and members of its Homeless Response Team and that providing mental health workers would be a reasonable accommodation to this program.  Opp'n at 11.  The City's only response to this allegation is that "the ADA does not require the City to offer mental health outreach" because "public entities are not required to create new programs" and "the City does not provide mental health services."  Mot. at 15. A public entity is only entitled to provide a reasonable accommodation under the ADA if a disabled person "was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities…"  *Payan*, 11 F.4th at 737–38.  To determine what constitutes a public entity's services programs, or activities, a court must identify a program's

---

[7] Ms. Williams alleges that she cannot live in a tent because it gets too cold and the metal pins in her arm cause her pain, and because she is a survivor of domestic violence and her former partner is actively pursuing her.  FAC, ¶¶ 68-69.  However, Ms. Williams does not specifically tie these allegations to her need for an accommodation from the City's parking enforcement policies.

[8] Ms. Prado alleges that, due to her mental health history, she is unable to use shelters that have no-visitor policies because she relies on her community network for support.  FAC, ¶ 25.  This allegation is not specifically tied to her need for an accommodation from the City's parking enforcement policies.

[9] Ms. Whitson alleges that the constant threat and actuality of negative contacts with the police while she is parking illegally on the street triggers her CPTSD.  FAC, ¶ 50.  This allegation is not tied to *why* Ms. Whitson cannot park legally due to her disability.

United States District Court
Northern District of California

scope to determine what the "programs do and do not entail and therefore what could be a 'reasonable modification' of that program." *Where Do We Go Berkeley*, 32 F.4th at 861. Precisely what constitutes the scope of an applicable "program" is less than clear under current Ninth Circuit precedent.  In *LA Alliance for Human Rights v. County of Los Angeles*, the court defined the "program" broadly: "Skid Row area sidewalks are a service, program, or activity of the City within the meaning of Title II of the ADA."  14 F.4th 947, 959 (9th Cir. 2021).  In contrast, in *Where Do We Go Berkeley*, the court narrowly defined what constitutes a "program." 32 F.4th at 861.  In that case, Caltrans created an Interim Guidance instructing Caltrans how to assess the risks posed by homeless encampments and how to prioritize clearing them.  *Id*. at 855. Encampments were assigned priority levels based on their level of threat to public safety.  *Id*.  The Ninth Circuit narrowly defined the "program" as clearing "level 1" (*i.e.*, high risk encampments) classification of CalTrans property with "72 hours' notice before clearing and possible coordination with local partners."  *Id.* at 862.  However, because Caltrans Interim Guidance did not "provide social services or relocation assistance," those services could not have constituted part of its program.  *Id*. at 861.  Thus, *LA Alliance for Human Rights v. County of Los Angeles* can be contrasted to the Caltrans level 1 clearance program because the public streets of a municipality perform broad functions, so the scope of a sidewalk-related program is much broader.  14 F.4th at 959.  Thus, "[t]o determine if the modification fundamentally alters the program, the court should consider if it changes the 'essential nature' of the program.  This includes how the modification impacts the goals of the program and if it hinders addressing public risks the program targets." *Boyd v. City of San Rafael*, 2023 WL 6960368, at *24 (N.D. Cal 2023) (citing *Reed v. City of Emeryville*, 568 F.Supp.3d 1029, 1043 (N.D. Cal. 2021); *Where Do We Go Berkeley*, 32 F.4th at 862).

Plaintiffs have alleged that the City has a homeless outreach program that goes to encampments to discuss abatements and evictions.  FAC, ¶ 147 ("the City had held community meetings with Harrison Street encampment residents, during which the City's Homeless Response Team leader Peter Radu …"); ¶ 136 n.6 ("…Peter Radu, assistant to Berkeley's city manager and head of Berkeley's Homeless Response Team."); ¶ 91 ("on any average day, the HRT [Homeless

Response Team] has few than 10 vacancies to work with across the entire shelter system…"); ¶ 148 ("During these months of outreach, representatives of the City communicated with encampment residents alluding to an approaching eviction…").  Indeed, the City has a homeless outreach program, whose goal it is to provide outreach to encampment residents regarding evictions and abatements.

The City argues that "the ADA does not require the City to offer mental health outreach" because "public entities are not required to create new programs" and "the City does not provide mental health services."  Mot. at 15.  However, Plaintiffs are not asking the City to create a *new* mental health services program—they are asking for a modification to the City's *existing* homeless outreach *program*, by adding mental health professionals to the outreach team.  On its face, the Plaintiffs have plausibly alleged they are being excluded from participation in an existing program – a "program" within the meaning of the ADA – that is directed at serving unhoused individuals such as themselves; they allege it would be a reasonable accommodation for the City's homeless outreach program to include mental health workers.[10]  There is no showing at this juncture that this would effect a fundamental alteration of the program.

### 4.    Offers of Shelter

Plaintiffs allege that architectural barriers in the shelters severely limits the availability of shelter for individuals with mobility disabilities and the shelter program policies pose difficulties for some residents with disabilities.  FAC, ¶ 199.  In particular, Mr. White Jr., Ms. Williams, Ms. Prado, Mr. Spencer, and Mr. Jeffords want to have visitors in their rooms.  For example, Ms. Williams has stated that seeing her friends and family helps her to mitigate her PTSD symptoms.  Ms. Prado alleges that she cannot stay in a shelter because of the no-visitor policies because her community is critical to mental health.  *Id*. ¶ 25.  Mr. Jeffords wants visitors because he relies on the support of his neighbors "to watch out for him and check on him with his health issues."  *Id*. ¶ 30.  Mr. Spencer wants to have visitors in his room because "he relies on his community for social

---

[10] The City only argues that it is not required to provide mental health outreach; it does not address whether Plaintiff's requested accommodation is a reasonable accommodation.  Thus, this argument is waived.

and emotional support; without this support, he would go back to his trauma response and feel lost." *Id*. at ¶ 40. These Plaintiffs have not connected their specific disabilities to the need to have visitors *in* their rooms. It is not evident why many if not most of these Plaintiffs could not visit friends and family outside of their rooms in order to fulfill their social needs, except for Mr. White Jr. as discussed below. Thus, these Plaintiffs have not demonstrated the no-visitor policy denies them access to services.[11]

For Mr. White Jr., he has significant physical disabilities and requires assistance with tasks such as cleaning and caring for himself. *Id*. ¶ 208. Currently, he relies on friends and neighbors to help him with these tasks. He has essentially alleged a need to have visitors in his room on occasion because of his disability. The City argues that the request to modify the shelters' "no visitor" policy is invalid because "their need for community is [not] a qualifying disability." Mot. 15. The issue is whether the denial of visitors as stated in the shelters' rules denies meaningful access to shelters by those with disabilities. To state a prima facie case for a violation of Title II, a plaintiff must show:

> (1) [They] "[are] an individual with a disability;" (2) [they] "[are] otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities;" (3) [they] "[were] either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity;" and (4) "such exclusion, denial of benefits, or discrimination was by reason of [their] disability."

*McGary*, 386 F.3d at 1265 (quoting *Thompson*, 295 F.3d at 895, *cert denied*, 538 U.S. 921). Plaintiffs allege that those with mental health disabilities, such as OCD, anxiety, and PTSD especially need to see friends and family for emotional support and that the denial of visiting privileges makes the shelter inaccessible because the bar on visitors creates an intolerable condition. FAC, ¶¶ 44, 70. To establish the need for an accommodation to the shelters' no-

---

[11] Additionally, the City contends that the "Plaintiffs' allegations regarding the City's offers of shelter show why this claim also fails as a matter of law" and then lists that several Plaintiffs admit they currently reside in housing provided by the City, they do not claim to have been denied housing, they failed to claim any disability-related reason why they were unable to stay in housing provided by the City, or they do not allege that the City failed to offer them an ADA accessible bed in a shelter. Mot. at 14. The City has not connected any of these facts to a legal argument, so the Court cannot deduce exactly what is being argued.

visitors policy under the ADA, each plaintiff challenging the policy must show that they have a disability that is specifically linked to their need to have visitors in their room.  *Logan v. Matveevskii*, 57 F.Supp.3d 234, 256 (S.D.N.Y. 2014) (citations omitted) ("Ordinarily the duty to make reasonable accommodations is framed by the nature of the particular handicap."); *Sanzaro v. Ardiente Homeowners Association, LLC*, 364 F.Supp.3d 1158, 1178 (D. Nev. 2019) (discussing a "clear nexus" between plaintiff's disability and the requested accommodation).  Further, that plaintiff needs to show that their need for an accommodation to the no-visitors policy is reasonable, which "depends on the individual circumstances of each case, and requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodation that might allow him to enjoy meaningful access to the program." *Wyatt B. by McAllister v. Brown*, 2021 WL 4434011, at *12 (D. Or. 2021) (quoting *Mark H.*, 620 F.3d at 1098).

Typically, the plaintiff has the burden of producing evidence that a reasonable accommodation was possible, *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002) (a public employment case), and "seems reasonable on its face," *Dark v. Curry County*, 451 F.3d 1078, 1088 (9th Cir. 2006) (an employment case).  Thereafter, the burden of proof shifts to the defendants to produce rebuttal evidence that the requested accommodation was not reasonable. *Vinson*, 288 F.3d at 1154.  In that regard, a public entity "does not have to provide a disabled individual with every accommodation he requests or the accommodation of his choice." *Logan*, 57 F.Supp.3d at 256.  Rather, "there is no requirement to take into account the disabled individual's preferences in choosing his accommodation, so long as the means chosen were reasonable accommodations." *Resnick v. 392 Central Park West Condominium*, 2007 WL 2375750, at *2 (S.D.N.Y. 2007) (providing plaintiff with an alternative entrance to the condominium that took her on an alternative route around the problematic speed bump was sufficient; defendants did not need to remove the speed bump altogether) (citing *Fink v. New York City Dep't of Pers.*, 855 F.Supp. 68, 72 (S.D.N.Y. 1994), *aff'd*, 54 F.3d 565 (1995).  In short, the defendant has an opportunity to demonstrate that the requested accommodation is not reasonable.

A city need not accommodate a reasonable accommodation request if it poses a

fundamental alteration to the nature of the services provided by the city.  In *Reed*, unhoused persons challenged the City of Emeryville's homelessness outreach program, stating that it was inaccessible and that they needed several reasonable accommodations, like single room shelter beds, more frequent appointment reminders, and additional time to complete tasks.  568 F.Supp.3d at 1042.  The court there noted that, though the ADA does not require public entities to fundamentally alter the nature of the services they provide to accommodate people with disabilities, "what possible accommodations are reasonable and would not 'fundamentally alter' the nature of the services provided by [the City of Emeryville] is highly fact-specific and cannot be resolved at the motion to dismiss stage."  *Id*. at 1044 (citing *Crowder*, 81 F.3d at 1486).  For example, "while provision of single-bed shelter rooms might (on a factual record) be a fundamental alteration of the City's program that is not required, provision of quieter spaces or areas otherwise separated from the larger congregate setting within an existing shelter arrangement might be a reasonable accommodation."  *Id*.  Thus, the court denied the City of Emeryville's motion to dismiss the ADA claims, concluding that whether plaintiffs' requests were fundamental alterations to the city's programs could not be made based on the pleadings alone.  *Id*.

Here, as previously discussed, Plaintiff Mr. Rufus White Jr. has tied his specific disabilities to his need for in-room visitors and have thus established a denial of access to services absent a reasonable accommodation.  The burden of proof thus shifts to the Defendants to produce rebuttal evidence that the requested accommodation is not reasonable.  *Vinson*, 288 F.3d at 1154.  Defendants failed to demonstrate Mr. White's request would as a matter of law fundamentally alter the nature of the shelter or otherwise be unreasonable, particularly since his need is limited to occasional visits which the Defendant could regulate.  See *Reed*, 568 F.Supp.3d at 1044 ("what possible accommodations are reasonable and would not 'fundamentally alter' the nature of the services provided by [the defendant] is highly fact-specific and cannot be resolved at the motion to dismiss stage.").

However, Mr. White Jr. does not have standing to bring this claim, because he is currently not in shelter; he lives in a tent. FAC, ¶ 51.  Mr. White Jr. lived in congregate shelter but did not feel safe there because of the physical violence he witnessed.  *Id*. ¶ 56.  He states that "[h]e does

not want to go back to a congregate shelter." *Id*.  He would live to move into a motel room.  *Id*. ¶ 57.  In September 2023 a City outreach worker verbally offered him shelter, but never followed up with him.  *Id*.  When Mr. White Jr.  followed up with the City, the City said there were "no open ADA rooms" and he would need to wait until one became available.  *Id*.  "The standard for injury in fact is whether [the plaintiff] has encountered at least one barrier that interfered with her access to the particular public facility and whether she intends to return or is deterred from returning to that facility."  *Kirola v. City and County of San Francisco*, 860 F.3d 1164, 1175 (9th Cir. 2017).  Here, Mr. White Jr. has not alleged that he has encountered a no-visitor policy, so he has not suffered an injury and thus does not have standing to pursue this point.

> ### 5.   Waiver – The Rest of Plaintiff's ADA claims

Plaintiffs allege several more ADA claims which the City fails to address in its motion.  First, Plaintiffs contend that they should be able to lock their doors,[12] have second emotional support animals,[13] get support understanding the shelters rules,[14] be given more time after a notice is posted to comply with the notice due to their mobility disabilities,[15] and receive ADA accessible accommodations when shelters have architectural barriers.[16]  The City does not address these claims, so the Court need not address the merits of these specific ADA claims in the instant motion to dismiss.

---

[12] Mr. Spencer does not feel comfortable or safe living in an enclosed environment where he does not have control over who comes into his space.  FAC, ¶ 40.  Ms. Williams states that the lack of privacy at her motel makes her feel like her possessions are unsafe.  *Id*. ¶ 71.  The staff members knock and immediately enter without waiting for a response which triggers her PTSD.  *Id*.

[13] Mr. Jeffords would like to have a second emotional support animal as a reasonable accommodation.  FAC, ¶ 29.

[14] Ms. Williams has a hard time understanding and remembering the rules of the program due to her mental health issues and short-term memory loss.  FAC, ¶ 70.

[15] "The [City's] practice of posting unclear and inconsistent notices just days before a planned abatement or closure also fails to allow residents with disabilities time to prepare for such closures…"  FAC, ¶ 176.

[16] Mr. Rufus White Jr. could not stay at a shelter because there were no open ADA rooms.  *Id*. ¶ 57.

1

E.      Plaintiffs Have Sufficiently Pled a Claim Under the FHAA For Reasonable

2

Accommodations

3

The Plaintiffs allege that the City "has discriminated against Plaintiffs … by refusing to

4

make accommodations to the rules, policies, practices and services of its shelters that are

5

necessary to afford Plaintiffs … an equal opportunity to fully use and enjoy the shelters." FAC, ¶

6

279. The FHAA makes it unlawful to "discriminate in . . . the provision of services or facilities in

7

connection with . . . a dwelling" because of an individual's disability. 42 U.S.C. § 3604(f)(2)(A).

8

Disability discrimination under the FHAA includes a refusal to "make reasonable

9

accommodations in rules, policies, practices, or services, when such accommodations may be

10

necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. §

11

3604(f)(3)(B); 24 C.F.R. § 100.204(a). "It is well-settled that 42 U.S.C. § 3604(f)(3)(B) imposes

12

an 'affirmative duty' on public agencies to reasonably accommodate disabled individuals by

13

modifying administrative rules and policies." *McGary*, 386 F.3d at 1264.

14

Plaintiffs and the City disagree about which test applies in this context. The City says that

15

the Court should apply the burden shifting test from *McDonnell Douglas* and relied on *Cmty.*

16

*House Inc. v. City of Boise*, 490 F.3d 1041, 1047 n.1 (9th Cir. 2007) for its assertion. In that case,

17

the *McDonnel Douglas* test was appropriate for the plaintiffs' disparate treatment claims. *Id.* at

18

1053. Under the *McDonnel Douglas* test, the plaintiffs must first establish a *prima facie* case of

19

discrimination with regard to their disability discrimination claims. *Id.* To establish such a prima

20

facie case, the plaintiffs must show:

21
22
23

> (1) That they are members of a protected class;
> (2) That applied to and were qualified for shelter at [the defendant's
>       shelter];
> (3) That they were rejected;
> (4) That openings at the shelter remained available.

24

*Id.*

25

In opposition, the Plaintiffs cite to a Ninth Circuit case in arguing that the reasonable

26

accommodation analysis should apply here:

27
28

> "*[I]n order to a state a discrimination claim under the FHAA for
> failure to reasonably accommodate*," plaintiffs must allege: (1) "he
> suffers from a handicap as defined by the FHAA;" (2) the City

United States District Court
Northern District of California

"knew or reasonably should have known of" plaintiff's handicap; (3) "accommodation of the handicap 'may be necessary' to afford [plaintiff] an equal opportunity to use and enjoy [their] dwelling;" and (4) the City "refused to make such accommodation."

*McGary*, 386 F.3d at 1262 (quoting *Giebeler*, 343 F.3d at 1147) (emphasis added).

The Court agrees that the test in *McGary* and *Giebeler* apply because Plaintiffs have asserted a reasonable accommodation theory which is cognizable under the FHAA.  They do not assert a disparate treatment claim which embodies a distinct and different mode of analysis.  *Cf. Dunlap v. Liberty Natural Products, Inc.*, 878 F.3d 794, 798 ("We have recognized that a failure-to-accommodate claim 'is analytically distinct from a claim of disparate treatment or impact under the ADA.'").  That test is specific to a reasonable accommodation claim, whereas the *McDonnel Douglas* test applies broadly to disparate treatment claims.[17] Here, for the reasons stated above, Plaintiffs have stated some reasonable accommodation claims.  *Giebeler v. M & B Associates*, 343 F.3d 1143, 1149 (9th Cir. 2003) ("We therefore look to both RA and ADA interpretations of 'accommodation' of disabled individuals as indicative of the scope of 'accommodation' under the FHAA.).

F.    The *Martin* Claim under the Eighth Amendment has been dismissed.

Following the Supreme Court's decision in *City of Grants Pass v. Johnson*, 603 U.S. ___, 144 S. Ct. 2202 (2024), the parties stipulated to the dismissal of the Eighth Amendment claim.  Docket No. 85.

G.    Plaintiffs Have Adequately Alleged that the City Exposed Them to a State-Created Danger

Plaintiffs allege that the City has exposed them to a state-created danger in violation of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983.  FAC, p. 77-78.  The City contends that there are three ways that the City purportedly places Plaintiffs in danger—it fails to offer adequate shelter, to store Plaintiffs' survival gear, and to designate a sanctioned area for Plaintiffs to camp.  Mot. 20.  However, Plaintiffs have also alleged that the City places them in danger when it destroys their personal belongings except those that fit in a 3x3 foot space, which deprives them of

---

[17] The City's only argument here is that the plaintiff's FHAA claim fails because, under prong four of the *McDonnell Douglas* test, "that openings at the shelter remain available," plaintiffs have not shown that there are available shelter spots.  As stated above, the *McDonnell Douglas* test is inapplicable here.

United States District Court
Northern District of California

survival gear such as tents, blankets, waterproof materials, medications, eyeglasses, wheelchairs, walkers, and canes.  FAC, ¶ 289.  This has been done "both in the pouring rain and in extreme heat."  *Id*. ¶ 236.  Many of the disabled Plaintiffs cannot get new supplies because they are physically unable to do so and they "los[e] documents necessary to being housed [which] can mean months of delays to replace them which can have major health impacts including overdose and death."  *Id*. ¶ 138.  Further, the City breaks up encampment-communities in which disabled Plaintiffs rely on each other for support and it does not provide any sanctioned space in the City for Plaintiffs to go.  *Id*. ¶¶ 287-95.

The Ninth Circuit recognizes a substantive due process violation under the Fourteenth Amendment where a state actor "affirmatively place[s] an individual in danger by acting with deliberate indifference to [a] known or obvious danger in subjecting the plaintiff to it."  *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1062 (9th Cir. 2006).  The Ninth Circuit stated:

> In examining whether an officer affirmatively places an individual in danger, we do not look solely to the agency of the individual, nor do we rest our opinion on what options may or may not have been available to the individual.  Instead, we examine whether the officer[ ] left the person in a situation that was more dangerous than the one in which they found him.

*Id*. (quoting *Munger v. City of Glasgow*, 227 F.3d 1082, 1086 (9th Cir. 2000).  Deliberate indifference exists where the defendant "disregard[s] a known or obvious consequence of [its] action."  *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th Cir. 2011).  There are two prongs to exemplify this: (1) official (state) action that affirmatively placed an individual in danger; and (2) deliberate indifference to that danger with which the plaintiff has a clearly established right.  *Kennedy*, 439 F.3d at 1061, 1065; *see Sanchez v. City of Fresno*, 914 F.Supp.2d 1079, 1102 (E.D. Cal. 2012).

The Ninth Circuit has found a due process violation under the state-created danger theory in a number of contexts where the defendant makes conditions worse for the plaintiff, even where exposure to harm already existed.  *See Martinez v. City of Clovis*, 943 F.3d 1260, 1272 (9th Cir. 2019) (finding state-created danger where officer provoked abuser which led to another instance of domestic violence).  The Ninth Circuit has not limited the application of the doctrine to conduct

of individual state actors.  The court has recognized that a state-created danger claim may rest on a city-wide policy.

In *Sanchez*, the City of Fresno placed unhoused plaintiffs in a state-created danger when it "planned, directed, and implemented the demolition" of the unhoused Plaintiffs' shelters and their contents without providing adequate notice of its intent to seize and destroy Plaintiff's property, nor any means of retrieving the seized property.  914 F. Supp. 2d at 1093.  In that case, Plaintiffs alleged that Defendants knew that Plaintiffs "had no alternative shelter or means of protection from the elements nor any other means of keeping their personal property safe, and that no safe shelter was available to Plaintiff," though the Plaintiff had temporarily left his shelter at the time his property was destroyed.  *Id.*  The court denied the City's motion to dismiss with respect to the state-created danger claim, and stated:

> It is alleged that Defendants timed the demolitions of "plaintiff's shelter and property essential to protection from the elements" to occur at "the onset of the winter months that would bring cold and freezing temperatures, rain, and other difficult physical conditions." It is further alleged that "Defendants kn[ew] or should reasonably [have known] that their conduct threatened plaintiff's continued survival, but nonetheless continued their conduct in a manner that has created substantial risk to [Plaintiff's] ability to continue to survive and is shocking to the conscience ..."

*Id*. at 1102 (citations omitted).

Likewise, in *Boyd*, this Court found there was sufficient evidence for injunctive relief of a city ordinance that would separate encampments—effectively imposing a requirement that unhoused individuals would live in one or two person clusters, at least 200 feet from one another. *Boyd*, 2023 WL 6960368, at *1.  This ordinance would have "destabilize[d] the communal frameworks on which individuals rely for survival" and would have placed Plaintiffs "in danger of sexual and domestic violence, victimization as to crime, death due to drug overdose, and inability to access food, water, and shelter" especially given that a large portion of the plaintiffs had physical disabilities.  *Id*. at *21.  Thus, district courts have recognized that the clearing of homeless encampments may present a state-created danger claim when residents are exposed to increased risk of significant harm due to its clearing.  *See also Santa Cruz Homeless Union v.*

47

*Bernal*, 514 F. Supp. 3d 1136, 1144-45 (N.D. Cal. 2021) (granting a preliminary injunction when the City sought to disperse an encampment during the plight of the COVID-19 pandemic when the encampment had access to medical services, showers, handwashing stations, and donations and while the CDC recommended that unhoused persons stay put during the pandemic to prevent the spread of Covid.); *see also Jeremiah v. Sutter County*, 2018 WL 1367541 (E.D. Cal. 2018) (granting a temporary restraining order preventing the County from seizing Plaintiffs' shelters and possessions which the County knew or should have known that Plaintiffs relied on to stay physically safe from the elements, especially at the onset of winter.); *cf. Cobine v. City of Eureka*, 250 F. Supp. 3d 423, 433 (N.D. Cal. 2017) (citing *Sanchez*, 914 F.Supp.2d at 1093) ("In the absence of particular allegations that the state action put the Plaintiffs in an inherently dangerous situation, the Court is bound to find that the generalized dangers of living on the street preexisted Plaintiffs' relocation from the [encampment]. … Without allegations of intentional eviction during precarious weather or facts indicating deliberate indifference to the safety and welfare of the population, the court must dismiss the claim."); *but see Reed*, 568 F.Supp.3d at 1029 (denying the state-created danger claim because plaintiffs failed to allege that the circumstances of the abatement action made their safety any worse); *but see Young v. City of Los Angeles*, 2020 WL 616363 at *7 (C.D. Cal. Feb. 10, 2020) (denying the state-created danger claim because plaintiffs failed to allege that the City's actions "exposed Plaintiff to a danger which he would not have otherwise faced if he were not forced to move.").

Here, several of the Plaintiffs have plausibly pled a state-created danger claim. With respect to Mr. Spencer, Mr. Rufus White Jr., Mr. "Cat" White, and Ms. Williams each have pled that the City has seized and destroyed their personal property.[18] Plaintiffs allege that the City destroys their personal property, including "tents, bedding, jackets, medications, and mobility devices." FAC, ¶ 2.

For Mr. Spencer, the FAC alleges:

> In about 2015, Mr. Spencer built a shelter under the Gilman freeway

---

[18] Ms. Prado, Mr. Jeffords, and Ms. Whitson each live in their respective RVs, and there is no allegation that the City has seized their belongings.  .

exit.  Then state authorities destroyed all his belongings, forcing him to move from that location, and he built another shelter on the island across from the exit.  At Gilman, his shelter and belongings were destroyed again, and again by Caltrans and City authorities, depending on Mr. Spencer's exact position.  Mr. Spencer then relocated across from the Seabreeze encampment, near the University Avenue freeway exit, and built a new shelter.  Then he came over to 8th and Harrison, had his belongings taken by the City again, and moved back to Seabreeze.  He lived there for about two and a half years.  When the Seabreeze encampment was closed, he lost everything.  He then moved to near the Ashby freeway exit for about a year, was evicted, moved to 2nd and Page, back briefly to Seabreeze, and then finally moved back to 8th and Harrison.  He has been living at that location for a little over a year.

*Id.* ¶ 32.  On November 7, 2023, at the beginning of an abatement procedure, Mr. Spencer was actively trying to leave the area with a cart containing many of his belongings when he was surrounded by at least five officers.  *Id.* ¶ 166.  They grabbed him and handcuffed him, allegedly despite the fact that he was crying out in pain and telling them he had a shoulder disability and was stating he would not resist arrest.  *Id.*  They arrested him and bulldozed his belongings including his property designated in a 3x3 foot square, per the City's own policy.  *Id.* ¶¶ 167-68.

For Mr. Rufus White Jr., at the October 4, 2022, abatement action, the City threw away Mr. Rufus White Jr.'s tent and nearly all his belongings.  FAC ¶ 54.  They offered him a two-person tent, but he cannot access a two-person tent because his mobility disability prevents him from being able to get into the tent.  *Id.* ¶ 144.  As a result, he was left with nothing but his wheelchair – he did not even have pants.  He spent the next several nights completely without shelter.  *Id.*  The City has destroyed Plaintiff Mr. Rufus White Jr.'s tent and personal belongings four times.  *Id.* ¶ 53.  Here, the City did not have a warrant and it did not identify that Mr. Rufus White Jr.'s property was a public safety and/or health risk or was abandoned.  The City took and destroyed Mr. Rufus White Jr.'s property without providing him the opportunity to reclaim it before it was destroyed.

For Mr. "Cat" White, after one of the sweeps, he moved to the Berkeley Inn for 28 days, but was told to leave the program because he had no income.  FAC, ¶ 61.  But during the sweep, the City had taken and destroyed his camp, tent, and all of his other survival gear.  *Id.*  The City gave him a two-person tent but never advised him where in Berkeley he could safely or legally camp in the tent it provided.  *Id.*  His belongings have been seized in a number of evictions (the

49

FAC does not specify how many) and the City has never stored his belongings. *Id*. ¶¶ 59, 64.

For Ms. Williams, she previously lived in an RV. FAC, ¶ 68. When she was in conversations with the City about moving to a motel, she understood that if she accepted the motel option, her RV would be stored by the City. *Id*. Once Ms. Williams accepted a spot at the motel, the City took the keys and title to her RV, towed it away, and destroyed it. *Id*. Ms. Williams alleged that this "destroy[ed] [her] only source of permanent safe shelter." *Id*. ¶ 68. She "cannot live in a tent due to her disabilities because it gets too cold and the metal pins in her arm cause her pain." *Id*. In addition, she cannot live in a tent because she is a survivor of domestic violence. *Id*. ¶ 73. Her abuser is actively pursuing her, and he has tried to kill her several times in the past. *Id*. The program at the motel does not accommodate her disabilities but she essentially cannot leave the motel because she cannot safely live on the street and her RV has been crushed. *Id*. ¶ 70-71.

When Plaintiffs' shelter and personal belongings are destroyed, and they have no safe shelter alternative nor means to protect themselves from the elements, the state has made plaintiffs conditions worse. *See Martinez*, 943 F.3d at 1272. This case is similar to *Sanchez*, in which the City of Fresno placed unhoused plaintiffs in a state-created danger when it "planned, directed, and implemented the demolition" of the unhoused Plaintiffs' shelters and their contents without providing adequate notice of its intent to seize and destroy Plaintiff's property, nor any means of retrieving the seized property. 914 F. Supp. 2d at 1093 (denying the City's motion to dismiss plaintiffs' state-created danger claim).

The City argues that Plaintiffs cannot establish that the City is acting with "deliberate indifference" because "Plaintiffs admit that the City has offered them shelter," and this mitigated any potential exposure to the elements. Mot. at 20; *see Sanchez*, 914 F.Supp.2d at 1093 (there was a state-created danger where the state knew that Plaintiffs "had no alternative shelter or means of protection from the elements nor any other means of keeping their personal property safe, and that no safe shelter was available to Plaintiff" and destroyed their property anyway, leaving them exposed to the elements.). For Mr. Spencer, he has been offered a place at the Campus Motel temporary shelter program, but the restrictive policies, including the prohibition on visitors, limitations on storage, and lack of privacy mean that the motel program is not a viable option for

United States District Court
Northern District of California

1   him given his mental health needs.  FAC, ¶ 40.  The Court previously found that the City did not

2   oppose Plaintiff's arguments that some of them, including Mr. Spencer, require privacy in shelters

3   as a reasonable accommodation under the ADA.  *See* IV.D.5.  Therefore, the City waived any

4   argument regarding Plaintiff's claims for a need for privacy accommodation.  Because the Court

5   must take Plaintiffs' allegations as true at the pleading stage, the Court cannot find that the City

6   has provided Mr. Spencer with an accessible offer of shelter to prevent his exposure to the

7   elements.  For Mr. White Jr., he was verbally offered shelter, but when he followed up with the

8   City, he was told it could not provide him with shelter at that time because there were "no open

9   ADA rooms."  *Id*. ¶ 57.  For Mr. "Cat" White, he was housed via a voucher he received from

10   Insight Housing.  *Id*. ¶ 63.  However, when he went out of town for a week and a half, he was

11   "illegally locked out of his apartment."  *Id*.  He was unable to connect with his caseworker and set

12   up a tent outside.  *Id*.  Thus, these Plaintiffs have not been offered adequate shelter as an

13   alternative to exposure to the elements without protection.  When the City destroys their property,

14   they are left with "no alternative shelter or means of protection from the elements nor any other

15   means of keeping their personal property safe."  *Sanchez*, 914 F.Supp.2d at 1093.

16        The City claims that Plaintiffs have not adequately alleged that the City is deliberately

17   indifferent because the City provides notice before abatements and evictions.  While it is true that

18   in *Sanchez*, the state did not provide plaintiffs with any notice before seizing their belongings, it is

19   not clear that notice alone can avert placing the unhoused in a position of danger when their

20   personal shelter property is taken and destroyed if they do not have a way to avert such seizure and

21   destruction.

22        Here, as discussed above, there is a factual question about the adequacy of the notices.

23   There are allegations in the FAC that the City is aware that its sweeps are conducted with vague

24   notice and in such a way that brutally destroys Plaintiffs' shelter.  After the October 2022 sweep,

25   the City apologized for the harm it caused but continued to impose the same harm in subsequent

26   sweeps.  FAC, ¶ 25.  After the October 2022 sweep, Mr. Radu, the assistant City Manager,

27   "admitted [on behalf of the City] to being 'overhanded' in its methods, providing vague and

28   conflicting instructions to residents, and apologized for its tactics."  *Id*.  Nonetheless, disruptive

51

evictions and abatements have continued to occur since then.  In *Sanchez*, the court found it sufficient that "Defendants kn[ew] or should reasonably [have known] that their conduct threatened plaintiff's continued survival, but nonetheless continued their conduct in a manner that has created substantial risk to [Plaintiff's] ability to continue to survive and is shocking to the conscience ..."  914 F.Supp.2d at 1102 (citations omitted).  Here, the FAC essentially alleges that the City knew or reasonably should have known that destroying Plaintiffs' survival gear such as tents, blankets, waterproof materials, medications, eyeglasses, wheelchairs, walkers, and canes, FAC, ¶ 289, would create substantial risk to Plaintiff's ability to continue to survive.  These evictions and abatements have "created substantial risk to [Plaintiff's] ability to continue to survive" and therefore Mr. Spencer, Mr. Rufus White Jr., and Mr. "Cat" White have adequately pled a state-created danger.  *Sanchez*, 914 F.Supp.2d at 1102.

## H.    Plaintiff's State Law Claims Are Not Dismissed

The City contends in a two-sentence paragraph that the Court should dismiss the state law claims because the Court should dismiss the federal claims, and therefore the Court no longer has supplemental jurisdiction over the state law claims.  *Pristavec v. Meno Holdings SPV, LP*, 593 F.Supp.3d 930 (N.D. Cal. 2022).  However, Plaintiffs have plausibly alleged multiple federal causes of action, so it retains supplemental jurisdiction over the state law claims.  The state law causes of action are, therefore, not dismissed at this time.

## V.    CONCLUSION

The Court GRANTS in part and DENIES in part the Motion to Dismiss as follows:  The Court DENIES striking events in the FAC that occurred after September 4, 2023.  The Court DENIES dismissal based on organizational standing.  The Court DENIES dismissal based on Fourth and Fourteenth Amendment violations.

The Court rules on the ADA claims as follows: it GRANTS dismissal with leave to amend the claim that the City failed to assist moving Plaintiffs' personal property during evictions and abatements.  It DENIES dismissal of Mr. Jefford's request for reasonable accommodation of the 72-hour parking ordinance, and GRANTS dismissal of Ms. Williams, Ms. Prado, and Ms. Whiston's requests with leave to amend.  It DENIES dismissal of Plaintiffs' request for a

United States District Court
Northern District of California

reasonable accommodation for the City's homeless program to include mental health workers.  It GRANTS dismissal of Plaintiffs' request for a reasonable accommodation in the offers of shelter.

The Court DENIES dismissal based on the FHAA claim.  The Court has already granted stipulated dismissal of the Eighth Amendment Claim.  The Court DENIES dismissal based on Fourteenth Amendment state created danger.  The Court DENIES dismissal of the state law claims.

Plaintiffs have 30 days from the date of this order to file an amended complaint.

A further case management conference is set for August 27, 2024.

**IT IS SO ORDERED**.

Dated: August 6, 2024

_____
EDWARD M. CHEN
United States District Judge