**Sabyl Landrum (CA BAR NO. 303852)**
slandrum@ebclc.org
**Brigitte Nicoletti (CA BAR NO. 336719)**
bnicoletti@ebclc.org
EAST BAY COMMUNITY LAW CENTER
2001 Center Street, Fourth Floor
Berkeley, CA 94704
Tel:    (510) 548-4040

**Thomas Zito (CA BAR NO. 304629)**
tzito@dralegal.org
**Sean Betouliere (CA BAR NO. 308645)**
sbetouliere@dralegal.org
**Jameelah Najieb (CA BAR NO. 349644)**
jnajieb@dralegal.org
DISABILITY RIGHTS ADVOCATES
2001 Center Street, Third Floor
Berkeley, California 94704-1204
Tel:    (510) 665-8644

**Emily Roznowski (*Pro Hac Vice*)**
eroznowski@dralegal.org
DISABILITY RIGHTS ADVOCATES
300 S. Wacker Drive, Floor 32
Chicago, Illinois 60606
Tel:    (332) 217-2328

**Osha Neumann (CA BAR NO. 127215)**
oshaneumann@oneumannlaw.com
LAW OFFICES OF OSHA NEUMANN
1840 Woolsey Street
Berkeley, CA 94703
Tel:    (925) 452-7603

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| YESICA PRADO, LUCIEN JEFFORDS, ERIN SPENCER, AMBER WHITSON, RUFUS LEE WHITE JR., JERMAINE WHITE, MONIQUE WILLIAMS, and WHERE DO WE GO F/K/A WHERE DO WE GO BERKELEY, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF BERKELEY,<br><br>Defendant. | Case No. 23-cv-04537-EMC<br><br>**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**CLASS ACTION**<br><br>Judge:    Edward M. Chen |

1    Plaintiffs Yesica Prado, Lucien Jeffords, Erin Spencer, Amber Whitson, Rufus Lee White,

2 Jr., Jermaine White, Monique Williams, and Where Do We Go ("Plaintiffs") complain and allege,

3 on behalf of themselves and all others similarly situated, as follows:

4 **I.    INTRODUCTION**

5    1.    The City of Berkeley ("City" or "Defendant" or "Berkeley") is home to over

6 1,000 unhoused residents, over 800 of whom are unsheltered. Over 60% of Berkeley's unhoused

7 residents have a mental health disability, over 18% have a developmental health disability, and

8 over 30% have a physical disability.[1] Many members of this group need accommodations to

9 access the homelessness services offered by Berkeley. Berkeley is aware of these statistics and

10 the need for accommodations, yet the City consistently and systematically fails to accommodate

11 unhoused residents' disability-related needs.

12    2.    The City of Berkeley's policies and practices for addressing homelessness

13 consistently and systematically deprive Berkeley's unhoused residents of rights under state and

14 federal laws, and subject unhoused residents to a devastating cycle of property loss, trauma,

15 community separation, and criminalization. During enforcement actions at encampments

16 (referred to herein as "sweeps," "closures," or "abatements"), the City of Berkeley engages in a

17 practice of disposing of unhoused residents' belongings, including necessary survival gear such

18 as tents, bedding, jackets, medications, and mobility devices. If residents refuse to leave areas

19 subject to abatement or closure, they are subject to arrest.

20    3.    The City of Berkeley, by its own admission, does not have enough shelter space

21 to accommodate its unsheltered residents. It couples its shelter outreach efforts with its eviction

22 efforts, forcing individuals to either move to another area on the street with only what they can

23 carry (losing everything else), or to give up their existing shelter and communities to enter

24 temporary shelter facilities that have strict property-storage limits and other restrictive rules.

25 Most, if not all, of the temporary shelter facilities are not accessible to people with disabilities, or

26

27 [1] City Manager Dee Williams-Ridley, Memorandum to Honorable Mayor and Members of the City Council re: Eighth St and Harrison St Encampment Efforts 34 (Feb. 20, 2024),
https://berkeleyca.gov/sites/default/files/documents/2024-02-20-
28 %20Eighth%20St%20and%20Harrison%20St%20Encampment%20Efforts.pdf.

1  they fail to make accommodations to their policies to accommodate the disability-related needs

2  of unhoused residents. Rather than using its shelter to prioritize people with disabilities who are

3  most in need, the City often reserves its shelter beds for individuals it plans to sweep, while

4  people with disabilities who have been desperately seeking shelter are ignored. For example,

5  when Plaintiff Rufus White Jr., who uses a wheelchair, followed up with the City about an offer

6  of shelter, a City employee told him that there were "no open ADA rooms" and that he would

7  need to wait until one became available.

8        4.     For residents who do receive shelter offers during sweeps, in order to enter the

9  shelter facilities, they are often forced to give up their previous sources of shelter including RVs,

10  tents, and built structures, in addition to many of their other belongings. The majority of the

11  City's shelters are temporary in nature, both because the programs place limits on participants'

12  stays and because the City engages in a practice of temporarily leasing shelter spaces and then

13  exiting remaining program participants back onto the streets when those leases end. Thus,

14  Berkeley residents who do enter temporary homeless shelters are frequently terminated from

15  programs and forced to return to homelessness without the belongings and sources of shelter to

16  which they previously had access, thereby placing them in increased risk of harm.

17        5.     This complaint challenges the City's failure to accommodate the needs of

18  unhoused residents with disabilities with respect to three aspects of the City's service provision.

19  First, when the City conducts outreach to its unhoused residents, it fails to do so in a way which

20  acknowledges and accommodates their mental health and other disability-related needs. This is

21  best illustrated by the fact that the City's homeless outreach team does not include any mental

22  health professionals or other people with sufficient mental health training, and is also apparent in

23  the City's practice of coupling the majority of its outreach and shelter offers with traumatizing

24  encampment abatements and closures, rendering it difficult or impossible for many individuals

25  with mental health disabilities to access this outreach.

26        6.     Second, when the City enforces the municipal code provisions that most impact

27  unhoused individuals, it does so in a way that (1) makes it impossible for many unhoused

28  residents to comply, especially given their disabilities; (2) deprives them of property including

1    tents and vehicles, which are essential to their survival on the streets; and (3) places them in

2    increased danger by depriving them of their shelter without providing them with anywhere to go.

3        7.    For example, the City enforces a regulation and policy that requires Plaintiffs and

4    Class members residing on the street to reduce their belongings to items that would fit into a "9

5    square foot" area, without any consideration of the amount of space people (particularly people

6    with disabilities) need for shelter and survival. On November 2, 2023, the City of Berkeley

7    spray-painted a square of this size on the sidewalk, and instructed Plaintiffs Erin Spencer, Lucien

8    Jeffords, and Yesica Prado that any of their possessions that do not fit within this square footage

9    would be subject to immediate disposal, if not otherwise marked for storage. As depicted below,

10   a square area of this size is barely large enough to accommodate an individual's wheelchair, and

11   certainly cannot accommodate essential survival gear of any individual.



21       8.    In fact, at an August 2024 meeting of the City of Berkeley Peace and Justice

22   Commission, Assistant to the City Manager and Neighborhood Services Manager Peter Radu

23   admitted that it is impossible for someone to even maintain a sleeping bag in a designated 9

24   square foot space. Although in that same meeting Mr. Radu falsely claimed that the City does not

25   enforce this regulation, the City in fact provides notices in relation to encampment sweeps that

26   routinely reference this regulation and instruct residents to reduce their possessions to a nine

27   square foot space, threatening those who fail to comply with citation and arrest.

28

9.      Third, temporary shelters operated by the City do not accommodate individuals' physical and mental health disabilities. Many of the shelters have physical access barriers; there are extremely limited spaces accessible to individuals who have mobility disabilities. Additionally, a number of rules in place at the shelters pose difficulties for residents with disabilities, especially mental health disabilities. For example, all of the shelters prohibit visitors, even prohibiting shelter residents to visit each other in their rooms; yet many individuals with disabilities who live on the streets rely on their community for emotional and other support, and being isolated in a motel room without being able to have visitors exacerbates their mental health issues. Additionally, the shelters limit residents' privacy, which is triggering for residents who have experienced violence and violation of their personal spaces during their years living on the streets. The City has been informed that residents need accommodations to these policies and has refused to engage in the interactive process or modify these rules.

10.     Plaintiffs are all unhoused residents of Berkeley with physical, intellectual, and/or mental health disabilities who, on behalf of a class of those similarly situated, call on this Court to require the City to: (1) provide reasonable accommodations and modifications to its policies, practices and procedures to enable them to benefit from Berkeley's services and activities related to homelessness, and to avoid a disparate impact on people with disabilities (as described in more detail in the Prayer for Relief, below); (2) to end its practice of seizing and destroying property of Plaintiffs and class members during sweeps (including without constitutionally-required notice); (3) to adopt and follow clear policies allowing for the storage and return of seized property (including constitutionally sufficient post-deprivation processes); (4) to end the City's policies, practices, and procedures that place Plaintiffs and Class members in state-created danger by depriving them of their essential belongings and survival gear without first ensuring that they have access to adequate and appropriate shelter, sanctioned safe haven locations for unsheltered individuals to camp or park, or, at a minimum, an alternative location to encamp or park without threat of being subject to another sweep; and (5) appoint a monitor to oversee compliance with the Court's order and require City of Berkeley to submit to regular monitoring and compliance checks by the Court at defendant City of Berkeley's expense.

1    **II.    JURISDICTION AND VENUE**

2        11.    Plaintiffs' claims arise under the laws and Constitution of the United States,

3    including 42 U.S.C. § 12132 and 42 U.S.C. § 1983. Therefore, this Court has jurisdiction over

4    this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4).

5        12.    This Court has jurisdiction to issue a declaratory judgment pursuant to the federal

6    Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

7        13.    This Court has supplemental jurisdiction over Plaintiffs' related state law claims

8    pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy

9    under Article III of the United States Constitution. Plaintiffs' state law claims share common

10   operative facts with their federal law claims, and the parties are identical. Resolving Plaintiffs'

11   federal and state claims in a single action serves the interests of judicial economy, convenience,

12   consistency, and fairness to the parties.

13       14.    Venue is proper in the United States District Court for the Northern District of

14   California pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2) because Defendant City of Berkeley is

15   located in this district and a substantial part of the events and/or omissions were committed in this

16   district.

17       15.    Because the events and omissions giving rise to Plaintiffs' claims occurred in

18   Alameda County, this case is properly assigned to the Northern District's San Francisco

19   Division, pursuant to N.D. Cal. L.R. 3-2(d).

20   **III.    THE PARTIES**

21       **A.    Plaintiff Yesica Prado**

22       16.    Named Plaintiff Yesica Prado is a journalist and community advocate. She has

23   lived in her RV in numerous locations in Berkeley, often joining established RV encampment

24   communities because they provide her with safety, security, and support that is necessary for her

25   to succeed. Her RV is currently parked on 8th Street between Harrison and Gilman. Though it is

26   operable, it has mechanical issues that prevent it from being moved more than a few hundred

27   feet.

28

1    17.    Plaintiff Prado has, as both an unhoused resident and a journalist, witnessed and

2    been subject to numerous evictions carried out by Defendant City of Berkeley. The City has

3    taken and destroyed her belongings without her consent, and she has seen others lose everything,

4    even the tent they were sleeping in, during evictions. In her current community at 8th and

5    Harrison, she and her neighbors support each other through mutual aid and chores, and they have

6    welcomed other unhoused residents to join the community.

7    18.    Plaintiff Prado is a "qualified person with a disability" and a person with "a

8    disability" within the meaning of all applicable statutes and regulations including 42 U.S.C.

9    § 12131(2), 28 C.F.R. § 35.104, and California Government Code § 12926. Ms. Prado has been

10   diagnosed with Post Traumatic Stress Disorder (PTSD) and Attention Deficit Hyperactivity

11   Disorder (ADHD). These disabilities limit major life activities, including by affecting her ability

12   to handle stressful situations, feel safe, learn, read, think, and communicate. As a result of her

13   ADHD, to process information, she often needs to take notes or record spoken information to be

14   able to go back over it to be sure she can take it in. Being in community and being able to live

15   with others is critical to her mental health and ameliorating her PTSD.

16   19.    The trauma from the City's repeated, highly stressful sweeps, both threatened and

17   actualized, have exacerbated Plaintiff Prado's mental health conditions, impacting her ability to

18   work, engage in self-care, and to plan and make decisions.

19   20.    Because Plaintiff Prado is still homeless, she is at risk of future harms resulting

20   from the City's continuing discriminatory policies, customs, and practices, including the loss of

21   her property and injuries she may suffer if ordered to move or if she were to lose her vehicle,

22   unless and until the City permanently modifies those policies and practices to comply with both

23   the constitution and with relevant disability rights laws. Plaintiff is also currently deterred from

24   accepting or accessing Berkeley's shelter program and related programs, because of the

25   discriminatory policies and practices alleged herein.

26

27

28

**B.    Plaintiff Lucien Jeffords**

21.    Named Plaintiff Lucien Jeffords currently lives in the Campus Motel shelter. He previously lived in his RV on Harrison Street between 7th and 8th Streets. The City towed and destroyed his RV after Plaintiff Jeffords accepted shelter at the Campus Motel.

22.    Plaintiff Jeffords is a "qualified person with a disability" and a person with "a disability" within the meaning of all applicable statutes and regulations including 42 U.S.C. § 12131(2), 28 C.F.R. § 35.104, and California Government Code § 12926. Plaintiff Jeffords has serious respiratory and gastrointestinal issues that have left him very physically weak, easily winded, and that cause great difficulty walking long distances. Plaintiff Jeffords has intellectual and mental health disabilities that affect his memory, cognitive functioning, his ability to think clearly, and his ability to understand written materials. These disabilities impact his major life activities. When he lived at 8th and Harrison, he relied on community members, including Plaintiff Prado, to help him access groceries, medical care, and other necessary services.

23.    While Plaintiff Jeffords is currently residing in temporary shelter, he is still homeless, and at risk of being unsheltered. He is thus still at risk of future harms resulting from the City's continuing discriminatory encampment policies, customs, and practices, including the loss of his property in future sweeps, unless and until the City permanently modifies those policies and practices to comply with both the Constitution and with relevant disability rights laws. Plaintiff Jeffords is also currently impacted by the City's discriminatory shelter policies in place at the Campus Motel, including the no-visitor policy and lack of mental health care.

**C.    Plaintiff Erin Spencer**

24.    Named Plaintiff Erin Spencer is a veteran of the U.S. Marine Corps. He has lived on the streets of Berkeley for at least eight years in many locations around the city. He has faced numerous encampment sweeps carried out by the City of Berkeley in which he lost most of his property and was forced to relocate. He currently lives in a structure he has built on the sidewalk of Harrison Street between 7th and 8th streets in Berkeley, along with several other residents.

25.    Plaintiff Spencer is a "qualified person with a disability" and a person with "a disability" within the meaning of all applicable statutes and regulations including 42 U.S.C.

§ 12131(2), 28 C.F.R. § 35.104, and California Government Code § 12926. Plaintiff Spencer has physical disabilities, including injuries in his shoulder and back that cause him significant chronic pain, and limit his shoulder mobility. These limitations impact his ability to engage in daily life activities, including lifting and carrying heavy objects and cleaning his space. When he lifts heavy objects, it is extremely painful and he is debilitated for days afterward, exacerbating his condition. He became disabled during his military service.

26.    Additionally, Plaintiff Spencer has been diagnosed with mental health disabilities, including Major Depressive Disorder and PTSD. He has complex trauma from a childhood of abuse and neglect, from his time in the military, and from his time in jail. The blank walls, rules, and violence of the military and jail were traumatizing for him. These disabilities impact his ability to function within rigid, hierarchical rule structures, to comply with orders, to process information when he is stressed, and they sometimes lead to panic attacks. Plaintiff Spencer's past traumas make institutional settings triggering for him and make him feel unsafe, and such settings can exacerbate his mental health conditions. Evictions are also traumatizing for him. He has had panic attacks during evictions conducted by the City. When City agents surround him and begin throwing away his belongings and taking apart his home, he can only see the people around him as enemies and his experience from the military overwhelms him. The experience of continually moving and losing his possessions and shelter exacerbates his PTSD and makes him feel lost. It also makes it hard for him to remember dates clearly. He also struggles with hoarding, partially related to his trauma of constantly losing his belongings in City sweeps. His mental health disabilities require him to have close contact with his social support system. The community of people living at Harrison Street welcomed Mr. Spencer when the City left him with nowhere else to go without fear of removal. He relies on the community support he receives from his neighbors for his survival, emotional support, and physical support.

27.    Because Plaintiff Spencer is still homeless, he is at imminent risk of future harms resulting from the City's continuing discriminatory policies, customs, and practices, including the loss of his property and injuries he may suffer if ordered to move, unless and until the City

1  permanently modifies those policies and practices to comply with both the Constitution and with

2  relevant disability rights laws.

3       **D.**     **Plaintiff Amber Whitson**

4       28.     Named Plaintiff Amber Whitson is a 43-year-old woman who has been homeless

5  for 27 years. She first became homeless when she was 16. Ms. Whitson began living in RVs in

6  2014, parking in various locations until enforcement by police forced her to move. She

7  previously lived in the City-run Safe Parking and Respite Kickstart ("SPARK") parking lot, until

8  it closed in 2022. When the SPARK program closed, she was not connected with other shelter

9  and so was forced to move back to living in her RV on the street on Dwight Way between 5th

10 and 6th Streets, even though her disabilities make it impossible for her to comply with the City's

11 72-hour parking law. She now lives in an unhoused community with several other disabled

12 women for support and protection.

13      29.     Plaintiff Whitson has two vehicles: the RV she lives in and an RV where she

14 keeps her tools. Ms. Whitson works as a shade tree mechanic: she fixes the vehicles of other

15 unhoused people and nonprofits in the area. Ms. Whitson is actively working to register her

16 vehicles and pay off unpaid parking tickets.

17      30.     Plaintiff Whitson is a "qualified person with a disability" and a person with "a

18 disability" within the meaning of all applicable statutes and regulations including 42 U.S.C.

19 § 12131(2), 28 C.F.R. § 35.104, and California Government Code § 12926. Plaintiff Whitson has

20 Complex Posttraumatic Stress Disorder (CPTSD), Attention Deficit Hyperactivity Disorder

21 (ADHD); Gastrointestinal Reflux Disease (GERD), sciatica, lymphedema, and dysmenorrhea.

22 Plaintiff Whitson's disabilities impact major life activities and also cause her to be in physical

23 pain that limits her ability to work. Her sciatica causes extreme back and leg pain, and her

24 dysmenorrhea causes such severe menstrual pain for five to seven days each month that she

25 cannot do much of anything at all. She receives Supplemental Security Insurance (SSI).

26      31.     Because Plaintiff Whitson is still homeless, she is at imminent risk of future

27 harms resulting from the City's continuing discriminatory policies, customs, and practices,

28 including the loss of her property and injuries she may suffer if ordered to move or if she were to

1  lose her vehicle, unless and until the City permanently modifies those policies and practices to

2  comply with both the Constitution and with relevant disability rights laws.

3      **E.    Plaintiff Rufus Lee White, Jr.**

4      32.    Named Plaintiff Rufus Lee White, Jr., is 51 years old and resides in a tent on 8th

5  Street near Harrison Street in Berkeley. He has been subject to numerous encampment evictions,

6  during which he has lost critical survival gear, mobility aids, and other essential property.

7      33.    Plaintiff White is a "qualified person with a disability" and a person with "a

8  disability" within the meaning of all applicable statutes and regulations including 42 U.S.C.

9  § 12131(2), 28 C.F.R. § 35.104, and California Government Code § 12926. Plaintiff White has

10  physical, intellectual, and mental health disabilities. Many of his disabilities are due to injuries

11  from a serious accident in which he was hit by a car, as well as physical attacks by others. In an

12  accident ten years ago, Mr. White broke his neck and suffered nerve damage in his lower body.

13  He also experienced a traumatic brain injury. He has screws in his neck and his lower body is

14  partially paralyzed. Due to being partially paralyzed, Mr. White often needs assistance getting in

15  and out of his wheelchair. He also has an amputated middle finger on his left hand, and he has

16  suffered from a head injury, which has impacted his long-term memory. He experiences chronic

17  pain. He has glaucoma and no peripheral vision . These disabilities restrict major life activities

18  such as his ability to walk, lift items, move his belongings, clean his space, and comprehend

19  written and oral instructions.

20      34.    Mr. White has previously been diagnosed with bipolar disorder and psychosis and

21  has experienced related symptoms. His mental health symptoms have included depression, panic

22  attacks and mood swings, among others. Both Mr. White's mental health and intellectual

23  disabilities impact his memory and limit his attention, concentration, executive functioning, and

24  ability to sustain employment and relationships with others.

25      35.    Because Plaintiff Rufus White Jr. is still homeless, he is at imminent risk of future

26  harms resulting from the City's continuing discriminatory policies, customs, and practices,

27  including the loss of his property and injuries he may suffer if ordered to move, unless and until

28  the City permanently modifies those policies and practices to comply with both the Constitution

1    and with relevant disability rights laws. Plaintiff Rufus White Jr. is also currently deterred from

2    accepting or accessing Berkeley's shelter Program and related programs, because of the

3    discriminatory policies and practices alleged herein.

4          **F.**     **Plaintiff Jermaine Lee "Cat" White**

5          36.     Named Plaintiff Jermaine Lee "Cat" White was born in Modesto, California, and

6    raised in Berkeley. He has experienced intermittent homelessness in Berkeley since 2016. He has

7    lived in and been evicted from a number of encampments in Berkeley, including encampments

8    on Gilman and Harrison Street. He was living in a tent on the Adeline median in Berkeley before

9    he was evicted from that location. He then moved across the street to the west side of Adeline

10   where the encampment was targeted for multiple deep cleanings. On or about February 7, 2024,

11   Plaintiff White moved into the Berkeley Inn during a strong winter storm, despite trauma from

12   having participated in shelter programs in the past and being exited from shelter or housing

13   placements, and then being back on the streets without the survival gear he had lost.[2] Mr. White

14   is back living on the street after being told to leave the Berkeley Inn, once again having lost and

15   had to replace his survival gear.

16         37.     Recently, Mr. White was told to leave the Berkeley Inn for three days. Back on

17   the street, Mr. White's mental health and PTSD symptoms deteriorated so much that he was too

18   anxious to return to the shelter after the three days had passed. As a result, the City exited him

19   from the shelter program without an opportunity to appeal this decision. When he eventually

20   inquired about returning, the City did not communicate clearly about the steps he needed to take

21   to receive shelter. With no other options or clear communication from the City, Mr. White has

22   since been back to living in a tent on the corner of 8th and Harrison. Mr. White wishes to stay in

23   shelter and would like to return to the Berkeley Inn.

24

_____

25   [2]     Mr. White was previously terminated from a temporary shelter program when the
     program was unable to identify a housing placement for him because he lacked income. He later
26   participated in a shelter program where he was subsequently placed into a subsidized housing
     unit and was illegally locked out during a temporary absence from his unit. His social worker
27   identified his hoarding behaviors as a result of his hoarding disorder as a basis for the landlord's
     grievance with him. In both circumstances he had surrendered possession of his belongings and
28   survival gear to move into a temporary shelter, and then was returned back onto the streets
     without the survival gear and possessions he lost.

1    38.    Plaintiff Jermaine White is a "qualified person with a disability" and a person

2    with "a disability" within the meaning of all applicable statutes and regulations including

3    42 U.S.C. § 12131(2), 28 C.F.R. § 35.104, and California Government Code § 12926. Mr. White

4    has mental health disabilities that are directly tied to his experience of being unhoused, including

5    complex PTSD, which makes him experience anxiety, and hoarding disorder. These disabilities

6    impact his major life activities, including his ability to concentrate, process information,

7    communicate, and sort and organize his belongings. His mental health issues are directly

8    exacerbated by Defendant's practice of destroying his belongings and forcing him to move.

9    When he knows the City is coming to clear an encampment, Mr. White experiences a trauma

10   response that manifests in him hiding or simply walking away to avoid the trauma of seeing his

11   belongings destroyed and thrown away. Mr. White has been subjected to so many encampment

12   sweeps and closures that it has impacted his memory and ability to tell events chronologically.

13   None of his belongings have been stored by the City during any of his evictions. The experience

14   of losing his belongings repeatedly has left him afraid to leave his belongings unwatched during

15   the day. This makes it difficult for him to take steps to identify housing or seek services.

16   39.    Because Plaintiff Jermaine White is still homeless, he is at imminent risk of future

17   harms resulting from the City's continuing discriminatory policies, customs, and practices,

18   including the loss of his property and injuries he may suffer if ordered to move, unless and until

19   the City permanently modifies those policies and practices to comply with both the Constitution

20   and with relevant disability rights laws. Plaintiff Jermaine White is also currently deterred from

21   accepting or accessing Berkeley's shelter Program and related programs, because of the

22   discriminatory policies and practices alleged herein.

23   G.    **Plaintiff Monique Williams**

24   40.    Named Plaintiff Monique Williams currently lives at the Campus Motel in

25   Berkeley. Before living at the motel, Ms. Williams lived in her RV for about a year at the 8th and

26   Harrison encampment.

27   41.    Plaintiff Williams is a "qualified person with a disability" and a person with "a

28   disability" within the meaning of all applicable statutes and regulations including 42 U.S.C.

§ 12131(2), 28 C.F.R. § 35.104, and California Government Code § 12926. Ms. Williams has PTSD related to an abusive relationship and other incidents, and other mental health disabilities, including impaired short-term memory due to blunt trauma to her head. Ms. Williams also suffers from a serious hip injury that makes sitting for long periods extremely difficult. She has metal pins in her arms that hurt when it is cold outside or when she is exposed to extreme elements. These disabilities impact major life activities, including her ability to withstand exposure to the cold, sit for long periods of time, and her ability to process information.

42.     Ms. Williams has repeatedly reached out to officials from the City of Berkeley, expressing her need for support due to her mental health condition and past experiences with domestic violence. She has specifically requested a reasonable accommodation to the City's "no visitor policy," seeking permission for her daughter to visit her and provide necessary care. Despite her numerous pleas, the City of Berkeley has not granted her any accommodations for her disabilities. The "no visitor policy" implemented in the Berkley shelter system severely impacts her ability to cope with trauma, as staying connected with her family and friends is essential to her well-being.

43.     Because Plaintiff Williams is still homeless, she is at imminent risk of future harms resulting from the City's continuing discriminatory policies, customs, and practices, including the loss of her property and injuries she may suffer if ordered to move, unless and until the City permanently modifies those policies and practices to comply with both the Constitution and with relevant disability rights laws. Plaintiff Williams is also currently impacted by the City's discriminatory shelter policies in place at the Campus Motel.

### H.    Plaintiff Where Do We Go

44.     Plaintiff Where Do We Go ("WDWG"), formerly known as Where Do We Go Berkeley, is a 501(c)(3) nonprofit Corporation whose board is made up of people who are homeless or housing insecure and advocates. WDWG's mission is to serve, support and advocate for homeless individuals in the East Bay. WDWG was founded in September 2019 in response to local government policies and practices of evicting and sweeping homeless encampments without providing residents with accessible shelter, housing, or indeed any legal place to go.

1    45.    WDWG provides direct outreach, advocacy, and material support for people

2  living on the street and for people temporarily housed in shelters and transitional facilities funded

3  by government and operated by nonprofits.

4    46.    Over the years, WDWG has developed strong relationships with people living

5  unsheltered in East Bay encampments. By spending time in their communities, it has acquired an

6  intimate knowledge of unhoused residents' material needs. It has provided port-a-potties, fire and

7  rodent abatement, hand washing stations, tents, tarps, medical support, harm reduction supplies,

8  food, tent heaters, hotel rooms, pet supplies, employment, trash removal, clothing, furniture,

9  blankets, and a host of other items critical to the survival of people experiencing homelessness

10  living on the streets and sidewalks of Berkeley and neighboring jurisdictions and on state

11  property.

12    47.    In addition to providing material support, WDWG advocates on behalf of people

13  experiencing homelessness with city, county, and state officials, and with nonprofit service

14  providers. It works to connect people experiencing homelessness with organizations, agencies,

15  volunteers and nonprofits, which serve the homeless such as Consider the Homeless, Berkeley

16  Free Clinic, Suitcase Clinic, East Bay Community Law Center, Lifelong Homeless Medical

17  Street Team, Berkeley Outreach Coalition, Berkeley Mental Health Services, East Bay Angels,

18  Berkeley Needle Exchange and Emergency Distribution, Homeless Action Center, Berkeley

19  Copwatch, and many more.

20    48.    When Berkeley evicts people living in encampments without providing them an

21  accessible legal place where they can go, it frustrates the mission of WDWG to support them and

22  prevent the violation of their constitutional and statutory rights. When evictions happen,

23  established encampments that WDWG has supported and supplied with material resources are

24  disbanded, and individuals who had been living in those encampments scatter. WDWG is then

25  forced to expend resources providing replacement tents, sleeping bags, and other basic survival

26  equipment, as well as finding residents who have been displaced, reestablishing a relationship,

27  and reconnecting them to various supports. This diversion of resources negatively impacts

28  WDWG's ability to help people in the community.

49.     Evictions without the provision of accessible alternatives make it particularly difficult to provide services to people with disabilities. Additionally, the evictions make it difficult for WDWG to keep track of the sick, elderly, mentally and physically disabled it has been working to help. If WDWG and other providers cannot find a person they have been working with, that person can easily lose their connection to other service providers that WDWG was helping them stay in touch with. They may then lose all housing opportunities and will have to start the process again once they are located. Spending time and resources tracking down people to continue providing services frustrates WDWG's mission and impacts their ability to help more people.

50.     When the City of Berkeley destroys people's possessions during sweeps and evictions, it drains the resources of WDWG, which is forced to expend limited funds replacing belongings the City has destroyed that are essential for survival on the street. Following evictions by the City of Berkeley, WDWG has resupplied people with new shelters and tents, sleeping bags, clothes, undergarments, food, shoes, tent heaters, tarps, buckets for fecal waste, toothbrushes, toothpaste, toilet paper, socks, deodorant, blankets, medicines, storage tubs, and many other items that were destroyed or discarded by the City.

51.     WDWG has been required to divert resources to advocating for people residing in transitional facilities such as motels operated by non-profit service providers under contract with the City of Berkeley. There is no independent review board to investigate complaints against operators of transitional housing and shelters such as Insight Berkeley, which runs the Campus Motel. WDWG has received numerous complaints about service providers that operate these facilities who do not accommodate the disabilities of residents and enforce rules and regulations arbitrarily in ways that render the facilities inaccessible to people with disabilities. It receives complaints about the poor quality of food provided residents; failure to assure the safety of residents, particularly female residents; failure to respect the privacy of residents; excessively strict enforcement of curfews that result in vulnerable and disabled residents being locked out for the night; failure to provide housing navigation services to move people into permanent housing; failure to accommodate people with disabilities in the provision of services; and failure to

provide a fair and accessible way that people can bring grievances to the organization facilities and have complaints fairly evaluated and addressed. The need to devote a disproportionate amount of time to dealing with grievances about transitional facilities frustrates the mission of WDWG to support the greatest possible number of people experiencing homelessness in the East Bay.

## I.     Defendant City of Berkeley

52.     Defendant City of Berkeley is a municipal corporation organized under the laws of the State of California. Upon information and belief, it provides homeless shelter and housing services through its contracts, it sets the policies for evictions and property destruction, and it is in all ways responsible for the violations of the laws alleged herein.

## IV.     FACTUAL ALLEGATIONS

### A.     The majority of Berkeley's unhoused and unsheltered residents have disabilities.

53.     According to Berkeley's 2022 Point In Time Count, there were over 1,000 individuals in the City of Berkeley experiencing homelessness.[3] Of those individuals, 53% depend on a tent for their primary shelter and 34% depend on their car, camper, or RV as their primary form of shelter.[4] In 2023, the City reported that as many as 2,000 people will experience homelessness over the course of a year, most of them unsheltered.[5]

54.     Among those experiencing homelessness in Berkeley, people with disabilities are disproportionately represented. In 2023, it was reported that 80% of people experiencing homelessness in Berkeley have one or more types of disability.[6] 62% of unhoused residents in

---

[3] EveryOne Home, Berkeley 2022 Point In Time Count: Unsheltered & Sheltered Report (2022), https://everyonehome.org/wp-content/uploads/2022/05/Berkeley-PIT-2022-Infographic-Report.pdf.

[4] *Id.*

[5] Peter Radu, Memorandum to Honorable Mayor and Members of the City Council re: Referral Response: Gap Analysis of Berkeley's Homelessness System of Care 3 (July 9, 2024), https://berkeleyca.gov/sites/default/files/documents/2024-07-09%20Item%2016%20Referral%20Response%20%20Gap%20Analysis%20of%20Berkeley%E2%80%99s%20Homelessness.pdf.

[6] *Id.*

1  Berkeley reported having a severe mental health disability, 33% reported a physical disability,

2  30.6% had a chronic health condition, and 18.3% had a developmental health condition.[7]

3      55.    According to a recent City Council report submitted by Assistant City Manager

4  Peter Radu, the City is aware people with disabilities make up an increasingly large percentage

5  of the City's homeless residents and the proportion of people with a disability who are

6  experiencing homelessness in the City is trending up over time.[8]

7      56.    Despite the City's awareness of the significant disability-related needs among

8  Berkeley's unhoused residents, the City has failed to make its homeless services accessible to

9  people with disabilities.

10      57.    Nearly two-thirds of Berkeley's unhoused population report having a severe

11  mental health disability, yet mental health professionals or others with sufficient training are not

12  regularly included in outreach to unhoused residents or in communications between City staff

13  and these residents regarding service options.

14      58.    Enforcement actions are noticed and carried out against encampments without any

15  effort to accommodate the needs of unhoused people with disabilities. Additionally, the

16  temporary shelters run by the City do not accommodate the needs of individuals with disabilities.

17  There is a lack of shelter space that is accessible to individuals with mobility disabilities, and

18  many shelters fail to meet basic accessibility guidelines. Additionally, shelter policies frequently

19  render these facilities inaccessible for those with mental health disabilities.

20      **B.    Berkeley violates the rights of unhoused residents with disabilities by
21      operating its homeless outreach, enforcement, and shelter activities without
        consideration of their unique needs.**

22      59.    The job of addressing and providing services to Berkeley's unhoused population,

23  upon information and belief, falls primarily on Berkeley's Neighborhood Services Division. This

24  division, "brings together staff from different City departments and partners in the community to

25

26  _____

    [7] City Manager Dee Williams-Ridley, Memorandum to Honorable Mayor and Members of the
27  City Council re: Eighth St and Harrison St Encampment Efforts 34 (Feb. 20, 2024),
    https://berkeleyca.gov/sites/default/files/documents/2024-02-20-
    %20Eighth%20St%20and%20Harrison%20St%20Encampment%20Efforts.pdf.

28  [8] Radu Memorandum, *supra* Note 5, at 23.

_____

*Prado, et al., v. City of Berkeley,* No. 23-cv-04537-EMC
**Second Amended Complaint**                                                    17

1    address citizen complaints and other problems that affect the quality of life in Berkeley, such as

2    blight, unsafe living conditions and graffiti. This division includes the Code Enforcement Unit

3    and Homeless Response Team."[9]

4        60.    In addition to routinely failing and refusing to consider or grant individual

5    requests for reasonable accommodation, the City's written polices and the actual practice of the

6    Neighborhood Services division and homeless outreach, sweeps, and shelter programs and

7    activities impose a discriminatory disparate impact on people with disabilities by systemically

8    failing to assess, consider, or respond to their unique disability-related needs.

9        1.    <u>Berkeley consistently fails to accommodate the known disabilities of its</u>
        <u>houseless residents, at Harrison Street and elsewhere.</u>

10

11       61.    Despite knowing that the vast majority of unhoused Berkeley residents have

12   disabilities, Defendant does not accommodate their unique needs.

13       62.    According to the City, 62.3% of unhoused Berkeley residents have mental health

14   disabilities, but the City does not provide adequate mental health services or supports in

15   connection with its outreach efforts.

16       63.    Mental health outreach at the Harrison encampment is virtually nonexistent,

17   despite the City being well aware that 86.2% of the Harrison encampment residents have mental

18   health disabilities. This is a significantly higher percentage than the 62.3% among Berkeley's

19   overall homeless population, as depicted in the chart below, taken directly from a City memo:

20

21

22   

23

24

25

26

27

28
<hr>
[9] City of Berkeley, City Manager's Office: Neighborhood Services Division (2024)
https://berkeleyca.gov/your-government/about-us/departments/city-managers-office.

64.    This chart comes from a memo written by Peter Radu, assistant to Berkeley's city manager and head of Berkeley's Homeless Response Team.[10]

65.    Similarly, the City is aware that 33.1% of unhoused residents have physical health conditions, 18.3% have developmental health conditions, and 30.6% have chronic health conditions. These conditions are more highly concentrated at the Harrison street encampment, where 65.5% of residents have physical health conditions, 51.7% have developmental health conditions, and 82.8% have chronic health conditions.[11]

66.    In an April 2023 email to Plaintiffs' counsel subsequently forwarded to Assistant City Manager Peter Radu, a communication from Olivia deBree, Associate Medical Director of Lifelong Street Medicine, which provides medical services to residents of the Harrison Street encampment that summarized the specific disability needs of encampment residents as follows:

> "There are numerous seniors living at 8th and Harrison, most of whom have chronic [musculoskeletal] or joint issues that make moving, carrying, lifting challenging.
>
> --There are people with serious psychiatric issues who use art therapy to cope. In the midst of a sweep, taking possessions that they make art with means risking manic or psychotic episodes.
>
> --There are people with serious foot injuries that mean they can't walk easily/normally and will need transportation to wherever they are supposed to be next and care not to throw away mobility devices (shoes that fit deformed or surgically repaired feet, crutches, etc.), bikes that enable them to get to appointments because they can't walk but can pedal.
>
> --There are people with major mobility issues for different reasons. If their mattresses, food, clothing, adult diapers, etc. are taken, they will not be able to get new ones. They don't have the capacity to do so. Neither person can pack things, throw things away, move things, etc. It should not be assumed that others will help them.
>
> --Psych issues: many of our patients have passive suicidal ideation regularly. At 8th and Harrison, there are also some individuals with significant suicidal ideation. The possibility that they could be pushed to the brink by a stressful or traumatic event should be considered. There are also numerous people with PTSD who experience flashbacks, hypervigilance, panic attacks and need extra time and trauma-informed care/interactions. Exacerbating depression and PTSD can lead to risky substance use, which can lead to overdoses.

---

[10] Radu Memorandum, *supra* note 5, at 23.

[11] *Id.*

--Risk of MI/CVA: There are people at high risk for MI or stroke at this camp. We advise strongly against additional stressors on these individuals.

--Anyone who is pregnant at the camp needs extra care. I wish I could say more on this but cannot for patient privacy reasons. I cannot urge CAUTION enough.

--The health of people at 8th and Harrison will be most improved by rapid housing. Anything that results in people losing documents necessary to being housed can mean months of delays to replace them which can have major health impacts including overdose and death."

67.    Despite this knowledge, the City has consistently failed to account for the known mental health needs and other known disability-related needs of houseless residents at Harrison Street and elsewhere, as further detailed below.

68.    Instead, the City conducts (or allows the entities with which it contracts to conduct) its homeless outreach, enforcement, shelter, and other related activities and programs without consideration of their unique needs, and without making necessary reasonable accommodations or modifications for those needs.

69.    Though facially neutral, the City's insistence on conducting outreach, enforcement, shelter, and other activities according to "standard operating procedures"—that is, generally without any evaluation or consideration of disability-related needs, and without any necessary accommodations of those needs—has a disparate impact on encampment residents with disabilities.

70.    The City's failure to accommodate or respond to the known or obvious disability-related needs of encampment residents has had tragic results: for example, in August 2023, Jennifer Gerlach, was having a severe medical and mental health crisis after being discharged from the hospital to Harrison Street. Despite repeated requests for mental health support, the City never sent mental health outreach. Without mental health outreach, Ms. Gerlach was unable to access medical care. She died lying behind a dumpster on Harrison Street on August 19, 2023.

2.    <u>Berkeley fails to accommodate the mental health needs or cognitive disabilities of unhoused residents when conducting outreach, or when giving "notice" prior to enforcement actions.</u>

71.    The City continually neglects unhoused residents with serious mental health or cognitive disabilities during outreach efforts, excluding such residents from the benefits of the City's outreach program. As part of this neglect, the City denies these residents genuine opportunities to be connected to housing or services and to be informed of upcoming City enforcement actions that will affect them.

72.    When the City's Homeless Response Team conducts outreach to unhoused residents prior to an enforcement action, mental health professionals are rarely included, despite multiple specific requests for their presence by individuals who need their support to access the outreach services, and despite the City's knowledge of this obvious need among encampment residents with known serious mental health or cognitive disabilities.

73.    For example, on August 15, 2023, City officials from the City's Homeless Response Team (including Joshua Jacobs, Okeya Vance, and several Berkeley Police Officers) came to 8th and Harrison to inform residents that they would need to leave by August 22, 2023, or risk arrest.

74.    City officials did not bring anyone with mental health training to speak with residents. Concerned about the City's lack of engagement to assess if individuals need accommodations in communication, Plaintiff Prado set up her own tent by the creek to support residents. Eve, an unhoused resident, lives in a tent near the creek to feel safe. Eve has serious mental health disabilities, but is able to engage with people she trusts. Plaintiff Prado asked Assistant City Manager Peter Radu if he had talked with Eve to inform her of the enforcement action, and he claimed she would not engage with him.

75.    Plaintiff Prado asked Mr. Radu if trained outreach workers from the Berkeley Mental Health Department could come to speak with Eve and try to communicate with her in a manner that would be accessible to her given her mental health needs. Mr. Radu replied that the Mental Health Department did not do outreach, and that Eve would need to either call them or go

1    in person during their limited hours. Plaintiff Prado stated that this was an emergency situation as

2    Eve was at risk of losing her shelter and could be arrested if she did not comply with the orders

3    of City officials. Eventually, four Berkeley Mental Health workers came to 8th and Harrison and

4    went to talk to Eve and she did engage with them.

5        76.    Plaintiff Prado and others have repeatedly requested that the City provide mental

6    health professionals prior to and when conducting encampment sweeps. In response, Ms. Prado

7    has been told that residents themselves must call the mental health phone number or go in person

8    during limited hours to access services. When Ms. Prado raises practical issues such as the fact

9    that some residents do not have phones or transportation, City employees have told her that they

10   could use Ms. Prado's phone or she could help transport them. When she has raised the fact that

11   some residents may be too unwell to call or visit and require in-person meetings to engage in

12   services, the City has not meaningfully responded.

13       77.    For instance, the City ignores the mental health needs of Victoria, who lives on

14   Harrison Street, in its outreach efforts. Instead of attempting to use professionals with

15   appropriate training to engage with her, City outreach workers simply claim that she refuses

16   services, despite the fact that she can engage with other residents and advocates. Similarly, the

17   City ignores Mama Lisa, who has lived at 8th and Harrison for years, during outreach efforts.

18   Because City staff or contractors do not know how to communicate effectively with her as a

19   result of her mental health issues, she is effectively denied the benefits of those efforts.

20       78.    The City of Berkeley similarly has a policy and practice of informing

21   encampment residents of upcoming sweeps, cleanings, and other actions through written notice,

22   despite knowing that these notices are incomprehensible to Plaintiffs and many other

23   encampment residents as a direct result of their mental health or cognitive disabilities.

24       79.    Plaintiff Jeffords, who the City knows or should know has mental health

25   disabilities that affect his ability to concentrate and process information, has repeatedly asked for

26   clarification of notices when he has seen outreach staff posting them, because they cannot

27   understand the notices. In response, Plaintiff Jeffords has been told that "the notices speak for

28   themselves."

80. When Plaintiff Prado attended her intake meeting for shelter, she requested accommodations related to her disabilities to be allowed to record the meeting and have someone with her to assist her in understanding both what she needed to do and all the rules of shelter. She was initially denied her requested accommodations based on "privacy" grounds. It took the intervention of the City's ADA coordinator and counsel to allow her to have those necessary accommodations for the intake meeting.

81. Plaintiff Jermaine White has requested that he receive more time prior to sweeps to speak with his caseworker to help him process shelter offers and upcoming sweeps, and these requests have been denied.

82. Plaintiffs and others have repeatedly asked the City to communicate the content of notices orally to encampment residents (ideally by people with experience and training in communicating with people who have serious mental health disabilities or cognitive impairments). Despite these requests, and despite knowing that the vast majority of encampment residents have mental health or cognitive disabilities that make the City's written notices impossible to read or comprehend, the City has repeatedly failed and refused to communicate the content of notices in an accessible manner advance of its various enforcement actions. One of the more recent such refusals occurred in connection with a July 30, 2024 "deep cleaning" of the Harrison Street encampment.

83. Similarly, the City has generally failed and refused to post key information regarding enforcement actions (such as the planned date, time, specific location, details of what will be done, and details of what encampment residents must do to comply) in a clear and simplified format, despite multiple requests that it do so, and despite its knowledge that the vast majority of encampment residents have mental health or cognitive disabilities that make the City's standard notices impossible to read or comprehend.

3. Berkeley violates the rights of its disabled unhoused residents under the ADA when it "abates" and closes encampments.

84. The City of Berkeley has a pattern and a set of practices that it employs when seeking to sweep or clear an encampment. Throughout the enforcement process, the City has a

1    pattern and practice of refusing to provide encampment residents with reasonable

2    accommodations that they need in order to comply with the City's actions.

3                      a.      *Berkeley violates disabled unhoused residents' rights when it fails
                                to provide reasonable accommodations to the notices posted for
4                               these residents during enforcement actions.*

5        85.    When the City posts abatement notices, the City does not engage in meaningful

6    outreach and does not communicate effectively with unhoused people with disabilities. On the

7    rare occasion when the City conducts outreach related to an abatement, the City does so in an

8    inaccessible manner such that residents still cannot understand how to comply and secure their

9    belongings. Abatement notices are often posted by City of Berkeley personnel that do not have

10   training on how to meaningfully explain the notices to Plaintiffs and Class members impacted by

11   the abatement procedure. In some closures, such as the one at the Adeline median, the only pre-

12   closure outreach was conducted by Berkeley Police, which can be traumatizing to class members

13   who have PTSD from negative interactions with police officers.

14       86.    Even if the notices provided by Defendant prior to encampment closures and

15   cleanings were in plain language and not vague and confusing, certain unhoused residents with

16   disabilities need additional accommodations in order to understand the implications of the notice.

17       87.    As a result of his disabilities, Plaintiff Lucien Jeffords was so confused by the

18   notice he received on September 1, 2023, that he could not understand it. Plaintiff Jeffords faced

19   similar difficulty in processing and comprehending another abatement notice he received on

20   October 30, 2023.

21       88.    Similarly, as a result of her disabilities, Plaintiff Yesica Prado was so confused by

22   the lengthy and contradictory notice issued on September 1, 2023, that she believed her RV was

23   subject to abatement, when at the time it was not.

24       89.    Plaintiff Rufus Lee White Jr. has difficulty reading because of glaucoma and also

25   his intellectual disabilities, and so needs the notice to be verbally communicated to him. On

26   information and belief, the City is aware of Plaintiff Rufus White's vision and intellectual

27

28

disabilities and therefore has an affirmative obligation to accommodate his needs when posting notices.

90.     The City knows (or should know) that numerous encampment residents—including Plaintiffs—have PTSD, mental health or cognitive disabilities, and other conditions that make it difficult or impossible to understand the complex and often contradictory information contained in its standard notices. And yet, it has taken no affirmative steps to accommodate these known disabilities and to ensure that essential information is actually communicated to encampment residents in an effective way - such as in the form of a simple plain-language, larger-print, document containing key information, combined with in-person outreach by individuals who are trained to communicate with people who have serious mental health or cognitive disabilities.

> b.     *Berkeley violates disabled unhoused residents' rights when it fails to provide accommodations during sweeps.*

91.     The City has a standard policy and practice of failing to evaluate or consider the disability-related needs of encampment residents in connection with sweeps and other enforcement actions, instead using a "one size fits all" approach to enforcement that disparately impacts people with disabilities, and leaves them particularly vulnerable to harm.

92.     In addition, the City has a standard policy and practice of refusing to make any accommodations to meet the disability-related needs of encampment residents in connection with sweeps and other enforcement actions, even when that disability-related need is or should be known to the City (as in the case of people with obvious physical disabilities or mental health disabilities that the City is already aware of), and even when specific requests for accommodation have been made.

93.     During sweeps and clean-ups, the City frequently requires encampment residents to move their shelter and belongings from one area to another. Many unhoused residents have obvious physical disabilities which prevent them from being able to pack their items quickly or to move large objects around.

94.     For example, Plaintiff Rufus Lee White Jr. uses a wheelchair or a walker and is unable to move his tent or belongings during encampment cleanings. The City has repeatedly failed or refused to provide Mr. White with assistance moving his belongings to a place where they will not be destroyed, despite his need for such assistance being readily apparent.

95.     On July 24, 2024, Plaintiff White requested assistance with cleaning the area around his tent and asked the City to allow him to keep his furniture outside the tent for mobility support during the deep cleaning scheduled for July 30, 2024. Ultimately, the City directed Plaintiff White to seek assistance from Plaintiff WDWG, which was attempting to assist residents with clean-up in advance of the cleaning. In this way, the City ignored its own duty to respond to accommodation requests and engage in the interactive process, and forced WDWG to further deplete its resources.

96.     Other residents have physical disabilities which, even if not immediately visible, are known to the City. For example, the City is aware that Plaintiff Spencer has a shoulder injury which prevents him from being able to lift large or heavy objects without being in extreme pain. Plaintiff Spencer has submitted multiple request for reasonable accommodations in moving and storing items, all of which were either denied or ignored by the City.

97.     In the case of residents with obvious or known disabilities, like Mr. White and Mr. Spencer, the City has an affirmative obligation to provide reasonable accommodations during encampment cleanings. *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001).

98.     The City also regularly denies or does not respond to reasonable accommodation requests during encampment clean-ups. On July 24, 2024, the Berkeley Homeless Union requested various reasonable accommodations on behalf of Plaintiff Spencer and Plaintiff Rufus White Jr., as well as other Class members in connection with a planned July 30, 2024 cleaning, including assistance with moving items due to physical disabilities, on-site mental health services for people with mental health disabilities who were likely to suffer increased anxiety and stress or exacerbation of other symptoms during the action, and for clear communication in formats that could be understood by people with a variety of mental health and cognitive disabilities. The City refused each of these requests.

99.    Plaintiff Spencer submitted a request for reasonable accommodations on November 13, 2023, asking for additional time to move his shelter and belongings before the City of Berkeley closed his encampment on November 14, 2023 due to his physical disabilities and limited mobility. The City responded by stating: "[w]e are unable to offer Mr. Spencer an accommodation of more time...given the competing demands on staff resources, we do not have the ability to reschedule it at this time."

100.    Again, on January 16, 2024, Plaintiff Spencer submitted a reasonable accommodation request asking for 72 hours, instead of the 24 hours, to relocate belongings due to his physical disability in response to the Public Notice of Encampment Deep Cleaning scheduled for January 17, 2024. Neither the City nor Counsel for Defendant responded to this request.

101.    As a result of the City's refusal to provide such obviously necessary accommodations in connection with cleanings and other enforcement actions, people with mental health or cognitive disabilities are denied their right to effective communication regarding what the City will do, how to retain their possessions, and how to avoid arrest (among other essential information); people with physical disabilities are denied a meaningful opportunity to safeguard essential supplies (and often, subjected to increased risk of injury or harm as a result—whether from trying to move things they cannot independently move, or because essential survival gear that they could not move is ultimately destroyed); and people with mental health disabilities are subjected to unnecessary extra stress, anxiety, and exacerbation of symptoms because of the City's failure to offer trained staff and basic mental health supports in preparation for and in conjunction with enforcement actions.

102.    The above is, of course, is only a partial list of the consequences of the City's pervasive and systemic failure to evaluate, consider, or accommodate the needs of people with disabilities (the vast majority of which are known to the City) in connection with its enforcement actions.

c.     *Berkeley violates disabled unhoused residents rights when it enforces particular code sections.*

i.     **Berkeley violates disabled unhoused residents' rights when it fails to provide reasonable accommodations to the 72-hour parking policy.**

103.     Berkeley Municipal Code authorizes "[a]ny regularly employed and salaried employee of the City of Berkeley Police Department designated by the Chief of Police" to "remove or cause to be removed: (A)Any vehicle that has been parked or left standing upon a street or highway for 72 or more consecutive hours." B.M.C. § 14.08.090.

104.     Moving vehicles every three days to comply with the 72-hour ordinance is not possible for those, like Plaintiff Whitson, whose disabilities that make doing so exceedingly difficult.

105.     Ms. Whitson cannot move her vehicles every 72 hours because of her disabilities. In order to live in her RV, it must be level (which it will generally not be when simply parked on the street). To level the RV, Ms. Whitson has to bend down close to the ground and put the vehicle on blocks, often making repeated adjustments. Her sciatica makes it extremely painful to bend down and level her RV. Moving her vehicles every 72 hours would require her to level the vehicles every 72 hours, which would significantly worsen her sciatica. In addition, moving her RV necessarily involves moving and securing the RV's contents, each time, which can be difficult as a result of her disabilities. Her dysmenorrhea also prevents her from doing almost anything for five to seven days each month, including moving her vehicles. She has received numerous tickets because she is not able to move her RVs every 72 hours due to her disabilities.

106.     Plaintiff Whitson used to reside in the Safe Parking and Respite Kickstart (SPARK) parking lot. For Ms. Whitson, the SPARK parking lot was "paradise" and parking on the street is "hell." The SPARK lot was safe and secure. She did not have to worry about having her belongings stolen. SPARK provided a hose so she could wash her vehicle and her dishes. She had access to a port-a-potty, filtered drinking water, a charging station for her cell phone, and a refrigerator with a freezer. She felt like she was part of a community in which people got along well.

107.    Ms. Whitson now parks on a block near two other single women with disabilities who previously lived on the SPARK lot. The women provide emotional support for each other. Since being forced to leave SPARK and relocating to Dwight Way, they all receive frequent citations for not moving their vehicles.

108.    Ms. Whitson needs a place where she can park safely. The constant threat and actuality of negative contacts with the police while she is parked illegally on the street triggers her CPTSD. The trauma that is the source of her CPTSD began after police, accompanying CPS workers, took her son from her custody and was exacerbated by the constant police harassment she experienced in People's Park, where she lived for a number of years.

109.    In the fall of 2023, Plaintiff Prado also asked the City for an accommodation to the 72-hour notice for her neighbor who lives in an RV and has a mobility disability that requires him to use crutches and that prevents him from moving his belongings frequently. The City denied this request.

110.    Plaintiff Prado and Ms. Whitson live with PTSD and other mental health disabilities. For them, staying in a stable community with trusted individuals helps manage their symptoms, while frequent relocations and disruptions significantly worsen their conditions. Plaintiff Prado has informed the City of her need to remain in community and the City knows (or should know) how disruptive enforcement of the 72-hour ordinance is to her ability to remain in community in order to manage her mental health. The City has taken no affirmative action to accommodate her needs with respect to its enforcement practices.

          **ii.**    **Berkeley discriminates against unhoused residents with disabilities by failing to modify its policy prohibiting belongings from occupying more than 9 square feet—an amount of space that is barely large enough to accommodate a wheelchair.**

111.    The City of Berkeley's Administrative Regulations permit enforcement officers to "Request that [Temporary Noncommercial] Objects be reduced to a 9-square-foot footprint (measured as 3' x 3', 4' x 2.25', 9' x 1', etc.) and/or less than 5 feet in height." AR 10.2.D.2. In

1  practice, police interpret this policy as disallowing any objects on the sidewalk larger than a 3' x

2  3' footprint per person, including tents, mobility aids, and any other survival gear.[12]

3        112.    People with mobility aids, such as wheelchairs or walkers, are

4  disproportionately affected by the sidewalk ordinance requiring downsizing to 9 square feet. This

5  is because their mobility aids, along with other essential items needed for their daily life and

6  independence, occupy more space. The ordinance does not account for the additional space

7  required for these necessary items, making it difficult for individuals using mobility aids to

8  comply without sacrifice. As a result, they face greater challenges in meeting the ordinance's

9  requirements while maintaining their essential equipment.

10        113.    The City is aware that Plaintiff Rufus White and others need additional space for

11  belongings because of their disabilities, but it has repeatedly failed and refused to provide them

12  with this necessary accommodation, instead insisting that all encampment residents—including

13  those who rely upon mobility devices—fit their belongings into the same small space.

14        4.    <u>Berkeley Violates the Rights of its Disabled Unhoused Residents by</u>

15  <u>Failing to Provide Disability Accommodations in its Temporary Homeless</u>
<u>Shelters</u>

16        a.    *Berkeley fails to accommodate the mental health or cognitive*

17  *disabilities of unhoused residents in shelter offers and intake*
*appointments*

18        114.    The City does not provide offers of shelter to Plaintiffs and Class members in an

19  accessible way, especially for residents with mental health disabilities. As previously alleged, the

20  City fails to accommodate unhoused residents with mental health disabilities when it fails to

21  provide effective communication when offering shelter.

22        115.    Plaintiffs and Class Members are excluded from shelter programming from the

23  very start of the process. The manner in which the shelter rules are presented to residents during

24  intake is not accessible. When Plaintiff Monique Williams sat down to do her intake for Campus

25  Motel program, the shelter employee put a huge stack of paper in front of her and started talking

26

27

28  _____

[12] In August 2024, Assistant to the City Manager and Neighborhood Services Manager Peter Radu admitted at a public meeting that it is impossible for someone to even maintain a sleeping bag in a designated 9 square foot space. *See supra* ¶ 8.

1    rapidly and for a long time about how the program works. Ms. Williams could not process what

2    the worker was saying, and later could not remember what she had heard because of her memory

3    problems. She has a hip injury that makes it difficult for me to sit for long periods of time

4    without intense pain, which made it even harder to focus during the intake.

5          116.    When arriving at intake, Plaintiffs and Class members are swamped with

6    information and staff do not provide written copies of the information that they are receiving

7    verbally or copies of the documentation they are being asked to sign. In 2023, when Plaintiff

8    Prado attended her intake meeting for a room in Berkeley's temporary motel shelters, she

9    requested accommodations to receive the paperwork before her intake appointment. Her request

10   was denied. Additionally, during the intake meeting when Ms. Prado requested to review the

11   paperwork herself to process it, staff would not let her see it and instead offered to just read it

12   verbally to her which was difficult for her to process. Ms. Prado also requested to be allowed to

13   record the intake meeting and have someone with her to assist her in understanding both what

14   she needed to do and all the rules of the shelter due to her ADHD. She was initially denied her

15   requested accommodations based on "privacy" grounds. It took the intervention of the City's

16   ADA coordinator and Plaintiffs' Counsel to allow her to have those necessary accommodations

17   for the intake meeting.

18                      b.    *Berkeley's temporary homeless shelters are not accessible to and*
19                            *do not accommodate people with mobility disabilities.*

20         117.    Defendant is a local government entity with responsibility for providing

21   Plaintiffs with full and equal access to its public facilities. Defendant is responsible for

22   constructing, altering, maintaining, repairing, regulating, operating, and staffing the shelter

23   systems for its unhoused residents within the City of Berkeley.

24         118.    Publicly available data, including from the City's own surveys, reveals that at

25   least 30% of unhoused people in Berkeley have a mobility disability.

26         119.    Despite knowing of this need, and of its legal obligations to provide accessible

27   facilities and ensure program access, Berkeley's temporary homeless shelters are rife with

28

1  architectural barriers for people with disabilities and do not comply with state and federal

2  architectural accessibility requirements.

3       120.    On information and belief, there has been no consistent effort by the City of

4  Berkeley to ensure that the temporary shelter options it offers unhoused residents comply with

5  federal and state accessibility requirements. As a result, the number of shelter spaces available to

6  individuals with mobility disabilities is extremely limited.

7       121.    One example of the City of Berkeley's lack of accessible shelter options is

8  Pathways STAIR Navigation Center ("Pathways"), located at 1601 Second Street, built by the

9  City in 2017. Pathways was designed to be a transitional, low-barrier shelter that offered

10  residents mental health services, hygiene, drug/alcohol abuse services, job search assistance,

11  disability benefits, and ultimately a path to permanent housing. However, when the facility was

12  constructed in 2017, there was no effort to ensure that it complied with architectural accessibility

13  guidelines. As a result, a host of accessibility barriers at Pathways prevented unhoused people

14  with mobility disabilities from being physically able to access this shelter and its resources,

15  meaning that they were effectively excluded from its services.

16       122.    After pressure from disability activists, in 2020, the City of Berkeley hired a firm

17  called Disability Access Consultants to prepare a detailed survey of Pathways' compliance with

18  federal and state accessibility regulations. The report revealed that the ramps leading to the main

19  entrance to the shelter building, the restroom, and nearly all other parts of the facility, were too

20  narrow to comply with accessibility requirements. The report also detailed the lack of

21  accessibility of the shelter's bathrooms and showers, the lack of accessible parking, the presence

22  of inaccessible doorways and heavy doors, and the lack of an accessible path of travel throughout

23  the facility, among other barriers. The report ultimately estimated that it would cost $300,000 for

24  Pathways to fix its architectural violations. On information and belief, Pathways is still not

25  compliant with accessibility regulations.

26       123.    In November 2022, Barbara Geib, who at the time was an unhoused person in

27  Berkeley, received an offer of shelter at Pathways. Ms. Geib is 74 years old and uses crutches or

28  a walker to get around. When she arrived at Pathways, Ms. Geib had to walk more than a city

1    block to reach the women's section from the parking lot—a strenuous walk for Ms. Geib due to

2    her disabilities. Once she arrived at the women's section, program staff informed her that the

3    only available accessible bathroom was a port-a-potty located half a block away from the

4    women's section. Due to the inaccessibility of the existing bathrooms, the program had installed

5    a port-a-potty outside. Ms. Geib has health conditions that require her to use the restroom

6    frequently, sometimes three or four times during the night. She would not have been able to use

7    the inaccessible bathroom located within the shelter due to the lack of space to turn around and

8    the inadequacy of the grab bars. The accessible bathroom was so remote that she would have had

9    to spend hours getting to and from the restroom during the night. As a result of these

10   accessibility issues, Ms. Geib was not able to stay in this shelter and benefit from the other

11   resources present there, including housing navigation, benefits assistance, and mental health

12   services.

13       124.    Other female-identified people with mobility disabilities would struggle with

14   issues similar to Ms. Geib in connection with the City's Pathways shelter.

15       125.    In addition to the newly-constructed Pathways shelter, the City of Berkeley leases

16   several pre-existing motels to provide temporary shelter programs for its unhoused residents.

17   However, these programs have very limited rooms and placements for people with mobility

18   disabilities who require accessible rooms.

19       126.    The City routinely fails to ensure that accessible rooms in these leased motels are

20   available for people who need them, and has not taken any actions to make more rooms

21   accessible to meet this need.

22       127.    As a result, many people with mobility disabilities are effectively excluded from

23   the City's non-congregate "motel" shelters, and from its non-congregate shelter programs.  For

24   example, in September 2023, Plaintiff Rufus White Jr. was verbally offered shelter in one of the

25   temporary shelter motel programs operated by the City. When Mr. White followed up with the

26   City through counsel regarding the offer, the City told him that it could not provide him with

27   shelter at that time because there were "no open ADA rooms" and he would need to wait until

28   one became available. As a wheelchair user, Mr. White cannot access any non-accessible rooms.

1    Because of the City's failure and refusal to provide him with an accessible room, Mr. White Jr.

2    has been deterred from entering the City's non-congregate shelters.

3        128.    Additionally, in January 2024, Mr. White Jr. faced severe health challenges due to

4    the extremely cold weather, prompting a request for accommodations to allow him access to a

5    temporary shelter, despite the unavailability of an ADA-accessible room. Due to his significant

6    disabilities, Mr. White is affected by the weather and his living situation on the street was

7    untenable and a serious cause for concern. After multiple back and forth exchanges with

8    unhoused advocates, the City agreed to provide Mr. White with a room due to his serious health

9    concerns. However, when an advocate suggested the need for a makeshift wheelchair ramp over

10   stairs leading up to his room, City staff dismissed the request as "too much." For this and other

11   reasons related to the City's failure and refusal to accommodate his disability-related needs—

12   including its refusal to allow people he relies on for care to accompany him—Mr. White Jr. is

13   still unsheltered.

14       129.    Similarly, in December 2023, Class member Lewanda Parnell, an unhoused

15   person with a disability, requested that the City install grab bars in a bathroom so that she could

16   access the shelter program at the Campus Motel. In response to a separate lawsuit filed by Ms.

17   Parnell and two other unhoused individuals, this Court issued a temporary restraining order

18   which prohibits the City from removing Ms. Parnell from her encampment unless and until the

19   City installs grab bars in the bathroom of a shelter room at the Campus Motel. *See Parnell et al.

20   v. City of Berkeley*, No. 3:23-cv-06379-EMC, ECF No. 28. On information and belief, the City

21   still has not installed grab bars over eight months later and that restraining order remains in

22   place.

23       130.    Further, Plaintiffs and Class members could not access the City's main winter

24   shelter at Old City Hall due to architectural barriers. On or around December 12, 2024, City staff

25   told Jeremy, a resident of 8th and Harrison with disabilities who uses a wheelchair, that he could

26   go seek shelter at Old City Hall. Despite this representation, shelter staff informed him that the

27   front entrance was not physically accessible. Staff then decided that he could enter through the

28   back of the building. He was able to use the shower, but when he tried to stay the night, shelter

staff told him to leave because the shelter bathrooms were not ADA accessible and the staff did not want to get in trouble. Jeremy was exited from the shelter without being provided with any other accessible shelter option and forced to return to living in his car. Jeremy spent the entire winter living in his car, and still resides at 8th and Harrison.

> c.    *Berkeley's temporary homeless shelters do not accommodate the needs of people with disabilities in their policies and rules*

131.    The temporary shelters offered by the City, both congregate and non-congregate, have policies and rules that make them effectively inaccessible to individuals with mental health disabilities and intellectual disabilities. These include restrictions such as the "no visitors policy" and challenges related to understanding and following shelter rules that can subject an individual to be kicked out without any opportunity to contest that termination. The rules of the City's shelter programs disparately impact people with disabilities and create inaccessible programs for many residents with mental health and intellectual disabilities.

132.    Although the City refers to the motel programs as "resource rich" services, the reality is that services are scarce, particularly for those with behavioral or medical issues that require additional work or training to interact with successfully. This has the effect of making those with the greatest need feel like they are being set up to fail by the programs' behavioral expectations. Many residents are wary of accepting a placement in the motel because they expect that they will be unable to comply with these rules, and that there is a high likelihood that they will be terminated from the shelter program after a short stay, only to end up back on the street without the survival gear they had prior to going into the shelter.

133.    Plaintiffs and class members are deterred from accepting spaces in the City's shelter program as a result of these restrictive rules and policies, to which they are informed and believe that the City and its contractors will not make any accommodations.

134.    For example, the Campus Motel program does not meet Ms. Williams's disability-related needs. Her mental health issues and short-term memory loss make it difficult for her to understand and remember the program rules. She finds the rules unclear and constantly changing, which causes her anxiety about accidentally violating a rule and being expelled from

the program. Given that the City destroyed her RV and she cannot live in a tent due to her physical disabilities, Ms. Williams fears being left without shelter if she is ever removed from the program, and requires reasonable accommodations to the shelter's immediate "kick out policy," under which residents can be summarily terminated for any violation of the rules. On information and belief, the Campus Motel makes no exceptions to this policy on account of disability, and does not offer a hearing process or any other mechanism by which to contest terminations. Based on this information and belief, Ms. Williams has not requested accommodations to the kick out policies, because she reasonably believes such requests would be futile. *Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133, 1136-37 (9th Cir. 2002).

135.     Plaintiff Williams' fear is escalated because the program staff at the Campus Motel inconsistently enforce rules. The lack of clarity regarding behavioral expectations makes residents feel that they may be terminated from the program at any time by the program staff.

136.     Unhoused people with disabilities are regularly exited from Berkeley shelter programs because they cannot independently complete the steps required to obtain permanent housing. The shelter programs require residents to participate in the housing navigation process which includes gathering proof of income, documentation of disability from medical providers, a social security card, and other necessary documents.

137.     On information and belief, the City routinely fails to provide residents with mental health or cognitive disabilities that affect their ability to perform the requisite steps with sufficient assistance. Residents with disabilities that affect their ability to gather this information and otherwise complete the application process for permanent housing, which often requires lengthy trips to government offices and medical providers, are summarily exited from the shelter program.

138.     On information and belief, shelter policies and practices at the Berkeley Inn are similar to or the same as those at the Campus Motel.

139.     Individuals with mental health conditions are even more at risk of being terminated from the program due to disability-related behavior, or becoming subject to law enforcement action. The programs do not have any on-site mental health workers, nor does the

1  City provide mental health support on request. The programs do not provide support to residents

2  who are having serious mental health issues.

3      140.    Moreover, the city-wide "no visitor policy" in Berkeley shelters exacerbates many

4  residents' mental health disabilities and other disabling conditions. As a result of this blanket

5  policy, people with disabilities who rely on physical assistance from friends and community

6  members to perform everyday tasks cannot receive it. People who need support from others to

7  take medications or manage other medical conditions similarly cannot receive such support.

8      141.    Moreover, many people with mental health disabilities, including named

9  Plaintiffs, rely on friends and community members to help manage their mental health

10  conditions, and need to be able to connect with these sources of support and talk through issues

11  in some relatively private and safe space. By denying such individuals the ability to have visitors

12  in their homes (or indeed anywhere on the premises) at any time, the City makes it extremely

13  difficult or impossible for them to manage their mental health conditions while in shelter, and

14  deters many of them from accepting shelter at all.

15      142.    On information and belief, neither the City nor the contractors operating its

16  various congregate and non-congregate will allow for disability-related accommodations to the

17  City's "no visitor" policy.

18      143.    Residents of the program at the Campus Motel are not allowed to have visitors in

19  their rooms or anywhere on the premises. They are required to be at the hotel every night. If a

20  resident is not at the hotel every night, the program can decide that the resident no longer needs

21  shelter and require them to forfeit their room.

22      144.    Ms. Williams needs to spend time with safe and trusted individuals, including

23  family and friends, to manage her PTSD. However, she is not allowed to have friends visit her in

24  a Berkeley shelter. She rarely sees her family because most of her family is in Richmond, and

25  she fears being kicked out of the program if she visits them.

26      145.    In addition, one of Ms. Williams' family members performs a range of caregiving

27  duties, including essential tasks like cleaning and providing emotional support. Without having

28  her family member visit her in her shelter room, Ms. Williams cannot receive crucial caregiving

1   support that she cannot provide for herself due to her disabilities. Ms. Williams needs caregiving

2   support in order to manage her disability-related needs and maintain her overall well-being. The

3   City has not engaged in an interactive process to assess whether Ms. Williams's request for an

4   accommodation to the no-visitor policy is reasonable or to explore alternative accommodations.

5          146.    Plaintiff Lucien Jeffords relies on community and his neighbors to provide them

6   with emotional support. Isolation because of the rules preventing visitors could exacerbate his

7   existing mental health and other disabilities. Since entering into the Campus Motel, Plaintiff

8   Jeffords has experienced a significant decline in his mental health due to feelings of isolation

9   from his community at 8th and Harrison who he would depend on to alleviate his fear that

10  someone is constantly out to get him. He was unable to enter shelter until he surrendered one of

11  his two emotional support animals, because the City would only allow him to bring one.

12         147.    Plaintiff Rufus White Jr. relies on community and his neighbors to provide him

13  with mobility-related support. Rufus White has significant physical disabilities and requires

14  assistance with tasks such as cleaning and caring for himself. Currently, he relies on friends and

15  neighbors to help him with these tasks. Without visitors who can assist him with these tasks, Mr.

16  White would not be able to comply with other program rules.

17         148.    In order to receive additional care, Plaintiff Rufus White Jr. intends to apply for

18  assistance from the Alameda County In-Home Supportive Services ("IHSS") program. However,

19  he cannot participate in the IHSS program without an address. To solve this problem, in January

20  2024, Mr. White requested a space in the Campus Motel. While the City agreed to allow an IHSS

21  worker to provide him with care in the shelter, Mr. White needs care during the interim period

22  when he is in shelter but before he applies for and receives IHSS support. On information and

23  belief, this process will take at least a month if not more due to IHSS staffing shortages.

24         149.    In January 2024, Mr. White requested an accommodation to the no-visitor policy

25  so that he can receive care from friends or neighbors, but the City refused his request.

26         150.    Even if Plaintiff Rufus White were to receive accessible shelter and IHSS

27  caregiving, he requires additional care beyond the maximum number of hours that IHSS

28  provides. As a result, Mr. White requires an accommodation to the visitor policy to allow friends

1  or neighbors to provide care to him in shelter even after receiving IHSS support. As stated above,

2  the City denied Mr. White's request for an accommodation.

3      151.    The rules and policies at the Berkeley Inn and Campus Motel and other shelters—

4  and the City of Berkeley's refusal to reasonably modify those rules and policies—make them

5  inaccessible to Plaintiff Prado and other people who have a disability related need to be in their

6  RVs rather than on the streets, or to have visitors to support their mental health. Like many other

7  people with mental health disabilities, Ms. Prado relies on friends and community members to

8  help manage her mental health conditions, and needs to be able to connect with these sources of

9  support and talk through issues in some relatively private and safe space. By denying Ms. Prado

10  the ability to have visitors in her room (or indeed anywhere on the premises) at any time, the

11  City would make it extremely difficult or impossible for her to manage her mental health

12  conditions while in shelter. The City's complete refusal to reasonably modify this policy and

13  other restrictive policies described below has deterred Ms. Prado from entering the shelter

14  Program.

15      152.    While Ms. Prado did receive an offer of shelter at the Campus Motel, the

16  shelter's policies regarding visitors and lack of RV parking made it inaccessible to her. Ms.

17  Prado's mental health history impacts her ability to access shelter options with rules that overly

18  restrict her access to her community support network, such as the no-visitor policies. She told the

19  City that, as an accommodation for her mental health disabilities, she needs to be able to have

20  visitors in her space at any shelter, because her community is critical to her mental health. She

21  was told that all City shelters have a "no visitor" policy. No accommodation to the "no visitor"

22  policy was granted to her.

23      153.    Additionally, Ms. Prado needs to retain her RV because the relative safety,

24  security, and privacy of her RV allows her to manage her mental health disabilities (particularly

25  if she were to be exited from temporary shelter and be faced, once again, with a choice between

26  her RV and living on the streets). However, the City shelter programs do not offer RV parking.

27  When she asked if she could park her RV at the Campus Motel, she was told she could not. She

28  was told she could park it on the streets, even though there are no places in the City of Berkeley

1   to park an RV for more than 72-hours without being subjected to ticketing and tows. Despite

2   knowing of Ms. Prado's disability-related need to retain her RV, the City did not offer any

3   accommodation, such as a permit that would give her the ability to park her RV on city streets

4   (but not live in it) while in shelter, and until she was able to obtain reliable permanent housing.

5        154.    The shelter programs do not provide residents with adequate privacy and

6   security. At the Berkeley Inn, residents cannot have keys to their own rooms and must rely on

7   program staff to let them in each time they return. At the Campus Motel, while residents have

8   magnetic cards, these cards frequently fail, and the deadbolts on the doors have been removed,

9   leaving residents unable to secure their rooms properly. They often have to wait for program

10  staff to let them in, which is particularly problematic for those experiencing mental health crises

11  who need to retreat to a private space to feel safe.

12       155.    Additionally, program staff regularly enter residents' rooms to check on

13  their status, often without knocking or allowing enough time for a response. Multiple residents,

14  including Plaintiff Williams, have reported privacy violations, such as staff entering their rooms

15  while they are showering. The inability to lock doors and the lack of privacy trigger PTSD

16  symptoms and make residents feel unsafe. For Ms. Williams, the lack of privacy and security at

17  the Campus Motel exacerbates her fears, as she cannot deadbolt her door and is especially

18  anxious because her abuser is still pursuing her. She also worries about staff entering her room

19  without permission, moving her belongings, or taking her possessions, which further triggers her

20  PTSD.

21       156.    Similarly, Plaintiff Jeffords has been experiencing worsening mental health

22  symptoms, including a persistent fear that people will break into his motel room and steal from

23  him. This has caused him to put up sheets to cover the walls in an effort to feel safe. During

24  inspections, staff have either instructed him to take down the sheets or openly laughed at him,

25  despite multiple request for help and support.

26       157.    On information and belief, the City will not make any accommodation to its

27  general policy of having doors that cannot be locked, and that staff can and do enter at any time.

28

This policy makes the City's shelters effectively inaccessible to many people with PTSD and other mental health disabilities, including Plaintiffs.

    **C.**    **Berkeley violates unhoused residents' constitutional rights when it unlawfully seizes and destroys property without adequate notice or an opportunity to be heard.**

    158.    The City has a longstanding policy and practice of seizing houseless people's possessions or vehicles without constitutionally-required notice, and without giving them an opportunity to contest this deprivation. Very often, these possessions or vehicles—which Plaintiffs and other houseless people rely on for shelter and survival—are summarily destroyed during the City's enforcement actions (whether as part of encampment "sweeps," "abatements," or "cleanings"), leaving people with nothing but what they were able to wear or carry away with them.

    159.    The City's unlawful seizure and notice policies and practices, described in detail below, are ongoing.

    160.    Moreover, Plaintiffs, all of whom are either unsheltered or in temporary shelter that they can lose access to at any time, remain at imminent risk of being subjected to these unlawful policies and practices and having their vehicles and/or essential possessions taken and destroyed by the City, without adequate notice and without any real opportunity to contest the deprivation.

    1.    Inadequate notice

    161.    The City of Berkeley regularly posts inadequate notice prior to enforcement actions. The notices are written and distributed only in English, and they are often lengthy, complicated, and internally contradictory.

    162.    For example, the notices will state on one page that sleeping bags will be stored, while on another page they say sleeping bags cannot be stored. Additionally, the notices often fail to provide a specific time and date for when the City's abatement action will take place, and they do not clearly define the areas affected by the action.

1    163.    The City sometimes posts notices only on street signs, or inconsistently in other

2    locations, making it unlikely that all residents in an affected area will actually see them.

3    164.    Furthermore, the City does not provide notices with enough lead time to allow

4    residents to organize or move their belongings (or otherwise comply) before enforcement;

5    notices are often posted on a Friday for an action scheduled on Monday, making it particularly

6    hard for encampment residents to connect with various groups or organizations that might be

7    able to offer help, because many such groups and organizations do not operate over weekends.

8    165.    This lack of clear and timely notice leads to unnecessary confusion and panic

9    among Plaintiffs and class members, who are left unsure of how to secure their belongings and

10    vehicles, and whether the City will actually store them.

11    166.    These notices are not effectively and individually communicated to all residents.

12    Instead, the City of Berkeley's current method of notifying abatements and closures intensifies

13    the trauma Plaintiffs and other residents are experiencing, and compounds the harm experienced

14    by Plaintiffs and other residents with disabilities.

15                        2.    Property destruction

16    167.    During closures and cleanings, Defendant City of Berkeley has a pattern and

17    practice of destroying Plaintiffs and Class members' property during abatements and closures,

18    even when faced with individuals making legitimate claims of possessory interest in the property

19    and protesting its seizure and destruction.

20    168.    On some occasions, the City destroys medication and mobility devices like

21    wheelchairs, walkers, and crutches. For example, in October 2022, the City confiscated and

22    destroyed a wheelchair belonging to an unhoused resident named Street, leaving him with only

23    his walker for mobility support.

24    169.    The City does not provide Class members subject to abatement or encampment

25    closures a meaningful opportunity to identify and preserve their property. The City's practice is

26    to arrive early in the morning with a backhoe to destroy encampment residents' possessions,

27    without first identifying in advance who is there, whether they have alternative shelter to go to,

28    what property they have, and where it will be stored.

170.    For example, on September 7, 2023, during a regular clean up conducted by the City of Berkeley, the City threw away, without Plaintiff Spencer's consent, a large number of his belongings that were not garbage. These belongings included metal frames he intended to use to replace wood pallets currently holding up his shelter. Additionally, during this clean-up, the City threw away materials and trailers that he needed to move from his location at 8th and Harrison.

171.    During the abatement on November 7, 2023, the City arrested Mr. Spencer for unlawful lodging, even though he was actively attempting to move himself and his belongings outside of the originally noticed "abatement" area. The City destroyed his shelter and all of his belongings, save for a handful of items the City agreed to store after prompting from Plaintiffs' counsel, and the few belongings his friends were able to set aside after Mr. Spencer was taken away by the police.

172.    The City has also taken and thrown away Plaintiff Rufus White's belongings on multiple occasions when they have come through Harrison Street to pick up trash or perform encampment closures. On four separate occasions, the City has taken his tent with all of the belongings that were inside it, including important personal documents that he needs to access benefits and services. When his property is taken and thrown away, he endures a long process of replacing documents such as his ID and SSI cards and locating replacement survival gear, including tents, sleeping bags, blankets, clothes, and mobility devices. He is often forced to make do with very little, or with nothing at all.

173.    The City has taken and destroyed Plaintiff Jermaine White's belongings many times. During one sweep, the City destroyed his four bikes, his guitar, and everything else in his camp, all of which were destroyed by trash compactors. In another operation, the City came out in riot formation to destroy people's belongings, and he was too traumatized to stay and watch his belongings be destroyed. The City has never stored any of his belongings. During one of the sweeps on Harrison Street, he voluntarily moved to the Berkeley Inn for an initial 14-day term that was renewed once. After 28 days in this program, he was informed that because he had no income they could not find housing for him and he would have to leave the program. He was returned to the streets. But during the sweep, the City had taken and destroyed his camp, his tent,

1    and all of his other survival gear. He was given a two-person tent by the City to set up a new

2    camp but not provided with any of the other items the City destroyed and that he had gathered to

3    survive on the streets.

4          174.     As recently as August 2024, the City has continued to engage in the practice of

5    destroying critical survival gear of class members during encampment sweeps. On August 7,

6    2024, at the encampment located at 2nd and Page streets, city workers threw away and destroyed

7    a tent and all its contents over the protests of the owner of the tent, who was standing right by his

8    shelter while the city destroyed it. The city destroyed a total of four tents on that day, none of

9    which were abandoned. On August 13, 2024, at a cleaning at the encampment at Grayson Street,

10   city workers took another resident's tent and emptied all its contents into a dump truck. The city

11   workers intended to throw away the tent too, but ultimately returned just the tent itself to the

12   resident.

13              3.     Vehicle seizure and destruction

14         175.     Defendant has a pattern and practice of towing and destroying residents' vehicles

15   without notice as part of abatement actions, even when those vehicles are not impeding traffic or

16   posing any threat to public safety.

17         176.     During the proposed sweep that initiated this case, originally scheduled for

18   September 4, 2023, the City provided vague notice to residents in the area of 8th and Harrison

19   that the City would be sweeping and seizing their belongings. Despite the City's intent to seize

20   Plaintiff Jeffords' RV, the city did not provide actual notice to Mr. Jeffords that it would be

21   doing so and did not place any notice on his vehicle that he was living in of any violations of law

22   or why his RV would be seized. Nor was Mr. Jeffords informed by the City in person.

23         177.     Plaintiff Whitson has also had her vehicles towed without notice. In April 2023

24   her van was towed, and the only notice she received was when it was in the process of being

25   seized—not before. In April or May of 2023, a second RV was towed without notice, which she

26   inherited from her deceased boyfriend.

27         178.     During the sweep on October 3, 2022, Homeless Response Team staff asked 8th

28   and Harrison resident Clarence Galtney to step out of his RV for a moment to talk. Once he

1    stepped out, they refused to let him re-enter and, despite his protests, towed his RV with all his

2    belongings inside to an impound lot. The City claimed the RV was a health hazard due to a

3    rodent infestation, but provided no proof of the infestation and no assistance with cleaning it. Mr.

4    Galtney believed, based on the posted notice, that the sweep applied only to belongings on the

5    sidewalk, not to vehicles. He learned 15 days later that his RV had been destroyed.

6        179.    In August of 2023, the City offered Plaintiff Williams a room in the temporary

7    shelter program at the Campus Motel. Based on conversations she had with the City, she

8    understood that if she accepted the motel option, her RV would be stored by the City. This made

9    sense to her because she knew that the motel stay being offered was temporary and she could be

10   kicked out at any time, so she believed she would to be able to hold onto her RV in case her

11   shelter at the motel ended. However, once Ms. Williams accepted her room at the motel, the City

12   took the keys and title to her RV, towed the RV away, and destroyed it, thereby destroying Ms.

13   Williams' only source of permanent, safe shelter. She cannot live in a tent because it gets too

14   cold and the metal pins in her arm cause her pain. Ms. Williams would also be much more

15   vulnerable to attacks from her abuser if she had to leave shelter and move into a tent.

16       180.    Jasmine Black-Wheeler, who has lived in Berkeley for about two years,

17   experienced the seizure of her camper in order to receive a temporary hotel offer. In March 2023,

18   she relinquished her camper, which was not registered in her name, to gain admission into a

19   Super 8 hotel room offered by Peter Radu. However, Peter Radu did not provide Ms. Black-

20   Wheeler with adequate time to retrieve her possessions from the camper, which she had lived in

21   for seven months. Ms. Wheeler's stay in the hotel program lasted for seven months before she

22   was kicked out of her room. After being kicked out of shelter, she relocated back on the street in

23   a tent on 2nd and Page. Ms. Wheeler's disabilities, including anemia and nerve damage, are

24   exacerbated by cold weather. Without her camper, Ms. Wheeler does not have warmth or a

25   secure environment, and her mental health has gotten worse.

26

27

28

**D.    Berkeley violates residents' 14th Amendment rights by exposing them to state-created danger.**

1.    Berkeley places residents in state-created danger by destroying residents' essential property, and by clearing encampments even when it is aware that residents have no viable alternative shelter.

181.    Berkeley has a pattern and practice of destroying encampment residents' survival gear, food, and other belongings even when it knows that no suitable alternative shelter is available, thereby exposing them to state-created danger.

182.    The U.S. Interagency Council on Homelessness advises municipalities to avoid operations that destroy unhoused people's belongings. In its "7 Principles for Addressing Encampments," it provides the following guidance: "Communities should take special care to avoid destroying personal belongings when an encampment closes and provide storage for an adequate period to allow a person the opportunity to collect their belongings. . . . When an encampment is closing, or a person chooses to go into a shelter or treatment program that cannot accommodate all of their belongings, providing secure, accessible storage options can ensure that they do not lose personal items, including clothing and identification."[13]

183.    Studies have found that municipal operations that destroy unhoused people's belongings can lead to worse health outcomes, particularly for individuals with disabilities.[14] The loss of tents, clothes, and sleeping bags can make people who are already ill much sicker. Repeated encounters with municipal crews that throw away people's belongings can compound existing trauma. The unnecessary suffering caused by these experiences can also decrease hope for the future and motivation for self-care, further impairing a person's capacity for managing physical and mental health conditions.

184.    Courts have also recognized the necessity of living in community for unhoused individuals with mental health disabilities such as PTSD. *Boyd v. City of San Rafael*, No. 23-cv-

---

[13]    U.S. Interagency Council on Homelessness, 7 Principles for Addressing Encampments, https://www.usich.gov/sites/default/files/document/Principles_for_Addressing_Encampments_1.pdf (last updated June 17, 2022).

[14]    Diane Qi et al., Health Impact of Street Sweeps from the Perspective of Healthcare Providers, 37 J. Gen. Internal Med. 14, 3707-14 (Nov. 2022).

1   04085-EMC, 2023 WL 6960368, *14-15 (N.D. Cal. Oct. 19, 2023) (finding likelihood of

2   irreparable harm where City ordinance required camping in isolation and granting preliminary

3   injunction allowing camping in community).

4       185.    The City has repeatedly taken Plaintiff Spencer's belongings and destroyed his

5   shelter —sometimes as often as every two weeks—forcing him to start over gathering materials

6   for shelter and survival. Mr. Spencer has lost everything from essential shelter materials to his

7   DD-214 certificate, which is his record of military discharge that allows him to connect to

8   military services in these sweeps. During the November 7, 2023 abatement, the City arrested

9   Plaintiff Spencer and destroyed his shelter and all of his belongings. As a result of these

10   continuous evictions, Mr. Spencer has been left exposed to the elements, separated from his

11   support network, unable to access benefits, and mentally and physically depleted.

12       186.    The City has destroyed Plaintiff Rufus White Jr.'s tent on no less than four

13   separate occasions. In the October 2022 sweep, the City threw away his tent and nearly all his

14   belongings. They offered him a two-person tent, despite the fact that he cannot enter or use a

15   two-person tent because of his disabilities. As a result, he was left with nothing but his

16   wheelchair—he did not even have pants. He spent the next several nights without shelter, falling

17   asleep wherever he got tired. It was very difficult for him physically and mentally. After several

18   days of this exposure, LifeLong Medical donated a larger tent for him to live in.

19       187.    Plaintiff Rufus White Jr. has been attacked multiple times while living on the

20   streets. Because he is in a wheelchair, he is defenseless against attackers. When he calls on the

21   police for help, he often receives no response. The police and the Berkeley city officials appear

22   to have no concern for his safety and wellbeing. Defenseless against attackers, he is unsafe living

23   on the streets without security, protection, or privacy, and when the City deprives him of his

24   housing and belongings and separates him from the community that supports and protects him, it

25   knowingly places him in extreme state-created danger.

26       188.    The City has destroyed Plaintiff Jermaine "Cat" White's belongings in a number

27   of evictions. During one of the sweeps on Harrison Street, Mr. Jermaine White voluntarily

28   moved to the Berkeley Inn for an initial 14-day term that was renewed once. After 28 days in this

program, he was informed that because he had no income that would allow him to obtain more permanent housing, he would have to leave the program, and he was returned to the streets. During the sweep, the City destroyed his camp, his tent, and all of his other survival gear. He was given a two-person tent by the City to set up a new camp, but not provided with any of the other items the City destroyed that he had gathered to survive on the streets, thus placing him in a far more dangerous and difficult situation than the one in which the City had originally found him.

189.    The City of Berkeley lacks sufficient shelter space for its unhoused residents, and there are no legal alternative places for them to move. By closing encampments even when it is aware that suitable alternative shelter does not exist, destroying residents' shelter and belongings, and without providing adequate time for outreach workers to contact displaced individuals and find them safe, accessible housing, the City forces people to move to more dangerous locations. This jeopardizes their health and safety. In doing so, the City of Berkeley places those it evicts in harm's way.

190.    These dangers are particularly acute for the many people who have been displaced with no place to go who have serious mental and physical disabilities. Persons with disabilities require more time, adequate and accessible notice, and more intensive assistance because of their disabilities.

    2.    <u>Despite knowing that its actions will leave Plaintiffs and other houseless residents in increased danger, over the past several years Berkeley has closed shelters, cleared encampments, and enacted or enforced a series of restrictive ordinances that leave unhoused people with no place to go— all without doing anything to ensure that adequate alternative shelter is available.</u>

191.    Berkeley's shelters do not have enough space for Berkeley's unhoused residents. There are very few shelter options available to Berkeley residents generally. In the past few years, defendant City of Berkeley has closed many city-run, sanctioned shelters, including the Grayson Street Shelter, the SPARK parking lot, and others, without ensuring that residents transition into other shelter options or permanent housing. The predictable result is that many of the shelter and safe RV park residents have been forced back to the streets.

192.    The City itself has acknowledged on multiple occasions that there are not enough shelter spaces available for all of Berkeley's unsheltered residents. In a memo submitted to the Berkeley City Council on September 21, 2023, assistant City Manager Peter Radu stated, "[o]n any average day, the [Homeless Response Team] has fewer than 10 vacancies to work with across the entire shelter system."[15]

193.    Similarly, a draft policy document circulated by Mr. Radu in 2024 acknowledges that encampments are "born of necessity for basic human needs (like sleep, shelter, and community) among residents who lack viable alternatives," and that they will continue to exist "so long as our State and region remain in an affordable housing and shelter crisis."[16]

194.    Nonetheless, over the past several years, the City and other agencies have closed or participated in the closure of a large number of encampments, such as the Berkeley Marina, Seabreeze (located at University Avenue and Interstate 80), the Gilman Underpass, Ashby Shellmound (near the Ashby freeway exit off of I-80), People's Park, Here/There, Shattuck Avenue, and Second Street camps.

195.    Defendant City of Berkeley has also aggressively enforced parking regulations such as 72-hour and 4-hour parking limits that target vehicularly housed residents, decreasing the number of locations individuals who live in their vehicles can park, even in commercial areas. These laws were rarely enforced in these areas previously.

196.    As a result, unhoused Berkeley residents have very few locations where they can gather as communities in the area for safety and mutual support. Many Class members, including all of the Plaintiffs, moved to their current locations when defendant City of Berkeley and other government agencies evicted them from other encampments in the area.

197.    There is nowhere in the City where unsheltered residents can legally camp. Berkeley has passed and enforces a series of ordinances and regulations that, taken together,

---

[15]City Manager Dee Williams-Ridley, Memorandum to Honorable Mayor and Members of the City Council re: Draft Encampment Policy and Good Neighbor Guidelines (Sept. 21, 2023), https://berkeleyca.gov/sites/default/files/documents/2023-09-21%20Encampment%20Policy%20Referral%20Response%20-%20Off%20Agenda%20Memo.pdf.

[16] *Id.*

1   effectively make it impossible for a person experiencing homelessness to shelter in a public

2   space. They cannot legally erect a tent or structure on a sidewalk or in a park; they cannot park a

3   vehicle and live in it without violating city ordinances and/or the California vehicle code. An

4   incomplete list of Berkeley's ordinances and regulations includes:

5       a)  Berkeley Municipal Code ("BMC") 14.48.020, which provides that "[i]t is unlawful

6           for any person to place or cause to be placed anywhere upon any Sidewalk, Parklet or

7           roadway, any object which obstructs, restricts, or prevents the use of any portion of

8           such Sidewalk, Parklet or roadway." Subsequent sections of the BMC contain a list of

9           exceptions.

10      b)  BMC 14.48.120 contains the exception for what it calls "Temporary Noncommercial

11          Objects ('TNC Objects')." These it defines as "personal belongings." Homeless

12          people's property, including their tents and living quarters are personal belongings.

13          However, they only fall within this exception if they are "[i]n the immediate custody

14          and control of a person or persons at substantially all times." (BMC 14.48.120 A.1).

15      c)  There are further limits on this exception. BMC 14.48.020 provides that the scope of

16          an exception can be limited by "a regulation promulgated by the City Manager and

17          adopted by the City Council." The City Council has adopted Administrative

18          Regulation 10.2, which describes the policies and procedures for enforcing BMC

19          14.48.120. It provides that all "TNC Objects are prohibited on Sidewalks in

20          Residential Districts, except Objects in Transit." (AR 10.2 C. 1) They are absolutely

21          prohibited "in the Bart Access Corridor" defined as the "wide plaza area, on the same

22          side of the street as a BART Station entrance." (AR 10.2 Definitions). In other areas,

23          AR 10.2 allows for "[b]lankets, cushions, mats, or other material providing

24          cushioning ("Cushioning Material") while an individual is seated on such an item,

25          which does not expand beyond 2' x 2' in size and is outside of the Path of

26          Travel."(AR 10.2 B.2). AR 10.2 states that "enforcement should be a 'low priority'

27          except when 'TNC Objects have been in the same approximate location for 24 hours

28          or more' or 'm]ore than two accumulations of TNC Objects occupy a single

1  blockface,'" AR 10.2 D. 2. Finally, it states that "[e]nforcement officers may:

2  Request that TNC Objects be reduced to a 9-square-foot footprint (measured as 3' x

3  3', 4' x 2.25', 9' x 1', etc.) and/or less than 5 feet in height)." AR. 10.2 D. 2. In

4  practice, this has been interpreted by police enforcing the regulation as disallowing

5  objects including tents larger than a 3' x 3' footprint.

6  d)  The BMC contains particular restrictions pertaining to "commercial sidewalks." BMC

7  13.36.015, titled "Creation of accessibility on commercial sidewalks—Related

8  restrictions," provides that "[n]o person shall lie upon a commercial sidewalk or upon

9  any object on such sidewalk" between 7:00 a.m. and 10:00 p.m. Monday through

10  Saturday, and between 10:00 a.m. and 6:00 p.m. on Sundays and holidays, except in

11  the case of a medical emergency.

12  e)  All city parks are closed at night. BMC 6.32.020. Overnight camping and sleeping is

13  prohibited at the marina, which is not closed at night. BMC 6.20.260.

14  f)  BMC 14.40.120 prohibits parking any heavy-duty commercial vehicle on any street

15  between the hours of two a.m. and five a.m. for a greater length of time than one

16  hour. This section has been interpreted as applying to RVs that homeless people have

17  been using as habitation.

18  g)  BMC 14.08.090 authorizes "[a]ny regularly employed and salaried employee of the

19  City of Berkeley Police Department designated by the Chief of Police" to "remove or

20  cause to be removed: (A)Any vehicle that has been parked or left standing upon a

21  street or highway for 72 or more consecutive hours."

22  h)  When the City proceeds with abatement notices, as opposed to notices of cleanings or

23  closures, a reference is made to public nuisance. Nuisance under BMC 23.414.040

24  includes  "[a] violation of **any** City, state, or federal ordinance, law, or regulation" or

25  "***any other activity declared by the City to be a public* nuisance.**" This definition is

26  so broad that, in the context of the municipal codes identified herein, it effectively

27  makes it impossible to exist as an unhoused resident without being potentially subject

28

1    to a nuisance abatement. Their very presence unsheltered on the streets is, by the

2    City's Municipal Code definition, arguably a nuisance.

3    198.    In addition to the above ordinances, certain Berkeley City council members have

4    recently introduced a resolution to allow sweeps to occur without offers of shelter being

5    extended in circumstances that include **any** violation of local law. This resolution is explicitly

6    intended to allow for immediate sweeping and displacement of residents at 8th and Harrison. It is

7    anticipated that City Council will consider the resolution, without amendments, on September

8    10, 2024.[17]

9    199.    In addition to the above, people attempting to live in their vehicles in Berkeley are

10    also at risk of having their vehicles towed or receiving numerous citations that they cannot pay,

11    because their vehicles are considered not "street legal," lacking proper registration, smog

12    certificates, or being inoperable, as the people living in them often do not have the money to

13    make the necessary repairs or pay the fines and fees required.

14    200.    Those who live in RVs or other vehicles must move them constantly to avoid

15    being cited and/or towed for violation of parking ordinances. There is nowhere in the city where

16    people dwelling in their vehicles can park for more than three days at a time. Many vehicles are

17    also unregistered, and residents are not able to get them registered due to financial or other

18    constraints, and so those vehicles are also subject to tow.

19    201.    The City uses threat of arrest and arrest under these code sections to force

20    residents to comply with noticed actions, forcing residents to choose between arrest and

21    protecting their belongings and community. Residents sometimes abandon necessary survival

22    gear in order to avoid arrest.

23    202.    When the City actually makes arrests based on its notices, residents are subject to

24    immense harm. Despite the City of Berkeley's abatement notices stating a preference for not

25    citing or arresting individuals who decline to vacate their shelters or to allow the removal of their

26

27    _____

28    [17] Berkeley City Council Agenda & Rule Committee Special Meeting, *City of Berkeley* at 179
(Aug. 26, 2024), https://berkeleyca.gov/sites/default/files/legislative-body-meeting-
agendas/2024-08-26%20Agenda%20Packet%20-%20Agenda%20Committee.pdf.

belongings, the City began a 2023 abatement action with an arrest. On the morning of November 7, 2023, at approximately 7:45 a.m., Plaintiff Erin Spencer was arrested by the Berkeley Police Department less than two minutes after the start of the abatement process. At an encampment closure at the Adeline median, one resident was threatened with arrest or involuntary hospitalization if he did not voluntarily and immediately relocate to another location. Defendant City of Berkeley also issues arrests and citations to individuals for engaging in behavior related to their unhoused status and threatens arrest in lieu of providing accessible outreach.

   **E.**    **The following are descriptions of recent abatement and closure actions by the City that exemplify the pattern and practices of violations described above.[18]**

       1.    8th and Harrison – October 3, 2022

   203.    Berkeley has taken a number of actions to force out the unhoused from 8th and Harrison Streets. On September 30, 2022, the city posted a "Notice of Imminent Health Hazard and Emergency Abatement," near the intersection of 8th and Harrison Streets, stating that the "abatement" would take place just three days later, on October 3, 2022. City officials attached copies of the notice to fences, tents, and telephone poles with duct tape. Minimal effort was made to communicate with residents regarding what this abatement action would entail, and what residents could do to comply. The abatement was authorized for purposes of addressing rodent harborage, although nothing in the notice indicated that residents were being asked to leave, or what shelters would be removed.

   204.    At 6:20 a.m. on October 4, 2022, Defendant City of Berkeley moved in with heavy machinery, a phalanx of Berkeley Police officers, and city officials, to destroy 29 tents, three structures, and impound and then crush four vehicles that unhoused residents were relying on for shelter.[19] The City proceeded to destroy many residents' only source of shelter, offering no alternative or replacement. Due to this abatement, two residents were hospitalized. One was

---

[18] The examples listed here are not a complete recounting of all encampment sweeps performed by the City relevant to this case.

[19] Yesica Prado, *'Everything is Gone, and you Become More Lost': 12 Hours of Chaos as Berkeley Clears Encampment*, San Francisco Public Press (Dec. 22, 2022), https://www.sfpublicpress.org/everything-is-gone-and-you-become-more-lost-12-hours-of-chaos-as-berkeley-clears-encampment/

1  Alice Barbee, a resident of 8th and Harrison. During the sweep, Ms. Barbee began having heart

2  palpitations—a symptom that likely could have been mitigated if City mental health

3  professionals had been present to offer support. She refused to go to the hospital because she was

4  concerned that if she left her shelter unattended, the City would destroy it. She was finally

5  hospitalized the next day due to continuing complications. Another resident was arrested and put

6  in jail for three days. When he came back to 8th and Harrison after his release, he found his tent

7  and all his belongings had been thrown away.

8       205.   Plaintiff Prado witnessed this sweep firsthand. She also had her belongings seized

9  and witnessed the seizure of other people's belongings the abatement action by the City on

10  October 4, 2022. She documented this action and published her account of it on the Berkeleyside

11  website, where she provides more information or shares her story in greater detail and is

12  incorporated into this complaint.[20]  She also documented the apology by the assistant City

13  Manager, Peter Radu, where the City admitted to being "overhanded" in its methods, providing

14  vague and conflicting instructions to residents, and apologized for its tactics. Ms. Prado's

15  account of the City's apology has been published in San Francisco Public Press and is

16  incorporated herein.[21] This experience and other experiences have traumatized Ms. Prado and

17  exacerbated her PTSD.

18

19

---

20  [20] Yesica Prado, *First Person: Berkeley Encampment Clearing Meant Chaos for Unhoused

21  People*, BERKELEYSIDE (Jan. 10, 2023), https://www.berkeleyside.org/2023/01/10/berkeley-
    clears-encampment-sweep-harrison-eighth ("[t]he morning after the encampment sweep, city

22  workers came while residents were still sleeping, and everything outside people's tents was
    thrown into the garbage truck again, including working bikes, wagons, scooters and pet supplies.

23  'If you want to remain unsheltered, you are going to have to play by our rules,' Radu said to a
    camp resident who was asking for his property back"); This account is also reprinted and

24  attached to Ms. Prado's declaration in support of Temporary Restraining order at Exhibit H.
    (ECF No. 2-3 at 40-105).

25  [21] Yesica Prado, *Berkeley Says It Was Aggressive in Homeless Encampment Sweeps, Promises
    Reforms*, San Francisco Public Press, (Aug. 2, 2023), https://www.sfpublicpress.org/berkeley-

26  apologizes-for-aggressive-homeless-encampment-sweeps-promises-reforms/ ("Peter Radu,
    assistant to the city manager, said the city acknowledged that it had mishandled encampment

27  cleanings and used 'overhanded' measures that included the destruction of personal property and
    giving vague, sometimes conflicting instructions to encampment residents"); This account has

28  been previously submitted to the Court and attached to Ms. Prado's declaration in support of
    Temporary Restraining Order at Exhibit I. (ECF No. 2-3 at 106-117).

206. During this sweep, Ian Cordova Morales, President of Plaintiff Where Do We Go, and an outreach specialist for the Homeless Action Center, repeatedly asked Peter Radu for assistance storing belongings. Mr. Radu refused to get a truck to transport and store items. He also said the City would not store "bulky items" but did not specify what this meant.

207. As a result of this sweep, WDWG was forced to expend resources buying tents and supplies for people whose belongings were taken. Mr. Radu later publicly apologized for the City's actions, claiming defendant City of Berkeley would work with people as opposed to against them moving forward.[22]

2. 8th and Harrison – September 4, 2023 (Labor Day)

208. Around September 2023, approximately 50 individuals resided in the area around 8th and Harrison. During the summer, the City had held community meetings with Harrison Street encampment residents, during which Mr. Radu had emphasized the importance of clear communication.

209. During these community meetings, representatives of the City communicated with encampment residents alluding to an approaching sweep, but provided no concrete information regarding when this sweep would take place, and what actions the City was planning to take during the eviction.

210. In spite of this professed commitment to clear communication between unhoused residents and the City, in the late afternoon of September 1, 2023, the City, again, without any warning to the community, posted notices for a planned abatement action at 8th and Harrison to take place on Labor Day, September 4, 2023. One notice was a "Notice of Imminent Health Hazard and Emergency Abatement Beginning Sept. 4, 2023." This notice claimed that conditions of the area posed a health and safety hazard in violation of various provisions of the Berkeley Municipal Code. It stated that by September 4, 2023, individuals must discard debris and reduce their possessions to a 3x3 foot area. It stated that defendant City of Berkeley could store a limited amount of property but that items left unattended would be discarded. It provided no guidance as

---

[22] *Id.*

1  to how individuals should mark their 3x3 foot area or designate the items they need to have

2  stored. It provided a list of shelters, storage facilities, and other resources, the vast majority of

3  which were closed during the period between when the notice was posted on a Friday afternoon,

4  and Monday, a federal holiday.

5      211.    At the same time, the "Notice of Imminent Health Hazard and Emergency

6  Abatement" was posted, defendant City of Berkeley also posted a Public Notice with the subject,

7  "Shared Sidewalk Policy – Notice of Violation." This document was addressed to "Persons at

8  Harrison," with no indication which residents on which portions of Harrison would be impacted.

9  It did not contain any reference to a date of enforcement.

10      212.    Based on these notices, it was unclear what action the City would take place on

11  September 4, 2023, what laws it would enforced, and how residents could comply with Berkeley

12  Municipal Code.

13      213.    When Plaintiff Prado saw the notices, she felt fear for herself and her community,

14  which was exacerbated by her PTSD from prior City encampment clean-ups.

15      214.    The looming abatement action posed significant risk of imminent injury to

16  Plaintiffs and other residents of 8th and Harrison. If the abatement proceeded and individuals

17  were forced to move before adequate shelter options were available, Plaintiffs would have lost

18  not only their shelter and homes, but also the support of their community, placing them in

19  immense risk of harm. They also would have lost touch with other service providers who reliably

20  visit them at 8th and Harrison. Residents with disabilities would have been particularly harmed.

21  Therefore, Plaintiffs filed the first Complaint in this case and a Motion for Temporary

22  Restraining Order on September 3, 2023. (ECF Nos. 1 & 2). Defendant was enjoined from

23  closing the encampment until September 27, 2023, when a hearing date for a preliminary

24  injunction would occur. (ECF No. 15).

25      215.    After the hearing on September 27, 2023, District Judge Edward M. Chen issued

26  an Order Dissolving the Temporary Restraining Order, permitting Defendant City of Berkeley to

27  move forward with the abatement action provided it meet certain criteria in order to ensure the

28  balance of hardships remained tipped in Defendant's favor. (ECF No. 26).

3.     <u>8th and Harrison – November 7, 2023</u>

216.     At 7:30 a.m. on October 30, 2023, City officials posted Public Notices titled, "Notice of Imminent Health Hazard and Emergency Abatement Beginning November 7, 2023, at Harrison Street in Berkeley between 7th and 8th Streets. The notices were individually addressed to the Named Plaintiffs and placed on their individual belongings. The notices state that the location of the abatement operation would be "limited to the streets and sidewalks of Harrison St. between 7th St and 8th St in Berkeley, CA."

217.     These notices listed the shelter options available to the Named Plaintiffs for purposes of abatement. For Plaintiff Lucien Jeffords, the notice states that there would be a room reserved at the Super 8 Motel during the abatement, and that he would be permitted to bring one "pet." Given that Mr. Jeffords informed the Court that he has two cats that serve as emotional supports, and the City offered no accommodation, this meant he would need to surrender one cat. The notice stated that his RV would be subject to a cleaning to treat a rat infestation.

218.     The notices also laid out a procedure for Plaintiffs and Defendant City of Berkeley to demarcate Plaintiffs' belongings. The notice stated Defendant City of Berkeley would come to 8th and Harrison on Thursday, November 2, 2023, and provide Plaintiffs with caution tape to mark belongings they wished to have Defendant store and spray-paint to mark a 9 square feet area where they could place belongings they wished to store during the abatement.

219.     Before November 2, 2023, no notices were posted directed to other residents of Harrison Street between 7th and 8th Streets.

220.     On November 2, 2023, representatives from Defendant City of Berkeley, including Peter Radu, Okeya Vance, a representative from the Berkeley Fire Department, and several Berkeley Police Officers, came to 8th and Harrison to meet with Plaintiffs Prado, Spencer, and Jeffords. Plaintiffs Spencer and Jeffords indicated where they would like their 9 square feet area to be located and received their tape. The square placements are as depicted below:

221.    During this time, Plaintiff Spencer requested clarification from Peter Radu regarding which of his belongings the City would store. Mr. Radu repeatedly referred Mr. Spencer to the City's storage policy, as stated in the notice. When pressed for clarification regarding which items the City would store, Mr. Radu on his own discretion offered to store a speaker in Mr. Spencer's shelter, but not a trailer Mr. Spencer had built to move his items. He refused to provide any further clarification regarding how the City's storage policy would be applied to specific items belonging to Mr. Spencer.

222.    During the City site visit to demarcate Plaintiffs square footage, Mr. Radu confirmed that there would be no mental health professionals present from the City during the abatement action noticed to take place on Tuesday, November 7.

223.    After this demarcation took place for Plaintiffs' items, at about 4 p.m. on of the same day, city officials began posting new notices. These notices were titled, "Notice of Imminent Health Hazard and Emergency Abatement Beginning November 7, 2023, at 7:30 AM." They were addressed to "[p]ersons who are encamped on the North side of Harrison Street between 7th and 8th Street, Berkeley, CA, who are not named plaintiffs in *Prado v. City of Berkeley* (Lucien Jeffords, Erin Spencer, Yesica Prado, or Angel Kennett)." The location of the abatement is, "limited to the streets and sidewalks of Harrison St between 7th St and 8th St in Berkeley, CA." It states that, "[o]n the day of the abatement, the City will make every effort to offer you either non-congregate or congregate shelter, based on availability." It orders individuals to reduce their belongings to a 9 square foot area but does not provide them guidance about how to demarcate these belongings.

1    224.    On November 7, 2023, at around 7:30 a.m., city officials, including around eight

2    police officers began gathering on 8th and Harrison to conduct their abatement procedure. By

3    7:45 a.m. Plaintiff Erin Spencer was cuffed and aggressively detained by police officers. On

4    information and belief, Mr. Spencer's arrest was pre-cleared by the Chief of Police in advance of

5    the sweep.

6    225.    Mr. Spencer was actively trying to leave the area of 8th and Harrison with a cart

7    containing many of his belongings when he was surrounded by at least five officers. They

8    grabbed him, forced him to sit on a curb while standing over him, put handcuffs on him despite

9    the fact that he was crying out in pain and telling them he had a shoulder disability and stating

10   that he would not resist. Mr. Spencer asked what he was being arrested for and received no

11   answer. Plaintiffs' counsel repeatedly told the officers and city staff that Mr. Spencer has

12   disabilities and was in pain due to his shoulder injury. Plaintiffs' counsel asked what Mr.

13   Spencer was being arrested for, and were told Penal Code Section 647(e), illegal lodging.



23   226.    Police officers did not engage in any mental health support before resorting to

24   arresting Plaintiff Erin Spencer and detaining him on accusations of illegal lodging. Police

25   officers proceeded to drag Spencer by his shoulder, despite being informed that he has a shoulder

26   disability. By around 7:55 a.m., Erin Spencer was driven away in the back of a police car to be

27   booked and charged at Berkeley Jail. As soon as Erin Spencer was detained, Peter Radu

28

1  informed bulldozer operators and clean-up crews, identified as Public Works, to begin

2  demolishing Spencer's structure. At least one other encampment resident was arrested.

3      227.    Mr. Spencer's neighbors advocated for the City to store Mr. Spencer's belongings

4  while he was detained, however City officials refused to store the majority of his items on the

5  cart, including solar panels, metal poles, and clothes. City officials then permitted the entire area

6  that had been Mr. Spencer's home to be bulldozed, making no effort to separate any items for

7  storage. Even the items located in the square designated by the City for Mr. Spencer were

8  crushed and thrown away. The picture below depicts the 3x3 foot square set aside for Mr.

9  Spencer, empty and now behind a fence.

10
11
12
13
14  
15
16
17

18      228.    This abatement scheduled at 8th and Harrison was originally expected to span

19  approximately three days for cleanup, according to the City's notices that were posted. Notably,

20  the entire encampment was cleared by 3 p.m. on the very same day. The speed of the clean-up

21  was largely due to the indiscriminate destruction of items leaving Class Members scrambling to

22  shift through their items as bulldozers were destroying them at the same time.

23      229.    The City's rapid cleanup of encampments disproportionately impacts individuals

24  with disabilities, such as Thomas Barnett. Due to his limited physical mobility in his right arm

25  and hand, which prevents him from lifting heavy objects, Mr. Barnett was unable to move or

26  store many of his belongings, including tools and clothing, before his shelter was destroyed. The

27  indiscriminate speed of the cleanup did not allow him sufficient time to manage or protect his

28  essential items, exacerbating the difficulties he faces due to his disabilities.

1    230.    Some unhoused class members did not even receive a tent to replace their lost

2  shelter. Notably, one class member, named Saree, was displaced when Mr. Spencer's shelter was

3  destroyed. She received no outreach from the City and she was left with no place to go and her

4  belongings destroyed.

5    231.    Another class member, Mike Douglas, lost his shelter and nearly all his

6  belongings. Mr. Douglas has mental health disabilities and a severely injured foot that requires

7  him to use a mobility device. City officials made no attempt to speak with Mr. Douglas, who was

8  lying on the side of 7th Street because he was in immense pain, before a bulldozer moved in. The

9  City barely allowed Plaintiffs' counsel to grab his mobility device for him. After Plaintiffs'

10 counsel exited the structure, city workers immediately began bulldozing the structure, making no

11 effort to sort items for storage. Mr. Douglas lost his wallet as a result.

12   232.    The City of Berkeley conducted this abatement similar to its pattern and practice

13 in other abatements, when it failed to engage in accessible outreach, especially to residents

14 requiring accommodations related to mental health disabilities and failed to engage in a process

15 that could entertain and accommodate disability related needs of encampment residents, and left

16 many residents in a position of greater danger when it destroyed their camps without extending

17 offers of shelter or replacing the shelter it had destroyed. The practice of posting unclear and

18 inconsistent notices just days before a planned abatement or closure also fails to allow residents

19 with disabilities time to prepare for such closures and makes it impossible for residents to discern

20 what will occur and what actions they need to take to protect their belongings and necessary

21 survival gear.

22         4.    Adeline Median Closure – September 11, 2023

23   233.    Late Friday afternoon on September 8, 2023, Berkeley police noticed another

24 encampment closure for Monday September 11, 2023. One of the notices directed the resident to

25 a shelter on Grayson Street that had been closed for some time. No other outreach workers were

26 present with them.

27

28

234.    The camp was located on the large, partially paved, parklike median of Adeline St., between Ashby Avenue and Russell Street ("the Adeline Median"). The median is wide, with ample room for individuals to place tents and belongings without impinging on traffic.

235.    All residents of the Adeline median encampment were individuals with disabilities as defined by the ADA. One encampment resident is a disabled, senior citizen who has a number of mental and physical disabilities and is immunocompromised. Plaintiff Jermaine White, who resided at the encampment, suffers from PTSD and severe anxiety from trauma of past encampment sweeps. Another resident, Mr. Lambert, is hearing-impaired, hears voices in his head, and requires interpretation services for effective communication. Ms. Sides suffers from the mental health impacts of past trauma and attempted to cut her wrist the last time she was evicted from an encampment.

236.    The City had not done meaningful outreach to the people residing on the Adeline Median, nor had it offered residents any services or an opportunity to request accommodations they may need due to their disabilities. It did not offer them shelter that met their disability-related needs. The only interactions they had with City officials prior to the planned closure was with Berkeley police warning them a closure was imminent and that residents should move.

237.    Due to his disabilities, Mr. Lambert cannot read written notices, and spoken communication is very challenging for him. Mr. Lambert would have been unable to understand the content of the written notices and it is believed that no outreach was conducted in a manner that would have been accessible to him prior to the planned closure. Council for Plaintiffs, Osha Neumann, attempted to engage Mr. Lambert over the weekend prior to the encampment closure to inform him of the planned closure, but communication proved to be too difficult without the assistance of an interpreter.

238.    Because of his mental health disabilities, Plaintiff Jermaine White has difficulty meaningfully engaging City officials and police in relation to enforcement activities, is unable to comply with notices related to encampment closures and enforcement activities, and requires supports to accept shelter and housing. The only outreach provided to Mr. White prior to the encampment closure was conducted by Berkeley Police. One of the police officers, Officer

1  Futch, asked him if he was interested in housing, and he said he wanted to talk to his Insight

2  worker first, as he believes he has a housing voucher and wanted to understand his options. On

3  the day of the closure, City officials made a vague offer to Mr. White for a motel room. They

4  gave him no details. Because of his disabilities, Mr. White could not engage City officials to

5  learn more about the offers, and ask for the accommodation he needed, which was to connect to

6  his caseworker. He did not have time to make a decision about the offer of shelter, before the

7  pressure to preserve his belongings required him to move across the street to a sidewalk.

8      239.    The manner in which this encampment closure occurred is consistent with the

9  City's pattern and practice in other closures and enforcement actions against encampments

10  whereby no meaningful outreach is conducted that is accessible to disabled residents, especially

11  individuals with mental health disabilities. Further residents' disability related needs are not

12  addressed at the time of enforcement, nor are offers of shelter made that address residents'

13  disability related needs.

14          5.    Adeline - Additional Enforcement October 2023

15      240.    On Friday, October 20, 2023, Adeline residents who had just relocated to the

16  sidewalk on the west side of Adeline and south of Russell Street, were once again subjected to an

17  enforcement/abatement action, with notice posted on a Friday for a Monday eviction. Once

18  Plaintiff Jermaine White saw the notice, he was so traumatized he could only hole himself up in

19  his tent and was unable to take steps to separate out the belongings he wanted to keep.

20      241.    When Mr. White heard the City vehicles coming, he felt depressed and hid in his

21  tent until the City left. He was at one point able to ask the City not to take his bicycle, but he was

22  unable to further engage with the City. When he emerged from his tent, all of the items that were

23  outside of his tent had been removed, except for his bicycle.

24      242.    Mr. White lost most of his belongings, except for his tent, the belongings in his

25  tent, and his bicycle. He saw compactors there the day of the cleaning and believes his

26  belongings were destroyed by the compactors. He also observed that a neighboring camp

27  belonging to a resident, Charles Henson, was completely removed when another individual who

28  was watching the camp was not present.

243.    Counsel has since confirmed with Peter Radu that no items from this action were stored from any of the Adeline Street residents.

244.    Prior to this sweep, the City did not engage residents in meaningful outreach and Mr. White received no offer of shelter. The manner in which this encampment closure occurred is consistent with the City's pattern and practice in other closures and enforcement actions against encampments.

## V.    CLASS ALLEGATIONS

245.    Pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and all other persons similarly situated.

246.    The proposed class is defined as: "All unhoused persons who have a 'disability' as defined under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102, who reside in a vehicle or other shelter in public spaces in Berkeley, California, or who reside in temporary or transitional shelters in Berkeley, California" (the "Class").

247.    The proposed Class meets the Rule 23(a) requirements.

248.    The Class is so numerous that joinder of its members is impracticable. The City of Berkeley's latest survey of unhoused residents found a total of 1,057 unsheltered and sheltered homeless Berkeley residents, with 254 residents living in temporary shelters and 803 unsheltered. Of these unsheltered residents, 426 residents were living in tents, 198 in cars or vans, 69 in RVs, and 109 living "Street/Outside."[23] In general, a high percentage of homeless people have disabilities. According to the United States Interagency Council on Homelessness, an estimated 24% of people experiencing homelessness on any given day are people with

---

[23] EveryOneHome, Berkeley 2022 Point In Time Count Unsheltered & Sheltered Report at 2, *available at* https://everyonehome.org/wp-content/uploads/2022/05/Berkeley-PIT-2022-Infographic-Report.pdf (last accessed September 5, 2024).

disabilities who meet the definition of chronically homeless.[24] These rates are higher for unsheltered homelessness, the category that includes the vehicularly housed.[25]

249.    According to the City, in 2022, in Berkeley, 62.3% of unsheltered homeless people reported having a "Mental Health Condition," 18.3% reported having a Developmental Health Condition, 33.1% reported having a Physical Health Condition, and 30.6% reported having a Chronic Health Condition. For residents at the Harrison Street Encampments, where many named Plaintiffs reside, these numbers are much higher, with 86.2% identifying as having Mental Health Conditions, 51.7% having Developmental Health Conditions, 65.5% as having Physical Health Conditions, and 82.8% as having Chronic Health Conditions. Of the 1,057 unhoused Berkeley residents counted in the 2022 Point In Time Count, 62.3% had at least one disability; this means that the class likely includes at least 658 members.

250.    The relief sought is common to all members of the Class, and common questions of law and fact exist as to all members of the Class. Plaintiffs seek prospective relief from abatement actions in Berkeley, California.

251.    Questions of law and fact that are common to all members of the Class include, but are not limited to, the following:

    a)    Whether the City has failed or refused to provide reasonable modifications of its policies, practices or procedures in enforcing City ordinances in the abating or sweeping of encampments and vehicles used for housing as required under the ADA, 42 U.S.C. § 12132 and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 and state laws by failing to modify enforcement of those laws to not have a disproportionate burden on or otherwise accommodate Plaintiffs and class members disabilities or providing a process for individuals with disabilities to seek accommodations to enforcement and abatement actions;

---

[24] U.S. Interagency Council on Homelessness, *Homelessness in America: Focus on Chronic Homelessness Among People With Disabilities* (Aug. 2018), https://www.usich.gov/resources/uploads/asset_library/Homelessness-in-America-Focus-on-chronic.pdf.

[25] *Id.*

b) Whether the City has failed to provide outreach and other services to the houseless community in a manner that is accessible to Plaintiffs and the members of the class. I.e. whether the City has failed or refused to provide reasonable modifications to its programs for Plaintiffs and members of the Subclass in order for them to meaningfully access those programs and services;

c) Whether the City has failed to provide reasonable accommodations and/or modifications to the policies, practices, rules, and regulations of its shelter programs as required by state and federal laws;

d) Whether the City fails to make reasonable modifications to its encampment management policies, practices, and procedures that are necessary to accommodate Plaintiffs' and Class members' disabilities;

e) Whether the City fails to make reasonable modifications to the policies, practices and procedures in place at its temporary shelters that are necessary to accommodate Plaintiffs' and Class members disabilities while they are residing in the shelters;

f) Whether the City's policies, practices, and procedures in enforcing City ordinances in the cleaning or clearing of encampments and vehicles puts Plaintiffs and class members in greater danger than leaving them in place;

g) Whether the named Plaintiffs and other Class members are at risk that their shelter and other personal belongings will be seized and impounded or destroyed by the City;

h) Whether the City's notices to Class members are sufficiently specific to provide adequate constitutionally required notice prior to requiring them to vacate or seizing property;

i) Whether the City's policies, practices, and procedures in enforcing City ordinances in the abating or sweeping of encampments and vehicles despite the lack of available shelter beds, violates the law by placing them in state created danger.

j) Whether the City's policies, practices, and procedures in enforcing City ordinances in the abating or sweeping of encampments and vehicles violates one or more of the constitutional and statutory provisions enumerated herein;

1  k)  Whether named Plaintiffs and the other Class members are entitled to equitable relief,

2  including system-wide policy and practice changes to address the constitutional and

3  statutory violations detailed in this Complaint.

4  252.  Plaintiffs who have disabilities have claims that are typical of, and not

5  antagonistic to, the claims of other Class members. Plaintiffs and Class members have been

6  similarly harmed by the disproportionate burden imposed on people with disabilities by the

7  City's policies, procedures and practices, and seek similar relief in the form of a process by

8  which Class members with disabilities can seek a reasonable modification from these policies,

9  practices and procedures in the form of an exemption from enforcement or an alternative such as

10 a managed encampment or safe parking program. Additionally all members of the Class seek

11 modifications to policies, practices and procedures to ensure that programs and services are

12 provided in a manner that is accessible to the members of the Class. The claims of named

13 plaintiffs with disabilities arise from the same practices and conduct that give rise to the claims

14 of all Class members and are based on the same legal theories.

15 253.  Plaintiffs' claims are appropriate for class treatment pursuant to Rule 23(b)(2)

16 because the City has acted to enforce its ordinances and abatement policies in a manner which

17 are generally applicable to the Class as a whole, thereby making appropriate final declaratory

18 and injunctive relief appropriate respecting the class as a whole.

19 254.  Plaintiffs are adequate representatives of the Class defined herein, will fairly

20 protect the interests of the members of the Class, have no interests antagonistic to the members

21 of the Class, and will vigorously pursue this suit via attorneys who are competent, skilled, and

22 experienced in litigating matters of this type. Class counsel are competent and experienced in

23 litigating large class actions.

24 255.  A class action is the appropriate and superior method for the fair and efficient

25 adjudication of this controversy. Prosecuting separate actions would create the risk of

26 inconsistent or varying adjudications, establishing incompatible standards of conduct for the City

27 of Berkeley. Allowing this lawsuit to proceed as a class action will permit the class of similarly

28 situated persons to prosecute their common claims in a single forum simultaneously and

1   efficiently, and without the unnecessary duplication of effort and expense that numerous

2   individual actions would entail.

3       256.    To the extent that any member of the class could afford individual litigation, it

4   would be unduly burdensome to the judicial system. Concentrating this litigation in one forum

5   will promote judicial economy, consistency, and parity among the claims of individual members

6   of the Class.

7       257.    Plaintiffs know of no difficulty that would be encountered in the management of

8   this litigation that would preclude its maintenance as a class action.

9   **VI.    CAUSES OF ACTION**

10                      **FIRST CAUSE OF ACTION**

11                       **(All Plaintiffs and the Class)**
        **Discrimination Against Persons with Disabilities**
12   **Under the Americans With Disabilities Act (ADA), 42 U.S.C. § 12131 et seq.**

13      258.    Plaintiffs re-allege and incorporate by reference all the above allegations as

14   though fully set forth herein.

15      259.    Defendant is a public entity within the meaning of Title II of the Americans with

16   Disabilities Act. 42 U.S.C. § 12131.

17      260.    All named Plaintiffs are qualified individuals with disabilities under the

18   Americans with Disabilities Act. 42 U.S.C. § 12132; 42 U.S.C. § 12131; 28 C.F.R. § 35.104.

19      261.    Title II of the Americans with Disabilities Act (ADA) provides that "no qualified

20   individual with a disability shall, by reason of such disability, be excluded from participation in

21   or be denied the benefits of the services, programs, or activities of a public entity, or be subjected

22   to discrimination by any such entity." 42 U.S.C. § 12132. Discrimination under Title II of the

23   ADA includes administration of programs in a way that has a discriminatory effect on people

24   with disabilities, or that has the "effect of defeating or substantially impairing the

25   accomplishment of the objectives of the service, program, or activity with respect to individuals

26   with disabilities." 28 C.F.R. § 35.130 (b)(3)(ii).

27

28

262.    Under the ADA, a "program, service, or activity" includes within its scope "anything a public entity does." *Cohen v. City of Culver City*, 754 F.3d 690, 695 (9th Cir. 2014) (citation omitted); *see also Barden v. City of Sacramento*, 292 F.3d 1073, 1076-77 (9th Cir. 2002) (discussing rationale for broad construction).

263.    Defendant's enforcement of local ordinances, cleaning streets, removing homeless individuals and their possessions from public property, providing outreach services to the unhoused community, providing shelter and/or housing navigation services to the unhoused community, as well as other services are all programs, services, and/or activities covered by Title II of the ADA. *See Cohen, supra; Barden, supra; McGary v. City of Portland,* 386 F.3d 1259 (9th Cir. 2004) (enforcement of city ordinances subject to the ADA); *Crowder v. Kitagawa*, 81 F.3d 1480, 1482 (9th Cir. 1996) (same for state laws).

264.    The ADA protects people with disabilities against facially neutral policies that burden people with disabilities more than non-disabled people, by requiring the public entity provide reasonable modifications to avoid discrimination unless the public entity can demonstrate such modifications would result in a fundamental alteration of the program. 28 C.F.R. § 35.130(b)(7); *Crowder v. Kitagaw*a, 81 F.3d 1480, 1485 (9th Cir. 1996).

265.    Reasonable modifications can adjust for the financial limitations that arise from a disability, not just the immediate manifestations of the impairment giving rise to the disability. *Giebeler v. M & B Associates*, 343 F. 3d 1143, 1152 (9th Cir. 2003).

266.    Title II regulations interpreting the ADA prohibit a public entity from utilizing criteria or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination based on disability. 29 C.F.R. § 35.130(b)(3).

267.    A public entity is also prohibited from imposing eligibility criteria that screen out or tend to screen out individuals with disabilities from fully and equally enjoying any service, program, or activity. 28 C.F.R. § 35.130(b)(8).

268.    Failure to provide proper assistance, additional time, or other support to disabled individuals when demanding that unhoused people remove themselves or their belongings or their vehicles from public space is a violation of the ADA. *See Cooley v. City of Los Angeles*,

2019 WL 3766554, at *6 (C.D. Cal. Aug. 5, 2019) ("Cooley […] told LAPD officers that she needed help to carry her property because of her disability and that she lost most of her essential property because her needs were not accommodated […] the City's practices, even if it facially neutral, violate the ADA by unduly burdening people with disabilities such as Cooley").

269.    Failing to provide shelter options to unhoused people that meet their disability related needs is also a violation of the ADA because it means that shelter is functionally unavailable to them because of their disability. *See Bloom v. City of San Diego*, 2018 WL 9539238, at *3 (S.D. Cal. June 8, 2018) ("[B]ecause of plaintiffs' disabilities, they cannot seek housing in a homeless shelter because the shelters cannot accommodate their disabilities; . . . the shelters are 'functionally unavailable' to them"). Failing to modify rules, policies and procedures to accommodate people's disabilities functionally makes the shelter unavailable to them.

270.    Defendant's policies and practices in administering their ordinances and parking programs through threatened ticketing, towing, and removal of vehicles used by unhoused people with disabilities has the effect of discriminating and imposing a disproportionate burden on people with disabilities. Similarly, requiring them to surrender their vehicles or other property necessary to accommodate their disabilities as a condition for accessing shelter has the effect of imposing disproportionate burdens on people with disabilities who are more vulnerable to otherwise camping in the elements, and has the effect of screening out people with disabilities or otherwise discriminating against people with disabilities by preventing them from accessing shelter programs..

271.    Defendant City of Berkeley discriminates against unhoused individuals by failing to provide accessible services, parking accommodations, adequate notice, time, and assistance to unhoused people with disabilities who are forced to move themselves or their belongings from public space in response to defendant City of Berkeley's homeless sweeps.

272.    Defendant City of Berkeley discriminates against unhoused individuals by failing to provide accessible shelters and/or failing to reasonably modify rules, policies and procedures at its shelters to accommodate the needs of Plaintiffs and other unhoused residents with disabilities.

273.    Defendant's policies and practices fail to provide services to unhoused individuals in an accessible manner, including but not limited to outreach and housing navigation services, without providing additional support in the form of mental health professionals to assist unhoused residents to access those outreach services, or otherwise accommodating unhoused residents with disabilities has the effect of screening out people with disabilities or otherwise discriminating against people with disabilities from accessing those programs, services and activities.

274.    Forcibly removing unhoused residents without first identifying and offering alternative shelter or services that meet the individualized needs of people with disabilities does not serve any sufficiently compelling or bona fide and legitimate interest of defendant City of Berkeley, and less discriminatory options are available to defendant City of Berkeley to achieve any interests it claims it is trying to advance.

275.    The City fails to modify its shelter rules, regulations, policies and practices to accommodate Plaintiffs with mental or physical disabilities, both in response to requests and where the need for the accommodation is obvious or previously known to the City. Plaintiffs have been injured by Defendant City of Berkeley's discriminatory response to unhoused residents with disabilities.

276.    The ADA also requires public entities like Defendant to ensure that communications with people with disabilities as effective as communications with others, and "shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 U.S.C. § 35.160(a)(1), (b)(1).

277.    The ADA regulations provide that "[i]n determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities." *Id.* § 35.160(b)(2).

278.    To be effective, the "auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability." *Id.*

279.    Auxiliary aids and services include notetakers, written materials, large print materials, and other similar services and actions. *Id.* § 35.104.

280.    The City fails to ensure that communications with Plaintiffs and other unhoused residents with mental health, cognitive, or visual disabilities are as effective as communications with others by (1) failing to communicate essential information  in in a way reasonably likely to be understood by people with disabilities that affect their ability to see, process, or understand complex written information (such as via plain language, in large print, and/or orally by staff with appropriate training);  and (2) failing and refusing to reasonably accommodate disability-related needs during shelter intake appointments and similar encounters, including (but not limited to) by denying requests for notetakers and/or audio-recording, and presenting information **only** in oral form.

281.    WHEREFORE, Plaintiffs pray for relief as set forth below.

## SECOND CAUSE OF ACTION

**(All Plaintiffs and the Class)**
**Discrimination Against Persons With Disabilities**
**Under Cal. Gov. Code § 11135**

282.    Plaintiffs re-allege and incorporate by reference all the above allegations as though fully set forth herein.

283.    California Government Code section 11135 sets forth a nondiscrimination policy for state programs. It provides that in pertinent part:

> [n]o person in the State of California shall, on the basis of race, national origin, ethnic group identification, religion, age, sex, sexual orientation, color, genetic information or disability, be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state.

Cal. Gov't Code § 11135(a).

284.    Cal. Gov. Code § 11135 is intended to prohibit all forms of discrimination prohibited under Title II of the Americans with Disabilities Act and, where possible, to be more protective of people with disabilities. See Cal. Gov. Code § 11135(b).

1    285.    Defendant, City of Berkeley, is a recipient of financial assistance from the State

2  of California.

3    286.    It is a discriminatory practice for a recipient of state financial assistance, in

4  carrying out any program or activity, on the basis of disability, (a) to deny a person the

5  opportunity to participate in, or benefit from an aid, benefit or service; (b) to afford a person the

6  opportunity to participate in or benefit from an aid, benefit or service that is not equal to that

7  afforded others; (c) to provide a person with an aid, benefit or service that is not as effective in

8  affording an equal opportunity to obtain the same result, to gain the same benefit, or to reach the

9  same level of achievement as that provided to others…(g) to otherwise limit a person in the

10  enjoyment of any right, privilege, advantage or opportunity enjoyed by others receiving any aid,

11  benefit or service resulting from the program or activity." 22 Cal. Code Regs. § 98101 (a)-(c),

12  (g).

13    287.    It is also discrimination for a recipient of state financial assistance to utilize

14  criteria or methods of administration that: "(1) have the purpose or effect of subjecting a person

15  to discrimination on the basis of disability; [or] (2) have the purpose or effect of defeating or

16  substantially impairing the accomplishment of the objectives of the recipient's program with

17  respect to a person with a disability…" 22 Cal. Code Regs. § 98101(i).

18    288.    Defendant City was, at all times relevant to this action, and is currently operating

19  or administering a program or activity that receives state financial assistance, within the meaning

20  of Section 11135.

21    289.    Defendant City has violated the rights of Plaintiffs with disabilities secured by

22  Cal. Gov't Code § 11135 et seq.

23    290.    Because Defendant's discriminatory and wrongful conduct is ongoing,

24  declaratory, and injunctive relief are appropriate remedies. Further, as a direct result of

25  Defendant's actions, Plaintiffs with disabilities are suffering irreparable harm and therefore

26  speedy and immediate relief is appropriate.

27    291.    Plaintiffs with disabilities are entitled to declaratory and injunctive relief as well

28  as reasonable attorneys' fees and costs incurred in bringing this action.

1

## THIRD CAUSE OF ACTION

2

3

**(All Plaintiffs and the Class)**
**Unreasonable Seizure**
**Under the Fourth and Fourteenth Amendments to the U.S. Constitution**
**Pursuant to 42 U.S.C. § 1983**

4

5      292.    Plaintiffs re-allege and incorporate by reference all the above allegations as

6  though fully set forth herein.

7      293.    The Fourth Amendment prohibits local governments from summarily seizing and

8  destroying the personal property of unhoused individuals. *See Lavan v. City of L.A.*, 797 F. Supp.

9  2d at 1012 (declaring that the Fourth Amendment protects homeless persons from government

10 seizure and summary destruction of their unabandoned, but momentarily unattended, personal

11 property), *aff'd*, *Lavan*, 693 F.3d 1022; *see also Lavan*, 693 F.3d at 1030 ("[E]ven if the seizure

12 of the property would have been deemed reasonable had the City held it for return to its owner

13 instead of immediately destroying it, the City's destruction of the property rendered the seizure

14 unreasonable."); *Garcia v. City of L.A.*, 11 F.4th 1113, 1124 (9th Cir. 2021) ("our prior caselaw

15 states clearly that the government may not summarily destroy the unabandoned personal property

16 of homeless individuals that is kept in public areas").

17     294.    The Fourth Amendment also prohibits local governments from summarily seizing

18 and destroying or impounding vehicles of unhoused individuals regardless of how they are

19 parked. "**Due process requires that individualized notice be given** before an illegally parked

20 car is towed unless the state has a 'strong justification' for not doing so." *Grimm v. City of*

21 *Portland*, 971 F.3d 1060, 1063 (9th Cir. 2020) (emphasis added); *see also Clement v. City of*

22 *Glendale,* 518 F.3d 1090, 1094 (9th Cir. 2008) (explaining that imposition of the significant

23 costs and burdens of towing cannot be justified as means of deterring illegal parking).

24     295.    The Fourth Amendment prohibits any warrantless seizure of property. To justify

25 an exception to the Fourth Amendment's prohibition on warrantless seizures under the

26 "community caretaking exception," the government has a "heavy burden" to show that the

27 exception applies. *United States v. Cervantes*, 703 F.3d 1135, 1142 & n.1 (9th Cir. 2012).

28

1      296.    All of the City of Berkeley's seizure and destruction of Plaintiffs' and class

2  members' property has been done without obtaining a warrant. The City of Berkeley has a policy

3  and practice of seizing and destroying Plaintiffs and class members property without first

4  obtaining a warrant.

5      297.    Defendant City of Berkeley engages in a practice of providing vague and

6  inadequate notice prior to conducting abatements and sweeps. The language of the notices is

7  often confusing and contradictory, or vague. The notices are frequently posted on Friday

8  afternoon for actions that will commence the following Monday, meaning the majority of the

9  notice period falls outside the work week, greatly reducing residents' ability to seek clarity about

10  the action or services.

11      298.    City of Berkeley provided inadequate and confusing notice prior to the planned

12  abatement on September 4, 2023. The Notice of Abatement was posted, not delivered to

13  individuals as required by Berkeley Municipal Code. The notices did not provide individuals

14  with guidance related to how to define the property they wished to keep, have stored, or discard.

15  The Notice of Violation was also only posted and did not apply to a clearly defined area, and

16  does not include an enforcement date. Thus, the notices were vague and invalid.

17      299.    City of Berkeley provided similarly inadequate notice before the Adeline

18  evictions on September 2023 and October 2023, and before the November 7, 2023 abatement on

19  Harrison Street.

20      300.    The Defendant City of Berkeley has a policy, custom, or practice of inadequately

21  notifying unhoused vehicle residents that their vehicle will be towed, and/or towing such

22  vehicles without adequate lawful justification such as that the vehicles are blocking traffic or

23  otherwise justified under any community caretaking exception, as demonstrated by the City's

24  unwarranted destruction of four RVs during the October 4, 2022 abatement of 8th and Harrison,

25  and the destruction of the RVs of Monique Williams.

26      301.    Further, Defendant City of Berkeley has a policy, custom, and practice of seizing

27  and destroying unhoused people's personal belongings. Defendant City of Berkeley seizes and

28  destroys such property even if that property poses no threat to public health and does not

constitute evidence of a crime and there is no other community caretaking exception to
Constitutional protections.

302.     Defendant City of Berkeley policy, custom, and practice is to evict unhoused residents and, in the process, to destroy their belongings. Witnesses who have worked in the community for many years have observed city officials demolishing people's shelters, confiscating their tents, and leaving people exposed to the elements. This has been done both in the pouring rain and in extreme heat. Witnesses have also observed employees of defendant City of Berkeley destroying property even while the owners of that property have been telling them that it belongs to them and that they want to keep it.

303.     Defendant City of Berkeley's unconstitutional policies and practices continue, subjecting Plaintiffs to persistent and imminent threat of having their personal property seized and destroyed in violation of the Fourth Amendment.

304.     WHEREFORE, Plaintiffs pray for relief as set forth below.

## FOURTH CAUSE OF ACTION

**(All Plaintiffs and the Class)**
**Property Destruction: Unreasonable Search and Seizure**
**Under Article I, § 13 of the California Constitution**

305.     Plaintiffs re-allege and incorporate by reference all the above allegations as though fully set forth herein.

306.     The California Constitution involves even greater protections than the Fourth Amendment with respect to property seizures. See Cal. Const., art. I, § 13; *In re Lance W.*, 37 Cal. 3d 873, 879 (1985).

307.     Despite Defendant City of Berkeley's written policies to the contrary, it has an unwritten policy, custom, and practice of seizing and destroying unhoused people's personal belongings and/or towing their vehicles. Defendant City of Berkeley destroys such property even if that property poses no threat to public health and does not constitute evidence of a crime and there is no other community caretaking exception to Constitutional protections.

308.    Defendant City of Berkeley's unconstitutional policies and practices continue, subjecting Plaintiffs to persistent and imminent threat of having their personal property seized and destroyed in clear violation of the more expansive protections under Article I, Section 13 of the California Constitution.

309.    WHEREFORE, Plaintiffs pray for relief as set forth below.

## FIFTH CAUSE OF ACTION

**(All Plaintiffs and the Class)**
**Violation of the Fair Housing Amendments Act**
**(42 U.S.C. 3601 et. seq)**

310.    Plaintiffs re-allege and incorporate by reference all the above allegations as though fully set forth herein.

311.    The rooms in the Berkeley Inn, Campus Motel and spaces in other congregate shelter offered by the City of Berkeley are dwelling units within the meaning of 42 U.S.C. § 3602(b). 24 C.F.R. § 100.20 (defining "Dwelling"); 24 C.F.R. §100.201 (defining "Dwelling unit" to include "sleeping accommodations in shelters intended for occupancy as a residence for homeless persons.")

312.    The Defendant provides funds to the owners and/or operators of these shelters in consideration for the operators providing rooms or bed space for unhoused individuals in Berkeley.

313.    Plaintiffs are all people with disabilities, or "handicap"[26] within the meaning of the Fair Housing Amendments Act because they each have "a physical or mental impairment which substantially limits one or more of such person's major life activities, [or] a record of having such an impairment." 42 U.S.C. § 3602(h).

---

[26] The Fair Housing Act uses the term "handicap" instead of "disability," although it is well-established that these terms are comparable. For example, the Senate Report for the Americans with Disabilities Act of 1989 ("ADA") notes that the ADA's definition of "disability" is comparable to the definition of the term 'individual with handicaps' in section 7(8)(B) of the Rehabilitation Act of 1973 and section 802(h) of the Fair Housing Act." Sen. Rep. No. 101-116, at 20 (1989). This Complaint uses "disability," which is the more widely-accepted term unless directly quoting a section of the statute. For purposes of this Complaint, "disability" and "handicap" or their derivatives are interchangeable.

314. Defendant is a "person" within the meaning of 42 U.S.C. § 3602(d). *Keith v. Volpe*, 858 F.2d 467, 482 (9th Cir. 1988). The City of Berkeley is liable for its own discriminatory action as well as those of its agents. 24 C.F.R. §100.7(b). Defendants are liable for the acts of their employees and agents. *Id.*

315. The Fair Housing Act, 42 U.S.C. §3604(f) makes it unlawful to "discriminate in . . . the provision of services or facilities in connection with such a dwelling, because of a handicap of – [] that person." 42 U.S.C. §3604(f)(2)(A); 24 C.F.R. §100.202(b). Discrimination includes "a refusal" by "any person" "to make reasonable accommodations to rules, policies, practices, or services when such accommodations may be necessary to afford such persons equal opportunity to use and enjoy a dwelling," or dwelling unit. 42 U.S.C. §3604(f)(3)(B); 24 U.S.C. 100.204(a).

316. Defendant has discriminated against Plaintiffs and other unhoused people with disabilities by refusing to make accommodations to the rules, policies, practices and services of its shelters that are necessary to afford Plaintiffs and other unhoused people with disabilities an equal opportunity to fully use and enjoy the shelters.

317. Because Defendant's discriminatory and wrongful conduct is ongoing, declaratory and injunctive relief are appropriate remedies.

## SIXTH CAUSE OF ACTION

**(all Plaintiffs and the Class)**
**Exposure to State-Created Danger**
**in Violation of the Fourteenth Amendment to the U.S. Constitution**
**Pursuant to 42 U.S.C. § 1983**

318. Plaintiffs re-allege and incorporate by reference all the above and subsequent allegations as though fully set forth herein.

319. Governmental action that affirmatively places a person in a position of danger deprives that person of substantive due process rights guaranteed by the Fourteenth Amendment to the United States Constitution. *See* U.S. Const. Amend. XIV.

320. Local governments violate the substantive due process rights of unhoused people when they place unhoused individuals in more vulnerable situations by seizing their essential

possessions used for shelter, warmth, survival, and protection from the elements. *See Santa Cruz Homeless Union*, 514 F. Supp. 3d 1136 at 1144-1145; *Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1101-02 (E.D. Cal. 2012). Further, courts have recognized that disbanding unhoused communities and separating unhoused individuals from community resources and support is a threat to residents' health and safety likely to rise to the level of irreparable harm. (Order Granting Plaintiffs' Motion for a Temporary Restraining Order, *Boyd et al v. City of San Rafael et al*, No. 23-cv-04085, August 16, 2023, (N.D. Cal.), p. 7-8).

321.    Defendant City of Berkeley's patterns, customs and practices knowingly and affirmatively place Plaintiffs and Class members in danger in at least three ways. First, the City of Berkeley deprives unhoused people living in public spaces of their shelter and survival equipment without providing them with comparable replacements or alternative shelter that is accessible to them, and it does so even when it knows that there is no appropriate alternative shelter available for the individuals it is displacing or destroying the possessions of. Second, when the City of Berkeley offers temporary shelter to unhoused people, including Plaintiffs and Class members, it requires them to give up their survival gear and often the vehicles in which they dwell, without providing them with any opportunity to store or preserve these items for when the temporary shelter comes to an end. Third, the City of Berkeley conducts abatements and closures without making adequate offers of shelter and refusing to designate any area where unhoused residents can legally live in the City. This forces residents to leave the area where they had been living in community and to disperse, and thus City of Berkeley is placing them in danger by separating them from their communities, support systems, and service providers.

322.    Defendant City of Berkeley has a pattern, custom, policy, and practice of depriving unhoused people living in public spaces of their shelter and survival equipment without providing them with comparable replacements or alternative shelter and/or housing options that are accessible to Named Plaintiffs and Class Members with disabilities. In particular, the City of Berkeley's requirement that Plaintiffs and Class members dispose of all of their belongings except those that fit in a "3 by 3 foot square" is arbitrary, and deprives them of essential property necessary for them to survive living outside. Additionally, the City refuses to

1  provide unhoused individuals including Plaintiffs and Class members with a meaningful

2  opportunity to have their items stored by the City. The City in practice does not provide

3  unhoused individuals with sufficient time to work with the City to identify which items can be

4  stored, and the City's practice of refusing to store any belongings of unhoused individuals during

5  cleanings and evictions that it deems to be "soiled" means that in effect, the City refuses to store

6  the possessions of Plaintiffs and Class members during City actions.

7    323.    Depriving Plaintiffs and Class members of property essential to their survival,

8  including tents, blankets, waterproof materials, medications, eyeglasses, and mobility devices

9  such as wheelchairs, walkers and canes, places Plaintiffs and Class members in danger. In

10  particular, medications may be essential for the treatment of chronic and acute illnesses, such as

11  HIV, diabetes, and other behavioral medication. Once these possessions are destroyed by

12  Defendant City of Berkeley, unhoused people face extreme difficulties to replacing them, which

13  can lead to adverse health consequences.

14    324.    Without any other available and accessible options for shelter and without their

15  tents, survival, or medical gear unhoused individuals are forced to live exposed to the elements,

16  without protection from heat, cold, wind, and rain. Individuals who are forced to leave

17  established encampments are also separated from community support, including food and water

18  donations, community safety networks, and access to service providers and their neighbors'

19  support and company. This severely jeopardizes their physical and mental health.

20    325.    Defendant City of Berkeley, through its agents and employees, has a pattern,

21  custom and practice of proffering temporary shelter accommodations that do not properly

22  accommodate individuals with disabilities to Named Plaintiffs and Class members in exchange

23  for the confiscation of that individual's belongings, including their tents, RVs, and other vehicles

24  used for shelter.

25    326.    Defendant City of Berkeley conducts some clearings without making any offers

26  of shelter. When Defendant City of Berkeley does make shelter offers, it knows these programs

27  severely limit the amount of property, including survival gear, that participants can bring to

28  programs, meaning unhoused residents will be forced to give up property to enter the programs.

1    Defendant City of Berkeley knows these programs do not allow for RV parking, meaning

2    residents will have to leave their RVs unattended on the streets, subject to break-ins and towing.

3    Defendant City of Berkeley has attempted to get residents to even sign documents permitting

4    Defendant to destroy their belongings if they enter shelter. Given the temporary nature of the

5    offer of shelter, Named Plaintiffs and Class members have exited the shelter program with less

6    than they entered the shelter program with.

7        327.    Defendant City of Berkeley knows offers of shelter at programs like congregate

8    shelters and motels are temporary in nature, and participants can be terminated from the

9    programs at any time at the discretion of the operators. Defendant City of Berkeley knows that

10   there is a high rate of mental and physical health disabilities in the unhoused community in

11   Berkeley. Defendant City of Berkeley knows or should know that these programs do not

12   adequately accommodate individuals with physical and mental health disabilities, placing

13   residents with disabilities at heightened risk of being terminated from the programs.

14       328.    Defendant City of Berkeley's practice of offering residents temporary shelter that

15   cannot accommodate their needs and that will force them to give up property, including survival

16   gear, shelters, and vehicles, places unhoused Berkeley residents in danger. Deprived of their

17   shelter, vehicles, and/or RVs, Plaintiffs and Class members find themselves involuntarily

18   exposed to the harsh outdoor elements, subject to the dangers described herein when forced to

19   live unsheltered on the streets. Moreover, Class members whose RVs are confiscated lose access

20   to various life necessities that were previously provided by their vehicles, including running

21   water, restroom facilities, showers, cooking and food storage capabilities, as well as temperature

22   control, and the safety of being able to lock the door. RVs and other vehicles serve as secure,

23   private sleeping accommodations and a place to safeguard vital personal belongings.

24   Consequently, the impoundment of the Plaintiffs' and Class members' vehicles has detrimental

25   impact on their physical and mental well-being.

26       329.    Many unhoused residents, particularly unhoused residents with disabilities,

27   choose to live together in encampments because of safety concerns and because of the mutual aid

28   offered by the community. By breaking up these communities during cleanings and sweeps and

1  not offering adequate shelter, forcing individuals to scatter with what few belongings they can

2  grab, the City is placing them in danger.

3      330.    It is known or should be obvious to Defendant City of Berkeley that its

4  affirmative conduct as described above places Plaintiffs and Class members at elevated risk of

5  serious harm to their health and safety. In the absence of Defendant's affirmative actions,

6  Plaintiffs and Class members would not face that elevated risk.

7      331.    This practice by Defendant City of Berkeley impacts the rights and living

8  conditions of the unhoused and raises broader concerns about the city's approach to

9  homelessness.

10     332.    The Defendant City of Berkeley's patterns, practices, and customs violate the

11 substantive Due Process Clause of the Fourteenth Amendment because they place their unhoused

12 residents in a situation of immediate and known danger with deliberate indifference to their

13 personal or physical safety.

14     333.    WHEREFORE, Plaintiffs pray for relief as set forth below.

15 ## SEVENTH CAUSE OF ACTION

16 **(All Plaintiffs and the Class)**
**Exposure to State-Created Danger**
17 **Under Article I, § 7(a) of the California Constitution**
**Pursuant to 42 U.S.C. § 1983**
18

19     334.    Plaintiffs re-allege and incorporate by reference all the above allegations as

20 though fully set forth herein.

21     335.    Governmental action that affirmatively places a person in a position of danger

22 deprives that person of substantive due process rights guaranteed by the California Constitution.

23 Cal. Const., art. I, § 7(a). The substantive due process protections under the California

24 Constitution are at least as expansive as those under the U.S. Constitution.

25     336.    Defendant City of Berkeley's policy, custom, and practice of removing unhoused

26 people from public spaces and of seizing and destroying their personal property, such as tents

27 and other survival gear—particularly when it knows that there is no available and appropriate

28 alternative shelter—endangers the health and safety of unhoused people in a way that shocks the

1    conscience. Defendant City of Berkeley knows or should know that its actions endanger the

2    health and safety of unhoused individuals.

3        337.    Defendant City of Berkeley's policies and practices have and will continue to put

4    Plaintiffs in immediate danger in violation of their substantive due process rights under the

5    California Constitution.

6        338.    WHEREFORE, Plaintiffs pray for relief as set forth below.

7    **VII.    PRAYER FOR RELIEF**

8        WHEREFORE, Plaintiffs respectfully request that the Court:

9    **Declaratory Relief:**

10       A.    Declare that defendant City of Berkeley's ongoing removal of unhoused people

11   from public property and seizure of their necessary survival gear, shelters, and vehicles, in the

12   absence of adequate housing or shelter that accommodates their disability-related needs, violates

13   their right to be free from state-created dangers under the Fourteenth Amendment to the U.S.

14   Constitution and Article I, § 7(a) of the California Constitution;

15       B.    Declare that defendant City of Berkeley's ongoing warrantless seizure and

16   destruction of the personal property of unhoused people violates the Fourth and Fourteenth

17   Amendments to the U.S. Constitution; and Article I, §§ 7(a) and 13 of the California

18   Constitution;

19       C.    Declare that defendant City of Berkeley's ongoing enforcement and seizure

20   practices, parking enforcement, its outreach to unhoused people, and its shelter programs are

21   government programs that discriminate against people with disabilities in violation of 42 U.S.C.

22   § 12131 and Cal. Gov. Code § 11135;

23   **Injunctive Relief:**

24       A.    Grant a permanent injunction requiring defendant City of Berkeley to a) establish

25   and maintain a meaningful process for reasonable accommodation requests relating to any of the

26   City's services, programs, or activities that involve unhoused individuals to be submitted to the

27   City, investigated, and responded to in a timely manner; b) establish and maintain a process by

28   which the City will affirmatively ask unhoused individuals about any disabilities and disability-

related needs, in connection with its outreach, enforcement, and shelter programs or activities, as well as any other programs or activities relating to the unhoused population; c) establish and maintain a process to affirmatively engage in an "interactive process" regarding any accommodations necessary to meet known or obvious disability-related needs of unhoused individuals (such as, for example, the need of people with mobility disabilities to have physical assistance with moving items), as soon as the disability and need is known, or should reasonably be known, to the City and/or its employees or contractors; d) grant the specific reasonable accommodation requests of Plaintiffs, discussed herein; and e)  reasonably modify their standard outreach, enforcement, and shelter policies and practices to avoid continued disparate impact discrimination against unhoused people with disabilities by, for example, ensuring that **by default**:

1. Information about enforcement actions is presented in plain language, and communicated orally by people with appropriate training, as well as in writing;

2. People with appropriate mental health training participate in all outreach and enforcement actions, to help ensure effective communication and to mitigate the foreseeable consequences of enforcement actions on residents' mental health conditions;

3. Physical assistance with moving or sorting items, and with relocating, is provided to people with mobility disabilities or other disabilities that affect their ability to perform these tasks;

4. People who have a disability related need for more space to store belongings ahead of enforcement actions – such as those who use mobility devices – are given that additional space;

5. Communicate clear storage policies that allow for the storage and return of seized property;

6. People with a disability-related need to move their vehicles less frequently than every 72 hours can apply for and receive a permit allowing them to park in one location for longer periods of time;

7.  People with appropriate training in communicating with people who have mental health and/or cognitive disabilities participate in communications regarding shelter whenever needed;

8.  Shelter offers take into account people's disability-related needs;

9.  A sufficient number of spaces in both congregate and non-congregate shelter are accessible to people with mobility disabilities, including with access to accessible bathrooms within a short distance of sleeping quarters; and

10. That specific shelter policies and practices – including those around visitors, privacy and the locking of doors, and a limitation on the number of emotional support animals – are revised, such that foreseeable disability-related needs are accommodated as a matter of course;

B.    Grant a permanent injunction enjoining and restraining defendant City of Berkeley from seizing and disposing of homeless individuals' property in a manner that violates the Fourth and Fourteenth Amendments to the U.S. Constitution and Article I, §§ 7(a) and 13 of the California Constitution;

C.    Grant a permanent injunction enjoining and restraining defendant City of Berkeley from removing unhoused people from public property and seizing their property, in the absence of adequate housing or shelter, in violation of the Fourteenth Amendment to the U.S. Constitution and Article I, § 7(a) of the California Constitution;

D.    Grant a permanent injunction requiring defendant City of Berkeley to adequately train staff to stop enforcing ordinances against unhoused people and stop seizing their property except in conformance with the Fourth and Fourteenth Amendments to the U.S. Constitution; Article I, §§ 7(a), 13, and 17 of the California Constitution; and

E.    Appoint a monitor to oversee compliance with the Court's order and require City of Berkeley to submit to regular monitoring and compliance checks by the Court at defendant City of Berkeley's expense;

**Other Relief:**

A.      Order defendant City of Berkeley to pay for Plaintiffs' attorneys' fees and costs; and

B.      Grant Plaintiffs such further relief as the Court deems just and proper.

Dated: September 5, 2024                          Respectfully submitted,

DISABILITY RIGHTS ADVOCATES

By: */s/ Emily Roznowski*

EAST BAY COMMUNITY LAW CENTER

By: */s/ Brigitte Nicoletti*

LAW OFFICES OF OSHA NEUMANN

By: */s/ Osha Neumann*

*Attorneys for Plaintiffs*