1
2
3
4                    UNITED STATES DISTRICT COURT
5                  NORTHERN DISTRICT OF CALIFORNIA
6
7    YESICA PRADO, et al.,                    Case No.  23-cv-04537-EMC
8                    Plaintiffs,
9          v.                                **ORDER GRANTING IN PART AND
                                             DENYING IN PART MOTION TO
10   CITY OF BERKELEY,                        DISMISS SECOND AMENDED
                                             COMPLAINT**
11                   Defendant.
12                                            Docket No. 124
13          I.        **INTRODUCTION**

14          This case concerns Defendant City of Berkeley's (the "City" or "Berkeley") treatment of

15   unhoused individuals with disabilities.  Plaintiffs allege that, throughout the City's abatements,

16   evictions, and treatment of disabled unhoused persons, the City has violated the Fourth

17   Amendment's prohibition against seizures of personal property, the Americans with Disabilities

18   Act ("ADA"), the Fair Housing Amendments Act ("FHAA"), and Plaintiffs' due process rights by

19   placing them in a state-created danger.  Plaintiffs also assert analogous claims under state law

20   where applicable.

21          Previously, the Court granted in part and denied in part Defendant's motion to dismiss

22   Plaintiffs' First Amended Complaint ("FAC"), with leave to amend.  Order re Motion to Dismiss

23   FAC (Dkt. 87).  Plaintiffs subsequently filed a Second Amended Complaint ("SAC").  SAC (Dkt.

24   94).  Defendant now moves for dismissal of the SAC.  Motion to Dismiss ("MTD") (Dkt. 124).

25          Having considered the parties' briefs and accompanying submissions, as well as the oral

26   argument of counsel, the Court hereby **GRANTS IN PART** and **DENIES IN PART** Defendant's

27   motion.

28

United States District Court
Northern District of California

## II.    FACTUAL & PROCEDURAL BACKGROUND

Plaintiffs are several unhoused residents and the organizational plaintiff Where Do We Go Berkeley ("WDWG").  Many of the individual plaintiffs live or have lived at an encampment which spans several blocks around the intersection of 8th Street and Harrison Street in Berkeley, California ("the 8th and Harrison Encampment").  Order re Motion to Dismiss FAC at 2.  The Court issued an Order granting in part and denying in part Defendant's motion to dismiss the FAC on August 16, 2024.  *Id.*  The Court ruled as follows:

***First***, the Court rejected the City's standing challenge to WDWG, holding that WDWG adequately alleged diversion of resources and interference with its ability to conduct outreach to unhoused disabled residents and therefore had organizational standing.  *Id.* at 15–19.

***Second***, the Court refused to dismiss the Fourth Amendment claim, holding that the FAC plausibly alleged that, during abatements, City personnel seized and summarily destroyed Plaintiffs' personal property, including vehicles, without adequate justification, notice, or protection or reclamation procedures, implicating Fourth Amendment protections against unreasonable seizures.  *Id.* at 19–27.

***Third***, the Court refused to dismiss Plaintiffs' Fourteenth Amendment state-created danger claim.  The Court found that the FAC plausibly alleged that the City's abatement practices exposed unhoused persons to heightened risk of harm.  *Id.* at 45–52.

***Fourth***, the Court granted dismissal with leave to amend as to three disability claims: (1) the City's alleged failure to provide moving assistance during abatements, because the FAC did not adequately allege that any plaintiff actually requested and was denied such assistance; (2) the 72-hour parking enforcement theory, because Plaintiffs failed to allege that the inability to comply was caused by a disability or that the City denied any plaintiffs' accommodation requests; and (3) the City's alleged failure to provide reasonable accommodations in its offers of shelter — namely accommodations to shelters' no-visitor policies.  *Id.* at 31–43.  The Court held that ADA claims must generally be "predicated on a request for assistance which is denied" and that a plaintiff "'lacks standing to challenge a rule or policy to which he has not submitted himself by actually applying for the desired benefit.'"  *Id.* at 35 (quoting *Madsen v. Boise State Univ.*, 976 F.2d 1219,

1220 (9th Cir. 1992). The Court refused to dismiss Plaintiffs' claims alleging the City's failure to include mental health workers or other disability-related supports in the City's outreach and abatement teams. *Id.* at 37–39.

**Fifth**, the Court held that Plaintiffs sufficiently pled a claim under the FHAA for failure to provide reasonable accommodations, concluding that the same factual allegations supporting Plaintiffs' surviving ADA accommodation claims also state a plausible basis for relief under the FHAA. *Id.* at 44–45.

**Finally**, the Court held that it retains supplemental jurisdiction over the Plaintiffs' state law claims: property destruction and unreasonable search and seizure under Article I, section 13 of the California Constitution; discrimination on the basis of disability under California Government Code § 11135; and exposure to state-created danger under Article I, section 7 of the California Constitution. *Id.* at 52; FAC ¶¶ 239–43, 263–72, 300–04.

Plaintiffs subsequently filed a SAC that adds new factual allegations to ameliorate the deficiencies identified in the Court's order. The additional allegations are summarized below.

A.     Plaintiff Yessica Prado

Plaintiff Yessica Prado lives in an RV parked along the 8th and Harrison Encampment. SAC ¶ 16. Ms. Prado has been diagnosed with Post Traumatic Stress Disorder ("PTSD") and Attention Deficit Hyperactivity Disorder ("ADHD"). Her disabilities limit major life activities by affecting her ability to handle stressful situations, feel safe, learn, read, think, and communicate. *Id.* She alleges that "being in a community and being able to live with others is critical to her mental health and ameliorating her PTSD. Her experiences living as an unhoused person in Berkeley have contributed to her PTSD, which makes it difficult for her to trust and be around representatives of the City." *Id.*

Ms. Prado received an offer of shelter at the Campus Motel, but claims she was deterred from accepting the offer largely because she was informed that (1) she would not be able to park her RV there for more than 72 hours, and (2) she would not be permitted to accept visitors at the Campus Motel. SAC ¶ 152. The SAC alleges that these policies "made [the Campus Motel] inaccessible to" Ms. Prado. *Id.* Specifically, Ms. Prado claims that she requested, and was not

granted, an accommodation allowing her to park her RV on public streets for more than 72 hours. *Id.* ¶ 153. She alleges that her RV is a necessary accommodation that provides her with security and privacy to help her manage her mental health disabilities. *Id.* Ms. Prado also informed the City that, as an accommodation for her disabilities, she would need to have visitors in her space at the shelter, because her community is critical to her mental health. *Id.* ¶ 152.

The SAC does not establish that Ms. Prado ever requested an accommodation with respect to the 72-hour parking ordinance. Instead, it alleges that she asked for an accommodation — which the city denied — for a neighbor who lives in an RV and has a mobility disability that prevents *him* from "moving his belongings frequently." *Id.* ¶ 109. The SAC instead alleges that "the City knows (or should know) how disruptive enforcement of the 72-hour ordinance is to [Ms. Prado's] ability to remain in community in order to manage her mental health. The City has taken no affirmative action to accommodate her needs with respect to its enforcement practices." *Id.*

B.    <u>Plaintiff Lucien Jeffords</u>

Plaintiffs now concede that Mr. Jeffords's claims are moot, because Mr. Jeffords lives in "permanent supportive housing that is accessible to him." Opposition to Motion to Dismiss ("Opp. to MTD") (Dkt. 126) at 5, 21.

C.    <u>Plaintiff Erin Spencer</u>

Plaintiff Erin Spencer's disabilities include "injuries in his shoulder and back that cause him significant chronic pain and limit his shoulder mobility and ability to engage in daily life activities such as lifting and carrying objects and cleaning his space." SAC ¶ 25. He has also been diagnosed with Major Depressive Disorder and PTSD.

The SAC adds details linking Mr. Spencer's disabilities to purported harms from the City's abatement operations. According to the SAC, on several occasions in late-2023 and early-2024, Mr. Spencer requested reasonable accommodations from the City in connection with planned abatements. *Id.* ¶¶ 96, 98–100. The SAC alleges that "the City is aware that Plaintiff Spencer has a shoulder injury which prevents him from being able to lift large or heavy objects" without experiencing pain. *Id.* ¶ 96.

On November 13, 2023, Mr. Spencer requested additional time to move his shelter and

belongings prior to a planned abatement of an encampment.  *Id.* ¶ 99.  The City denied the request.  *Id.*

On January 16, 2024, Mr. Spencer submitted an accommodation request asking for an extension of time to relocate his belongings due to his physical disability.  *Id.* ¶ 100.  The City did not respond to his request.  *Id.*

On July 24, 2024, the Berkeley Homeless Union ("BHU") requested "reasonable accommodations on behalf of Plaintiff Spencer" and other class members in connection with a planned cleaning, "including assistance with moving items due to physical disabilities, on-site mental health services for people with mental health disabilities who were likely to suffer increased anxiety and stress or exacerbation of other symptoms during the action, and for clear communication in forms that could be understood by people with a variety of mental health and cognitive disabilities."  *Id.* ¶ 98.  The City denied each of these requests.  *Id.*

The SAC further alleges that during a November 2023 abatement, the City arrested Mr. Spencer as he was attempting to move his belongings outside of the noticed abatement area.  *Id.* ¶ 171.  The police handcuffed Mr. Spencer, "despite the fact that he was crying out in pain and telling them that he had a shoulder disability and stating that he would not resist."  *Id.* ¶ 225.  The City also destroyed his shelter and personal items.  *Id.* ¶ 171.  As a result of the arrest and seizure, Mr. Spencer was "left exposed to the elements, separated from his support network, unable to access benefits, and mentally and physically depleted."  *Id.* ¶ 185.

According to the SAC, the City's refusal to grant Mr. Spencer additional time or assistance with moving his belongings, and its enforcement of abatement procedures without consideration of his disabilities, exacerbated his conditions.  *Id.* ¶ 101.

D.    <u>Plaintiff Amber Whitson</u>

Plaintiff Amber Whitson has, among other conditions, Complex Post-Traumatic Stress Disorder ("CPTSD"), ADHD, dysmenorrhea, and sciatica, the latter of which causes extreme back and leg pain.  *Id.* ¶ 30.  She lives in an RV and has been ticketed because she is not able to move her RV every 72 hours, as required by the City.  *Id.* ¶ 29.  She previously lived in the City-run Safe Parking and Respite Kickstart ("SPARK") parking lot until it closed in 2022.  *Id.* ¶ 28.  She

United States District Court
Northern District of California

has not been connected with another shelter since the closure of SPARK, and she alleges that her disabilities make it difficult or impossible to comply with the City's 72-hour parking ordinance. *Id.* ¶¶ 28, 105. Specifically, before she can move her RV, Ms. Whitson must level the vehicle — a painful physical task due to her sciatica. *Id.* She also states that dysmenorrhea prevents her "from doing almost anything for five to seven days each month, including moving vehicles." *Id.*

The SAC alleges that repeated enforcement actions and citations by the City have placed Ms. Whitson at risk of losing her RV, which serves as her primary residence, and have caused ongoing distress. *Id.* ¶¶ 105–08. The SAC alleges that the City "has taken no affirmative action to accommodate her needs" with respect to the 72-hour parking rule, SAC ¶ 110, but the SAC does not allege that Ms. Whitson ever requested an accommodation from the City. *See* SAC.

E.    Plaintiff Rufus Lee White, Jr.

Plaintiff Rufus Lee White, Jr. ("Mr. White Jr.") lives in a tent on 8th Street near Harrison Street in Berkeley. Mr. White Jr. has physical, intellectual, and mental health disabilities, in part arising from being hit by a car. *Id.* ¶ 33. His lower body is partially paralyzed, and he uses a wheelchair. *Id.*

The SAC alleges that Mr. White Jr. requested, as a disability-related accommodation, assistance from the City in cleaning the area around his tent and an allowance to keep his furniture outside his tent for mobility support during the camp abatement. *Id.* ¶¶ 94–95. The City allegedly directed Mr. White Jr. to seek assistance from WDWG, and effectively ignored his request for accommodation. *Id.* ¶ 95.

Plaintiffs concede that Mr. White Jr. "qualified for and was accepted into the Maudelle Miller Shirek Community housing," a "program of the City of Berkeley and part of its overall response to unhoused people living in the City," as of May 2025. Opp. to MTD at 10. The SAC alleges that Mr. White Jr. does not currently reside in the housing program, however, because he was "deterred from accepting or accessing" shelters or related programs. *Id.* ¶ 35. Specifically, Plaintiffs' brief explains that, although Mr. White Jr. has permanent housing, it is inaccessible to him because the bathroom lacks grab bars, and because Mr. White Jr. needs in-home assistance to help with eating and other personal care needs. Opp. to MTD at 10.

F.    Plaintiff Jermaine Lee "Cat" White

Plaintiff Jermaine Lee "Cat" White ("Jermaine White") has CTPSD, which impacts his ability to concentrate, process information, communicate, and sort and organize his belongings. *Id.* ¶ 38.  The City has repeatedly destroyed Jermaine White's belongings during abatement operations.  *Id.* ¶¶ 36–38.  The SAC alleges that Jermaine White requested more time prior to sweeps to speak with a caseworker to help him process shelter offers and upcoming sweeps, but that those requests have been denied.  *Id.* ¶ 81.  Jermaine White allegedly has difficulty understanding abatement notices and requires assistance in order to comply with notices related to encampment closures and enforcement activities, and requires assistance to process and accept shelter and housing offers.  *Id.* ¶ 238.

G.    Plaintiff Monique Williams

Monique Williams has PTSD, other mental health disabilities, and physical injuries affecting her hip and arms.  *Id.* ¶ 41.  Ms. Williams currently lives at the Campus Motel in Berkeley — a shelter.  *Id.* ¶¶ 21, 40.

The SAC alleges that the City has failed to accommodate Ms. Williams's mental health and physical disabilities in shelters.  Specifically, Ms. Williams relies on her daughter to provide caregiving services, including cleaning and emotional support.  *Id.* ¶ 145.  Without being able to have her daughter visit her shelter room, Ms. Williams is allegedly deprived of "crucial caregiving support."  *Id.*  The SAC states that Ms. Williams has specifically requested an accommodation to the no-visitor policy, seeking permission for her daughter to visit her and provide necessary care. *Id.* ¶ 42.  The SAC alleges that the City has not granted her requested accommodation, nor has it engaged in an interactive process to explore alternative accommodations.  *Id.* ¶ 145.

### III.    REQUEST FOR JUDICIAL NOTICE

Plaintiffs filed a request that the Court take judicial notice of three documents: (1) a screenshot of a webpage of the City of Berkeley's website describing the Maudelle Miller Shirek Community housing complex; (2) a screenshot of a webpage on the City of Berkeley's website describing the City's Affordable Housing Preference Policy prioritizing "homeless or at-risk of homelessness;" and (3) Ordinance No. 7,934-N.S.  Request for Judicial Notice (Dkt. 128).  The

1  City does not object to this request.

2  　　The request for judicial notice concerns municipal ordinances or government websites,

3  both of which may be judicially noticed for their existence, though not for the truth of any

4  disputed facts.  *See, e.g.*, *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022,

5  1025 n.2 (9th Cir. 2006) (allowing judicial notice of municipal ordinances); *Sanchez-Martinez v.*

6  *Freitas*, 2024 WL 4309277, at *4 (N.D. Cal. Sept. 26, 2024) (taking judicial notice of website

7  "because the webpage is made publicly available by a government entity (Santa Clara County) and

8  neither party disputes the authenticity of the web site or the accuracy of the information

9  displayed").

10  　　Accordingly, the Court **GRANTS** Plaintiffs' request for judicial notice.

## IV.    DISCUSSION

12  　　The City moves to dismiss several aspects of Plaintiffs' SAC.

13  　　***First***, the City requests that the Court determine whether organizational plaintiff WDWG

14  has Article III standing in light of *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367

15  (2024), and related Ninth Circuit authority.  MTD at 6–7.

16  　　***Second***, the City argues that post-filing developments — Lucien Jeffords's and Rufus

17  White Jr.'s reported placement in housing — have mooted their individual claims.  *Id.* at 8–10.

18  Plaintiffs concede that Mr. Jeffords's claims are moot but maintain that Mr. White Jr.'s claims

19  remain live in light of ongoing barriers to accessing housing.  Opp. to MTD at 10.

20  　　***Third***, the City again challenges the sufficiency of Plaintiffs' disability discrimination

21  theories, which allege failures to provide reasonable accommodations in three key respects: (a)

22  assistance with moving belongings during encampment abatements, (b) modification of the City's

23  72-hour parking rule as applied to residents with disabilities, and (c) modification of the no-visitor

24  policy at City-operated shelters.  MTD at 10–14.

25  　　***Fourth***, the City seeks dismissal of Plaintiffs' state-created danger claim arising under

26  California Constitution Article I, section 7.  *Id.* at 14–15.

27  　　***Fifth***, if any claims are dismissed, the parties dispute whether further amendment or

28  substitution of parties should be permitted.  Opp. to MTD at 20–24; Reply in Support of MTD

("Reply Brief") (Dkt. 131) at 14.

Each issue is addressed in turn below.

A.  Plaintiff WDWG Has Organizational Standing

The City argues that WDWG lacks organizational standing because its alleged injuries amount to voluntary expenditures on advocacy and outreach, not a concrete impairment of its operations.  MTD at 6–7.  The City contends that the Court's order ruling on the motion to dismiss the FAC failed to account for the Supreme Court's decision in *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 369 (2024) ("*Hippocratic Medicine*").  *Id.* at 6.  According to the City, *Hippocratic Medicine* significantly narrowed the doctrine of organizational standing by rejecting attempts to convert voluntary programmatic expenditures into Article III injuries.  MTD at 6–7.

Under *Hippocratic Medicine*, organizations "may have standing 'to sue on their own behalf for injuries they have sustained,'" but an organization cannot "spend its way into standing" by devoting money to research or advocacy in response to a defendant's conduct.  602 U.S. at 369–70.

The City relies on *Hippocratic Medicine* to argue that WDWG's allegations of diverted staff time and frustrated objectives only describe voluntary expenditures consistent with general advocacy, rather than a compelled disruption of its operations attributable to the City's conduct.  MTD at 6–7.  But organizational standing remains viable where, as in *Havens*, the challenged conduct "directly affected and interfered with [the plaintiff organization's] core business activities."  *Id.* at 395; *see Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982).  The Ninth Circuit has more recently clarified that an organization "has direct standing to sue where a defendant's behavior has 'frustrated its mission and caused it to divert resources in response to that frustration of purpose.'"  *Immigr. Defenders L. Cntr. v. Noem*, 145 F.4th 972, 987 (9th Cir. 2025).  In *Immigrant Defenders*, the court found standing because the organizational plaintiff, whose mission was to provide direct legal representation and counseling to noncitizens, was forced to expand its services and physical operations in Mexico to continue representing clients affected by the "Remain in Mexico" policy.  *Id.* at 988.  The organization hired new staff, opened

9

an office abroad, conducted greater fundraising, and diverted operational resources to maintain its existing programs — demonstrating a direct interference with core functions, not merely ideological or voluntary opposition. *Id.*

In contrast, the Ninth Circuit declined to extend organizational standing to the Satanic Temple in *Satanic Temple v. Labrador*, 149 F.4th 1047 (9th Cir. 2025), where the plaintiff organization challenged Idaho's abortion restrictions. Although the Satanic Temple alleged frustration of mission and diversion of resources, the court held that these allegations were insufficient because the Temple could continue its core expressive and advocacy activities, and because its newly opened abortion clinic operated only in New Mexico, employed only nurse practitioners rather than Idaho-licensed medical doctors (who exclusively could prescribe abortion medication under Idaho law), and had no concrete plans to serve patients in Idaho. *Id.* at 1053–54.

At the pleading stage, WDWG's allegations are sufficient to establish organizational standing. WDWG's mission statement includes actions like "supplying tents, clothes, and food," driving unhoused individuals to critical services, and providing advocacy services "for people residing in shelters, hotel programs, and community cabins to ensure they are receiving safe and dignified care." Nicoletti Decl. (Dkt. 127), Ex. 1. The SAC describes concrete, operational impairments to WDWG's core services caused directly by the City's policies and enforcement practices. The City's abatements and sweeps disrupt WDWG's client-tracking and service-delivery systems, forcing diversion of staff time to locate displaced clients and re-establish care, ultimately expending time and resources that would otherwise have been used to "assist additional unhoused people that it had not previously assisted." Opp. to MTD at 9; SAC ¶¶ 48–51. The City's confiscation and destruction of unhoused residents' possessions further compels WDWG to spend its limited resources replacing essential survival items, such as tents, sleeping bags, and medicines, which are necessary for its clients' immediate survival. *Id.*; *see also* Nicoletti Decl., Ex. 2. As a result, WDWG's staff must either expend greater resources, or divert attention from outreach, advocacy, and material-aid programs, directly curtailing and straining the organization's ability to serve both new and existing clients and carry out its mission. *See id.* ¶ 49.

These allegations go beyond generalized mission frustration and describe interference with

1    WDWG's core operational functions — the day-to-day provision of material support and direct

2    assistance to unhoused individuals.  By forcing WDWG to divert personnel and material resources

3    from its regular outreach streams, client-tracking systems, and supply-distribution work to locate

4    displaced clients and replace destroyed survival gear, the City's practices could reasonably be seen

5    as curtailing WDWG's core operations.  *See* Opp. to MTD at 8–9; Nicoletti Decl., Exs. 1–2.

6    These instances of diversion impair WDWG's capacity to maintain consistent contact with clients

7    and expand services to new unhoused residents, directly constraining its organizational mission.

8    *See id.*  This drain on time and other resources is qualitatively different from the information-

9    gathering and advocacy actions rejected in *Hippocratic Medicine*.  Because the City's abatement

10   activities directly interfere with WDWG's core activities, forcing it to expend greater time and

11   material resources in response, WDWG has asserted an adequate injury to support standing.

12   Under *Havens*, *Hippocratic Medicine*, and more recent Ninth Circuit precedent, this kind of

13   compelled diversion of resources constitutes a cognizable injury in fact.  Unlike the plaintiff in

14   *Satanic Temple*, WDWG has not merely chosen to oppose the City's actions as a matter of policy

15   advocacy or ideology.  *Cf. Satanic Temple*, 149 F.4th at 1053–54.  Rather, WDWG has plausibly

16   alleged that the City's conduct has disrupted its day-to-day operations and impaired its ability to

17   carry out its pre-existing core mission.

18        Accordingly, the Court **DENIES** the City's motion to dismiss Plaintiff WDWG for lack of

19   standing.

20   B.    <u>Lucien Jeffords and Rufus White, Jr. Lack Standing</u>

21        The City next challenges the standing of two individual plaintiffs: Lucien Jeffords and

22   Rufus White, Jr.  MTD at 8–10.  Defendant argues that post-filing developments have mooted

23   both plaintiffs' claims, because each has obtained permanent housing and therefore no longer

24   faces a live controversy regarding the City's enforcement of its abatement, shelter, and parking

25   policies.  *Id.*

26        Plaintiffs concede that Mr. Jeffords's claims are moot.  Opp. to MTD at 10, 21.

27   Accordingly, the Court **DISMISSES** Mr. Jeffords's claims with prejudice.

28        The remaining question for the Court is whether Mr. White Jr.'s circumstances deprive

him of standing or render his claims moot.  At oral argument, Plaintiffs did not dispute that Mr. White Jr. has obtained permanent housing at the Maudelle Miller Shirek Community.  Plaintiffs instead contend that, although Mr. White Jr. has obtained permanent housing, he still lives in a tent on Harrison Street because the Shirek center is inaccessible to him.  Opp. to MTD at 10.  Specifically, the bathroom in Mr. White Jr.'s dwelling lacks grab bars.  Plaintiffs further assert that the unit is inaccessible to Mr. White Jr. because the City does not furnish needed in-home care services.  Opp. to MTD at 10.

Mr. White Jr. currently relies on the support of friends and neighbors to help him with tasks.  SAC ¶ 147.  At the hearing on Defendant's motion to dismiss, Plaintiffs conceded that Mr. White Jr. is not affected by a no-visitor policy, which is specific to City shelters rather than permanent housing units.  Consequently, it is unclear why Mr. White Jr. cannot continue to rely on existing support systems.  Moreover, the City is not obligated, as Mr. White seems to suggest, to provide personal in-home care services as a reasonable accommodation to disabilities.  *See* 28 C.F.R. § 35.135 (public entities not required to provide to disabled individuals "services of a personal nature including assistance in eating, toileting, or dressing").  So long as the housing is accessible, Plaintiffs cites no authority for the proposition that the ADA requires the affirmative supplementation by the city of in-home support services.  The Court therefore **DISMISSES** Mr. White Jr.'s reasonable accommodation claim except to the extent he alleges that Defendants have failed to install grab bars in his bathroom required by the ADA.

C.    Disability-Related Claims

In its motion, the City seeks dismissal of Plaintiffs' disability discrimination claims raised under the ADA and analogous state law with respect to particular conduct,[1]  MTD at 10–14.  The City maintains that each of the theories advanced — (a) the failure to provide reasonable moving assistance during abatements, (b) the failure to modify the 72-hour parking rule, and (c) the failure to modify the no-visitor policy at shelters — remain deficient because Plaintiffs do not allege a

---

[1] Plaintiffs' state law disability discrimination claims are raised under California Government Code § 11135, which generally adopts the "protections and prohibitions" contained in the ADA. *See* SAC ¶¶ 282–91.

1    specific request for accommodation or a concrete denial of services by the City. *Id.* at 11–13; *see*

2    *also* Order re Motion to Dismiss FAC at 35 (ruling that disability claims must be "predicated on a

3    request for assistance which is denied"). The motion also argues that the SAC merely repackages

4    allegations that the Court previously found inadequate in its order dismissing the FAC in part.

5         The amended pleading, however, meaningfully expands upon many of the allegations and

6    addresses some of the deficiencies identified in the Court's prior order. The SAC now provides

7    more detailed factual narratives for several of the named plaintiffs, identifying the disabilities at

8    issue, the accommodations sought, the City officials involved, and the specific ways in which the

9    City's acts or omissions denied Plaintiffs equal access to City programs and services. At this

10   stage, and drawing all inferences in Plaintiffs' favor, the SAC adequately alleges that the City's

11   policies and practices excluded at least some Plaintiffs from, or denied them the benefits of,

12   several City programs within the meaning of Title II. Accordingly, the Court **DENIES IN PART**

13   the City's motion with respect to two out of the three disability discrimination theories.

14        1.    The SAC States a Claim for Failure to Assist in Moving Personal Property

15        The City seeks dismissal of Plaintiffs' disability discrimination claims based on the City's

16   alleged failure to provide moving assistance during encampment abatements. MTD at 10–11. The

17   Court previously dismissed this theory without prejudice, finding that the FAC lacked allegations

18   showing that any plaintiff had actually requested moving assistance or put the City on notice of a

19   need for such accommodation. *See* Order re Motion to Dismiss FAC at 34–35. The SAC now

20   cures these deficiencies. It identifies Erin Spencer as an individual who requested disability-

21   related assistance in connection with the City's encampment abatement and property-removal

22   operations, and whose requests the City allegedly denied. SAC ¶¶ 91–102.

23        The SAC alleges that Mr. Spencer is a "qualified individual with disabilities" who suffers

24   from chronic shoulder and back injuries and PTSD that substantially limit his ability to lift, carry,

25   or move objects. SAC ¶¶ 24–27 ("When he lifts heavy objects, it is extremely painful and he is

26   debilitated for days afterward, exacerbating his condition."). Mr. Spencer requested

27   accommodations on several occasions through 2023 and 2024 in connection with planned

28   abatements, including requests for additional time and assistance with moving items due to his

United States District Court
Northern District of California

13

physical disabilities.  SAC ¶¶ 96, 98–100.  The SAC also alleges that, in addition to any accommodations, "the City is aware that Plaintiff Spencer has a shoulder injury which prevents him from being able to lift large or heavy objects" without experiencing pain.  *Id.* ¶ 96.  He alleges that the City's policies and lack of accommodations "impact [him] in a manner different from, and greater than, other unhoused people who do not have disabilities."  Opp. to MTD at 13.  At the pleading stage, Mr. Spencer's allegations suffice.

The SAC properly addresses the deficiencies found in the FAC and states a plausible claim for disability discrimination by Mr. Spencer based on the City's failure to provide reasonable moving assistance during encampment abatements.  Plaintiff Erin Spencer alleges a concrete disability, explicit requests for accommodation or constructive notice of the need for accommodations, the City's knowledge and refusal to accommodate, and resulting exclusion from or unequal treatment in City programs.  At this stage, those allegations suffice to proceed, and the motion to dismiss this cause of action is **DENIED** with respect to Plaintiff Erin Spencer.[2]

2.    The SAC Fails to State a Claim Regarding Enforcement of the 72-Hour Parking Rule

The City next seeks dismissal of Plaintiffs' claim challenging the City's enforcement of Berkeley Municipal Code § 14.08.090 — the "72-hour parking rule" — as applied to unhoused individuals with disabilities.  MTD at 11–14.  The ordinance prohibits vehicle owners from parking their vehicle for 72 or more consecutive hours and authorizes the City to remove any such vehicles.

The SAC explains that only two named plaintiffs — Ms. Prado and Ms. Whitson — own vehicles subject to the 72-hour parking rule.  To the extent that other plaintiffs purport to challenge the ordinance, they lack standing because they do not allege any personal exposure to the City's parking enforcement.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992).

The SAC's amendments with respect to Ms. Prado and Ms. Whitson, however, still fail to

_____

[2] Plaintiffs also assert that Mr. White Jr. was denied reasonable accommodations with respect to assistance moving.  For the reasons stated above, Mr. White Jr.'s challenges to City policies, actions, and omissions are moot.

United States District Court
Northern District of California

1    address the deficiencies identified by the Court's prior dismissal order.  The SAC does not allege

2    specific facts showing that Ms. Whitson requested an accommodation related to the 72-hour

3    parking rule, and Ms. Prado's claim falls short because her challenge does not convincingly

4    connect her disability with a need for an accommodation to the 72-hour parking rule.

5    Accordingly, Defendant's motion to dismiss is **GRANTED** with respect to Plaintiffs' challenge to

6    the 72-hour parking enforcement rule.

7             The SAC insufficiently alleges a failure to accommodate Ms. Whitson's disability.  While

8    it alleges that her physical and psychological disabilities make compliance with the 72-hour rule

9    difficult and thus could have stated a plausible claim based on failure to accommodate, it does not

10   allege that Ms. Whitson ever *requested* an accommodation, that she informed the City of her

11   disabilities, or that the City otherwise knew of her need for an accommodation.  *See* SAC.  Claims

12   asserting a failure to accommodate generally must be predicated on a denied request for

13   assistance.  *See Madsen v. Boise State Univ.*, 976 F.2d 1219, 1220 (9th Cir. 1992) (holding that "a

14   plaintiff lacks standing to challenge a rule or policy to which [they have] not submitted

15   [themselves] by actually applying for the desired benefit").  Plaintiffs have not alleged that Ms.

16   Whitson ever requested an accommodation to the 72-hour parking rule.  Nor have Plaintiffs

17   alleged that the City knew or should have known that Ms. Whitson suffered from physical

18   disabilities warranting a reasonable accommodation.  *See, e.g.*, *Gardner v. Fed. Express Corp.*,

19   114 Fed. Supp. 3d 889, 901 (N.D. Cal. 2015) (holding, in the ADA Title I context, that employers

20   have an affirmative duty to make reasonable accommodations under FEHA for "a known

21   disability" and that "[e]mployers who are aware of an employee's disability have an affirmative

22   duty to make reasonable accommodations for such disability, even if the employee has not

23   requested an accommodation"); Cal. Code Regs. tit. 2, § 11068(a) ("An employer or other covered

24   entity has an affirmative duty to make reasonable accommodation(s) for the disability of any

25   individual applicant or employee if the employer or other covered entity knows of the

26   disability[.]").  While a request for accommodations may not be necessary, especially in

27   circumstances showing a "widespread practice of refusing to consider" accommodation requests

28   and the futility of any such request, *cf. Young v. Crofts*, 64 Fed. App'x 24, 26 (9th Cir. 2003), the

United States District Court
Northern District of California

15

allegations here concern individualized incidents and the City's alleged failure to accommodate specific needs arising from discrete disabilities; and there is no factual basis for alleging the City was specifically aware of Ms. Whitson's unmet accommodation needs.  The City has, at times, reasonably accommodated Plaintiffs' disabilities.  Accordingly, Ms. Whitson's challenge to the 72-hour parking rule is **DISMISSED** with leave to amend because she has not alleged that she ever requested and was denied a reasonable accommodation to the 72-hour parking rule or that the City was aware of her disability and need for an accommodation with respect to the 72-hour rule. Plaintiffs are given leave to file within 30 days of the date of this order an amended complaint addressing Ms. Whitson's claim.

The SAC also falls short with respect to Ms. Prado's challenge to the 72-hour parking rule. Although Ms. Prado currently lives in an RV, she was offered shelter at the Campus Motel but claims that the offer was inaccessible to her in part because of the 72-hour parking rule.  *See* SAC ¶ 152.  She alleges that remaining near her community is critical to her mental health and that she was not permitted to park her RV at the Campus Motel.  *Id.* ¶ 153.  As a result, she continues to park her RV on public roads and must relocate the RV every few days to comply with the 72-hour rule.  *Id.* ¶¶ 152–53.  In sum, Ms. Prado has access to a shelter placement and, as a supplement, retains the option of using an RV.  Ms. Prado contends that the City's parking enforcement disrupts her connection to her community and that the City "did not offer any accommodation, such as a permit that would give her the ability to park her RV on the city streets (but not live in it) while in shelter."  *Id.*  Yet in the briefing and at the hearing before this Court, Plaintiffs' counsel could not articulate how a disability prevents Ms. Prado from moving her RV every 72 hours, or why she could not maintain community ties in the multitude of other private spaces beyond her RV.  Nor do Plaintiffs explain why exempting Ms. Prado from the 72-hour rule would constitute a reasonable accommodation, particularly given that she was already offered shelter at the Campus Motel.  Accordingly, the challenge to the 72-hour rule as applied to Ms. Prado is **DISMISSED** without leave to amend.

        3.      The SAC States a Claim Based on the No-Visitor Policy

The City moves to dismiss Plaintiffs' ADA claims challenging the no-visitor policies

United States District Court
Northern District of California

United States District Court
Northern District of California

1    enforced in City-operated shelters.  MTD at 13–14.  The Court's prior order dismissed this claim

2    with leave to amend, holding that the FAC failed to show how the no-visitor policy at shelters

3    denied Plaintiffs access to services, because Plaintiffs did not connect "their specific disabilities to

4    the need to have visitors in their rooms."  Order re Motion to Dismiss FAC at 39–40.  The City

5    contends that the SAC fails to allege any actual accommodation requests or specific ways in which

6    the no-visitor rule prevented disabled residents from accessing shelter services.  MTD at 13–14.

7         Plaintiff Monique Williams pleads a plausible claim.  She alleges that she suffers from

8    mental and physical disabilities and relies on her daughter for essential caregiving, including

9    cleaning and the provision of emotional support.  SAC ¶¶ 42, 145.  Ms. Williams further alleges

10   that she specifically requested an accommodation to the no-visitor rule so that her daughter could

11   enter her shelter unit, but that the City neither granted the request nor engaged in any interactive

12   process to determine whether such visits were reasonably necessary or could be subject to

13   reasonable limits.  *Id.*  Under the ADA, once a request for accommodation is made, the City has an

14   affirmative obligation to engage in an interactive process in good faith to identify possible

15   reasonable accommodations.  *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001)

16   (holding that, after receiving a request for disability accommodations, public entities must

17   "undertake a fact-specific investigation to determine what constitutes a reasonable

18   accommodation"); *Constantin v. Navarrete*, No. 22-cv-07075-VKD, 2025 WL 770359, at *5

19   (N.D. Cal. Mar. 10, 2025) ("'[O]nce a public entity receives notification of [an individual's]

20   disability and the desire for accommodation, it has an affirmative obligation to engage in an

21   interactive process to consider [the disabled individual's] requested accommodations.'") (brackets

22   in original) (internal quotation marks omitted) (quoting *Payan v. L.A. Cmty. Coll. Dist.*, 2018 WL

23   6164269, at *14 (C.D. Cal. Oct. 16, 2018)).  Even if the City ultimately could have offered

24   alternative arrangements, for instance, off-site support, its failure to even consider or discuss any

25   reasonable accommodations after receiving a request could plausibly constitute a violation of the

26   ADA.  At this stage, the SAC's allegations suffice, and the Court **DENIES** the motion to dismiss

27   Ms. William's challenge to the no-visitor policy.

28         By contrast, Ms. Prado's allegations are insufficient.  She claims that she declined an offer

17

of shelter at the Campus Motel in part because the facility enforced a no-visitor policy.  SAC ¶ 152.  Ms. Prado alleges that she "relies on friends and community members to help manage her mental health conditions, and needs to be able to connect with these sources of support and talk through issues in some relatively private and safe space," and that the no-visitor rule prevents her from doing so.  *Id.* ¶ 151.  While the SAC alleges that Ms. Prado requested a reasonable accommodation which was denied, *id.* ¶ 152, it does not explain why her mental health needs required in-person visits inside the shelter, rather than in alternative settings such as online meeting spaces, local community spaces, other individuals' dwellings, or even her RV if she is able to maintain it.  The SAC's generalized assertions that community interactions are therapeutic for her PTSD do not, by themselves, establish that the City's no-visitor rule denied her equal access to shelter by reason of her disability.  Accordingly, the Court **DISMISSES** Ms. Prado's challenge to the no-visitor policy without leave to amend.

Accordingly, the Court **DENIES** the motion with respect to Ms. Williams and **GRANTS** the motion with respect to Ms. Prado.

D.    Plaintiffs' Seventh Cause of Action Fails

The City seeks dismissal of the SAC's seventh cause of action, which asserts a state-created danger claim arising under Article I, section 7 of the California Constitution.  The City failed to challenge this claim in its earlier motion to dismiss the FAC which was directed to the claim based on the Fourteenth Amendment to the U.S. Constitution.  *See* Motion to Dismiss FAC (Dkt. 51).

Plaintiffs contend that Defendant is waived from moving to dismiss the seventh cause of action because Defendant failed to assert the 12(b)(6) defense in its prior motion to dismiss the FAC.  Opp. to MTD at 18–20.  The City concedes that it erred in failing to move to dismiss the state-law variant of Plaintiffs' state-created danger claim.  Reply in Support of MTD at 14.  But there is no indication that Defendant did so to manufacture delay or to otherwise prejudice Plaintiffs.

Rule 12's text limits defendant's ability to move for dismissal on grounds that could have been raised in an earlier motion.  Fed. R. Civ. Proc. 12(g).  The Ninth Circuit has held, though,

that courts in the circuit are to construe the Federal Rules of Civil procedure in a manner that secures "the just, speedy, and inexpensive determination of every action and proceeding," and that "[d]enying late-filed Rule 12(b)(6) motions" on mechanistic procedural grounds "can produce unnecessary and costly delays, contrary to the direction of Rule 1." *In re Apple iPhone Antitrust Litig.*, 846 F.3d 313, 318 (9th Cir. 2017). It furthers judicial efficiency to entertain this claim and there is no obvious prejudice to Plaintiffs. If the Court were to deny Defendant's motion on Rule 12(g) grounds, Defendant could simply re-assert identical arguments in its answer or in a Rule 12(c) motion of later in a motion for summary judgement under Rule 56. *See Banko v. Apple, Inc.*, No. 13-02977 RS, 2013 WL 6623913, at *2 (N.D. Cal. Dec. 16, 2013) ("Although Rule 12(g) technically prohibits successive motions to dismiss that raise arguments that could have been made in a prior motion . . . courts faced with a successive motion often exercise their discretion to consider the new arguments in the interests of judicial economy."). Defendant's omission of a challenge to Plaintiffs' state law claim in its earlier motion to dismiss "does not appear to have been filed for any strategically abusive purpose," nor would review of the motion on the merits at this stage be anything other than "harmless." *In re Apple*, 846 F.3d at 320. Accordingly, the Court considers the merits of Defendant's challenge in the furtherance of judicial economy.

Turning to the merits, no California court has recognized a "state-created danger" cause of action under Article 1, section 7, and multiple courts, including within this District, have expressly declined to do so. *See, e.g.*, *Shen v. Albany Unified Sch. Dist.*, 436 F. Supp. 3d 1305, 1315 (N.D. Cal. 2020) (Donato, J.) ("Shen asserts the same state-created danger claim under Article I, section 7 of the California Constitution. But he has not identified any case law or other authorities demonstrating that California recognizes the claim. . . . While the [14th Amendment and Article I, section 7] may be similar, they are not identical, and it is emphatically not the role of this federal court to create new doctrines under the California state constitution. In light of the absence of any apparent foundation in California state law, this claim is dismissed.") (citation omitted); *Sacramento Homeless Union v. Cnty. of Sacramento*, 617 F. Supp. 3d 1179, 1195–96 (E.D. Cal. 2022) (noting that plaintiffs cited no authority recognizing a state-created-danger theory under the California Constitution and declining to grant relief on that basis).

United States District Court
Northern District of California

1    In light of the absence of any authority indicating that a state-created danger claim may be

2    asserted under Article I, section 7 of the California Constitution, the Court **GRANTS** Defendant's

3    motion to dismiss Plaintiffs' seventh cause of action without leave to amend.

4    E.    The Court Denies Plaintiffs' Request to Amend or Substitute New Plaintiffs

5    Plaintiffs request that the Court allow them "to amend their complaint to cure any

6    deficiencies and, if necessary, to allow additional putative class members to intervene." Opp. to

7    MTD at 20. This request is not properly before this Court. Plaintiffs have not filed a notice

8    motion for leave to amend under Rule 15 or a motion for intervention under Rule 24, nor have

9    they identified any proposed amendments or specific class members seeking to intervene.

10    Under Rule 15, leave to amend is "freely given when justice so requires," but courts may

11    deny leave where there has been a "repeated failure to cure deficiencies by amendments

12    previously allowed," "futility of amendment," or "undue prejudice to the opposing party."

13    *Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma Cnty.*, 708 F.3d 1109, 1117 (9th Cir. 2013).

14    Here, Plaintiffs have already filed three complaints, and the Court has provided clear and detailed

15    instructions expressly laying out how Plaintiffs can avoid dismissal with their SAC. To the extent

16    Plaintiffs invoke Rules 23 and 24 to preemptively preserve class claims, that request is premature.

17    Dismissal here does not threaten to moot the entire class action. Plaintiffs' vague, contingent

18    request to add unnamed class members is unnecessary and procedurally improper.

19    Except as provided herein, the Court therefore **DENIES** without prejudice Plaintiffs'

20    request for leave to amend or permit intervention.

21                        **V.        CONCLUSION**

22    For the foregoing reasons, the court **GRANTS IN PART** and **DENIES IN PART** the

23    City's motion to dismiss the SAC as follows: (1) organizational plaintiff WDWG has standing,

24    and the City's motion is therefore **DENIED** with respect to that challenge; (2) the claims raised by

25    plaintiffs Lucien Jeffords and Rufus White, Jr. are **DISMISSED** as moot; (3) the motion is

26    **DENIED IN PART** with respect to disability discrimination claims concerning accommodations

27    in moving assistance and accommodations to the no-visitor policy, but **GRANTED** with respect

28    to challenges to the 72-hour parking rule as to Plaintiffs Yessica Prado and Monique Whitson; and

(4) the motion is **GRANTED** with respect to Plaintiffs' state-created danger cause of action arising under Article I, section 7 of the California Constitution.  Plaintiffs' request for further leave to amend or to permit intervention by unidentified putative class members is **DENIED.**

        **IT IS SO ORDERED**.


Dated: November 13, 2025

_____
EDWARD M. CHEN
United States District Judge