UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YESICA PRADO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF BERKELEY,<br><br>Defendant. | Case No. 23-cv-04537-EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR CLASS CERTIFICATION**<br><br>Docket No. 157 |

## I.    <u>INTRODUCTION</u>

Plaintiffs filed a Motion for Class Certification in this civil rights action brought by a group of disabled, unhoused residents of the City of Berkeley. Plaintiffs present three categories of claims. First, they allege that the City's encampment enforcement policies violate the United States Constitution and California Constitution by authorizing the seizure and destruction of personal property without adequate notice or procedural safeguards. Second, they allege state-created danger in violation of the Fourteenth Amendment. Third, they allege that the City's categorical refusal to grant disability accommodations to the 72-hour parking restriction violates Title II of the Americans with Disabilities Act ("ADA"), as applied to disabled vehicle residents who are unable to comply with the parking rules by reason of their disabilities. Plaintiffs seek declaratory and injunctive relief only, and certification exclusively under Rule 23(b)(2).

Before the Court are two distinct class certification requests. *First*, Plaintiffs seek certification of an "Unhoused People Class" comprised of all unhoused persons with a disability residing in public spaces, temporary or transitional shelter, or vehicles in Berkeley. They seek to appoint Erin Spencer, Amber Whitson, Jermaine White, and Monique Williams as class representatives. *Second*, Plaintiffs seek certification of a "Vehicle Resident Subclass" comprised

of all disabled unhoused persons residing in vehicles in Berkeley's public spaces who are unable to comply with the City's 72-hour parking restriction by reason of disability. They seek to appoint Amber Whitson as the sole representative of the subclass.

Plaintiffs' Motion for Class Certification is **GRANTED IN PART AND DENIED IN PART** as follows:

1. The Unhoused People Class is **CERTIFIED** under Rule 23(b)(2) as to Plaintiffs' property seizure and destruction claim under the Fourth and Fourteenth Amendments of the United States Constitution, and Article I, section 13 of the California Constitution. Erin Spencer, Amber Whitson, Jermaine White, and Monique Williams are appointed as class representatives. Disability Rights Advocates and East Bay Community Law Center are appointed as class counsel under Rule 23(g).

2. Certification is **DENIED** as to Plaintiffs' state-created danger claim. This denial does not affect any named plaintiff's individual state-created danger claims.

3. The Vehicle Resident Subclass is **CERTIFIED** under Rule 23(b)(2) as to Plaintiffs' challenge to the City's categorical denial of disability accommodations from the 72-hour parking restriction under Title II of the ADA. Amber Whitson is appointed as the sole representative of the Vehicle Resident Subclass.

## II.    BACKGROUND

The following facts are adopted from the Court's independent analysis of the evidence presented in the record. Although courts "must take the substantive allegations of the complaint as true," they need not accept conclusory or generic allegations, and Plaintiffs bear the burden of demonstrating by a preponderance of the evidence that the Rule 23 requirements are satisfied. *See, e.g.*, *Miles v. Kirkland's Stores Inc.*, 89 F.4th 1217, 1222 (9th Cir. 2024) ("Importantly, a party cannot plead or speculate her way to class certification. She must marshal facts showing, by a preponderance of the evidence, that class issues predominate."); *Small v. Allianz Life Ins. Co. of N. Am.*, 122 F.4th 1182, 1197 (9th Cir. 2024) (holding that plaintiffs must prove by preponderance of evidence that the proposed class satisfies the requirements of Rule 23) (citing *Black Lives Matter L.A. v. City of L.A.*, 113 F.4th 1249, 1258 (9th Cir. 2024)); *In re NVIDIA Corp. Secs. Litig.*,

United States District Court
Northern District of California

825 F. Supp. 3d 1047, 1065 (N.D. Cal. 2026) (Gilliam, J.) ("Courts 'must take the substantive allegations of the complaint as true' but 'need not accept conclusory or generic allegations regarding the suitability of the litigation for resolution through class action.'") (quoting *Keilholtz v. Lennox Hearth Prods., Inc.*, 268 F.R.D. 330, 335 (N.D. Cal. 2010)); *King v. Nat'l Gen. Ins. Co.*, 2025 WL 2173951, at *2 (Ryu, J.) ("In analyzing Plaintiffs' motion for class certification, the court accepted Plaintiffs' version of the disputed facts as true, as it is legally required to do."). Class certification is proper only if the Court is "satisfied, after a rigorous analysis" that the Rule 23(a) prerequisites have actually been satisfied. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011); *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982) ("[A]ctual, not presumed, conformance with Rule 23(a) remains, however, indispensable."). Finally, although many of the below facts certainly bear on the merits of Plaintiffs' claims against the City, "[m]erits questions may be considered to the extent — but only to the extent — that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013); *see also Wright v. Renzenberger, Inc.*, 656 F. App'x 835, 837 (9th Cir. 2016) (mem.).

Applying the preponderance of the evidence framework to the record established thus far, the Court finds the facts below for purposes of this Rule 23 motion.

Berkeley has maintained a substantial unhoused population for years. The 2024 Point-in-Time ("PIT") Count — a biennial census of the Alameda County population experiencing "sheltered and unsheltered homelessness" on a single night in January 2024 — counted 844 unhoused individuals in Berkeley, of whom 445 were unsheltered and 399 were residing in emergency shelter or transitional housing. Zito Declaration, Ex. A at 1 (Dkt. 158-1). Disabilities are pervasive among Berkeley's unhoused population. The 2024 PIT Count estimated that 43% of surveyed unhoused individuals, approximately 363 people, had a serious mental illness. *Id.*, Ex. A at 2. A separate report by the City estimated that over 80% of people experiencing homelessness in Berkeley had some type of disability, with 62% reporting severe mental or psychiatric disabilities and 37% reporting physical disabilities. *Id.*, Ex. B at 23. Nurse practitioner Olivia deBree ("NP deBree"), who has provided care in Berkeley since 2015 through LifeLong Medical

Care's Street Medicine Program and has direct patient-level knowledge of the unhoused population, states that "many (indeed, most) of Berkeley's unhoused residents have physical and/or mental disabilities," including heart failure, dementia, COPD, PTSD, bipolar disorder, spinal cord injuries affecting mobility, seizure disorders, and schizophrenia, among other ailments including HIV/AIDS, diabetes, and cancer. deBree Declaration (Dkt. 170) ¶¶ 2–3, 7.

A.    Berkeley's Encampment Enforcement Framework

    1.    Administrative Regulations 10.1 and 10.2

Berkeley's encampment abatement operations are governed in large part by Administrative Regulation 10.1 ("AR 10.1"), which authorizes City staff to remove tents and personal property from public spaces, and Administrative Regulation 10.2 ("AR 10.2" or the "3×3 Rule"), which restricts personal property left on public sidewalks to a three-by-three-foot footprint. Zito Declaration, Exs. C–D (Dkts. 158-3, 158-4). Both regulations are administered by the same City departments, applied to the same population of unhoused persons, and subject to the same alleged structural deficiencies in notice, documentation, and classification standards. Together, they constitute the City's integrated framework for deciding when to seize property, when to store it, and when to destroy it. Plaintiffs' challenge to the City's enforcement operations primarily center around AR 10.1's property seizure and destruction framework.

Under AR 10.1, before removing unattended property, City staff "shall provide at least 24 hours' notice," photograph the property, complete a Property Inventory Form recording the date, location of removal, and anticipated storage duration, and post a retrieval notice at the removal site. Zito Declaration, Ex. C (AR 10.1) at 2. Certain categories of property are exempt from these procedural requirements and may be immediately destroyed, including "soiled or moldy items," "loose or scattered papers," "wet or damp clothing, bedding or sleeping bags if storing it would cause it to mold," "broken or disassembled items or those stripped of parts," and "bike carcasses and parts." *Id.* at 3. Items that appear to have a resale value of less than $100 "from visual observation" may be disposed after 14 days of storage, and items with a higher resale value must be held for 90 days. *Id.* at 1. "Items that are usable for shelter, such as tents, tarps and sleeping bags, shall be retained for a minimum of 45 days regardless of apparent value." *Id.* From the

United States District Court
Northern District of California

United States District Court
Northern District of California

policy text, however, it appears that City personnel may dispose of items usable as shelter if such gear is soiled, moldy, or otherwise deemed to be "clearly refuse or garbage." *See id.* ("Unattended Property that is clearly refuse or garbage may be disposed of immediately.").

AR 10.1 provides no definitions for the operative terms governing its destruction-eligible categories. The regulation does not define "soiled," "hazardous," or "abandoned," and does not provide any guidance calibrating those terms to a constitutional or other legal standard. The City's 30(b)(6) designee, Peter Radu, confirmed at his deposition that no specific policy guidance governs what constitutes "soiled" to the point of justifying summary destruction. Zito Declaration, Ex. E at 155:1–157:14. Mr. Radu also confirmed that staff training on property classification and valuation has not been updated or conducted since before the COVID-19 pandemic. *Id.* at 203:1–21. AR 10.1 further provides that City staff shall photograph unattended property before removal, but the City's general practice is to photograph broader encampment zones as a whole rather than individual items seized. *Id.* at 151:18–153:1. As a result, no item-specific record is created to catalogue precisely what was taken, from whom, or on what basis it was classified as subject to storage or destruction.

AR 10.1 also categorically exempts "loose or scattered papers" from storage regardless of their content, directing staff to destroy such materials. Zito Declaration, Ex. C at 3. Mr. Radu confirmed that the City follows this categorical exclusion even where loose papers include Social Security cards, military discharge certificates, and medical records — though City staff "theoretically" could exercise discretion to store such documents. Zito Declaration, Ex. E at 156:15–157:14. No protocol governs how or when that discretion is exercised.

AR 10.2 (the "3x3 Rule") restricts property left on public sidewalks to a nine-square-foot footprint. The City's 30(b)(6) designee acknowledged that nine square feet is insufficient to accommodate a two-person tent, and mobility devices and medical equipment frequently cannot fit within that limit. Zito Declaration, Ex. E at 37:14–21. It is also obvious that even a single-person tent cannot fit into a 3x3 space. Certain putative class members attest that they have been directed by law enforcement officers to stack their belongings in a pile in order to comply with the 3x3 Rule and to avoid seizure of their property. Peddycoart Declaration (Dkt. 165) ¶ 14 (police officer

5

United States District Court
Northern District of California

directed declarant to place wheelchair atop pile of all his belongings in order to retain it).

Berkeley Municipal Code provisions independently prohibit camping in City parks overnight and lying on commercial sidewalks during daytime hours. *E.g.*, BMC §§ 6.32.020 (prohibiting park access at night), 13.36.015 B.1 (prohibiting lying on commercial sidewalks), 14.48.020 (prohibiting property on sidewalks if it obstructs, restricts, or prevents the use of any portion of the sidewalk). The City's 30(b)(6) designee, Peter Radu, testified that there is, by operation of City law and regulation, no place in Berkeley where an unhoused person can camp without violating a local or state rule. Zito Declaration, Ex. E at 34:20–35:2.

2.     Encampment Enforcement in Practice

City records reflect that the enforcement of the above framework has resulted in the disposal of substantial quantities of personal property. According to data produced by the City, over the course of nearly three years, Berkeley's enforcement operations disposed of approximately 959,800 pounds of material across 52 encampment closures, 34 deep cleaning operations, and 11 RV closures. Roznowski Declaration, Ex. H at 9–12 (Dkt. 223). Despite that volume of enforcement activity and property disposal, the City issued only 34 Property Inventory Notices — formal notices of stored property and retrieval opportunities — across all such operations. *Id.* at 13. The disparity between the volume of material disposed and the formal storage notice issuances is significant context for understanding how the City's framework operates in practice.

Named plaintiffs and putative class members describe a consistent pattern of inadequate notice and summary destruction at the individual level. Named Plaintiff Erin Spencer attests that posted sweep notices, when provided, "do not specify the date or times," span multiple days, and are "often inconsistent," failing to provide meaningful notice or an opportunity to protect belongings. Spencer Declaration (Dkt. 161) ¶ 12. During a sweep on November 7, 2023, police officers arrested Mr. Spencer for illegal lodging, preventing him from moving his property. *Id.* ¶ 14. As a result, his shelter, clothes, bedding, tools, and other essential belongings were subsequently seized and destroyed. *Id.* His Certificate of Release or Discharge from Active Duty (DD214) — an essential document for accessing veteran benefits — was also seized and never

returned. *Id.* ¶¶ 14–16.

Putative class member Robbie Peddycoart attests that he has lost all of his belongings on approximately 25 occasions over the course of 13 years of living unhoused in Berkeley, frequently without any advance notice or information about storage and retrieval of his property. Peddycoart Declaration ¶¶ 10–11. Putative class member James Hunter attests that the City seized a generator worth over $1,500 and left a notice indicating it would be stored, but that when he called the listed phone number the operator informed him no such generator existed matching the description. Hunter Declaration (Dkt. 166) ¶¶ 8–9. Putative class member Keith Holder attests that the City took his passport, social security card, and other essential belongings. Holder Declaration (Dkt. 167) ¶ 9. Named Plaintiff Jermaine White attests that the City has taken and destroyed his essential survival belongings during encampment closures, including tents, tarps, food, tools, bicycles, and a ring worth approximately $1,800. White Declaration (Dkt. 162) ¶¶ 5–6. Other putative class members describe the loss of medications, mobility devices, government identification documents, tents, and other essential survival materials as a result of City enforcement actions. *E.g.*, Peddycoart Declaration ¶¶ 10, 14 (stating that the City has taken his tent, clothes, and mobility devices); White Declaration (Dkt. 162) ¶ 5 (stating that the City has taken and destroyed his "essential survival belongings" during encampment closures and cleanings, including tents, tarps, food, and tools).

The record contains abundant — and troubling — anecdotal evidence of an enforcement framework weighted in favor of property disposal. These facts help illustrate both the *breadth* of the risk faced by the class, and the *severity* of the actual harms arising from the City's challenged property seizure and destruction framework. *See Miles*, 89 F.4th at 1222 ("Importantly, a party cannot plead or speculate her way to class certification. She must marshal facts showing, by a preponderance of the evidence, that class issues predominate."); *Falcon*, 457 U.S. at 160 ("[A]ctual, not presumed, conformance with Rule 23(a) remains, however, indispensable.").

///

///

///

7

### 3. State-Created Danger

Plaintiffs also present evidence concerning the health and safety consequences of encampment enforcement for individual class members. Professor Chris Herring, an assistant professor and researcher on homelessness, attests that encampment clearances regularly result in adverse health effects and the loss of personal belongings, interference with medical and social service provision and access to employment and housing, and exposure to theft and violence. Herring Declaration (Dkt. 169) ¶ 24. Professor Herring further explains that public health workers struggle to locate displaced patients, that displacement may move individuals to areas without access to clean water, and that encampments generally play a role in anchoring social networks, facilitating hygiene, providing physical security, and pooling resources. *Id.* ¶¶ 28–29, 32, 36. Involuntary displacement from encampments thus risks eliminating established support functions and exposing individuals to novel dangers. *Id.* ¶ 36.

Nurse practitioner Olivia deBree complements Professor Herring's research with direct clinical observations from her extensive tenure treating and caring for residents of Berkeley encampments. deBree Declaration (Dkt. 170) ¶¶ 9–11, 15. NP deBree attests that sweeps interrupt ongoing medical care and result in the loss of medications, medical supplies, and mobility devices that are difficult or impossible for unhoused individuals to replace. *Id.*

Although there are certain general risks from encampment abatements identified by Herring and deBree, the harms described in this record vary substantially based on each individual's pre- and post-enforcement circumstances. Named plaintiffs' accounts reflect this individual variability: Mr. Spencer describes acute psychological harm and loss of shelter materials leaving him exposed to the elements, with the severity of risk turning on weather conditions at the time of each sweep. Spencer Declaration ¶ 13 (describing harm from losing shelter which "leaves me exposed . . . [e]specially when weather is extreme"). Mr. White describes cognitive and emotional responses to enforcement that prevent him from adequately protecting his own property in those moments. White Declaration ¶¶ 11–12 ("When I saw the notice, my PTSD was triggered and I was so depressed and traumatized that I could only stay in my tent. . . . They began to throw away all of my belongings around me that were outside my tent,

8

and I could not do anything about it."). Other class members have been offered City shelter and declined; still others have no tent or vehicle to serve as shelter at the time of a given sweep. The record reflects a range of pre-enforcement circumstances, post-enforcement impacts, and intervening variables — including whether any alternative shelter was offered and whether the individual had the means or capacity to access it — that distinguish each putative class member's situation from others. On this motion for class certification, and in the absence of conclusory or otherwise unsupported allegations, the Court accepts Plaintiffs' above statements as credible and true. *See In re NVIDIA*, 825 F. Supp. 3d at 1065; *Williams*, 2010 WL 3632197, at *2; *see also* 28 U.S.C. § 1746 (allowing declarations to be used to support a motion where presented in writing, subscribed as true under penalty of perjury, and dated).

>        4.        72-Hour Parking Restriction

Berkeley Municipal Code § 14.36.050 prohibits parking a vehicle in the same location for more than 72 consecutive hours. The City's 30(b)(6) designee testified that there is no location on Berkeley's public streets where an unhoused person may legally reside in a vehicle without being required to move every 72 hours. Zito Declaration, Ex. E (Radu Deposition) at 35:15–24. In the past, the City has operated parking lots, including the Safe Parking and Respite Kickstart ("SPARK") lot, where unhoused individuals could park for extended periods without the threat of enforcement, but no such program seems to operate currently. *See* Whitson Declaration (Dkt. 164) ¶ 2.

The City enforces the 72-hour restriction in part by towing and impounding vehicles, including without prior notice in certain circumstances. The City admits that it does not provide notice before towing where a vehicle's registration has been expired for more than six months or where vehicles are classified as inoperable. Zito Declaration, Ex. E (Radu Deposition) at 296:16–297:5. Named Plaintiff Amber Whitson's vehicles were towed on at least three separate occasions without prior notice. Whitson Declaration (Dkt. 164) ¶¶ 13–15. Putative class member James Hunter's vehicle was towed following a deep cleaning notice, with no indication that the vehicle itself would be removed. Hunter Declaration (Dkt. 166) ¶ 6.

Across every accommodation request presented in the record, the City's ADA Coordinator,

United States District Court
Northern District of California

Thomas Gregory, provided a uniform reason for denial: granting an individualized exemption from enforcement of the 72-hour rule would "fundamentally alter" the City's parking enforcement program or impose an undue administrative burden. *See* Roznowski Declaration, Ex. G (Gregory Declaration) ¶¶ 18–20; *id.*, Ex. A (compiling accommodation requests and the City's responses); Fuchs Declaration, Ex. A (Dkt. 172-1) at 11–12; Prado Declaration (Dkt. 160) ¶¶ 8–13. Thomas Gregory's own Declaration states this position as a categorical rule: "Granting individualized exemptions for Plaintiffs would require creating a new program for personalized parking enforcement" and would "fundamentally alter the encampment management program." Roznowski Declaration, Ex. G (Gregory Declaration) ¶ 19. The City's articulation of this position has been consistent, and substantively identical across all accommodation requests in the record, seemingly without individualized consideration of the realistic impacts of any particular request. *E.g.*, *id.*; Fuchs Declaration, Ex. A at 11–12; Prado Declaration ¶¶ 8–13.

B.      Class Representatives

Plaintiffs seek to certify a class of "all unhoused persons who have a disability" who reside in a vehicle or other shelter in public spaces in Berkeley, California, or who reside in temporary or transitional shelters in Berkeley. Motion for Class Certification (Dkt. 157) at 1. This "Unhoused People Class" is comprised of four representatives: Amber Whitson, Monique Williams, Erin Spencer, and Jermaine White.

Plaintiffs also seek to certify a subclass of "all unhoused persons who have a disability" who reside in a vehicle in a public space in Berkeley, California and who are unable to comply with the City's 72-hour parking restriction due to a disability. This "Vehicle Resident Subclass" is comprised of one representative: Amber Whitson.

1.      Amber Whitson

Amber Whitson resides in an RV along Dwight Way in Berkeley. Whitson Declaration ¶ 2. She also possesses a second RV, which she uses to store tools, and a van, both of which are parked on public streets. *Id.* ¶¶ 8, 13, 17–18.

Ms. Whitson lives with CPTSD, ADHD, GERD, dysmenorrhea, sciatica, and lymphedema. *Id.* ¶ 3. She claims that her physical disabilities affect her ability to stand, move,

10

United States District Court
Northern District of California

and perform the tasks necessary to relocate her vehicles. *Id.* In particular, moving her RV requires her to first level it using heavy ramps that are difficult to maneuver and painful to handle given her physical conditions. *Id.* ¶¶ 6–7. She also claims that her lymphedema makes it difficult to grip objects like steering wheels, which is also a necessary aspect of moving her vehicles. *Id.* ¶ 3. Ms. Whitson has had her vehicles cited at least a dozen times and her vehicles have been towed on multiple occasions without prior notice. *Id.* ¶¶ 8, 13–15.

With respect to property seizure, Ms. Whitson attests that City employees took her solar panels and an air compressor that were stacked next to her RV, not mixed with trash, without any prior warning or notice while she was asleep. *Id.* ¶ 16. No City employee informed her of the property seizure, and she discovered that the City was responsible only after reviewing security camera footage. *Id.* Ms. Whitson also received no information about how she could retrieve the items that were seized. *Id.*

Ms. Whitson initially conceded that she never requested a disability accommodation in relation to the 72-hour rule, because she believed that doing so "would be futile." *Id.* ¶ 10. In March 2026, after the motion for class certification was filed, a representative submitted a disability accommodation request to the City's ADA Coordinator on Ms. Whitson's behalf, explaining that she is unable to comply with the 72-hour rule because of her disabilities and requesting an immediate stay of enforcement. Whitson Declaration iso Reply (Dkt. 224) ¶¶ 3–5. The City has not responded with a final determination on Ms. Whitson's accommodation request.

Ms. Whitson remains unhoused in Berkeley and subject to the City's ongoing encampment enforcement and parking enforcement frameworks. Ms. Whitson is the sole proposed representative of the Vehicle Resident Subclass. Motion for Class Certification at 1. Ms. Whitson is also a proposed representative of the Unhoused People Class.

2.    Erin Spencer

Erin Spencer is a veteran of the United States Marine Corps and has been unhoused since 2005. Spencer Declaration ¶ 2. His disabilities include significant shoulder and back injuries causing chronic pain and limiting mobility, major depressive disorder, and PTSD. *Id.* ¶¶ 3–4. Mr. Spencer describes multiple occasions in which the City has seized and destroyed his belongings

11

without adequate advance notice, resulting in the loss of his tent, shelter materials, bedding, and his Certificate of Release or Discharge from Active Duty (DD214), which allows him to receive veteran benefits. *Id.* ¶¶ 7–8, 10–16. The loss of his shelter and building materials leaves him "exposed and without protection" and "in a worse position than before the sweep. Especially when weather is extreme." *Id.* ¶ 13. Mr. Spencer attests that even when notices are posted, they typically fail to specify dates or times, span multiple days, and are inconsistent, leaving him without a meaningful opportunity to protect his property. *Id.* ¶ 12. He also describes the sweeps themselves as triggering acute psychological responses, including panic attacks that interfere with his ability to protect his belongings. *Id.* ¶ 6.

Mr. Spencer remains unhoused in Berkeley and subject to the City's ongoing encampment enforcement framework. He is a proposed representative of the Unhoused People Class.

### 3. Jermaine White

Jermaine White resides in the area around 8th and Harrison Streets in Berkeley. White Declaration (Dkt. 162) ¶ 2. He lives with PTSD and anxiety, which affect his ability to think clearly under stress, make decisions quickly, and communicate with authority figures. *Id.* ¶ 8. He attests that his PTSD is substantially related to repeated experiences of seeing his belongings destroyed and being forced to move without adequate notice or support. *Id.* ¶ 9.

Mr. White describes multiple instances in which, upon encountering City enforcement personnel, he became overwhelmed and "froze up," leaving him unable to move his property in time. *Id.* ¶¶ 11–12. He describes a personal need for "clear instructions and additional time" before sweeps to allow him to identify necessary items to relocate. *Id.* ¶ 13. He attests that the City typically destroys entire tents along with everything inside them, without providing any means for him to retain or retrieve his belongings. *Id.* He describes losing a tent, bicycles, a valuable ring worth $1,800, and other essential property. *Id.* ¶ 6.

Mr. White remains unhoused in Berkeley and subject to ongoing encampment enforcement. He is a proposed representative of the Unhoused People Class.

///

///

####    4.    Monique Williams

Monique Williams lives with anxiety and PTSD, as well as physical disabilities.  Williams Declaration (Dkt. 163) ¶¶ 3–4.  These conditions limit her ability to withstand exposure to the elements, process and retain information, and navigate complex institutional rules.  *Id.*

Ms. Williams currently resides at the Campus Motel, a temporary non-congregate shelter operated by the City of Berkeley, where she has lived since August 2023.  *Id.* ¶¶ 2, 5.  She understood from the outset that her motel placement was temporary.  *Id.* ¶ 5.  The conditions of the Campus Motel program, including restrictions on storage that Ms. Williams attests are unclear and frequently change, are particularly difficult for her to navigate due to her cognitive and psychiatric disabilities.  *Id.* ¶¶ 9–10.  She fears that she will inadvertently violate a rule that she did not know about or remember, and will lose her shelter placement as a result.  *Id.*  Ms. Williams describes the prospect of losing her shelter as a realistic and sustained fear, not a remote contingency.  *Id.* ¶¶ 9–11.

Ms. Williams states that if she were to return to Berkeley's public spaces, she and her personal belongings would be directly subject to the City's encampment enforcement framework under AR 10.1 and AR 10.2.  Williams's prior experiences with the City's enforcement framework give her direct knowledge of how it operates and its effects.  She claims to have had her property seized and destroyed by the City without adequate notice or any meaningful opportunity to retrieve her belongings, leaving her without essential resources.  *Id.* ¶ 6 (describing seizure and destruction of RV, tools, propane tanks, pots, pans, and clothing).

Ms. Williams resides in temporary shelter in Berkeley and claims to be at risk of injury by operation of the encampment enforcement framework.  She is a proposed representative of the Unhoused People Class.

C.    Procedural Background

The operative pleading is the Third Amended Complaint, filed after the Court ruled on Defendant's motion to dismiss the Second Amended Complaint.  Order re MTD SAC (Dkt. 139); TAC (Dkt. 147).

In a related action, *Berkeley Homeless Union v. City of Berkeley*, No. 25-cv-01414-EMC

13

("*BHU*"), the Court addressed the City's planned abatement of the encampment at 8th and Harrison Streets (the "Harrison Encampment").  Several of the proposed class representatives reside in the Harrison Encampment.  On April 3, 2026, the Court issued an order granting in part and denying in part cross-motions for summary judgment, setting out the applicable constitutional and ADA standards for property seizure and disability accommodations during encampment abatements, including the requirements for individualized assessment before vehicle seizure and the City's obligations to store and handle essential property.  *See BHU*, No. 25-cv-01414-EMC (Dkt. 288).

Now before the Court is Plaintiffs' Motion for Class Certification under Federal Rule of Civil Procedure 23.  Dkt. 157.  Plaintiffs seek certification of an Unhoused People Class and a Vehicle Resident Subclass, appointment of Spencer, Whitson, White, and Williams as representatives of the Unhoused People Class, appointment of Whitson as the sole representative of the Vehicle Resident Subclass, and appointment of Disability Rights Advocates and East Bay Community Law Center as class counsel.  *Id.*

### III.    LEGAL STANDARDS

Although expressly authorized by Rule 23, the "class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'"  *Wal–Mart*, 564 U.S. at 348 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)).  "In order to justify departure from that rule, 'a class representative must be part of the class and possess the same interest and suffer the same injury as [her fellow] class members.'"  *Id.* (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)).

Accordingly, before certifying a class, the Court "must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23."  *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012) (quoting *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1186, amended 273 F.3d 1266 (9th Cir. 2001), *overruled on other grounds by Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022)).  The Supreme Court has made it clear that Rule 23 "does not set forth a mere pleading standard."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Wal-Mart*, 564 U.S. at

14

349).  Rather, the party seeking certification must "affirmatively demonstrate" their compliance with the requirements of both Rules 23(a) and 23(b).  *See Wal-Mart*, 564 U.S. at 349.

Rule 23(a) permits plaintiffs to sue as representatives of a class only if (1) "the class is so numerous that joinder of all members is impracticable" ("numerosity" requirement); (2) "there are questions of law or fact common to the class" ("commonality" requirement); (3) "the claims or defenses of the representative parties are typical of the claims or defenses of the class" ("typicality" requirement); and (4) "the representative parties will fairly and adequately protect the interests of the class" ("adequacy" requirement).  Fed. R. Civ. P. 23(a)(1)-(4).  The purpose of Rule 23(a)'s requirements is largely to "ensure[ ] that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate," and to "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims."  *Wal-Mart*, 564 U.S. at 349 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982)).

If each of the Rule 23(a) requirements are satisfied, the purported class must also satisfy one of the three prongs of Rule 23(b).  Here Plaintiffs seek certification under Rule 23(b)(2).

Rule 23(b)(2) requires the Court to find that:

> [T]he party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

Fed. R. Civ. P. 23(b)(2).

The underlying merits of the case, while admittedly relevant at the class certification stage, should not overly cloud the Court's certification analysis — the only question presently before the Court is whether the requirements of Rule 23 are met.  *See Comcast*, 569 U.S. at 33–34.  The fact that certain elements of proof may favor the defendant on the merits does not negate class certification; the issue is whether the proof is amenable to class treatment.

Moreover, so long as plaintiff establishes the factual predicates to certification by a preponderance of the evidence, "[n]either the possibility that a plaintiff will be unable to prove [her] allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for declining to certify a class which

United States District Court
Northern District of California

apparently satisfies the Rule." *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975); *see also Small v. Allianz Life Ins. Co. of N. Am.*, 122 F.4th 1182, 1197 (9th Cir. 2024) (holding that plaintiffs must prove by preponderance of evidence that the proposed class satisfies the requirements of Rule 23) (citing *Black Lives Matter L.A. v. City of L.A.*, 113 F.4th 1249, 1258 (9th Cir. 2024)).

## IV.    DISCUSSION

### A.    Preliminary Matters

#### 1.    Request for Judicial Notice

Plaintiffs request judicial notice of two documents submitted as exhibits to the Zito Declaration: (1) City of Berkeley Administrative Regulation 10.2, governing temporary noncommercial objects on sidewalks and parklets; and (2) the 2024 Alameda County Point-in-Time Count. Dkt. 171. The City does not oppose the request.

The request for judicial notice is **GRANTED** as to both the existence and the factual contents of both documents. Federal Rule of Evidence 201 permits a court to take judicial notice of facts "not subject to reasonable dispute" because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).

AR 10.2 is a publicly available municipal regulation whose text and authenticity are not in dispute. Judicial notice of a municipal ordinance or regulation is routinely granted. *See Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1025 n.2 (9th Cir. 2006). The 2024 PIT Count is a publicly available statistical report prepared and published by Alameda County. Its authenticity is not disputed and the City does not challenge the accuracy of its contents. Judicial notice of a government-published report whose accuracy is not contested is equally appropriate. *See Sanchez-Martinez v. Freitas*, 2024 WL 4309277, at *4 (N.D. Cal. Sept. 26, 2024); *United States v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003) ("Courts may take judicial notice of some public records, including the records and reports of administrative bodies."). Because neither document's contents are subject to reasonable dispute, judicial notice extends to the factual contents of each, not merely their existence. *Suarez v. Beard*, 2017 WL 2652199, at *3

(N.D. Cal. June 20, 2017).

### 2. Evidentiary Objections

Civil Local Rule 7-3(a) requires that any evidentiary objections to a motion be contained within the opposing brief, which is subject to a 25-page limit. N.D. Cal. Civ. L.R. 7-3(a). The City filed a 25-page opposition brief and separately appended a nine-page document of evidentiary objections as an exhibit to the brief — in excess of the page limit and in contravention of the Local Rule — without seeking advance leave of Court. Dkt. 213; Dkt. 213-4. Plaintiffs moved to strike the separately-filed objections as procedurally improper. Administrative Motion to Strike (Dkt. 215). The City subsequently sought retroactive leave to file the objections separately, citing the complexity of the issues and concurrent briefing demands in the related BHU litigation. Motion to File Separate Objections (Dkt. 216).

The City failed to seek advance leave despite having ample opportunity to do so. The motion for class certification had been on file since February 2026, and the City obtained a stipulated extension of its opposition deadline of approximately six weeks. It neither sought leave during that period nor trimmed its opposition brief to accommodate objections within the page limit. Nonetheless, striking the objections outright would sacrifice a complete record on account of a procedural violation that caused Plaintiffs no material prejudice. Plaintiffs had full notice of the objections and responded to them substantively in their reply. Reply iso Motion, Dkt. 222. The Court has broad discretion to manage motion practice and to excuse noncompliance with the Local Rules where the equities favor doing so. *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1129 (9th Cir. 2002).

Accordingly, the City's motion for leave to file separate evidentiary objections (Dkt. 216) is **GRANTED**. Plaintiffs' administrative motion to strike (Dkt. 215) is **DENIED**.

### 3. Evidentiary Standard

With respect to the substance of the evidentiary objections, the applicable standard on a motion for class certification is more permissible than that at trial. In other words, a district court may consider evidence that would not be admissible at trial. *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1004 (9th Cir. 2018). With respect to expert declarations, while the Court cannot credit

17

evidence that is unreliable or lacks adequate foundation, expert testimony is evaluated under a somewhat relaxed standard, particularly with respect to the probative value of expert conclusions. *Olean*, 31 F.4th at 665; *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1030–31 (9th Cir. 2024); *Orshan v. Apple Inc.*, 2024 WL 4353034, at *2 (N.D. Cal. Sept. 30, 2024).

a.      Herring Declaration

The City argues that Professor Herring's opinions are irrelevant and unreliable because they are drawn from research conducted in cities other than Berkeley — including San Francisco, New York City, New Orleans, and London — rather than from Berkeley-specific data or analysis of the City's particular enforcement practices.  Defendant's Evidentiary Objections (Dkt. 213-4) at 5–7.  The objection is **OVERRULED**.

District courts evaluating challenged expert testimony in support of class certification evaluate admissibility under the *Daubert* standard.  *See Sali*, 909 F.3d at 1006; *Lytle*, 114 F.4th at 1030–31.  While evidence need not be admissible at the class certification stage, the *Daubert* inquiry goes "to the weight that evidence is given at the class certification stage." *Lytle*, 114 F.4th at 1025 (quoting *Sali*, 909 F.3d at 1006).  The Court finds Professor Herring's declaration reliable at the class certification stage.

Professor Herring is an assistant professor and researcher whose work centers on homelessness and the health and welfare consequences of local government policies on unhoused populations.  Herring Declaration (Dkt. 169) at 2.  His declaration is based on pre-litigation research that has been published in peer-reviewed publications.  *See id.*; *see also Daubert v. Merrell Down Pharms., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995).  Although the City correctly points out that Professor Herring's research was conducted in cities outside of Berkeley, the Herring Declaration does not purport to render any conclusions about Berkeley-specific residents, encampments, or policy impacts.  Instead, the Herring Declaration is broader in scope, explaining how "move along orders," displacement, and loss of belongings harm unhoused individuals' health and wellness.  The City does not challenge Professor Herring's qualifications or his methodology.  Nor do any of the City's experts directly counter Professor Herring's methodology or opinions.  The City's expert in general and forensic psychiatry, Michael MacIntyre, explicitly

United States District Court
Northern District of California

United States District Court
Northern District of California

stated that his "purpose . . . is not to evaluate [Plaintiffs' experts'] observations, but to identify relevant issues that their frameworks, however well-grounded within their own fields, do not and cannot answer. MacIntyre Declaration (Dkt. 213-1) at 17. Specifically, Dr. MacIntyre describes Dr. Herring's opinions as concerning "population-level patterns in encampment enforcement," while Dr. MacIntyre evaluates the individualized nature of disabilities and accommodations, which are "dependent on the specific person's diagnosis, functional limitations, and circumstances." *Id.* at 19. The MacIntyre Declaration renders opinions about a separate matter and does not purport to attack Professor Herring's methodology, credentials, or reliability. The same is true of the Jeffrey Goodyear declaration, which does not contain any comment about the Herring Declaration and does not list the Herring Declaration among the materials reviewed. *See* Goodyear Declaration (Dkt. 213-2).

The absence of Berkeley-specific data in the Herring Declaration does not render comparative research from peer jurisdictions inadmissible at this stage. The City's objection goes to the weight of Herring's opinions, not their admissibility. The City does not demonstrate that Professor Herring's conclusions are unsound, unsupportable, or otherwise irrelevant or useless in proving the material and health-based impacts of municipal encampment enforcement policies. The evidence has probative value relevant to Berkeley absent a showing otherwise. The City has not demonstrated that there is a fundamental flaw in Professor Herring's methodology. Accordingly, Professor Herring's declaration is considered for the purpose of establishing the systemic and widespread character of harms associated with encampment enforcement — comparative context that is relevant to evaluating the scope and nature of the challenged practices — and not necessarily as direct proof of any particular fact specific to Berkeley.

b.     deBree Declaration

The City objects to the deBree declaration on three grounds: (1) lack of personal knowledge under FRE 602 as to certain paragraphs; (2) improper lay opinion testimony under FRE 701; and (3) hearsay as to patient-reported statements in paragraphs 11 and 13. Defendant's Evidentiary Objections at 7–10. The objections are **OVERRULED**.

Olivia deBree is a licensed nurse practitioner who has provided direct clinical street

United States District Court
Northern District of California

medicine services to Berkeley's unhoused population through LifeLong Medical Care for over a decade. deBree Declaration ¶¶ 2–3. Her observations about the health consequences of encampment enforcement operations, the loss of medications and medical supplies during sweeps, and the disruption of ongoing clinical care are squarely within the scope of her direct clinical experience with this specific population. And again, although the City's expert Dr. MacIntyre explains that disabilities are individualized in their roots, symptoms, and necessary accommodations, he does not contest NP deBree's credentials, methods, or the contents of her declaration. *See* MacIntyre Declaration at 11–20 (concluding that NP deBree's declaration simply underscores the individualized nature of disabilities); *see also* Goodyear Declaration (containing no opinion about the deBree declaration). For the foregoing reasons, the Court finds NP deBree's declaration sufficiently reliable at this stage.

As to hearsay, medical practitioners may rely on patient-reported statements in forming clinical opinions. Fed. R. Evid. 703; *Trujillo v. Cnty. of L.A.*, 751 F. App'x 968, 970–71 (9th Cir. 2018) ("Expert witnesses may offer opinions on matters of which they do not have firsthand knowledge so long as it is permissible in their discipline. Medical experts regularly rely on a person's treatment records to form their opinions, and Dr. Dobkin saw Trujillo in person. The district court did not abuse its discretion by admitting Dr. Dobkin's declaration.") (citation omitted); *Calloway v. Contra Costa Cnty. Jail Corr. Officers*, 2007 WL 134581, at *16 (N.D. Cal. Jan. 16, 2007) (Armstrong, J.). The deBree declaration is therefore considered for the probative value of her clinical observations and professional assessments on health outcomes generally, not as affirmative proof of the truth of any particular patient-reported statement.

c.    Class Representative and Member Declarations (Whitson, Fuchs, Peddycoart, and Holder)

The City raises FRE 701 objections to several declarations, contending that certain statements constitute legal conclusions or speculation rather than admissible lay witness testimony. Defendant's Evidentiary Objections at 2–5. The City further argues that the White declaration should be disregarded as a sham affidavit inconsistent with his deposition testimony. The City's objections are **OVERRULED**.

20

The statements challenged are lay opinions rationally based on each declarant's direct personal observations: the loss of their own property, their individual experiences during City enforcement operations, and their understanding of those events.  Such testimony falls squarely within the scope of admissible lay opinion under FRE 701.  *See, e.g.*, *U.S. v. Whittemore*, 776 F.3d 1074, 1082 (9th Cir. 2015) ("However, 'personal knowledge includes opinions and inferences grounded in observations and experiences.'"); *Dill v. United States*, 2007 WL 1839817, at \*6 (N.D. Cal. June 26, 2007) ("A lay witness such as Harris can testify to events which he perceives and of which he has personal knowledge.").

The City separately objects to certain statements in the White and Spencer declarations, labeling them "sham affidavits" to the extent those statements contradict their deposition testimony.  Courts may bar a party from manufacturing a dispute of fact at the summary judgment stage by submitting an affidavit that flatly contradicts clear prior deposition testimony.  *See Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 267 (9th Cir. 1991).  First, this matter is not up on summary judgment, and a disputed issue of fact is not dispositive.  Moreover, the inconsistencies that the City identifies — including questions about White's ability to identify specific seized items and Spencer's physical disabilities — are matters bearing on incomplete recollection or even credibility, rather than the kind of direct, irreconcilable contradictions that the case law addressing sham affidavits tends to address.  *See, e.g.*, *id.* (holding that a contradictory affidavit is itself insufficient to invoke the doctrine and that the doctrine is instead "concerned with 'sham' testimony that flatly contradicts earlier testimony in an attempt to 'create' an issue of fact and avoid summary judgment"); *Foster v. Arcata Assocs.*, 772 F.2d 1453, 1462 (9th Cir. 1985) ("[I]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.").  At this stage, the Third Amended Complaint and the declarations at issue are consistent in establishing that Mr. White and Spencer have experienced property losses during Berkeley's encampment enforcement operations.  That consistency is sufficient for the present purpose of adjudicating the class certification motion, and the weight of any inconsistencies is a matter of credibility reserved for

trial. *See, e.g.*, *Hernandez v. Cnty. of Monterey*, 305 F.R.D. 132, 161 (N.D. Cal. 2015) ("And inconsistent deposition testimony in and of itself will not serve as a ground for denial of class certification.") (brackets and internal quotation marks omitted); *Perez v. It Works Mktg., Inc.*, 2025 WL 3500539, at \*5 (N.D. Cal. Sept. 2, 2025) (same).

B.    Motion for Class Certification

Before addressing the individual Rule 23(a) factors, the Court notes that Plaintiffs request declaratory and injunctive relief only, and seek certification exclusively under Rule 23(b)(2). Rule 23(b)(2) was designed in large part for civil rights actions like this one, which seeks declaratory and injunctive relief to reform an allegedly injurious systemic policy or practice, without the need for individualized inquiry into each member's damages. *See Parsons v. Ryan*, 754 F.3d 657, 686–88 (9th Cir. 2014) ("Although we have certified many different kinds of Rule 23(b)(2) classes, the primary role of this provision has always been the certification of civil rights class actions.").

The Court now proceeds to analyze the individual elements necessary for class certification.

1.    Rule 23(a)(1) — Numerosity

Rule 23(a)(1) requires that the class be so numerous that joinder of all members would be impracticable. Fed. R. Civ. P 23(a)(1). Numerosity is generally presumed where a class exceeds forty members, though no absolute threshold applies. *Rannis v. Recchia*, 380 F. App'x 646, 651 (9th Cir. 2010). The Court may rely on "reasonable inferences" from the available evidence to assess whether joinder is impracticable. *In re Yahoo Mail Litig.*, 308 F.R.D. 577, 590 (N.D. Cal. 2015) (Koh, J.). Where, as here, only injunctive and declaratory relief is sought, the requirement may be satisfied by reasonable inference from available data without a precise count of all class members. *Sueoka v. United States*, 101 F. App'x 649, 653 (9th Cir. 2004) ("Because plaintiffs seek injunctive and declaratory relief, the numerosity requirement is relaxed and plaintiffs many rely on the reasonable inference arising from plaintiffs' other evidence that the number of unknown and future members of [the] proposed class . . . is sufficient to make joinder impracticable."); *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1203 (N.D. Cal. 2017) (Chhabria, J.).
///

United States District Court
Northern District of California

United States District Court
Northern District of California

a.    Unhoused People Class

The proposed Unhoused People Class satisfies numerosity.  The proposed class encompasses all unhoused persons with a disability, as defined under the ADA, 42 U.S.C. § 12102, who reside in a vehicle or other shelter in public spaces, or in temporary or transitional shelter in Berkeley.  Motion for Class Certification at 1–2.  Three independent sources of evidence establish numerosity here.

*First*, the 2024 Point in Time Count, of which the Court takes judicial notice, reported 844 unhoused individuals in Berkeley on a single night in January 2024, of whom 445 were unsheltered and 399 resided in emergency or transitional shelter.  Zito Declaration, Ex. A at 1.  The class encompasses both groups.  Of the 844 total individuals, 43% (approximately 363 people) reported having a serious mental illness.  *Id.* at 2.  But the class is almost certainly larger than the PIT Count reflects.  The Ninth Circuit has recognized that point-in-time counts like this one likely undercount the actual unhoused population, as individuals may secure temporary housing on the night of the census and because adverse weather conditions in the Winter season affect the numbers of volunteers and unhoused people outside.  *Martin v. City of Boise*, 920 F.3d 584, 604 (9th Cir. 2019) ("The PIT Count likely underestimates the number of homeless individuals in Ada County.  It is 'widely recognized that a one-night point in time count will undercount the homeless population[.]'"), *abrogated on other grounds by City of Grants Pass v. Johnson*, 603 U.S. 520 (2024).

*Second*, the City Manager's 2023 report to the City Council estimated that approximately 2,300 people experienced homelessness in Berkeley over the course of 2023, and that over 80% of those individuals had some type of disability.  Zito Declaration, Ex. B at 25–28.

*Third*, nurse practitioner Olivia deBree attests from direct personal experience that "many (indeed, most) of Berkeley's unhoused residents have physical and/or mental disabilities."  deBree Declaration ¶ 7.  Her opinion is grounded in over a decade of experience providing direct medical care to Berkeley's unhoused population, during which she has personally observed and treated conditions including PTSD, spinal cord injuries, seizure disorders, schizophrenia, heart failure, dementia, HIV/AIDS, diabetes, cancer, among many others.  *Id.* ¶¶ 2–3, 7.  NP deBree's direct

23

clinical observations pertaining to numerosity are consistent with the City's own administrative estimates.

Plaintiffs maintain that all unhoused people with disabilities in Berkeley are subject to the AR 10.1 and AR 10.2 enforcement regime. The City's 30(b)(6) designee confirmed that no location within Berkeley exists where an unhoused person may lawfully reside without being subject to the City's enforcement authority. Zito Declaration, Ex. E (Radu Deposition) at 35:15–24. That significant breadth of exposure suffices for class membership purposes. *See Parsons*, 754 F.3d at 688 ("In this case, all members of the putative class and subclass are allegedly exposed to a substantial risk of serious harm by a specified set of centralized ADC policies and practices of uniform and statewide application.").

In light of the above evidence, the class exceeds forty members. Joinder of hundreds, and plausibly over a thousand, individuals lacking stable residence is plainly impracticable. Accordingly, numerosity is **SATISFIED** as to the Unhoused People Class.

> b.      Vehicle Resident Subclass

The record also supports a finding of adequate numerosity for the Vehicle Resident Subclass. The proposed subclass covers disabled unhoused persons residing in vehicles in Berkeley's public spaces who are unable to comply with the 72-hour parking restriction by reason of disability. Membership requires two elements: vehicle residency and a disability preventing compliance.

On the first prong of vehicle residency, the 2024 PIT Count reported that approximately 49% of Berkeley's 445 unsheltered individuals, or roughly 218 people, resided in vehicles. Zito Declaration, Ex. A at 1.

On the second prong of disability, the City's 2023 report estimated that 82% of Berkeley's unhoused population had some type of disability. Zito Declaration, Ex. B at 28. The Court acknowledges that this figure covers the unhoused population generally and is not calibrated specifically to the vehicle residents, but it is appropriate to draw a reasonable inference of numerosity from the best available figures. *See Sueoka v. United States*, 101 F. App'x 649, 653 (9th Cir. 2004); *Californians for Disability Rights, Inc. v. Cal. Dep't of Transp.*, 249 F.R.D. 334,

24

347 (N.D. Cal. 2008) (Armstrong, J.) ("Here, there is no real question that there are *at least* 22 class members, and, extrapolating from the statistical data presented by plaintiffs, common sense dictates that there are thousands — if not hundreds of thousands — more.") (emphasis in original). The PIT Count's countywide data further supports this inference of sufficient numerosity: 32.5% of respondents identified a physical disability and 34.8% reported a serious mental illness. Zito Declaration, Ex. F at 16. Applied to the approximately 218 vehicle residents, these figures support a reasonable estimate of an adequately numerous subclass.

The PIT Count's vehicle residency figures and the City's own disability prevalence estimates together establish, by a preponderance of the evidence, that the subclass well exceeds forty members. The transient character of the population further underscores the impracticability of joinder of individual plaintiffs. *See, e.g.*, *Opulento v. Dep't of Pub. Safety*, 2022 WL 2359092, at *3 (D. Haw. June 30, 2022) (Kobayashi, J.) (finding satisfaction of numerosity requirement because "there are at least forty-five individuals that meet the Class definition, and the transient nature of the proposed Class would make joinder impractical"); *Rivera v. Holder*, 307 F.R.D. 539, 550 (W.D. Wash. 2015) ("Thus, especially given the transient nature of the class and the inclusion of future class members, the Court finds the class sufficiently numerous and joinder impractical.").

Accordingly, numerosity is **SATISFIED** as to the Vehicle Resident Subclass.

2.      Rule 23(a)(2) — Commonality

Rule 23(a)(2) requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). What matters is "not the raising of common 'questions' — even in droves – but, rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350. A class satisfies Rule 23(a)(2) only when its claims "depend upon a common contention of such a nature that . . . its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Id.* The Ninth Circuit has consistently held that commonality is satisfied "where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001); *overruled on other grounds by Johnson v. California*, 543 U.S. 499 (2005); *accord Powers v. McDonough,* 163 F.4th 1162 (9th Cir. 2025). In such cases, "individual

United States District Court  
Northern District of California

factual differences among the individual litigants or groups of litigants will not preclude a finding of commonality." *Armstrong*, 275 F.3d at 868.

a.    Unhoused People Class — Property Seizure and Destruction Claim

The Court begins by establishing the analytical framework for determining the level of exposure to harm or risk of constitutional injury sufficient to satisfy Rule 23(a)(2).

The answer is supplied in large part by *Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014), *Brown v. Plata*, 563 U.S. 493 (2011), and *Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2001). Together, these authorities establish that the constitutional injury for class certification purposes may be the systemic exposure to harm and the risk of suffering that harm, and not necessarily the actualization of harm suffered by any individual class member. As *Parsons* explained: "although a presently existing risk may ultimately result in a different future harm for different inmates — ranging from no harm at all to death — every inmate suffers exactly the same constitutional injury when he is exposed to a single statewide ADC policy or practice that creates a substantial risk of serious harm." 754 F.3d at 678. Indeed, *Parsons* was explicit that "[s]ome inmates may not actually be harmed, but they are all allegedly exposed to a risk of harm that is, in its own right, a constitutional injury amenable to resolution in a class action." *Id.* at 680. Common class treatment is appropriate where the defendant's policies expose every class member to the same deficient framework, regardless of how that exposure ultimately manifests for each individual.

This principle, while stated most clearly in *Parsons*, pre-dates that decision. The Supreme Court recognized in *Helling v. McKinney*, 509 U.S. 25 (1993), that in the Eighth Amendment context, it "would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them," and that "a remedy for unsafe conditions need not await a tragic event." *Id.* at 33. *Brown v. Plata*, 563 U.S. 493 (2011) distinguished between challenges to care in prisons provided "on any one occasion" — which do in fact require individualized proof — and challenges to "systemwide deficiencies" that, "taken as a whole, subject sick and mentally ill prisoners in California to 'substantial risk of serious harm.'" *Id.* at 505 n.3 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The latter category does not require proof that any particular class member has yet

United States District Court
Northern District of California

suffered harm (such as death), because the systemic deficiency and the resulting risk of harm constitute the common constitutional injury suffered by all members of the class.[1]

Armstrong applied this principle to ADA claims, recognizing that systemic discriminatory treatment in parole proceedings violated federal law as to every affected disabled prisoner regardless of whether each had yet been denied parole or suffered a tangible consequence. 275 F.3d at 864–65. And the Ninth Circuit recently reaffirmed this principle outside of the detention context in Powers, 163 F.4th 1162, rejecting an argument that common questions were absent because the class members' claims "turn on each veteran's individual circumstances," and holding instead that a system-wide failure placing veterans "at serious risk of institutionalization" was sufficient for commonality. Id. at 1185. Other district court cases from within this circuit have recognized the applicability of this principle outside of the prison context. See, e.g., Sweet v. DeVos, 2019 WL 5595171, at *7 (N.D. Cal. Oct. 30, 2019) (Alsup, J.) ("At bottom, plaintiffs challenge the policy of inaction — to which each class member was subjected — not the outcome of each application."); Lyon v. U.S. Immigr. & Customs Enf't., 171 F. Supp. 3d 961, 983 (N.D. Cal. 2016) (Chen, J.) ("Plaintiffs need not demonstrate every member of the class has suffered from an adverse effect on the outcome of their renewal hearing. . . . This is particularly the case in a Rule 23(b)(2) class action, where the defining feature is whether 'the party opposing the class has acted or refused to act on grounds that apply generally to the class[]' and whether injunctive relief is appropriate respecting the class as a whole.") (emphases in original); see also Sullivan v. City of Berkeley, 328 F.R.D. 352 (N.D. Cal. 2018) (certifying class of unhoused individuals in Berkeley subject to the City's policies and practices of property collection, storage, and disposal, without requiring proof of injury).

---

[1] The "substantial risk of serious harm" standard in Parsons and Helling is specific to the Eighth Amendment context. For Plaintiffs' property seizure claim under the Fourth and Fourteenth Amendments and California Constitution Article I, § 13, the constitutional injury is interference with possessory interests in unabandoned personal property without adequate notice, process, or justification. Lavan v. City of L.A., 693 F.3d 1022, 1027–33 (9th Cir. 2012) (holding that the Fourth and Fourteenth Amendments protect possessory interests in unabandoned personal property from seizure and summary destruction, and that any meaningful interference with those interests triggers the Fourth Amendment's reasonableness requirement and Fourteenth Amendment's due process requirements). No particular quantum or degree of harm beyond that interference is required.

27

United States District Court
Northern District of California

United States District Court
Northern District of California

Instead of challenging individual enforcement decisions, Plaintiffs challenge the adequacy, as a structural matter, of the written regulatory framework itself *and* the systemic enforcement practice that framework has produced.  The common question for purposes of Rule 23(a) is whether the City's encampment enforcement framework, as written in AR 10.1 and as systematically and consistently administered, provides constitutionally adequate process for the seizure and destruction of unhoused persons' personal property.  That question applies identically to every member of the Unhoused People Class because every member is continuously subject to the same regulatory framework.  The City's own 30(b)(6) designee confirmed there is no location in Berkeley where an unhoused person may reside without being subject to the City's enforcement authority under AR 10.1.  Zito Declaration, Ex. E (Radu Deposition) at 34:20–35:2.  The framework operates uniformly across all enforcement operations citywide — whether that framework is constitutionally adequate can therefore be answered without being bogged by any individual member's particular circumstances.  Under the framework described above and below, all members of the class are exposed to a substantial risk of harm from a common regulatory scheme that is allegedly unconstitutional.  The question of whether the systemic framework is constitutionally adequate does not require proof that any individual class member has had property actually destroyed.

In this regard, Plaintiffs identify two distinct structural and systemic deficiencies. Together, Plaintiffs identify a common classwide question answerable for the class as a whole.

***First***, Plaintiffs raise a facial challenge to the City's written policies.  AR 10.1 categorically directs field staff to immediately destroy "loose or scattered papers," "broken or disassembled items or those stripped or parts," and bicycle frames, all without any individualized evaluation of their contents ownership, condition, or value.  Zito Declaration, Ex. C (AR 10.1) at 3.  This categorical directive applies to every enforcement operation in which such items are encountered.  Plaintiffs contend that the rule is unconstitutional in all its applications, because no application of a rule that categorically mandates the destruction of potentially unabandoned personal property without any particularized inquiry can satisfy the Fourth and Fourteenth Amendments of the Constitution, and Article I, § 13 of the California Constitution.  Motion for

28

United States District Court
Northern District of California

Class Certification at 1.

The fact that the policy operates uniformly in practice, not merely on paper, is confirmed by the City's own 30(b)(6) designee, who acknowledged that categorical destruction of loose papers is a consistent practice across all encampment enforcement operations, applied even to Social Security cards, military discharge certificates, and medical records, though City staff "theoretically" could exercise discretion to retain such documents despite the text of AR 10.1. Zito Declaration, Ex. E (Radu Deposition) at 156:15–157:14. The constitutional question that AR 10.1 presents is therefore one of a classwide character, and Plaintiffs challenge the lawfulness of the written policy itself rather than particularized circumstances of any individual. Because the categorical directive applies uniformly to every enforcement operation, every class member faces identical exposure to that facially deficient policy. All class members face a "substantial risk of serious harm," given the pervasiveness of the City's policies and practices, the evidence of serious mental and health impacts on Plaintiffs from the City's enforcement framework, and the evidence of immediate and downstream consequences from municipal enforcement, as described by Professor Herring and NP deBree. *See Parsons*, 754 F.3d at 678; *Plata*, 563 U.S. at 505 n.3.

***Second***, Plaintiffs challenge the framework's broader structural inadequacies. AR 10.1 authorizes field staff to classify property as "soiled," "hazardous," or "abandoned," and to destroy it on that basis without first storing the property for a duration of time and providing an opportunity for retrieval. Zito Declaration, Ex. C at 3. AR 10.1 defines none of those operative terms, it provides no guidance to staff on how to interpret those terms, and it has not been the subject of any staff training since before the COVID-19 pandemic. Zito Declaration, Ex. E at 155:1–157:14; 203:1–21. The enforcement regime thus fails to guide City staff in making constitutionally significant decisions by lacking a formal methodology for valuing items and leaving operative terms like "soiled" or "abandoned" undefined, all without even basic training to distinguish protected property from genuinely abandoned or otherwise disposable material. Every class member is therefore subject to property classification and seizure decisions made without any defined constitutional standard. The exposure to harm is common to all class members.

To compound these alleged structural enforcement defects and the commonality of the

harm threatened, Plaintiffs demonstrate that City staff consistently fail to comply with the few protections that are incorporated into the policy. Most notably, AR 10.1 requires City staff to photograph unattended property before removal: "City Staff shall photograph Unattended Property before it is removed, regardless of whether it is going to be disposed of or stored." Zito Declaration, Ex. C (AR 10.1) at 2. The City's consistent practice, however, is to photograph encampment areas as a whole rather than individual items. Zito Declaration, Ex. E (Radu Deposition) at 151:18–153:1 (stating that "it's impossible in practice" to take photographs of individual property, including tents, and that "we will . . . do our best to take photos that encompass an entire area if we know that that area is going to be removed. And then if property is going to be stored, it's taken to the corp yard, and that's where photographs are taken, . . ."). This insistence on documenting wide areas rather than an individual's specific property, even when seizing and destroying tents, results in an absence of item-specific records documenting what property was taken, from whom, and on what basis any particular item was classified for destruction rather than storage.

Indeed, the outcomes of the City's enforcement operations confirm a pervasive pattern of seizure and destruction. Over approximately three years, the City conducted 97 enforcement operations — 52 encampment closures, 34 deep cleaning operations, and 11 RV closures — from which it disposed of approximately 959,800 pounds of material. Roznowski Declaration, Ex. H at 9–12. Despite that significant volume, the City issued only 34 Property Inventory Notices. *Id.* Property Inventory Notices are the formal mechanism for documenting stored property and informing individuals about retrieval opportunities. *Id.* The astronomical disparity between the volume of destroyed property and the near-absence of actual storage of property demonstrates the systematic and pervasive nature of the City's actual practice of destroying property. This record confirms not only the systemic character of the exposure to injury, but the fact that the risk of actual harm from that exposure is in fact substantial.

AR 10.2 further reinforces these structural deficiencies of the City's policies and practices in another respect. By restricting unhoused persons' personal property to a 3x3 foot space, the regulation imposes a limit that cannot, as a practical matter, accommodate mobility devices,

30

medical equipment, and essential survival gear and shelter including tents.  Motion for Class Certification at 5–6.  The policy thus generates a predictable and pervasive recurrence of enforcement action risking unconstitutional property seizure and destruction.

Taken together, these elements present a common constitutional question susceptible to a single classwide answer: does the City's framework, as written and as consistently administered, provide constitutionally adequate standards, notice, and procedural safeguards for the seizure and destruction of property belonging to every member of the Unhoused People Class?  The City's policies and practices systemically pose a substantial risk of serious harm to class members, thereby giving rise to common constitutional questions.

The City relies principally on *Willis v. City of Seattle*, 943 F.3d 882 (9th Cir. 2019), for the proposition that class certification is categorically improper in encampment enforcement cases.  The differences between *Willis* and this case are material, however.  *Willis* affirmed denial of class certification on two related grounds: (1) that the plaintiffs' commonality argument "rested upon extra-regulatory conduct" — *i.e.*, employees acting contrary to the City's own written policies, rather than challenging the policies themselves; and (2) that the plaintiffs had themselves conceded that "each sweep is different," meaning plaintiffs had not experienced the same challenged practice or injury.  *Id.* at 885–87.  Both deficiencies are absent here.

Plaintiffs challenge AR 10.1 itself, specifically its categorical destruction provisions and the structural absence of definitional standards, training, and item-level documentation.  Plaintiffs do not contend that Berkeley's field staff deviate from AR 10.1 as a form of extra-regulatory conduct, but that the enforcement framework is itself uniform, systemic, and pervasive and hence "unconstitutional in all relevant applications."  *Id.* at 886; *see* Reply iso Motion at 10 ("Plaintiffs here allege that the City has a uniform policy and practice of destroying property that is protected by the Fourth Amendment.").  Unlike in *Willis*, the challenge is directed at the written regulatory framework and the uniform enforcement practice it has produced, not at deviations from that framework by individual employees.  And the *Willis* majority itself acknowledged that a "systemic deficiency or overarching policy of wrongdoing" may satisfy commonality.  *Id.* at 885; *see also Parsons*, 754 F.3d at 680 ("As exemplified by *Plata*, claims of this kind, involving detailed factual

31

and legal allegations of specified systemic deficiencies in prison conditions giving rise to a substantial risk of serious harm, have long been brought in the form of class action lawsuits."). The *Willis* plaintiffs failed to satisfy that standard because they presented no evidence of a specific practice uniformly applicable to all class members, and because their commonality argument rested on individual employees disregarding written policies rather than identifying any provision of those policies as uniformly deficient. *Id.* at 885–87. Plaintiffs here have done both: they identify specific written provisions as constitutionally deficient — AR 10.1's categorical destruction directives, its undefined operative terms, its absence of staff training, and the practice of photographing encampments rather than individuals' property — and connect those provisions and practices to a documented, consistent enforcement pattern that disposed of nearly one million pounds of material over three years.

The City also invokes *Wal-Mart* for the proposition that challenges directed at individual employees' exercise of discretion do not give rise to a common contention capable of class-wide resolution. While that is an accurate statement of the *Wal-Mart* holding, the cases are distinct in critical ways. In *Wal-Mart*, the Supreme Court held that a class of 1.5 million women employees failed to establish commonality because individual store managers exercised otherwise-neutral authority in a discriminatory way, and there was no common question linking the multitude of individual decisions. 564 U.S. at 343–45, 349–55. The challenge in *Wal-Mart* was not directed at a discriminatory policy itself, but to the discriminatory manner in which the individual managers exercised employment decisions. *Id.* Because the violation rested in each manager's individual decisionmaking, rather than a corporate policy, there were, as *Parsons* later explained, "many answers" to the central question of "why was I disfavored," and "demonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's." *Parsons*, 754 F.3d at 681 (quoting *Wal-Mart*, 564 U.S. at 355–56).

Here, the alleged constitutional deficiency is the City's enforcement framework itself, not merely individual applications of it. Plaintiffs do not allege that Berkeley employees have applied an otherwise adequate framework in an arbitrary or discriminatory manner on particular occasions; they contend that the overarching framework is constitutionally deficient because it gives rise to a

32

"uniform policy and practice of destroying property" that is constitutionally protected. Reply iso Motion at 11. Specifically, the City's enforcement framework mandates the categorical destruction of discrete categories of property regardless of value, ownership, or the existence of any legitimate public health or safety justifications, and it fails to provide the minimum procedural safeguards: no definitions of "soiled," "hazardous," or "abandoned"; no methodology for valuing property before destruction; no staff training on the application of these significant terms; and no item-level documentation of what is seized and on what basis. Those deficiencies are textual and structural, embedded in the written regulation itself and manifested in the City's uniform and consistent enforcement practices.

The City also suggests that divergences in how individual class members have experienced enforcement defeats commonality. But as discussed above, under *Parsons*, this argument is foreclosed. As noted in *Parsons*, "[t]he defendants' insistence that commonality is defeated by individual variations in preexisting conditions, demand for medical care, and response to treatment is incorrect." *Parsons*, 754 F.3d at 680 n.23. Dissimilarities between class members "do not in any way bear on or disrupt what they allegedly have in common, and it is that common exposure . . . that constitutes the core factual predicate of their shared legal claim." *Id.*; *see also Powers*, 163 F.4th at 1185 ("The VA's contention that to adjudicate these claims, the court will have to analyze every single Plaintiffs' situation individually is unavailing. We have held that in civil-rights suits challenging system-wide practices or policies, 'individual factual differences among the individual litigants or groups of litigants will not preclude a finding of commonality.'") (quoting *Armstrong*, 275 F.3d at 868). Here, the evidence reflects a pattern of enforcement consistent across operations, resulting in a pervasive pattern of property destruction. The constitutional injury here is the substantial risk of harm to which class members are subjected.

Every member of the Unhoused People Class is subject to the same enforcement framework, applied through the same consistent practices. All class members are subjected to a substantial risk of serious harm as a result of that pattern and practice of enforcement. Whether the City's enforcement framework is constitutionally adequate is answerable in one stroke for the entire class. Accordingly, commonality is **SATISFIED** as to the Unhoused People Class's

property seizure and destruction claim.

b.    Unhoused People Class — State-Created Danger Claim

The state-created danger doctrine requires proof that the government's affirmative conduct created or materially exacerbated a danger that was particularized to the specific plaintiff. Such dangers must be distinct from the dangers inherent in Plaintiffs' pre-existing circumstances, and causally attributable to the specific government act. *Sinclair v. City of Seattle*, 61 F.4th 674, 680 (9th Cir. 2023). The doctrine is therefore structured around a before-and-after comparison: what were the plaintiff's conditions before the government acted, and did the government's affirmative act place the plaintiff in a materially more dangerous position than the plaintiff would otherwise have faced?

Under the facts presented here, the before-and-after comparison cannot be conducted classwide. The relevant variables differ substantially across class members and enforcement encounters. Whether any given enforcement act gives rise to a cognizable state-created danger claim turns on, among other things, whether the class member had functional shelter before the act, whether that shelter was actually destroyed as opposed to relocated, whether adequate alternative shelter was offered and accessible to the class member, and whether the class member's post-enforcement circumstances were materially more dangerous than those that preceded the government intervention. Across a class of potentially hundreds of individuals subject to dozens of enforcement operations over multiple years, these variables do not converge on a single common answer. Plaintiffs' own circumstances illustrate this point: some have vehicular shelter, some have tents, some have neither; some were offered City shelter, some were not, and others were offered shelter that was inaccessible due to their particular disabilities; some were displaced in extreme weather, others under different conditions. The state-created danger inquiry is thus plaintiff-specific in precisely the way that the doctrine's own elements demand.

The post-enforcement availability and accessibility of shelter is itself an individualized variable that defeats commonality. The City has represented that it regularly offers shelter placements during enforcement operations, and the record reflects that several named plaintiffs were offered non-congregate shelter and declined. *See* Azizi Declaration, Ex. 6 (Spencer

Deposition) at 41:17–42:4; *see also* Ex. 7 (White Deposition) at 28:3–17.  Whether an offer of shelter forecloses a state-created danger claim, or whether the shelter was genuinely accessible in light of an individual's disability, is not a question answerable on a classwide basis.  That inquiry is inherently individualized.

As this Court found in the related *BHU* matter, No. 25-cv-01414-EMC, the City's encampment management program "does not operate by categorizing locations as universally permissible or impermissible — it operates by assessing conditions on the ground and responding to hazardous or obstructive conditions as they arise."  No. 25-cv-01414, Dkt. 288 at 44 (citing Radu Declaration (Dkt. 219-4) ¶¶ 6–12).  Because the viability of the state-created danger claim turns on specific on-the-ground conditions, the common question Plaintiffs would need to establish cannot be answered in one stroke.

The Court's summary judgment order in *BHU* held that the City's destruction of tents serving as primary shelter for identified residents of the Harrison Encampment could constitute state-created danger, because such actions would transform those individuals from unhoused but sheltered to unhoused and unsheltered, thereby exposing them to the elements and physical dangers they would not otherwise face.  *Id.* at 43–44, 58.  While the *BHU* order established the legal standard that affirmative destruction of primary shelter can, under defined circumstances, satisfy the state-created danger doctrine's elements, that determination was made with respect to a specific and identified group of individuals at a specific encampment whose shelter situations, health circumstances, and planned displacement were documented and known to the Court.  The doctrine's requisite before-and-after comparison was tenable in that context, precisely because the analysis was bounded, specific, and individualized.  For the reasons stated above, applying that legal standard on a classwide basis to this particular class, however, does not produce a common question that can be answered "in one stroke."  *Wal-Mart*, 564 U.S. at 350.  The circumstances for each individual relevant to the state-created danger claim are too varied, turning upon — among other things — whether the City has offered, and whether the individual is able to access, alternative shelter that would prevent the affected individual from being rendered completely unsheltered.  Scaled to a class of hundreds of individuals across an entire city and multiple

United States District Court
Northern District of California

enforcement operations, this issue does not generate a single common answer, but a series of plaintiff-specific inquiries.

Accordingly, commonality is **NOT SATISFIED** with respect to Plaintiffs' state-created danger claim. The Court finds that a class cannot be certified as to that claim under Rule 23(b)(2), and certification is therefore **DENIED** with respect to the state-created danger claim. Denial of certification at this stage does not affect any Plaintiff's individual state-created danger claim.

c.    Vehicle Resident Subclass — 72-Hour Rule Claim

The Vehicle Resident Subclass challenges the City's administration of Berkeley Municipal Code § 14.36.050, which prohibits parking a vehicle in the same location for more than 72 consecutive hours. Motion for Class Certification at 10. The question presented by the Vehicle Resident Subclass is narrow and specific: whether the City's categorical policy of denying all disability accommodation requests from the 72-hour parking restriction, on the ground that any such accommodation would constitute a fundamental alteration or undue burden, violates Title II of the ADA. *Id.* at 14–15. Due to the *categorical* nature of the accommodation denials and Plaintiffs' challenge (as proven by the evidence as discussed below), the question does not turn on any individual subclass member's particular disability, on the specific manner in which their disability prevents compliance with the 72-hour rule, or any other individualized circumstance. Either the City's categorical invocation of the fundamental alteration and undue burden defense (and resulting refusal to consider an accommodation) is legally valid, or it is not. That is a single question answerable in one stroke for every subclass member.

The evidence of the City's categorical position is consistent across the record and supports a finding that the common question is answered the same way for every subclass member. The City's ADA Coordinator, Thomas Gregory, articulated the fundamental alteration and administrative burden defenses in nearly-identical terms across every accommodation request in the record: an individualized exemption from the 72-hour rule would require deviation from the City's automated, uniform parking enforcement program and would undermine its core purpose of promoting vehicle turnover and ensuring equitable parking access. *E.g.*, Roznowski Declaration, Ex. G (Gregory Declaration) ¶¶ 18–20 (explaining the City's position that exemptions from

parking rules would be "unduly burdensome and would fundamentally alter the encampment management program by subordinating urgent hazard response and equitable use to personal requests"); Fuchs Declaration, Ex. A (Dkt. 172-1) at 11–12 (City denying accommodation from 72-hour rule for individual with physical and mental health disabilities on fundamental alteration grounds); Prado Declaration ¶¶ 8–13 (detailing Gregory's substantively identical responses to the accommodation requests submitted by Prado and BHU on behalf of Adrien Bouchard, Ray Johnson and Vanessa Bichard, and Merced Dominguez).  The Gregory declaration confirms that this position applies uniformly across the board: "Granting individualized exemptions for Plaintiffs would require creating a new program for personalized parking enforcement" and would "fundamentally alter the encampment management program," irrespective of the nature of the requesting individual's disability.  Roznowski Declaration, Ex. G (Gregory Declaration) ¶ 19. That uniform articulation of the City's position provides the "glue" that *Wal-Mart* requires.  564 U.S. at 352.

Here, there is more than a risk of harm as in, *e.g.*, *Parsons*, 754 F.3d at 678–80.  The harm suffered — alleged violation of the ADA — is essentially certain given the uniform and categorical position the City is taking.

The City argues that class certification is improper because subclass members have differing disabilities preventing compliance with the 72-hour rule, thus requiring individualized inquiry into each member's circumstances.  This argument misidentifies the thrust of Plaintiffs' challenge.  Plaintiffs do not ask the Court to determine whether any individual subclass member is entitled to an accommodation, but whether the City's *categorical refusal* to conduct an individualized analysis — because any accommodation would constitute a fundamental alteration or undue burden — is lawful under Title II.  That particular question is answerable in one stroke. *Wal-Mart*, 564 U.S. at 350.  Furthermore, the Ninth Circuit has expressly held that variations in class members' circumstances do not preclude a finding of commonality where the underlying legal question is the same for all.  *Armstrong*, 275 F.3d at 868 (rejecting argument that variation in the nature of class members' disabilities precludes commonality, and holding that "individual factual differences among the individual litigants or groups of litigants will not preclude a finding

United States District Court
Northern District of California

of commonality"); *Powers*, 163 F.4th at 1185 (rejecting argument that plaintiffs failed to meet commonality because claims "turn on each veteran's individual circumstances and thus cannot generate common answers that will resolve the litigation" because "in civil-rights suits challenging system-wide practices or policies, 'individual factual differences among individual litigants or groups of litigants will not preclude a finding of commonality'") (quoting *Armstrong*, 275 F.3d at 868). The shared legal injury here — exposure to parking enforcement and the City's categorical rejection of all accommodations without any individualized assessment — applies to the entire subclass without regard to their particular disability.

Accordingly, commonality is **SATISFIED** as to the Vehicle Resident Subclass.

3.      Rule 23(a)(3) — Typicality

Under Rule 23(a)(3), the claims of class representatives must be typical of the claims or defenses of the overall class. Fed. R. Civ. P. 23(a)(3). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Parsons*, 754 F.3d at 685 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)). "The test of typicality is 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Id.* (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). Typicality is defeated where a representative would be "preoccupied" with individualized defenses not shared by the rest of the class. *Hanon*, 976 F.2d at 508.

a.      Unhoused People Class — Property Seizure and Destruction Claim

Erin Spencer, Amber Whitson, Jermaine White, and Monique Williams all describe experiences with the City's encampment enforcement operations, including property seizures without adequate notice or process. *See* Spencer Declaration ¶¶ 10–16; Whitson Declaration ¶¶ 13–16; White Declaration ¶¶ 5, 11–12; Williams Declaration ¶¶ 5–6. These matters are central to the class claims. All are individuals who are or have been unhoused in Berkeley and subject to the same enforcement framework that the class challenges. The City's enforcement operations apply to each of them citywide, through the same regulatory policies and practices, and with the same

38

alleged structural deficiencies.  The continuity is sufficient to satisfy the threshold typicality inquiry.  Each proposed class representative therefore **SATISFIES** typicality as to the property seizure and destruction claim.

***Erin Spencer.***  Mr. Spencer's claims are directly and squarely typical of those of the broader class.  He describes multiple enforcement operations in which the City seized and destroyed his personal property, including his tent, bedding, tools, and other essential property, without adequate notice of the date or time of the sweep, thereby depriving him of a meaningful opportunity to protect or relocate his belongings.  Spencer Declaration ¶¶ 7–16.  During at least one sweep on November 7, 2023, City officers arrested Mr. Spencer for illegal lodging, physically preventing him from moving and securing his property from seizure.  *Id.* ¶ 14.  The property was subsequently destroyed.  *Id.*  The City has also failed to return his DD214, a military discharge document whose loss affects his access to veterans' benefits.  *Id.* ¶ 16.  Mr. Spencer remains unhoused in Berkeley and thus continuously subject to the City's ongoing enforcement framework.  *Id.* ¶ 2.  The constitutional injury he describes — having his property destroyed without adequate process under AR 10.1's framework — is precisely the injury the broader class asserts.  His claim arises from the same course of conduct and rests on the same legal theory as every class member's claim.  *Parsons*, 754 F.3d at 685; *Armstrong*, 275 F.3d at 869.

The City argues that Mr. Spencer's decision to decline City shelter offers weakens or defeats his property claims.  *See* Azizi Declaration, Ex. 6 (Spencer Deposition) at 41:17–42:4; 104:20–105:4.  That argument does not meet the preoccupation threshold to bar a finding of typicality.  *See Hanon*, 976 F.2d at 508 ("We agree that a named plaintiff's motion for class certification should not be granted if 'there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.'").  Whether Mr. Spencer declined shelter is not a wholesale defense against the constitutional inadequacy of AR 10.1's process for property seizure and destruction;  it bears on the severity of the harm, but not on the fundamental question of whether the framework is constitutionally adequate.  A defense that goes to the degree of harm in one representative's individual case does not, under these circumstances, defeat typicality where the underlying constitutional claim is the same for class members.  *See Parsons*,

United States District Court
Northern District of California

39

United States District Court
Northern District of California

754 F.3d at 685 ("It does not matter that the named plaintiffs may have in the past suffered varying injuries or that they may currently have different health care needs; Rule 23(a)(3) requires only that their claims be 'typical' of the class, not that they be identically positioned to each other or to every class member."); *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 n.9 (9th Cir. 2011) ("Differing factual scenarios resulting in a claim *of the same nature* as other class members does not defeat typicality.") (emphasis added).

*Amber Whitson.* Ms. Whitson's property seizure claims are typical of those of the class. She attests that City employees took her solar panels and an air compressor that were stacked beside her RV, visibly distinct from trash and not mixed with it, without any prior warning, while she was asleep in her vehicle. Whitson Declaration ¶ 16. No City employee knocked on her vehicle door before seizing the property. *Id.* She received no Property Inventory Notice or any information about how to retrieve the items. *Id.* This account is reasonably coextensive with the class's constitutional challenge: property is allegedly seized and destroyed under AR 10.1's framework without adequate notice, documentation, or process. *Parsons*, 754 F.3d at 685; *Armstrong*, 275 F.3d at 869.

The City argues that Ms. Whitson's repeated declinations of City shelter offers weaken her typicality because she thereby voluntarily acquiesced to the property seizure framework. That argument fails. One's voluntary presence in a location subject to enforcement does not constitute consent to unconstitutional seizure and destruction of property in that location. Again, the shelter-declination argument questions the severity of a representative's harm, but not the constitutional adequacy of the City's enforcement framework, which is the question at the center of this action.

*Jermaine White.* Mr. White's claims are typical of those of the class. He attests that the City has repeatedly seized and destroyed his personal property during encampment enforcement operations, including his tent, bicycles, a ring valued at $1,800, and essential belongings — all without providing any meaningful notice or opportunity for retrieval. White Declaration ¶¶ 5–6. He describes the City as routinely destroying entire tents with all their contents, without item-level inventory or special procedures for constitutionally protected unabandoned property. *Id.* ¶ 13. Mr. White remains unhoused in Berkeley and subject to ongoing enforcement. *Id.* ¶ 2. His claim

40

arises out of the same course of conduct and legal theory as those of the broader class. *Parsons*, 754 F.3d at 685; *Armstrong*, 275 F.3d at 869.

The City argues that Mr. White's deposition testimony, in which he experienced difficulty specifically recalling or identifying property he lost, is inconsistent with his declaration and that the testimony therefore defeats typicality. *See* Azizi Declaration, Ex. 7 (White Deposition) at 58:1–4. This argument is addressed in the context of the City's sham affidavit objection above, and the same analysis applies with equal force here. The record reflects that Mr. White experienced difficulty with specific recall at deposition, which is consistent with his documented cognitive and emotional challenges. Mr. White's response at deposition also appears limited to an individual sweep, and it does not concede that Mr. White has never had his belongings taken by the City during sweeps. While inconsistent statements raise credibility issues, the inconsistencies in the record are not sufficient to deny class certification. *See, e.g.*, *Hernandez v. Cnty. of Monterey*, 305 F.R.D. 132, 161 (N.D. Cal. 2015) (holding in the context of the adequacy prong of Rule 23(a) that "inconsistent deposition testimony in and of itself will not serve as a ground for denial of class certification") (brackets and internal quotation marks omitted); *Perez v. It Works Mktg., Inc.*, 2025 WL 3500539, at *5 (N.D. Cal. Sept. 2, 2025) (same). Mr. White's underlying claim, that property has been destroyed by the City without constitutionally adequate notice or process, remains typical of the class.

***Monique Williams.*** Ms. Williams currently resides at the Campus Motel, a temporary non-congregate shelter operated by the City of Berkeley, where she has lived since 2023. Williams Declaration ¶ 2. She is not presently residing in a Berkeley encampment. The preliminary question is whether a person residing in temporary City shelter may satisfy typicality when a class challenges the City's property seizure and destruction practices in encampment enforcement operations. Under the circumstances presented here, the answer is yes.

The class definition expressly encompasses not only persons who reside in a vehicle or other shelter in public spaces in Berkeley, but also persons "who reside in temporary or transitional shelters" in Berkeley. Motion for Class Certification at 1. Williams falls within the latter category. That class definition reflects the apparent reality that temporary shelter placements

41

are contingent and, as made apparent from the record, precarious. *See, e.g.*, Williams Declaration ¶ 10 (referring to fear of eviction from Campus Motel because of difficulty keeping areas clean and stating that Ms. Williams "feel[s] like [she] could get kicked out at any moment"); White Declaration ¶ 3 ("I previously was staying at Berkeley Inn, which is a temporary shelter program. Against my wishes, I was kicked out from the program in late 2024."); Holder Declaration ¶¶ 5–6 (describing eviction from Golden Bear Motel and City's refusal to transfer Holder to another shelter); Peddycoart Declaration ¶¶ 2, 5 (describing experience living in "several Berkeley shelter programs" and that Peddycoart was "wrongfully kicked out of the Campus Motel" in 2026). Ms. Williams consistently describes her specific shelter placement as "temporary" by design, and Ms. Williams understood the temporary nature of the shelter placement from the outset. Williams Declaration ¶¶ 2, 5, 7, 9–11.

In any event, the availability of temporary shelter does not obviate the threat of property destruction for Ms. Williams. She alleges that she has had her property seized and destroyed by the City without adequate notice or a meaningful opportunity for recovery. Williams Declaration ¶ 6 (describing instance of City's seizure of tools, supplies, propane tanks, pots, pans, and clothing from her RV without an opportunity for retrieval in 2023). This is the same constitutional injury asserted by the class. Ms. Williams thus raises a property seizure and destruction claim arising from the same course of conduct and resting on the same legal theory as the class. *Armstrong*, 275 F.3d at 869; *Wal-Mart*, 564 U.S. at 349 (stating that the purpose of Rule 23(a) is to "ensure[] that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate," and to "[e]ffectively limit the class claims to those fairly encompassed by named plaintiffs' claims") (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982)).

For the foregoing reasons, all representatives of the proposed Unhoused People Class **SATISFY** typicality with respect to the property seizure and destruction claim.

          b.        <u>Vehicle Resident Subclass</u>

Unlike the Unhoused People Class, which is centered around a purely constitutional property seizure claim without an ADA component, the Vehicle Resident Subclass theory is an ADA failure-to-accommodate claim. The subclass asserts that the City has uniformly and

United States District Court
Northern District of California

United States District Court
Northern District of California

categorically denied all disability accommodation requests to the 72-hour rule on fundamental alteration and undue burden grounds and that this categorical policy violates the ADA as applied to disabled vehicle residents who cannot comply with the rule by reason of their disability. The nexus between the disability that requires an accommodation and the claims based on the refusal to consider accommodation is apparent. The lack of an affected disability can defeat the claim. *See Hanon*, 976 F.2d at 508 (typicality is defeated where a representative would be "preoccupied" with individual defenses not shared by the broader class); *Backus v. ConAgra Foods, Inc.*, 2016 WL 7406505, at *5 (N.D. Cal. Dec. 22, 2016) (Alsup, J.) (finding that typicality was not satisfied in part because "Backus is so uniquely vulnerable to such defense tactics as a result of his personal background, it is predictable that this litigation will focus on arguments and facts unique to him rather than generate common answers apt to drive resolution of the dispute on a classwide basis"); *but see Ellis*, 657 F.3d at 985 n.9 ("Differing factual scenarios resulting in a claim *of the same nature* as other class members does not defeat typicality.") (emphasis added).

Given the record thus far, the Court finds that the predicate of a relevant disability has been satisfied for purposes of class certification. Ms. Whitson lives with sciatica, lymphedema, and GERD, each of which the record directly connects to the physical demands of moving and leveling her RV. Whitson Declaration ¶¶ 3, 6–7. Specifically, her sciatica and lymphedema make it "extremely painful and difficult" for her to "pick up the blocks and ramps" necessary to level her RV, "carry them to the right spot, put them down, and bend down to position them." *Id.* ¶ 6; Roznowski Declaration, Ex. D (Whitson Deposition) at 28:8–30:17. And apart from the challenges of leveling her RV, Ms. Whitson's lymphedema cause swelling in her hands which makes it difficult to grip vehicle steering wheels. *See* Whitson Declaration ¶ 3 ("I have lymphedema in my hands which causes them to be swollen all the time. I can't really curl my hands into full fists most of the time. This makes it difficult for me to grip things like the steering wheel of my RV."). The connection between these physical conditions and her inability to comply with vehicle moving requirements is direct and supported by the record. Ms. Whitson has demonstrated the existence of a disability plausibly related to her need for an accommodation.

Ms. Whitson claims that the City subjected her to the same categorical fundamental

alteration and undue burden response it issues to everyone who seeks an accommodation from the 72-hour rule, without engaging in any individualized assessment of her specific disabilities and barriers to compliance, or consideration of whether her specific request would in fact fundamentally alter the relevant program or impose an undue administrative or financial burden. That claim is typical of the subclass claim — it arises from the same systematic course of conduct and rests on the same legal theory as the broader subclass's claim.

The City raises three complications for the Court's consideration. Each is addressed in turn, but they are not sufficient to defeat typicality even when taken together.

***First***, the City argues that Ms. Whitson's specific disability barrier is tailored to the physical demands of leveling a large RV, which differs from the barriers facing subclass members who live in cars, vans, or inoperable vehicles, and that her claim is therefore not coextensive with the subclass. But the subclass claim does not ask the Court to determine whether any individual member's specific disability is severe enough or sufficiently connected to noncompliance to entitle *that member* to an accommodation. The claim is narrower — whether the City's *categorical* invocation of the fundamental alteration and undue burden defenses, applied uniformly across accommodation requests, violates Title II. That question does not vary based on the specific nature of any member's disability or the specific vehicle they inhabit or use.

***Second***, the City argues that Ms. Whitson's failure to formally request an accommodation before March 2026, after the motion for class certification was filed and after her deposition was taken, defeats typicality because a subclass representative who has never sought an accommodation cannot establish that her claim was subject to categorical denial. Individuals with disabilities, however, are not required to engage in futile gestures when they have knowledge that any accommodation request would be categorically denied and that a request would thus be futile. *See, e.g.*, *Civil Rights Educ. & Enf't Cntr. v. Hospitality Props. Tr.*, 867 F.3d 1093, 1098 (9th Cir. 2017) ("When a plaintiff who is disabled within the meaning of the ADA has actual knowledge of illegal barriers at a public accommodation to which he or she desires access, that plaintiff need not engage in the 'futile gesture' of attempting to gain access in order to show actual injury.") (brackets omitted) (quoting *Pickern v. Holiday Quality Foods, Inc.*, 293 F.3d 1133, 1135–37 (9th

United States District Court
Northern District of California

Cir. 2002)); 42 U.S.C. § 12188(a)(1) ("Nothing in this section shall require a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions."). The City's ADA Coordinator articulated the fundamental alteration or undue burden defense in substantively identical terms across every accommodation request in the record, giving Ms. Whitson notice that any accommodation request that she submitted would be denied on the same categorical grounds. A formal request under such circumstances would reasonably have been futile, and her failure to submit a request before filing a Motion for Class Certification does not defeat typicality. *See id.* In any event, Ms. Whitson has since submitted a pending accommodation request explaining her disabilities and requesting an immediate stay of enforcement of the 72-hour rule. Whitson Declaration iso Reply ¶¶ 4–7. As of the date of this Order, the City has not issued a final determination. *Id.* Thus, Ms. Whitson's positionality with respect to the broader subclass is consistent, and she remains at risk of the same conduct from which the subclass's claim arises. *Parsons*, 754 F.3d at 685; *Armstrong*, 275 F.3d at 869. The Court reserves discretion to revisit subclass certification, but that reservation does not affect the certification determination here, where the record does not reflect a departure from the City's alleged categorical conduct.

***Third***, the City points to Ms. Whitson's deposition testimony, in which she explained that she sometimes does not move her vehicles because she is "busy helping other community members move their vehicles and theirs are a bit easier to move than mine so I don't end up moving mine in time between moving their vehicles and struggling with my health problems." Azizi Declaration, Ex. 4 (Whitson Deposition) at 26:16–21. The City argues that this statement introduces a non-disability reason for noncompliance, introducing an individualized inquiry defeating typicality and weakening the causal nexus necessary for subclass certification. The City's argument is well-taken but ultimately unsuccessful. This evidence does not establish that Ms. Whitson is not in need of an accommodation with respect to her vehicle. The City's attempt to impeach her with this testimony is not sufficient to defeat typicality. Typicality merely requires that the representative's claim be reasonably coextensive with those of the subclass. *Parsons*, 754 F.3d at 685; *Hanlon*, 150 F.3d at 1020. The core of Ms. Whitson's claim — that her disabilities

45

cause her to be unable to comply and to require accommodations to the 72-hour rule, and that the City refused to assess her needs due to a categorical refusal to accommodate — is reasonably coextensive with that of the subclass.

Accordingly, typicality is **SATISFIED** as to Whitson for the Vehicle Resident Subclass.

4.    Rule 23(a)(4) — Adequacy

Rule 23(a)(4) requires that "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The Court must determine whether the named plaintiffs and their counsel have any conflicts of interest with other class members and whether the named plaintiffs and their counsel will prosecute the action vigorously on behalf of the class. *Sullivan*, 328 F.R.D. at 357–58 (citing *Hanlon*, 150 F.3d at 1020). Only conflicts that are "fundamental to the suit and that go the heart of the litigation" defeat adequacy. *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 942 (9th Cir. 2015). The adequacy requirement "tend[s] to merge" with the commonality and typicality criteria of Rule 23(a), *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997) (brackets in original), and this Order's analysis above has already addressed certain representative-specific concerns that also bear on adequacy.

***Erin Spencer.*** Mr. Spencer is an adequate class representative for the Unhoused People Class. The record does not reflect a conflict of interest with absent class members. His active participation in this litigation is well-documented: he has engaged with counsel throughout discovery, provided deposition testimony, and submitted a detailed declaration describing his experiences with encampment enforcement. The conflict the City identifies — Mr. Spencer's declinations of shelter offers — does not constitute the type of fundamental divergence of interests sufficient to render him an inadequate class representative. *See In re Online DVD-Rental*, 779 F.3d at 942–43 ("Only conflicts that are fundamental to the suit and that go to the heart of the litigation prevent a plaintiff from meeting the Rule 23(a)(4) adequacy requirement. A conflict is fundamental when it goes to the specific issues in controversy.") (citations and internal quotation marks omitted).

***Amber Whitson.*** Ms. Whitson is an adequate class representative for the Unhoused People Class and Vehicle Resident Subclass. Her interest in injunctive and declaratory relief is

United States District Court
Northern District of California

46

coextensive with that of the class. She has participated actively in this litigation, including through deposition testimony, the submission of two declarations, and engagement with representatives in connection with her accommodation request. Again, her refusals of shelter offers do not defeat adequacy, as no fundamental conflict has been identified.

Nor does Ms. Whitson's dual role as representative of both the Unhoused People Class and the Vehicle Resident Subclass create a conflict. Both the class and subclass seek declaratory and injunctive relief directed at the City's encampment enforcement frameworks. The claims are complementary and not in conflict. Ms. Whitson's personal interests in both claims are aligned, and no fundamental conflict exists.

*Jermaine White.* Mr. White is an adequate class representative for the Unhoused People Class. His interests align with those of the class, and there is no identified conflict between his individual position and the interests of absent class members. Mr. White has participated in discovery and has provided a declaration in support of the Motion for Class Certification. Mr. White's interest in challenging the City's property seizure framework is aligned with the interests of the class.

*Monique Williams.* Ms. Williams is an adequate class representative. Her interest in challenging the City's property seizure framework is in alignment with the broader class's interest. While she is currently housed in temporary shelter, she has experienced the same alleged constitutional injury and faces a realistic prospect of future exposure to the same systemic enforcement framework that the Unhoused People Class challenges. Ms. Williams has also actively participated in discovery and has provided a declaration in support of the Motion for Class Certification.

Accordingly, adequacy is **SATISFIED** as to both the Unhoused People Class and Vehicle Resident Subclass.

5.      Rule 23(g) — Class Counsel

Rule 23(g)(1)(A) directs the Court to consider counsel's work in identifying or investigating the claims, experience in class action and complex litigation, knowledge of applicable law, and resources available to represent the class. Fed. R. Civ. P. 23(g)(1)(A).

Disability Rights Advocates ("DRA") has served as lead counsel throughout this litigation, which has been actively litigated for several years.  DRA prepared the complaint and each amended complaint, briefed temporary restraining orders and preliminary injunctions, successfully opposed multiple motions to dismiss, conducted substantial discovery including the 30(b)(6) deposition of Peter Radu, retained and has worked with at least one expert witness.  Zito Declaration ¶¶ 1–12.  DRA represents that it has served as lead counsel in dozens of disability-related civil rights class actions across the country, including in this district.  *Id.* ¶ 6.

East Bay Community Law Center ("EBCLC") serves as co-counsel and brings additional civil rights litigation experience in state and federal courts.  Nicoletti Declaration (Dkt. 159) ¶¶ 2–5.  Neither organization has disclosed a conflict of interest, and no such conflict is apparent from the record.

Accordingly, both DRA and EBCLC are **APPOINTED** as class counsel under Rule 23(g).

C.      Rule 23(b)(2)

Having satisfied all four requirements of Rule 23(a), Plaintiffs must also satisfy the requirements of at least one subdivision of Rule 23(b).  Plaintiffs seek certification exclusively under Rule 23(b)(2), which provides for class certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

The Ninth Circuit has described Rule 23(b)(2) as "the appropriate vehicle for a broad, class-wide civil rights remedy," particularly where plaintiffs challenge systemic institutional policies and seek only injunctive or declaratory relief, such as here.  *See Parsons*, 754 F.3d at 688; *Armstrong*, 275 F.3d at 871.  The Supreme Court has clarified that Rule 23(b)(2) applies only where "a single injunction or declaratory judgment would provide relief to each member of the class."  *Wal-Mart*, 564 U.S. at 360.

For the reasons set forth below, the two requirements of Rule 23(b)(2) are met for the Unhoused People Class's property seizure claim, and the Vehicle Resident Subclass's 72-hour rule claim.

48

###### 1.    Rule 23(b)(2) — Property Seizure and Destruction Claim

The Unhoused People Class challenges both AR 10.1 as written, with its categorical destruction directives and undefined operative terms, as well as the systemic deficiencies in the City's enforcement of its policies, including the lapse of staff training and the practice of area-level rather than item-level documentation.  That framework challenged herein applies to every member of the Unhoused People Class;  there is no segment of the class that is exempt from it. The challenged conduct, as asserted herein, is therefore generally applicable to the class. *Rodriguez v. Hayes*, 591 F.3d 1105, 1125–26 (9th Cir. 2010) ("Similarly, although the current regulations control what sort of process individual class members receive at this time, all class members seek the exact same relief as a matter of statutory or, in the alternative, constitutional right. Hence, we conclude that the proposed class meets the requirements of Rule 23(b)(2)"), *abrogated on other grounds by Rodriguez Diaz v. Garland*, 53 F.4th 1189 (9th Cir. 2022).

The relief Plaintiffs seek is classwide reform of the City's enforcement framework.  The appropriate form of injunction is negative in scope: that the City may not categorically destroy loose papers and bicycle frames without individualized inquiry into content, ownership, or condition, and that the City must define classification standards, provide up-to-date training on those standards, mandate item-level documentation for property seizures subject to destruction, and provide adequate advance written notice of enforcement operations.  With respect to property classified as soiled, hazardous, or abandoned, the City may be required to adopt objective criteria calibrated to a genuine, immediate public health or safety threat standard, and provide staff training on those criteria so that destruction decisions are based on an individualized assessment. The precise terms of any injunction will be developed through subsequent proceedings.

A single injunction reforming the City's property seizure and destruction framework would provide meaningful relief to every class member, satisfying Rule 23(b)(2).  *E.g.*, *Parsons*, 754 F.3d at 688 ("[R]elief for some inmates would necessarily result in injunctive relief for all inmates."); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997) ("Rule 23(b)(2) permits class actions for declaratory or injunctive relief where 'the party opposing the class has acted or refused to act on grounds generally applicable to the class.'  Civil rights cases against parties

49

United States District Court
Northern District of California

charged with unlawful, class-based discrimination are prime examples."); *Baby Neal v. Casey*, 43 F.3d 48, 63 (3d Cir. 1994) ("The writers of Rule 23 intended that subsection (b)(2) foster institutional reform by facilitating suits that challenge widespread rights violations of people who are individually unable to vindicate their own rights.").

Accordingly, Rule 23(b)(2) is **SATISFIED**, and the Unhoused People Class is **CERTIFIED** with respect to its property seizure and destruction claim.

2.      Rule 23(b)(2) — State-Created Danger

Rule 23(b)(2) does not authorize certification of a class "when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Wal-Mart*, 564 U.S. at 360 (emphasis in original).  As the Court's commonality analysis explains, the state-created danger inquiry turns on the specific pre- and post-enforcement circumstances of each class member.  Specifically, whether that individual had shelter before enforcement, whether it was destroyed or relocated, whether alternative shelter was offered and accessible, and the severity of the resulting danger.  No single injunction could provide common relief as to the putative class.  The appropriate remedy, if any, would necessarily vary by plaintiff and by enforcement encounter.  Certification of the state-created danger claim under Rule 23(b)(2) is therefore unwarranted.  Fed. R. Civ. P. 23(c)(1)(B).

3.      Rule 23(b)(2) — 72-Hour Parking Rule

The City's categorical refusal to accommodate applies uniformly to every member of the Vehicle Resident Subclass.  An injunction requiring the City to conduct an individualized accommodation analysis rather than relying on categorical denial would apply uniformly to every subclass member.  It would not require the Court to determine the merits of any individual accommodation request, but instead would operate at a more general level, providing the same benefit to every subclass member.

Accordingly, Rule 23(b)(2) is **SATISFIED**, and the Vehicle Resident Subclass is **CERTIFIED** with respect to its challenge to the 72-hour parking rule.

///

///

50

## V.     CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Class Certification is **GRANTED IN PART AND DENIED IN PART** as follows:

1. The Unhoused People Class is **CERTIFIED** under Rule 23(b)(2) as to Plaintiffs' property seizure and destruction claim under the Fourth and Fourteenth Amendments of the United States Constitution, and Article I, section 13 of the California Constitution. Erin Spencer, Amber Whitson, Jermaine White, and Monique Williams are appointed as class representatives. Disability Rights Advocates and East Bay Community Law Center are appointed as class counsel under Rule 23(g).

2. Certification is **DENIED** as to Plaintiffs' state-created danger claim. This denial does not affect any named plaintiff's individual state-created danger claims.

3. The Vehicle Resident Subclass is **CERTIFIED** under Rule 23(b)(2) as to Plaintiffs' challenge to the City's categorical denial of disability accommodations from the 72-hour parking restriction under Title II of the ADA. Amber Whitson is appointed as the sole representative of the Vehicle Resident Subclass.

**IT IS SO ORDERED**.

Dated: July 14, 2026

_____
EDWARD M. CHEN
United States District Judge